**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION** ) ) ) ) | |
| ——————————————— ) | **Misc. Action No. 08-0764 (EGS)** |
| ) | **MDL DOCKET NO. 1993** |
| **This Document Relates To:** ) | |
| ***SAFARI CLUB INTERNATIONAL,*** ) | |
| **ET AL. V. SALAZAR, 08-881** ) | |

**OPPOSITION OF PLAINTIFFS SAFARI CLUB
INTERNATIONAL AND SAFARI CLUB INTERNATIONAL
FOUNDATION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION............................................................................................................1

II.   STATUTORY BACKGROUND ......................................................................................2

    A.    The Endangered Species Act.............................................................................2

    B.    The Marine Mammal Protection Act ...............................................................3

III.  FACTUAL BACKGROUND ............................................................................................5

IV.   STANDARD OF REVIEW ...............................................................................................6

V.    ARGUMENT ......................................................................................................................7

    A.    The Federal Defendants' Determination That the Importation
         of Sport-hunted Polar Bears is No Longer Authorized is Final
         Agency Action Subject to Judicial Review ......................................................7

         1.    The Import Ban is the Consummation of the
               Decision-making .....................................................................................8

         2.    The Import Ban Determination Establishes Rights and
               Gives Rise to Legal Consequences......................................................11

    B.    SCI and SCIF Have Alleged Facts Establishing Their Standing
         to Bring this Action...........................................................................................13

         1.    SCI and SCIF and SCI Members Have Suffered
               Injury-in-Fact Because the Import of Sport-hunted
               Polar Bears is Now Categorically Banned...........................................14

         2.    The Federal Defendants Caused These Injuries by
               Legally Determining That Imports Are No
               Longer Allowed ....................................................................................17

         3.    A Decision in Favor of SCI and SCIF Would Redress Their
               Injuries by Once Again Allowing Permits for the Import
               of Polar Bears from Approved Populations in Canada.......................19

         4.    SCI and SCIF Have Demonstrated Procedural Standing for
               Their Third Claim for Relief .................................................................20

VI.   CONCLUSION .................................................................................................................22

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Cases**

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................... 8, 9, 12

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..................................................................................... *passim*

*City of Waukesha v. EPA,*
    320 F.3d 228 (D.C. Cir. 2003) ...................................................................... 20-21

*de Pacheco v. Martinez,*
    515 F. Supp. 2d 773 (S.D. Tex. 2007) ................................................................ 7

*Doe v. U.S. Dept. of Justice,*
    753 F.2d 1092 (D.C. Cir. 1985) .......................................................................... 7

*Florida Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ............................................................... 14, 20, 21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................................ 9

*Fund for Animals v. BLM,*
    460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 10

*Hartman v. Moore,*
    547 U.S. 250 (2006) ............................................................................................ 7

*Haynesworth v. Miller,*
    820 F.2d 1245 (D.C. Cir. 1987) ......................................................................... 6

*Hunt v. Washington State Apple Advertising Comm'n,*
    432 U.S. 333 (1977) ......................................................................................... 14

*Kohli v. Gonzales,*
    473 F.3d 1061 (9th Cir. 2007) .......................................................................... 18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 13, 14, 20, 21

*NRDC v. EPA,*
    22 F.3d 1125 (D.C. Cir. 1994) ............................................................... 8, 10, 12

*Rennie & Laughlin, Inc. v. Chrysler Corp.*,
242 F.2d 208 (9th Cir.1957) ........................................................................ 7

*Stewart v. Evans,*
275 F.3d 1126 (D.C. Cir. 2002) .................................................................. 6

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) .................................................................................. 14

*Yates v. District of Columbia*,
324 F.3d 724 (D.C. Cir. 2003) .................................................................. 6

**Statutes**

5 U.S.C. § 551(13) ........................................................................................ 12

5 U.S.C. § 704 ............................................................................................... 8

16 U.S.C. § 1362(1) ...................................................................................... 4

16 U.S.C. § 1371(a)(3)(B) ............................................................................ 4

16 U.S.C. § 1372(b)(3) .................................................................................. 4

*16 U.S.C. § 1374(c)(5).......................................................................... *passim*

16 U.S.C. § 1374(d)(6) ......................................................................... 16, 19

16 U.S.C. § 1383b(a) .................................................................................... 4

16 U.S.C. § 1533(a)(1)................................................................................... 2

16 U.S.C. § 1533(b) ...................................................................................... 2

16 U.S.C. § 1538(a) ...................................................................................... 3

16 U.S.C. § 1538(c)(2)................................................................................... 3

**Regulations**

50 C.F.R. § 18.30(i)(1).................................................................................. 3

*73 Fed. Reg. 28212-28303 (May 15, 2008).......................................... 5, 7, 9, 17, 21

Local Rule 7(f)……………………………………………………………… 2

* Authorities principally relied on.

## I.    INTRODUCTION

Before May 15, 2008, the day the Federal Defendants listed the polar bear as a threatened species throughout its range, U.S. citizens could obtain a permit for the import of sport-hunted polar bears from six approved populations in Canada.  On May 15, 2008, that legal right—exercised by over 900 individuals since 1997—ended.  On that day, the Federal Defendants announced their legal determination that the Marine Mammal Protection Act ("MMPA") no longer authorizes the U.S. Fish and Wildlife Service ("FWS") to issue import permits for sport-hunted polar bears due to the Endangered Species Act ("ESA") listing ("Import Ban Determination").  Safari Club International and Safari Club International Foundation ("SCI and SCIF") have filed suit to challenge the FWS's Import Ban Determination and the Federal Defendants have moved to dismiss that action.  The crux of the Federal Defendants' Motion is the argument that the Import Ban Determination is not final agency action.  The Federal Defendants argue that this alleged lack of finality prevents review under the Administrative Procedure Act ("APA") and undermines SCI and SCIF's standing.

The Import Ban Determination, announced in the final rule listing the polar bear under the ESA, is final agency action.  It is the consummation of the Federal Defendants' decision-making process.  It changes the legal rights of U.S. citizens to obtain permits for the import of sport-hunted polar bears from Canada (assuming certain conditions are met).  The Import Ban Determination changed the regulatory landscape from one where the FWS analyzes each permit to determine if it satisfies the statutory conditions required before a permit is issued into one where no one, regardless of making the showing previously sufficient to qualify for a permit, will receive such a permit.  The Federal Defendants will conduct no more decision-making regarding whether this type of import permit is legally authorized.

The Import Ban Determination harms SCI members who have submitted an import permit application by foreclosing any chance of having that application granted.  It also harms SCI members who hunted polar bear this year, wish to import their trophies, but now have no reason to submit an application because the outcome of that application has already been decided.  Finally, the Import Ban Determination harms SCI members (1) who had planned and then cancelled a hunt for 2009 or 2010, likely with a loss of their deposit; (2) who will go forward with a hunt without the prospect of being able to import their trophy; or (3) who have put off a lifelong dream and decided not to book a hunt because of the import ban.  The Federal Defendants fail to properly address these injuries or do not address them at all.

In the factual allegations in their Complaint—which must be accepted as true for purposes of this motion—SCI and SCIF have alleged facts demonstrating that the Import Ban Determination is final agency action and that it causes harm to SCI and SCIF's interests sufficient to establish standing.  For these reasons, the Court should deny the Federal Defendants' Motion to Dismiss.  Pursuant to Local Rule 7(f), SCI and SCIF request an oral hearing on this dispositive motion, and have filed an unopposed motion to that effect, concurrent with the filing of this Opposition.

## II.      STATUTORY BACKGROUND

### A.      The Endangered Species Act

As pertinent to this lawsuit, the ESA provides for the listing of threatened and endangered species based on an evaluation of factors bearing of the status of the species.  16 U.S.C. § 1533(a)(1) & (b).  Upon listing of a species as threatened, as with the polar bear, a number of prohibitions and requirements come into play—for example, a prohibition on the "take" (kill, harm, harass, etc.) of the threatened species and a requirement for federal agencies

to consult on actions that might adversely affect the species. *Id.* § 1538(a). While the ESA generally prohibits the importation of listed species, the ESA allows the import of wildlife listed as threatened if it is also listed in Appendix II of the Convention on International Trade in Endangered Species (commonly known as CITES) and if the import is for non-commercial purposes. *Id.* § 1538(c)(2). Thus, as the polar bear is listed on Appendix II of CITES, the ESA does not prohibit its import.

### B.    The Marine Mammal Protection Act

The MMPA contains general prohibitions on conduct related to marine mammals, subject to provisions that allow activities that would otherwise be prohibited. Specific to this case, under the MMPA, the Federal Defendants may issue polar bear import permits and "shall" issue them if certain conditions are met: "The Secretary may issue a permit for the importation of polar bear parts (other than internal organs) taken in sport hunts in Canada to an applicant which submits with its permit application proof that the polar bear was legally harvested in Canada by the applicant. Such a permit shall be issued if the Secretary, in consultation with the Marine Mammal Commission and after notice and opportunity for public comment," makes the following findings related to the hunting program: (1) it is consistent with international agreement, (2) it is based on sound science, and (3) it does not contribute to illegal trade in polar bears. *Id.* § 1374(c)(5). The Federal Defendants have made these findings for six populations in Canada. Complaint ¶ 28; 50 C.F.R. § 18.30(i)(1). Thus, to receive a permit before the import ban, an applicant only had to demonstrate that he or she legally harvested the polar bear from an approved population in Canada.

In potential conflict with this provision, the MMPA also prohibits the importation of any marine mammal "taken from a species or population stock which the Secretary has, by regulation

published in the Federal Register, designated as a depleted species or stock;…."  16 U.S.C. § 1372(b)(3); *see also id.* § 1371(a)(3)(B) (no importation of any species "designated by the Secretary as depleted").  Under both of these provisions, the import ban only applies to a species that has been "designated" as depleted.  Under the MMPA, a species becomes "depleted" by one of two ways:  (1) by designation following rulemaking by the appropriate federal or state agency, *see id.* § 1383b(a) (setting out specific procedures for designating a species); or (2) by definition if it is listed under the ESA.  *Id.* § 1362(1). Thus, the import provisions only apply to species that become depleted through the first method, designation following rulemaking.

Thus, to conclude that the MMPA bans the import of previously importable polar bear parts from approved populations in Canada, the Federal Defendants made at least four final legal determinations:

- The provision specifically authorizing polar bear imports, *id.* § 1374(c)(5), was trumped by the provisions banning the import of species designated as "depleted," *id.* §§ 1372(b)(3), 1371(a)(3)(B).

- The listing of the polar bear as threatened under the ESA satisfied the MMPA requirement that the FWS "designate" the species as "depleted" for its import to be banned.

- Assuming the listing was a "designation" of the polar bear as depleted, the FWS provided notice and comment rulemaking on the designation of the polar bear as "depleted."

- Assuming the ESA listing is a designation as "depleted," the import ban applies to polar bears "taken" before the listing/designation went into effect on May 15, 2008.

### III.    FACTUAL BACKGROUND

The Federal Defendants announced and made effective the Import Ban Determination in the final rule listing the polar bear under the ESA.  Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range; Final Rule, 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Rule"); Complaint ¶ 1.  In at least four sections of the Final Rule, the FWS specifically addressed the import issue.  For example, the Final Rule states: "Therefore, authorization for the import of sport-hunted trophies will no longer be available under section 104(c)(5) of the MMPA."  73 Fed. Reg. at 28236, *see also id.* at 28242, 28278, 28301-302.  The Import Ban Determination was not the mere recitation of the statutory law, as asserted by the Federal Defendants.  Federal Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Complaint, Dkt. 18-2 ("Memo in Support") at 10, 15.[1]

Before the Import Ban Determination, the FWS routinely granted import permits for polar bears, granting over 900 since 1997.  Complaint, ¶¶ 1, 3; Answer, ¶ 3, Dkt. 16 (admitting granting import authorization to over 900 applicants).  Relying on this authorization and past practice, members of SCI and others hunted polar bears in the spring of 2008 and did so with the expectation and desire to import their trophies.  Complaint, ¶ 40.  Some of these hunters have applied for permits, others have not.  *Id.*  According to the document the Federal Defendant attached to their Motion to Dismiss, the FWS has "administratively clos[ed]" all pending applications.  They also invite the applicant to "submit a new permit application" "should the

---

[1]     Shortly after the Federal Defendants issued the Final Rule, the Solicitor of the Department of the Interior finalized a detailed Memorandum to Defendant Hall on the "Legal Implications Affecting Importation of Sport-hunted Polar Bears from Canada Resulting from the Listing of the Polar Bears as a Threatened Species Under the Endangered Species Act" (May 23, 2008).  This Memorandum, drafts of which presumably were available to Defendant Hall, helps demonstrate that the Federal Defendants made a legal determination establishing the law following the listing of the polar bear.

MMPA be amended in a manner that allow for the importation of polar bear sport-hunted

trophies."  (Dkt 18-3).  These statements evidence the Federal Defendants' final conclusion that

no permits can or will be issued until the MMPA is amended.

Other members of SCI have booked and often paid for hunts for 2009 or 2010, and now

must either cancel (often forfeiting a deposit) or hunt without the prospect of being able to

import their trophy.  Complaint, ¶ 40.  Finally, still other members of SCI have put off booking

or even considering a hunt because of the Import Ban Determination.  *Id.*

## IV.    STANDARD OF REVIEW

The Federal Defendants have already answered SCI and SCIF's Complaint.  Answer Dkt.

16.  Therefore, the Federal Defendants' Rule 12(b)(6) motion to dismiss should properly be a

Rule 12(c) motion for judgment on the pleadings.  *Yates v. District of Columbia*, 324 F.3d 724,

725 (D.C. Cir. 2003) ("[D]efendants had moved to dismiss for failure to state a claim, pursuant

to Rule 12(b), FED.R.CIV.P. … But Rule 12(b) was inapplicable:  the defendants had already

answered the complaint.  The motion therefore should have been for judgment on the pleadings

under Rule 12(c).").

The standard for reviewing a motion for judgment on the pleadings is similar to the

standard for a motion to dismiss:

> A motion for judgment on the pleadings shall be granted if the moving party
> demonstrates that "no material fact is in dispute and that it is entitled to judgment
> as a matter of law."  In considering a motion for judgment on the pleadings, the
> Court should accept as true the allegations in the opponent's pleadings and accord
> the benefit of all reasonable inferences to the non-moving party.

*Stewart v. Evans,* 275 F.3d 1126, 1132 (D.C. Cir. 2002) (internal citations omitted)), *see also*

*Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) ("A motion to dismiss should be

granted only when it appears beyond doubt that, under any reasonable reading of the complaint,

the plaintiff will be unable to prove any set of facts that would justify relief.  The standard for

awarding judgment on the pleadings is virtually identical: … .") , *abrogated on other grounds*

*Hartman v. Moore*, 547 U.S. 250 (2006).  For purposes of this motion, SCI and SCIF's general

allegations embrace those specific facts necessary to support their claims.  *See Bennett v. Spear,*

520 U.S. 154, 168 (1997) (standard for motion to dismiss).

      Finally, a motion for judgment on the pleadings, like a motion to dismiss, is disfavored.

*See Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985) ("A motion to dismiss for

failure to state a claim upon which relief can be granted is generally viewed with disfavor and

rarely granted."); *de Pacheco v. Martinez*, 515 F. Supp. 2d 773, 782 (S.D. Tex. 2007) ("Motions

to dismiss for failure to state a claim are viewed with disfavor based on the principle that 'the

primary objective of the law is to obtain a determination of the merits of any claim.'") (quoting

*Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir.1957)).

## V.   ARGUMENT

### A.   The Federal Defendants' Determination That the Importation of Sport-hunted Polar Bears is No Longer Authorized is Final Agency Action Subject to Judicial Review

      SCI and SCIF challenge final agency action—the Federal Defendants' legal

determination that with the listing of the polar bear as a threatened species, the FWS lacks

authority to issue import permits under MMPA Section 104(c)(5), 16 U.S.C. §1374(c)(5).  The

Federal Defendants announced this action in the Final Rule listing the polar bear.[2]  As relevant

---

[2]     The Federal Defendants variously characterize this determination and its announcement in the Final Rule as an "excerpt" from the Final Rule, "isolated statements in the preamble," and "the challenged discussion."  Memo in Support at 8, 9, 15.  The Final Rule discusses or mentions the Import Ban Determination at least four times.  73 Fed. Reg. at 28236, 28242, 28278, 28301-02.  The determination is much more than a discussion or recitation of the law, it is a legal interpretation of the interplay between numerous statutes, resulting in a conclusion that changes the law that applied before the determination.

here, the APA allows judicial review of "final agency action"; it does not allow review of

"preliminary, procedural, or intermediate agency action."  5 U.S.C. § 704.

> As explained by the U.S. Supreme Court:

> As a general matter, two conditions must be satisfied for agency action to be
> "final": First, the action must mark the ***"consummation" of the agency's
> decisionmaking process***, it must not be of a merely tentative or interlocutory
> nature. And second, the action must be one by which "***rights or obligations have
> been determined***," or from which "***legal consequences will flow***, …."

*Bennett,* 520 U.S. at 177-78 (citations omitted) (emphasis added); *see also Appalachian Power

Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000).  The D.C. Circuit has further explained:

> To determine finality, courts must decide "whether the agency's position is
> definitive and whether it has a direct and immediate ... effect on the day-to-day
> business of the parties challenging the action." … "The inquiry seeks to
> distinguish a tentative agency position from the situation where 'the agency views
> its deliberative process as sufficiently final to demand compliance with its
> announced position.'"

*NRDC v. EPA,* 22 F.3d 1125, 1132 (D.C. Cir. 1994) (citations omitted).  The form of the

agency's statement does not matter; the question is whether the document reflects a final agency

action.  *See id* at 1132-33 (agency cannot avoid judicial review "merely by choosing the form of

a letter to express its definitive position ….") (citations omitted).

> Thus, the questions that define final agency action are (1) whether the determination is

the "consummation" of the decision-making process or a definitive statement, and (2) whether

the determination affects rights or gives rise to legal consequences.

### 1.     The Import Ban is the Consummation of the Decision-making

> The Import Ban Determination is the consummation of the Federal Defendants' decision-

making on the legality of polar bear imports under MMPA Section 104(c)(5) as a consequence of

the polar bear listing as threatened under the ESA.  In no uncertain terms, the FWS has

determined:  "The effect of the listing [is] in this case an end to the import provision under

Section 104(c)(5) of the MMPA ….”  73 Fed. Reg. at 28242.  Nothing indicates, and the Federal

Defendants have not alleged, that they are still engaged in contemplating the legal impact of the

listing on their authority to issue this type of polar bear import permit.  Moreover, it is the final

decision of the head of the federal agency with authority to list species under the ESA.  Federal

Defendants cite one case for the proposition that an agency action is not final if it is “only ‘the

ruling of a subordinate official,’ or ‘tentative.’”  Memo in Support at 10, citing *Franklin v.*

*Massachusetts,* 505 U.S. 788, 797 (1992).  Secretary of the Interior Dirk Kempthorne, the

signatory of the Final Rule, 73 Fed. Reg. at 28303, is no subordinate official; nor is the Import

Ban Determination “tentative” or subject to further review in any fashion.

The Federal Defendants try to avoid the definitiveness of this legal determination by

arguing that their decision-making is not over until they apply the determination to individual

permit applications.  In *Bennett v. Spear,* the Supreme Court explained, “This [the government’s

argument in that case] confuses the question whether the Secretary’s action is final with the

separate question whether petitioners’ harm is ‘fairly traceable’ to the Secretary’s action.”

*Bennett,* 520 U.S. 177.  Although the “action agency” still had to make the actual water

allocation at issue in that case, the Supreme Court found final agency action in the issuance of

the FWS’s Biological Opinion (“BO”).  *Id.* (it is “uncontested” that the BO was the

consummation of the decision-making process).  In *Appalachian Power,* the “Guidance”

document at issue was to be applied by the States in subsequent permit proceedings regarding

emissions from power plants.  208 F.3d at 1022.  The D.C. Circuit found EPA’s Guidance

document to be “consummation” of the agency’s decision-making and a “settled agency

position.”  *Id.* at 1022, 1023.  Neither Court conditioned finality on the plaintiffs’ carrying out

the process of obtaining the water allocation or the state permit before challenging the agency action.[3]

Here, if anything, the legal determination SCI and SCIF are challenging is even more final, as it definitively establishes that any applications for a Section 104(c)(5) permit will not be granted under any circumstances (in *Bennett,* it was at least possible that the action agency would not follow the BO restrictions and thus avoid harming the plaintiff).  The Import Ban Determination is the consummation of the decision-making on the legality of Section 104(c)(5) permits, including for the general hunting public and the few individuals who have permit applications pending (permits that will inevitably be denied under the Import Ban Determination).[4]

---

[3]     Federal Defendants cite *Fund for Animals v. BLM,* 460 F.3d 13, 22 (D.C. Cir. 2006) for the proposition that SCI and SCIF "must challenge 'the specific implementation of the broader agency policy."  Memo in Support at 10.  The full discussion from *Fund for Animals* dispels the applicability of the snippet quoted by the Federal Defendants.  At issue was whether a "budget request" document was reviewable under the APA.  But standing between the budget request document and the final agency action that might affect plaintiffs were (1) the local office's discretion to render a decision after its own analysis and a public input process; and (2) the fact that the budget document did not command anyone to do anything or refrain from doing anything, affect any license or permit, subject anyone to liability, or create or destroy any legal right.  *Fund for Animals,* 460 F.3d at 22.  Only "in circumstances like this" do the courts "require the complaining party to challenge the specific implementation of the broader agency policy." *Id.*

[4]     The Federal Defendants disingenuously suggest that decision-making remains on the permit applications pending on May 15, 2008—listing of the polar bear only "**may** affect the Service's future enforcement of the MMPA."  Memo in Support at 9-10 (emphasis added).  As to the individuals with pending applications, the Federal Defendants even suggest that there is a "possibility that no injury will occur at all," presumably meaning that the FWS might grant these permits.  *Id.* at 13.  As alleged in the Complaint and as the July 29, 2008 letter appended to the Federal Defendants' Memo in Support (and other documents SCI and SCIF will not introduce into the record at this time) establish, the FWS is flatly refusing to issue Section 104(c)(5) polar bear permits under any circumstances.  Complaint ¶ 40; *see also NRDC,* 22 F.3d at 1133 ("that the decision as set forth in the three documents constitutes final agency action is clear from the EPA's subsequent conditional approval of non-I/M committal SIPs … under authority of those documents.")

As alleged in the Complaint, other members of SCI either have hunted polar bear in 2008 but not submitted an application (because it would be futile) or have decided not to hunt in 2009 or 2010 because of the import ban.  Complaint ¶ 40.  The Federal Defendants do not even argue that the agency still has action to perform for these members of SCI.  For these SCI members, the Import Ban Determination is equally final and definitive.  The Federal Defendants fail to account for these members of SCI in arguing finality.

2.     **The Import Ban Determination Establishes Rights and Gives Rise to Legal Consequences**

The Import Ban Determination also is agency action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett,* 520 U.S. at 178.  Before the Import Ban Determination, anyone, whether it was someone who had hunted and applied for a permit, who had hunted but not applied for a permit, or who was simply considering whether to hunt a polar bear, had the right to obtain a polar bear import permit upon complying with the statutory requirements of Section 104(c)(5) (FWS "shall" issue a permit if conditions met).  Now that right is gone.  This "legal consequence" flows from the Import Ban Determination.

The facts in *Bennett v. Spear* and *Appalachian Power,* in which the Supreme Court and D.C. Circuit, respectively, found final agency action, demonstrate that the Import Ban Determination satisfies the second requirement.  In *Bennett,* the Supreme Court concluded that the Biological Opinion "alter[s] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions."  520 U.S. at 178.  Likewise, the Import Ban Determination altered the "legal

regime" to which the FWS Permits Branch and members of SCI and the general public are now subject.

Similarly, the "Guidance" document at issue in *Appalachian Power* changed the legal regime. "It commands, it requires, it orders, it dictates. Through the Guidance, the EPA has given the States their 'marching orders' and EPA expects the States to fall in line, …." 208 F.3d at 1023. Where before issuance of the Guidance, a particular method for monitoring opacity limitations was allowed, following issuance of the Guidance, the States now required a different method. *Id.* "The short of the matter is that the Guidance, … is final agency action, reflecting a settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain Title V permits in order to continue operating." *Id*. Members of SCI are like the power plants, their ability to obtain a permit (or the terms of that permit for the power plants) is affected by the settled determination of the Federal Defendants as reflected in the Import Ban Determination.

Finally, a legal determination, like the Import Ban Determination, can be final agency action. APA defines agency actions as including a "rule" or "the equivalent … thereof." 5 U.S.C. § 551(13). In *NRDC,* the D.C. Circuit confirmed that a legal interpretation can be final agency action. "An agency may not, for example, avoid judicial review 'merely by choosing the form of a letter to express its ***definitive position on a general question of statutory interpretation***.'" 22 F.3d at 1132-33 (emphasis added). As explained above, the Import Ban Determination is the equivalent of a final rule, as it establishes the rights of the public to obtain Section 104(c)(5) permits.

**B.**     **SCI and SCIF Have Alleged Facts Establishing Their Standing to Bring this Action**

The Federal Defendants' argument that SCI and SCIF have not alleged facts sufficient to establish their standing to bring this action fails for many of the same reasons described above. The Federal Defendants have taken final action that bans the import of sport-hunted polar bear trophies from Canada, adversely impacting those SCI members who have or had pending applications, those who have hunted polar bears but have not submitted an application, and those who are deciding whether to book or cancel polar bear hunts in light of the import ban. Federal Defendants' actions cause injury in fact to these interests, in addition to SCI and SCIF's interests in the conservation benefits of the sport-hunting of polar bears. A ruling in SCI and SCIF's favor reversing the import ban would redress all these injuries. As further discussed below, SCI and SCIF have demonstrated their standing, particularly under the standards for considering a motion for judgment on the pleadings.

The standards for establishing standing in federal courts are well known:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is
(a) concrete and particularized, … and
(b) "actual or imminent, not 'conjectural' or 'hypothetical,'" ….

Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." …

Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (citations omitted). At the motion for judgment on the pleadings stage (equivalent to a motion to dismiss), "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

13

dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 561 (citation omitted).

For SCI and SCIF's third claims for relief, which alleges a failure to follow APA notice and comment rulemaking, SCI and SCIF must allege not only the existence of the procedural violation, but an "essential injury to the plaintiff's own interest." *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 665 (D.C. Cir. 1996).

Finally, SCI and SCIF must establish associational standing by showing:

(a) its members would otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to the organization's purpose; and
(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).  The injuries discussed below satisfy all of these standards.[5]

### 1.   SCI and SCIF and SCI Members Have Suffered Injury-in-Fact Because the Import of Sport-hunted Polar Bears is Now Categorically Banned

SCI and SCIF and SCI members have suffered injury-in-fact in a number of ways, all satisfying this first requirement of standing.  The ban on imports under MMPA Section 104(c)(5) "regulates" U.S. citizens, including members of SCI, by denying those who wish to import polar

---

[5]     The Federal Defendants only dispute associational standing with the argument that SCI's members do not have standing.  Therefore, it concedes that SCI and SCIF have alleged sufficient facts, at this stage of the proceeding, to satisfy the other two requirements.  *See* Complaint, ¶¶ 15-18 (describing SCI and SCIF's interests).  The Federal Defendants also have not raised any prudential standing arguments.  Prudential standing generally prevents courts from adjudicating claims based on third party standing, abstract questions, and generalized grievances, and requires a party to be in the zone of interest of the statute being challenged.  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982).  By not raising any prudential standing arguments, the Federal Defendants cannot dispute here that the Complaint alleges sufficient facts to satisfy any prudential standing requirements.  To the extent necessary, SCI and SCIF will address all these standing issues in briefing on summary judgment.

bear parts from approved populations in Canada.   The Supreme Court instructs that when "the plaintiff is himself an object of the action (or foregone action) at issue …, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62.   SCI and SCIF's complaint generally alleges that the Import Ban Determination injures three different types of SCI members:  (1) those with pending applications that no longer can be granted under any circumstances; (2) those who have hunted but have not yet submitted (and no longer have a reason to submit) an application; and (3) those who are deciding whether to book a new hunt or cancel a booked hunt for 2009 or 2010.  *See* Complaint, ¶ 40.

For all these SCI members, the ban is absolute and their right to import is gone.  The Import Ban Determination injures SCI members by destroying the right they enjoyed until May 15, 2008, the day the Import Ban Determination went into effect.  MMPA Section 104(c)(5) specifically created a protectable interest in importing sport-hunted polar bear parts from approved populations in Canada.  Over 900 U.S. citizens have exercised that right since 1997. Now, no one can.

In *Bennett v. Spear,* the Supreme Court found injury-in-fact in a similar situation. Plaintiffs challenged the issuance of a Biological Opinion ("BO") that contained restrictions on water allocations another federal agency would have to impose to avoid incurring liability for taking a listed species.  520 U.S. 154, 157-58 (2000).  Plaintiffs alleged that the amount of water allocated to them in that later decision would be reduced, causing them harm.  *Id.* at 168.  The Supreme Court presumed the specific fact that this would occur – *i.e.,* that the other agency would reduce the allocation – and determined the plaintiffs had alleged an injury-in-fact.  *Id.* The injury to SCI members is even more immediate and certain because on May 15, 2008, the

Federal Defendants conclusively determined that the FWS would no longer grant any Section 104(c)(5) permits.

As in *Bennett,* the fact that for some members of SCI there may be future agency action—the formal denial of their permit application—does not shift the time of the injury to that later time.  The applicants applied when the right to import still existed.  Their injury arose when the Import Ban Determination effectively extinguished this right on May 15, 2008, just as in *Bennett* the injury to the water user arose with the adoption of the BO, long before the other agency made a decision on actual water allocations.  The later inevitable and ministerial denial of polar bear import permit applications does not change the fact that the injury arose on May 15, 2008.[6]

For those SCI members who hunted in 2008 but did not submit a permit application, the loss of the right to import also occurred on May 15, 2008.  The standing doctrine does not require these members to complete and submit an application, pay the application fee, and have the FWS tell them what the Import Ban Determination already establishes—there can be no imports under Section 104(c)(5).

This is even clearer for SCI members who must decide—largely based on their ability to import their trophy—whether to book a new hunt or cancel a booked hunt.  The Import Ban Determination harmed them on May 15, 2008 by establishing an absolute ban on imports under

---

[6]     In fact, it appears that the Federal Defendants are trying to avoid "denying" these permit applications, as they are "administratively closing" the applications – an action that has no clear meaning.  *See* Memo in Support at 11 n.2.  Assuming this is not a denial triggering the Section 104(d)(6) judicial review provision and Federal Defendants are right that SCI and SCIF do not have standing to challenge the Import Ban Determination, then the Federal Defendants are trying to place their actions beyond judicial review.  Finding standing here would allow one court to review a final action that affects potentially hundreds of people interested in importing sport-hunted polar bears, as well as people and organizations whose ability to conserve polar bears has been foreclosed by the import ban.

Section 104(c)(5).  Some of them have already lost deposits on cancellation of hunts booked when imports were still allowed.  *See generally* Complaint ¶ 40.  The standing doctrine does not require SCI members contemplating a hunt to book the hunt, pay upwards of $50,000, harvest a bear, submit a futile application, and wait for the inevitable denial before they are harmed.  These members would have hunted polar bear in Canada in anticipation of importing a trophy, but now will not because of the import ban.  *Id.*

> **2.    The Federal Defendants Caused These Injuries by Legally Determining That Imports Are No Longer Allowed**

The Import Ban Determination caused the injuries described above, including loss of the right to import sport-hunted polar bear trophies from approved populations in Canada.  It also changed the legal regime to which SCI members are subject.  As explained above, before May 15, 2008, U.S. citizens, including members of SCI, could submit an application under MMPA Section 104(c)(5), make a showing of compliance with the statute and receive an import permit.  After May 15, 2008 and issuance of the Import Ban Determination, no U.S. citizen could exercise the right they had before.  Because U.S. hunters will inevitably hunt fewer polar bears, severely diminishing if not eliminating the conservation dollars these hunters directly and indirectly bring to the species—the conservation benefits of sport hunting were lost at this time also as a result of the Import Ban Determination.[7]

The Import Ban Determination operates to prevent imports just as surely as would an administrative rule that bans imports.  The Federal Defendants cannot avoid causation by

---

[7]    While the loss of U.S. hunters lowers the funds available for polar bear conservation, Complaint, ¶¶ 5, 41-42; *see also* Final Rule, 73 Fed. Reg. at 28236, it does not reduce polar bear mortality.  All polar bears harvested in Canada come from quotas for the various areas.  From the quotas, some tags go to sport-hunting, but most go to subsistence hunting.  If U.S. hunters do not use a tag for sport-hunting, then the tag will simply be used for subsistence hunting, resulting in the same overall mortality.  Complaint, ¶ 43.

suggesting that they might not follow the Import Ban Determination.  They assert that SCI and

SCIF's injuries "hinge on speculation regarding the Service's future actions."  Memo in Support

at 16.  Under the Import Ban Determination, the Federal Defendants have but one response to a

Section 104(c)(5) import application—deny it in one fashion or another.[8]  The result will be that

the applicant has no opportunity to enjoy the benefits of importing the polar bear trophy, as over

900 other U.S. citizens have before May 15, 2008.  The Import Ban Determination causes the

same type of harm to those who must consider it when deciding whether to book a new hunt or

cancel a booked hunt.  The import ban eliminates a major incentive to undertaking this

recreational activity.  In all ways, the injuries suffered by SCI and SCIF and SCI members is

"fairly traceable" to the Federal Defendants' action in making the Import Ban Determination.

In *Bennett v. Spear,* the Supreme Court rejected causation arguments similar to those the

Federal Defendants advance here.  In fact, the challenged action in *Bennett,* the issuance of a

Biological Opinion, merely had a "coercive" effect on the agency that would make the final

decision that could cause harm to the plaintiffs in that case.  520 U.S. at 168-69; *see also id.* at

170 ("action agency is technically free to disregard the Biological Opinion ….").  The challenged

action in *Bennett* did not, as here, have an absolutely determinative effect on that ultimate

decision.  Nonetheless, the Supreme Court found that the adoption of the BO caused injury to the

water users because it was "virtually determinative" of the harm the water user plaintiffs would

suffer.  *Id.* at 170.  So, when a final agency action is "determinative" or "virtually determinative"

of harm that another federal agency (or here a division of the defendant agency) will inflict on

---

[8]      A "well established principle" holds that administrative agencies are entitled to a
presumption that they will act according to the law.  *See Kohli v. Gonzales,* 473 F.3d 1061, 1068
(9th Cir. 2007).  In other words, the Federal Defendants will follow the Import Ban
Determination.  The individual, fact-specific assessment of permit applications has ended,
replaced by the Import Ban Determination's absolute bar to imports.

the plaintiff, causation is established.  The Import Ban Determination is determinative of the fate

of any current or future application for a Section 104(c)(5) permit—it will be denied.

> ### 3.  A Decision in Favor of SCI and SCIF Would Redress Their Injuries by Once Again Allowing Permits for the Import of Polar Bears from Approved Populations in Canada

Using the same analysis it employed on causation, the Supreme Court in *Bennett* also

rejected the government's redressability argument, as the Court should do here.  The Supreme

Court found that the injury to the water users would not occur if the Court set aside the BO.

Here, similarly, declaring the Import Ban Determination to be illegal, setting it aside, and (if

necessary) enjoining the FWS to continue to process and grant such applications, would redress

the injuries to SCI and SCIF and SCI members.[9]  Without an import ban, SCI members would be

free to exercise their right to apply for and obtain an import ban, just as they could have done,

and over 900 U.S. citizens did do, before May 15, 2008.

The Federal Defendants try to avoid the real redressability issue by discussing a judicial

review provision of the MMPA.  Memo in Support at 16-17.  Under this provision, an applicant

for a permit "may obtain judicial review of … any permit issued by the Secretary … or of his

refusal to issue such a permit."  16 U.S.C. § 1374(d)(6).  Federal Defendants argue that SCI and

SCIF's request for injunctive relief enjoining the FWS to continue to process permits is too

"broad" and "would not be appropriate."  Memo in Support at 16-17.  The apparently

discretionary review provision of Section 104(d)(6)—the statute uses "may" instead of "must"—

is presumably a fact intensive review of whether the applicant has met the conditions required

for a permit.  Such review is quite different from the judicial analysis requested by SCI and SCIF

---

[9]      Such an injunctive order would naturally flow from the declarative relief that SCI and SCIF seek here.  The Court could determine whether such an injunctive order was required, or whether the Federal Defendants could be expected to comply with the law, as declared by the Court, without such an order.

in this litigation.  The permit review process does not eliminate the ability of the public to challenge, under the APA, the Import Ban Determination, which applies as much to each permit applicant as to everyone.  The Import Ban Determination is final agency action, a "rule" or the "equivalent thereof," subject to review and, if contrary to law, being declared illegal and set aside.  Review of denials of individual permits, cannot substitute for review of a rule that affects numerous persons wishing to enjoy the benefits of a statutory provision, here Section 104(c)(5).

Federal Defendants' flawed redressability argument simply avoids the fundamental standing question of whether a court order granting the relief that SCI and SCIF seek would redress their injuries, including the loss of the right to obtain Section 104(c)(5) permits.  It also does not address the injuries of SCI members who have hunted polar bears but not applied for a permit (because it would be a waste of time, effort, and money, *i.e.*, futile) and those members who must decide whether to book a hunt or cancel a booked hunt.  The permit-denial review provision offers them no relief.  As in *Bennett,* an order declaring the Import Ban Determination illegal and setting it aside would redress the injuries SCI and SCIF and SCI members have suffered.

### 4.     SCI and SCIF Have Demonstrated Procedural Standing for Their Third Claim for Relief

Finally, SCI and SCIF have standing to bring their procedural challenge to the Import Ban Determination.  Complaint, Claim III, ¶¶ 60-67.  As the Supreme Court and D.C. Circuit have made clear, the failure of an agency to follow some required procedure alone is not sufficient to confer standing on a plaintiff to challenge that action.  The plaintiff must also show that "the procedural requirement was 'designed to protect some threatened concrete interest of the plaintiff'" and "it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  *City of Waukesha v. EPA,* 320 F.3d 228, 234 (D.C. Cir.

2003), quoting respectively *Lujan v. Defenders of Wildlife,* 504 U.S. at 573 n.8 and *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 665 (D.C. Cir. 1996).  Making this showing entails "'at least two links' in an 'adequate causal chain' between a procedural violation and injury-in-fact, 'one connecting the omitted [procedure] to some substantive government decision that may have been wrongly decided because of the lack of [the procedure] and one connecting that substantive decision to the plaintiff's particularized injury.'"  *City of Waukesha,* 320 F.3d at 234 (brackets in original), quoting *Bentsen,* 94 F.3d at 668.  The showing for the first link – between the procedural requirement and the substantive action "is not very stringent."  *Id.* at 235, citing *Lujan,* 504 U.S. at 572 n.7.  In reviewing the standing question, "the court … must therefore assume that on the merits the plaintiffs would be successful in their claims."  *Id.*

Here, the omitted procedure—failure to conduct rulemaking on the question of whether the polar bear should be "designated" a depleted species under the MMPA—is connected to the Import Ban Determination.  The import ban arose out of the Federal Defendants' determination, for purposes of the MMPA import provisions, that the polar bear is a "depleted" species due to the ESA listing.  While the MMPA prohibits the import of species which are "designated" as depleted, the Federal Defendants relied on one of the definitions of a depleted species to conclude the import ban was in effect.  *See* 73 Fed. Reg. at 28236.  SCI and SCIF's third claim— which the Court must assume would be successful—asserts that the Federal Defendants have failed to "designate" the polar bear, a process that would have to involve notice and comment rulemaking on this particular determination.  Therefore, the omitted procedure is connected to the substantive decision.  The Federal Defendants do not appear to contest this conclusion.

Instead, the Federal Defendants only address the second link, reiterating their argument that SCI and SCIF have not alleged an "essential" injury.  Memo in Support at 14.  For the same

21

reasons discussed above in subsection B.1, this argument fails.  The Import Ban Determination causes injury to SCI and SCIF and to SCI members by categorically banning the import of polar bears under Section 104(c)(5).

## VI.    CONCLUSION

The Federal Defendants have made what amounts to a final rule banning importation of sport-hunted polar bears from approved populations in Canada under MMPA Section 104(c)(5). The Import Ban Determination changes the law.  Such import permits are no longer allowed. The Import Ban Determination is final and it causes injury-in-fact to SCI and SCIF and SCI members.  Setting aside the Import Ban Determination, and thus restoring the right to import polar bears, would redress these injuries.

For all these reasons, the Court should deny the Federal Defendants' "Motion to Dismiss" (motion for judgment on the pleadings).

Dated this 10th day of March, 2009

Respectfully submitted,

/s/ Douglas S. Burdin
Douglas S. Burdin (DC Bar No. 434107)
Anna M. Seidman (DC Bar No. 417091)
Safari Club International
501 2nd Street NE
Washington, DC 20002
Tel.:    (202) 543-8733
Fax:    (202) 543-1205
dburdin@safariclub.org
aseidman@safariclub.org

*Counsel for Plaintiffs,*
*Safari Club International and*
*Safari Club International Foundation*