UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND 4(d) RULE LITIGATION ) ) ) ) ) ) ) | Misc. Action 08-0764 (EGS) MDL Docket No. 1993 |
| This Document Relates To: ) ) ) | |
| DEFENDERS OF WILDLIFE v. U.S. DEPARTMENT OF THE INTERIOR, et al., 09-153 ) ) ) ) ) ) ) ) ) | |

**DEFENDERS OF WILDLIFE'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

**INTRODUCTORY STATEMENT**

1. In this case, plaintiff Defenders of Wildlife ("Defenders") alleges that defendants United States Department of the Interior ("DOI") and U.S. Fish and Wildlife Service ("FWS" or "Service"), violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., in their promulgation of a December 16, 2008 final rule under section 4(d) of the ESA, id. at § 1533(d), broadly allowing "take" of the threatened polar bear (*Ursus maritimus*).

2. On May 15, 2008, FWS listed the polar bear as a "threatened" species under the ESA. Final Rule: Determination of Threatened Status for the Polar Bear Throughout Its Range, 73 Fed. Reg. 28,212. On the same day, FWS issued a separate, interim final "special rule" under section 4(d) of the ESA broadly removing "take" protections that would otherwise be provided for the polar bear upon listing. Interim Final Rule: Special Rule for the Polar Bear, 73 Fed. Reg. 28,318.

3. The ESA provides for the listing of imperiled species as "threatened" or "endangered." 16 U.S.C. § 1532(6), (20). Endangered species are protected by law from

"take," including actions or attempts to harass, harm, pursue, hunt, shoot, wound, kill, capture, or collect. Id. § 1532(19), § 1538. In contrast, ESA Section 4(d) mandates that the Secretary "shall issue such regulations as he deems necessary and advisable for the conservation" of threatened species, and directs that such regulations "may" provide take prohibitions. Id. § 1533(d). "Conservation" is defined, in turn, as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." Id. § 1532(3). Accordingly, the Secretary must ensure that all 4(d) regulations promulgated for threatened species do not simply prevent the extinction of the species, but are those rules "necessary and advisable" to ensure such species recovers to the point where the protections of the Act are no longer necessary.

4.  Shortly after the ESA was enacted, FWS in 1975 used its authority and responsibility under section 4(d) to promulgate a rule extending "blanket" take protections to all threatened species. 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975). More than 30 years later, and after several significant amendments to both the ESA and its implementing regulations, FWS's blanket rule remains largely unaltered. 50 C.F.R. § 17.31(a).

5.  In announcing the interim final 4(d) rule, former Interior Secretary Dirk Kempthorne did not address how removing existing take protections was necessary and advisable to promoting the protection and recovery of the polar bear; instead, the Secretary stressed that the purpose of the rule was to "prevent[] unintended harm to the society and economy of the United States," and "provide clarity and certainty to those regulated" under the ESA. Remarks by Secretary Kempthorne: Press Conference on Polar Bear Listing (May 14, 2008) ("Secretary's Remarks") (http://www.doi.gov/secretary/speeches/081405_speech.html) (last accessed 11 Mar. 2009).

6.  On December 16, 2008 FWS replaced its interim final rule of May 15, 2008 with a final 4(d) rule, Final Rule: Special Rule for the Polar Bear, 73 Fed. Reg. 76,249. The final rule provides sweeping exemptions from polar bear take protections for two extremely broad categories of actions: (1) any activity within the polar bear's current range if such

activity is authorized under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., or the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"); and (2) any activity outside of the polar bear's current range that causes polar bear take incidental to the purpose of carrying out that activity.  Id. at 76,269; 50 C.F.R. § 17.40(q)(1)-(4).

7. Under NEPA, federal agencies must prepare an environmental impact statement ("EIS") for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.4.  FWS's 4(d) rule falls squarely within NEPA's definition of "major Federal action," which includes "new or revised agency rules, regulations, plans, policies and procedures," 40 C.F.R. § 1508.18(a), (b)(1), and, by allowing for take of polar bears otherwise prohibited by FWS's ESA implementing regulations at 50 C.F.R. § 17.31(a), will also have a clear environmental impact.  The 4(d) rule will also result in the removal of procedural mechanisms under the ESA that would otherwise apply, such as application of the citizen suit provision.  16 U.S.C. § 1540(c).  Nonetheless, the agency conducted no NEPA analysis on the anticipated environmental effects of its final 4(d) rule.  As the final 4(d) rule was published without any of the environmental analysis required by NEPA, 42 U.S.C. § 4321 et seq., Defenders now seeks judicial relief declaring this failure unlawful and vacating the rule.

8. In addition, Defenders on January 5, 2009 provided former DOI Secretary Kempthorne and former FWS Director Dale Hall with 60-day notice (as required by section 11(g) of the ESA, 16 U.S.C. § 1540(g)) that in removing take protections that would otherwise apply to the polar bear, the final rule violates the ESA section 4(d) requirement that such rules be those "necessary and advisable" for the conservation of the species, and that the final rule will in fact will make the polar bear's continued decline and the destruction of its Arctic sea ice habitat more likely.  This notice became ripe on March 6, 2009, and thus Defenders now amends its Complaint in this action to add an ESA claim, seeking judicial relief declaring the final 4(d) rule unlawful and vacating the rule.  Defenders' NEPA and ESA claims are both governed by the standards of judicial review established by the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701-706.  Defenders is not challenging the separate polar bear listing rule in any respect in this action.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 16 U.S.C. § 1540(c) and § 1540(g) (ESA citizen suit provision).

10. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because plaintiff Defenders and all defendants reside in the District of Columbia; and a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

11. This case has been consolidated into the action, In Re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation, (D.D.C. Misc. Action No. 08-764 (EGS)) (MDL Docket No. 1993).

## PARTIES

12. Plaintiff DEFENDERS OF WILDLIFE is a non-profit organization based in Washington, D.C., with field offices throughout the United States, including in Anchorage, Alaska.  Defenders also maintains international offices, including an office in Alberta, Canada, and has an International Conservation Program based in Washington, D.C.  Defenders is dedicated to the protection of all native wild animals and plants in their natural communities, including the polar bear, and its staff in Washington, Alaska, and Canada are all actively involved in a variety of polar bear conservation efforts.  Defenders has approximately 600,000 members nationwide and more than 1,500 in Alaska.  Defenders advocates new approaches to wildlife conservation that will help keep species from becoming endangered, and employs education, litigation, research, legislation, and advocacy to defend wildlife and their habitat. Defenders, as an organization and on behalf of itself and its members, has long been involved in seeking to promote the protection and recovery of the polar bear in the United States, Canada, and throughout its global range.  Defenders brings this suit on behalf of itself and its members.

13. Defenders and its members include individuals with long-standing interests in the conservation and recovery of the polar bear, including scientific, professional, educational,

wildlife preservation and conservation, recreational, aesthetic, moral, spiritual, and other interests. Defenders and its members place great value on the polar bear, and the essential role it plays in ensuring the healthy functioning of the northern hemisphere's arctic sea ice habitats in which they evolved. An integral aspect of these protected interests in polar bears is the expectation and knowledge that the species is in its native habitat. For this reason, Defenders members' protected interests are dependent on the continued existence of healthy, sustainable, and viable populations of polar bears in the wild, as well as the continued existence of its arctic sea ice, terrestrial, and marine habitats. Defenders has actively sought to conserve and recover the species and its habitat through a broad diversity of efforts including public education, outreach to residents and elected officials, scientific analysis and advocacy, and legal efforts.

14. Individual Defenders members utilize lands within current polar bear habitat, and have traveled long distances at significant expense to observe, study, photograph, and otherwise appreciate polar bears and other wildlife in their wild, native habitats, especially the species' sea ice habitat, which the best available science indicates is already melting as a result of greenhouse gas emissions and consequent global warming. The legal violations alleged in this complaint cause direct injury to the scientific, professional, educational, wildlife preservation and conservation, recreational, aesthetic, moral, spiritual, and other interests of the staff and members of Defenders.

15. The above-described scientific, professional, educational, wildlife preservation and conservation, recreational, aesthetic, moral, spiritual, and other interests of Defenders and its members have been, are being, and will continue to be irreparably harmed by defendants' violations of law, their failure to comply with NEPA's requirement that an Environmental Assessment or Environmental Impact Statement be prepared, and their violation of ESA section 4(d)'s mandate that the 4(d) rule provide those measure necessary and advisable for the conservation of the polar bear.

16. Defendants' failure to comply with NEPA and the ESA make the continued decline of the polar bear and destruction and adverse modification of its Arctic sea ice, terrestrial, and marine habitats more likely. By removing take protections that would otherwise

1 apply, defendants have precluded the application of statutory and regulatory mechanisms that
2 would serve to protect individual polar bears and their habitats from direct adverse effects from
3 industrial activities such as oil and gas development, as well as indirect adverse effects through
4 the individual and aggregate operations of greenhouse gas emitters, no matter how large or
5 significant those emissions may be.  By making the continued decline of polar bear populations
6 and destruction of the species' habitat more likely, defendants' actions are causing or are
7 threatening harm to plaintiffs' varied interests described in detail above.  Defendants'
8 challenged actions under NEPA and the ESA have also resulted in informational, procedural,
9 and organizational harm to Defenders.

10      17.    It is likely that a favorable judicial decision in favor of plaintiff Defenders will
11 prevent or redress the injuries described above.  Defenders has no adequate remedy at law, and
12 thus the requested relief is appropriate under the APA.

13      18.    Defendant U.S. DEPARTMENT OF THE INTERIOR ("DOI") is a cabinet-
14 level agency.  The ESA delegates to DOI the ultimate responsibility for the administration of
15 the Act, and the agency is also responsible for compliance with other applicable federal laws
16 such as NEPA.

17      19.    Defendant UNITED STATES FISH & WILDLIFE SERVICE is a federal
18 agency within DOI.  Under ESA regulations, many of the responsibilities delegated to DOI and
19 the DOI Secretary have been subdelegated to FWS, including the responsibility for
20 administering the non-discretionary duties under section 4 of the Act.  FWS is also responsible
21 for compliance with other applicable federal laws such as NEPA.

22      20.    Defendant KEN SALAZAR, SECRETARY, U.S. DEPARTMENT OF THE
23 INTERIOR, is DOI's highest ranking official and, in that capacity, has ultimate responsibility
24 for the administration and implementation of the ESA with regard to the polar bear, and for
25 compliance with all other federal laws applicable to DOI such as NEPA.  He is sued in his
26 official capacity.

**STATUTORY AND REGULATORY BACKGROUND**

**A.     Endangered Species Act**

21.    Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress passed the ESA in order to "provide a program for the conservation of ... endangered species and threatened species," and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(a)(1), (b). Under ESA regulations, FWS has been delegated responsibility for administering the Act as it pertains to terrestrial species such as the polar bear. 50 C.F.R. §402.01(b).

22.    The ESA provides for the listing of imperiled species as "threatened" or "endangered." 16 U.S.C. § 1533. The Act defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range," and a threatened species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(6), (20). In determining whether a species is threatened or endangered, FWS is directed to list based on the presence of any one of the following five factors: the present or threatened destruction, modification, or curtailment of its habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting its continued existence. Id. § 1533(a)(1)(A)-(E).

23.    Once a species is listed, the ESA places a wide variety of procedural and substantive requirements on the federal government intended to help ensure that such species is adequately protected and ultimately recovered to the point where listing is no longer necessary. See, e.g., 16 U.S.C. § 1533(f)(1) (requiring development and implementation of recovery plan); § 1536(a)(2) (requiring federal agencies to consult with FWS on the effects of their actions on listed species and their habitat); id. § 1533(a)(3)(A) (requiring designation of critical habitat ).

24.    In addition, the listing of a species under the ESA triggers requirements that apply to any "person," broadly defined by the Act to include "an individual, corporation,

partnership, trust, association or any other private entity," as well as "any officer, employee, agent, department, or instrumentality" of Federal, State, and local governments. Id. § 1532(13).

25. For example, the ESA and its implementing regulations make it "unlawful for any person subject to the jurisdiction of the United States to take any [listed] species within the United States or the territorial sea of the United States." Id. § 1538(a)(1)(B); 50 C.F.R. § 17.31. There are limited exceptions to this prohibition; for example, section 10 of the Act provides that private applicants may receive a permit to take listed species upon submission of a conservation plan (commonly referred to as a habitat conservation plan) that meets several substantive requirements. 16 U.S.C. § 1539(a)(2)(A). Such permit, and the associated habitat conservation plan, can only be issued by FWS after opportunity for public comment is provided. Id. § 1539(a)(2)(B).

26. The ESA's take provisions do not automatically apply to species listed as threatened such as the polar bear. See 16 U.S.C. § 1538(a)(1). Instead, section 4(d) of the Act, id. § 1533(d), provides that FWS "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation" of threatened species, and that such regulations may include prohibitions on take.

27. Only two years after the ESA was enacted, FWS exercised its authority and responsibility under section 4(d) to provide take protections to all threatened species. See 40 Fed. Reg. 44,412, 44,414 (Sept. 26, 1975). After more than 35 years, and several subsequent changes to the ESA regulations, this overarching, general rule providing take protections to threatened species remains essentially unchanged.

**B.     National Environmental Policy Act**

28. Passed by Congress in 1969, NEPA is the Nation's "basic charter for protection of the environment." 40 C.F.R. § 1500.1(a). Among the critical purposes of the statute are to "insure that environmental information is available to public officials and citizens before . . . actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences." Id. § 1500.1(b)-(c).

29. NEPA requires each federal agency to prepare and circulate for public review and comment a detailed Environmental Impact Statement ("EIS") prior to undertaking any major federal action that may significantly affect the environment. 42 U.S.C. § 4332; 40 C.F.R. § 1501.4; 1502.5; 1508.3. Major federal actions are defined by NEPA regulations to include "[a]doption of official policy, such as rules, regulations, and interpretations" pursuant to the APA. 40 C.F.R. § 1508.18(b)(1).

30. The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which are binding on all federal agencies. Id. § 1507.1. When a federal agency is not certain whether a federal action will have a significant environmental effect, it must prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1508.9. If the agency concludes in an EA that a project may have significant environmental impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4. If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a "finding of no significant impact" to accompany its decision on the project. 40 C.F.R § 1508.13.

31. In determining whether a proposed action may significantly affect the environment, NEPA requires that both the context and intensity of that action be considered. 40 C.F.R. § 1508.27. In considering context, "[s]ignificance varies with the setting of the proposed action." Id. § 1508.27(a). Consideration of intensity, on the other hand, "refers to the severity of the impact," including "[t]he degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat"; "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"; and "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." Id. § 1508.27(b)(4), (6), (9).

32. The CEQ regulations also provide that each federal agency shall identify in its NEPA procedures those classes of actions that normally do not require either an EIS or an EA. Id. § 1507.3(b)(2)(ii). These "categorical exclusions" are actions that do not individually or cumulatively have a significant effect on the human environment. If an agency action falls

9

within one of the defined categorical exclusions, then no EIS or EA is required, unless one or more exceptions apply, which are also defined by the agency's NEPA procedures.

33. As part of the NEPA process, federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," and describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action." 40 C.F.R. § 1502.13. The consideration of alternatives to the proposed action is described by the regulations as the "heart" of proper NEPA analysis. Id. § 1502.14.

34. NEPA documents must assess the environmental impacts of the proposed action, including direct effects, indirect effects, and cumulative impacts. Id. §§ 1502.16. In conducting their analyses, federal agencies are directed to use high quality, accurate scientific information and to ensure the scientific integrity of their NEPA document. Id. § 1500.1(b); § 1502.24.

35. Congress will, in rare circumstances, provide statutory exemptions from NEPA's requirements. For example, section 7(k) of the ESA, 16 U.S.C. § 1536(k), provides that decisions of the Endangered Species Committee (the so-called "God Squad") exempting federal agency actions found to violate section 7(a)(2) of the Act, id. § 1536(a)(2), "shall not be major Federal action" for purposes of NEPA. No similar provision in the ESA exempts the 4(d) rulemaking process from NEPA's requirements, nor is the 4(d) rulemaking subject to any categorical exclusion adopted by DOI.

**FACTUAL BACKGROUND**

**A.     The Listing of the Polar Bear as a Threatened Species**

36. The polar bear (*Ursus maritimus*), the largest of the world's bear species, is distributed among nineteen arctic subpopulations, two of which—the Chukchi Sea and the southern Beaufort Sea populations, totaling approximately 3500 individuals—are located within the United States. In addition, the polar bear's current range also encompasses the nations of Canada, Denmark (in Greenland), Norway, and Russia. 73 Fed. Reg. at 28,212-13. The total number of polar bears worldwide is currently estimated to be 20,000-25,000 individuals.

37. As a general rule, polar bears remain on their sea ice habitat year-round or only spend short periods of time on land. Id. at 28,213. They depend on this habitat for all major life needs, "including as a platform from which to hunt and feed upon seals; as habitat upon which to seek mates and breed; as a platform to move to terrestrial maternity denning areas, and sometimes for maternity denning; and as a substrate on which to make long-distance movements." Id. at 28,214.

38. "Since the start of the industrial era, the effect of increased [greenhouse gas] concentrations (principally from carbon dioxide, nitrous oxide, methane, and halocarbons) in the atmosphere has been widespread warming of the climate, with disproportionate warming in large areas of the Arctic. A net result of this warming is a loss of sea ice, with notable reductions in Arctic sea ice." 73 Fed. Reg. at 28,244. Average temperatures in the Arctic have increased nearly twice as fast as the rest of the world in the last 100 years. Id. at 28,244.

39. The two polar bear populations "with the most extensive time series of data, western Hudson Bay and southern Beaufort Sea, are considered to be declining" due to the effects of climate change and consequent sea ice loss that has already occurred. Id. at 28,238. The southern Beaufort Sea population "has already experienced decreases in cub survival, significant decreases in body weights for adult males, and reduced skull measurements." Id. In 2004, previously rare instances of cannibalism and starvation were both documented in the southern Beaufort Sea population. Id. at 28,268. In the western Hudson Bay, spring air temperatures have increased by 2-3 degrees Celsius in the past 50 years, causing the sea ice to break up approximately 3 weeks earlier than it did 30 years ago. Id. at 28,267. With a contracted time period to hunt seals from their sea ice platforms, polar bears in the region have demonstrated decreased recruitment and body condition, and experienced a 22 percent population decline, from 1,194 bears in 1987 to 935 bears in 2004. Id.

40. In response to a Petition by the Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, FWS listed the polar bear as a threatened species on May 15, 2008. 73 Fed. Reg. 28,212. FWS largely based its decision on one statutory listing factor: the present or threatened destruction, modification, or curtailment of its habitat or range

caused by "ongoing and projected changes in sea ice habitat (i.e. the species is likely to become endangered throughout all of its range within the foreseeable future due to habitat loss.")."  73 Fed. Reg. at 28,277.  FWS defined the term "foreseeable future" for purposes of the listing rule as "the timeframe over which the best available scientific data allow us to reliably assess the effects of threats on the polar bear," which it found to be 40-50 years.

41.   Surveying a large body of scientific observation, research, study, and verification by the United Nations Intergovernmental Panel on Climate Change, United States Geological Survey, and others, FWS concluded in its Final Listing Rule that "[t]hese results present a consistent picture: there is a substantial loss of sea ice for most models and regions by 2050."  Id. at 28,231.

42.   Notably, in a study comparing observed arctic sea ice losses from 1953-2006 with simulation results, none predicted sea ice losses as large as those actually observed; indeed, "[t]he observational record indicates that current summer sea ice losses appear to be about 30 years ahead of the ensemble of modeled values."  Id. at 28,233-34.  As noted by FWS, this discrepancy "suggests" that a "transition to a seasonally ice-free Arctic might occur sooner than the models indicate."  Id. at 28,234.

43.   The final listing rule also addressed other threats to the polar bear and its habitat beyond climate change and the resultant melting of the bear's sea ice habitat, including harvest, contaminants, oil and gas development, and additional interaction with humans, leading FWS to conclude that "both the cumulative effects of multiple stressors and the rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears."  Id. at 28,256.

44.   In making its listing decision, FWS explicitly determined "that there are no known regulatory mechanisms in place at the national or international level that directly and effectively address the primary threat to polar bears—the rangewide loss of sea ice habitat within the foreseeable future."  Id. at 28,241.

**B.	The Polar Bear 4(d) Rule**

45.	On the same day FWS issued its final listing rule, the agency issued a second, "interim final rule" under the authority of section 4(d) of the ESA, 16 U.S.C. § 1533(d). 73 Fed. Reg. 28,306 (May 15, 2008). This interim final rule, in sweeping terms, directed that FWS's pre-existing regulation providing "take" protection to threatened species, 50 C.F.R. § 17.31, would not apply to the polar bear with respect to: 1) any activity within Alaska "conducted in a manner that is consistent" with the requirements of the MMPA or CITES; or 2) any incidental take of polar bears caused by any action taken anywhere in the United States aside from Alaska. Id. at 28,318.

46.	FWS provided a 60-day public comment period on its interim final rule, subsequently issuing a final 4(d) rule on December 16, 2008. 73 Fed. Reg. 76,249. The final rule contains, slightly revised but fundamentally unchanged, the two take exemptions instituted by the interim final rule. Specifically, the final 4(d) rule removes existing polar bear take protections for: 1) any activity "authorized or exempted" under the MMPA or CITES; and 2) any incidental taking caused by any activity in areas subject to the jurisdiction or sovereign rights of the United States outside the current range of the polar bear. Id. at 76,269; 50 C.F.R. § 17.40(q)(2), (4).

47.	Each of these two sweeping take exemptions will likely have significant environmental consequences that lawfully must be considered under NEPA. For example, the final 4(d) rule's exemption for incidental take outside of the polar bear's current range will preemptively insulate most greenhouse gas emitters from take liability despite the fact that global warming is the principal threat facing polar bears, the agency acknowledges that there are no other regulatory mechanisms that address this threat, and take liability would otherwise apply. See 73 Fed. Reg. at 76,254 (take exemption applies "regardless of whether a causal connection has been made between the conduct of the activity and effects on the species.") Despite the fact that the final 4(d) rule removes substantive protections for polar bears and their habitat and will likely have significant adverse environmental effects, FWS did not prepare an EIS or EA before promulgating the rule.

48.     FWS largely attempts to justify its decision in the final 4(d) rule to remove polar bear ESA take protections based on its assertion that the definitions of take under the ESA and MMPA "are similar in application." Id. at 76,252.  However, as the agency acknowledges, some MMPA provisions are indeed "less strict than the ESA provisions." Id. at 76,259.  For example, ESA regulations define "harm" as an act which kills or injures wildlife, including "significant habitat modifications or degradation." 50 C.F.R. § 17.3.  The MMPA does not provide similar explicit provisions addressing habitat protection.  In addition, while ESA regulations allow only designated agency authority to take threatened species for defense of property and welfare of the animal, the MMPA and its regulations broadly allow "any person" to deter marine mammals, allowing, for example, private oil and gas operators the authority to take polar bears deemed to be too close to industrial facilities.  73 Fed. Reg. at 76,257.

49.     By removing ESA take protections, the final 4(d) rule also precludes rights of citizen participation provided by the ESA for which no equivalent exists under the MMPA.  For example, the ESA contains a citizen suit provisions in order to address unlawful actions under the Act. 16 U.S.C. § 1540(g).  As FWS acknowledges, under the MMPA, "legal action against the person or entity causing the take could only be brought by the United States and not by a private citizen or citizen group." 73 Fed. Reg. at 76,255.  By removing ESA take protections, FWS also removes the opportunities for public comment that apply to section 10 habitat conservation plan development.  16 U.S.C. § 1539(a)(2)(B).

50.     Regardless of FWS's opinion regarding the relative merits of MMPA take regulation as compared to ESA take regulation, these regulatory schemes differ and choosing to implement one rather than the other or both will invariably have consequences for polar bear, as well as its habitat.  Under NEPA, FWS had a duty to consider these environmental consequences in an EIS or EA. 40 C.F.R. § 1502.16; see also id. § 1508.8 (agency has duty to consider effects "from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.").  By not conducting NEPA, FWS violated this duty.

51. In addition, FWS has failed to "[r]igorously explore and objectively evaluate all reasonable alternatives" to its proposed course of action. 40 C.F.R. § 1502.14. For example, FWS did not consider maximizing polar bear conservation efforts by instituting the strongest aspects of both the MMPA and ESA take regulations (rather than simply bypassing the existing ESA take regulations); broadening the scope of the rule to encompass other actions "necessary and advisable" for polar bear conservation, rather than only including take exemptions; or exploring the comparative benefits of a "no action" approach (i.e. simply leaving the status quo protections under the ESA in place). By promulgating the final rule without NEPA compliance, FWS has undermined the statute's overriding purpose to "provide full and fair discussion of significant environmental impacts and [] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts." 40 C.F.R. § 1502.1.

52. FWS expressly refused to conduct NEPA analysis prior to its promulgation of the final 4(d) rule. In its response to comments, the agency did not claim that its action was categorically excluded. Instead, FWS justified its refusal on its assertion that "[i]n 1983, upon recommendation of [CEQ], the Service determined that NEPA documents need not be prepared in connection with regulations adopted pursuant to section 4(d) rules." 73 Fed. Reg. at 76,268. Both CEQ's recommendation and FWS's own language in adopting that recommendation, however, were expressly limited to actions taken under section 4(a)—section 4(d) is neither addressed nor at issue in the 1983 memorandum. See Rule Related Notice: Preparation of Environmental Assessments for Listing Actions Under the ESA, 48 Fed. Reg. 49,244 (Oct. 25, 1983) (announcing that FWS "has ceased preparing EA's in connection with regulations adopted pursuant to section 4(a) [listings, delistings, reclassifications, and Critical Habitat designations] of the ESA.") (emphasis added). The rationale for that decision, that listings and critical habitat designations have no adverse impact on the environment, is not applicable to FWS's 4(d) rule in this case, which authorizes otherwise prohibited take of threatened polar bears, and thus has a clear impact on the environment. Moreover, FWS's position that the 1983 memorandum exempts section 4(d) from NEPA compliance conflicts with past agency policy

and practice to prepare at least an EA when promulgating 4(d) rules and issuing permits for the incidental take of listed species.

53. The final 4(d) rule also fails to demonstrate how removing take protections that would otherwise apply to the polar bear is either "necessary" or "advisable" to provide for the protection and recovery of the species—and both factors must be met in order for the rule to be found lawful under section 4(d) of the ESA. FWS provides no meaningful rationale for how the removal of otherwise applicable protections under the ESA helps in any way to further the conservation of the species.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**(Violations of NEPA, 42 U.S.C. § 4321 et seq.)**

54. Plaintiffs reallege and incorporate by reference Paragraphs 1-53.

55. This first claim for relief challenges Defendants' failure to carry out environmental analysis, as required under NEPA, 42 U.S.C. § 4331 et seq., of the environmental impacts of its promulgation of the 4(d) rule. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.

56. Defendants' promulgation of the final 4(d) rule, authorizing take of polar bears otherwise prohibited by law and regulation and removing opportunities for public participation, (including right to public comment and citizen suits) under the ESA that would otherwise apply, is a major federal action significantly affecting the quality of the human environment under NEPA.

57. Defendants' failure to conduct lawful NEPA analysis, through the preparation of an EA or EIS and issuance of a decision approving such document prior to promulgating the final 4(d) rule, is a violation of NEPA, 42 U.S.C. § 4321 et seq., and is arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2). Defendants' violation of law poses actual and imminent harm to the protected interests of plaintiff and plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

**SECOND CAUSE OF ACTION**
**(Violations of the ESA, 16 U.S.C. § 1531 et seq.)**

58. Plaintiffs reallege and incorporate by reference Paragraphs 1-57.

59. This second claim for relief challenges defendants' violation of their non-discretionary duty to issue such regulations as are necessary and advisable to provide for the conservation of the polar bear pursuant to section 4(d) of the ESA, 16 U.S.C. § 1533(d). This claim is brought pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(C).

60. The final 4(d) rule, authorizing take of polar bears otherwise prohibited by law and regulation both within and outside the current range of the species, is not a regulation necessary and advisable to provide for the conservation of the polar bear, and will in fact undermine the protection and recovery of the species by removing protections that would otherwise apply.

61. FWS largely bases its decision to exempt the polar bear from take protections on its assertion that the MMPA provides equal or greater protections. As alleged in this Complaint, this statement is arbitrary and capricious, as the ESA provides several protections and avenues for citizen participation that are distinct from, and additive to, those provided by the MMPA. Moreover, even if the ESA did not provide protections additional to those under the MMPA, FWS's decision to remove all ESA take protections and avenues for citizen participation as they would otherwise apply to the polar bear is neither "necessary" nor "appropriate," to the species' conservation, as required by section 4(d).

62. Defendants' promulgation of the final 4(d) rule for the polar bear is a violation of the ESA, 16 U.S.C. § 1531 et seq., and is arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2). Defendants' violation of law poses actual and imminent harm to the protected interests of plaintiff and plaintiffs' members, and it is likely that a favorable judicial decision will prevent or redress such injury.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Defenders of Wildlife requests that this Court:

(1) Declare that defendants' promulgation of the 4(d) rule prior to preparation of an EIS or EA and issuance of a decision approving such document violates NEPA;

(2) Declare that defendants' promulgation of the 4(d) rule violates their non-discretionary duty under the ESA to issue such regulations that are necessary and advisable to provide for the conservation of the polar bear;

(3) Vacate the 4(d) rule and remand it to defendants until such time as defendants comply with the requirements of NEPA and the ESA;

(4) Award plaintiff its costs of litigation; and

(5) Grant plaintiff such other relief as the Court deems just and proper.

Date:  March 12, 2009                                  Respectfully Submitted,

                                                       /s/ Brian Segee

                                                       Brian Segee (D.C. Bar. No. 492098)
                                                       Defenders of Wildlife
                                                       1130 Seventeenth Street, N.W.
                                                       Washington, D.C.  20036
                                                       (202) 682-9400
                                                       bsegee@defenders.org

                                                       Attorney for Plaintiff Defenders of Wildlife