**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION** | **Misc. Action No. 08-0764 (EGS)** <br> **MDL Docket No. 1993** |
| **This Document Relates To:** <br> **No. 1:08-cv-2113,** *Center for Biological Diversity, et al. v. Kempthorne, et al.* | **THIRD AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

<u>**THIRD AMENDED COMPLAINT OF PLAINTIFFS CENTER FOR BIOLOGICAL**</u>

<u>**DIVERSITY, NATURAL RESOURCES DEFENCE COUNCIL AND GREENPEACE, INC.**</u>

## I.      INTRODUCTION

1.      Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, AND GREENPEACE, INC., bring this action against Defendants KEN SALAZAR, United States Secretary of the Interior,[1] and the UNITED STATES FISH AND WILDLIFE SERVICE (collectively "the Secretary") to remedy the Secretary's violations of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531 et seq., and other statutes related to the Secretary's decision to list the polar bear (*Ursus maritimus*) as a threatened species under the ESA.

2.      Polar bears live only in areas of the Arctic where there is sea ice for a substantial portion of the year and are completely dependent upon sea-ice habitat for their survival. Global warming is transforming the Arctic and rapidly eliminating the habitat the polar bear needs to survive. Even using moderate projections of future greenhouse emissions levels, average winter temperatures are projected to rise by 18° Fahrenheit over the Arctic Ocean by the end of this century.

3.      The Arctic is melting faster than forecast. In September, 2007, the sea ice hit a new record low, fully one million square miles below the average minimum sea-ice extent of the past several decades. Alarmingly, there was less ice in the Arctic in 2007 than more than half of the world's leading climate models project for 2050. Some scientists now believe that the Arctic could be ice free in the summer as early as 2013.

4.      Polar bear populations are already declining due to global warming. Individual polar bears have drowned, starved, and even resorted to cannibalism as global warming transforms the Arctic. The Secretary projects that two thirds of the world's polar bears will be extinct by 2050 if "business as usual" emissions trends continue, and that the world's remaining bears will face an over 40% risk of extinction by century's end. The Secretary's projections may be overly optimistic, as they are based on modeling results of sea-ice decline that have underestimated the ice loss to date.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Ken Salazar, Secretary of the Department of the Interior is automatically substituted for his predecessor, Dirk Kempthorne.

5.      Polar bears are threatened by other factors as well, including but not limited to, proliferating oil and gas development in their habitat, high levels of organochloride and other pollution in the Arctic, and overhunting and poaching in some areas in Russia, Canada, and Greenland.

6.      On May 14, 2008, the Secretary announced the issuance of a final rule listing the polar bear as a threatened species.  This rule was published in the Federal Register on May 15, 2008.  Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range, 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Listing Rule").

7.      At the same time that the Secretary published the Final Listing Rule he also issued separate regulations, pursuant to Section 4(d) of the ESA, 16 U.S.C. § 1533(d), which authorized the widespread incidental take of polar bears.  Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear, 73 Fed. Reg. 28306-28318 (May 15, 2008) ("Interim 4(d) Rule").  The Secretary subsequently issued a slightly-modified version of these regulations on December 16, 2008.  Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear, 73 Fed. Reg. 76249-76269 (December 16, 2008); codified at 50 C.F.R. 1740(q). ("Final 4(d) Rule"). The Secretary's primary justification for the 4(d) Rule is that the polar bear is purportedly better protected under already-existing requirements of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1371 et seq.  Neither the Interim nor Final 4(d) Rule provide for the conservation of the polar bear, as required by the ESA.

8.      The Interim 4(d) Rule was also finalized and made effective without any advance public notice of, or an opportunity to comment on the rule, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. The subsequent publication of the Final 4(d) Rule was also flawed because of these deficiencies. Both the Interim and Final 4(d) Rules were also published without any of the environmental analysis required by National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.,

9.      Despite the fact that the best available scientific evidence demonstrates that the polar bear is "in danger of extinction throughout all or a significant portion of its range," and

therefore must be listed as an "endangered" species, the Secretary listed the polar bear as a "threatened" species throughout its range.  Id.  Unlike threatened species, the Secretary may not issue Section 4(d) rules for species listed as endangered.

10.     Having decided not to list the polar bear as endangered throughout its range, the Secretary also unlawfully failed to properly address whether the polar bear is endangered throughout a "significant portion of its range," and whether one or more distinct population segments of the polar bear should be listed as endangered rather than threatened.

11.     Plaintiffs first petitioned to list the polar bear under the ESA because the species needs the full protection of the Act in order to survive.  The Secretary has denied the species of many of these necessary protections.

12.     Plaintiffs now seek judicial relief declaring that the Secretary failed to properly classify the polar bear as "endangered" in all or parts of its range, and ask that the Court remand the Final Listing Rule to the agency (leaving the "threatened" listing in effect during the remand) to properly list the polar bear.  Plaintiffs further seek judicial relief declaring that the Interim and Final 4(d) Rules promulgated by the Secretary violate the APA, NEPA, and the ESA.  Plaintiffs ask the Court to vacate the 4(d) Rules. Such relief is necessary to afford the polar bear the full protections of law to which it is both entitled and so desperately needs.

## II.     JURISDICTION AND VENUE

13.      The Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) & (g) (action arising under the ESA and citizen suit provision), 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (APA), and 28 U.S.C. § 1361 (Mandamus).   The relief sought is authorized by 28 U.S.C. §§ 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540(g) and 5 U.S.C. § 701-706.

14.     Venue is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e).

15.     By written notices to Defendants, both hand-delivered and sent by facsimile May 15, 2008, and by facsimile and overnight delivery on December 16, 2008, Plaintiffs informed Defendants of the violations set forth in their Complaint as required by the ESA.  16 U.S.C. § 1540(g).

16.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

17.     Plaintiffs have no adequate remedy at law.  The Secretary's continuing failure to comply with the ESA, NEPA and the APA will result in irreparable harm to the polar bear, to Plaintiffs and Plaintiffs' members, and to the public.  No monetary damages or other legal remedy can adequately compensate Plaintiffs, their members, or the public, for this harm.

18.     Plaintiffs and their members are adversely affected or aggrieved by federal agency action and are entitled to judicial review of such action within the meaning of the ESA and the APA. The Secretary's failure to comply with the ESA's mandates prevents the full implementation of measures necessary to protect polar bears pursuant to the ESA.  Without the substantial protections of the ESA, polar bears are more likely to continue to decline and become extinct.  Plaintiffs are therefore injured because their use and enjoyment of polar bears and their habitat described below is threatened by the decline and likely extinction of the bears.  The Secretary's failure to comply with the ESA, NEPA and APA has also resulted in informational and procedural injury to Plaintiffs.  These are actual, concrete injuries to Plaintiffs, caused by the Secretary's failure to comply with these statutory provisions.  The relief requested will fully redress those injuries.

19.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

## III.    PARTIES

20.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit 501(c)(3) corporation with offices in California, Arizona, New Mexico, Oregon, and Washington, D.C.  The Center for Biological Diversity works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is actively involved in species and habitat protection issues throughout the United States and the world, including protection of Arctic wildlife in general and the polar bear in particular. The Center has over 40,000 members throughout the United States and the world.

21.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, Inc. ("NRDC") is a

non-profit 501(c)(3) corporation and a national environmental advocacy group. The NRDC maintains offices in San Francisco, Los Angeles, Washington, D.C., New York City, Chicago, and Beijing, China. Through advocacy, education, litigation, and other efforts, NRDC works to preserve threatened and endangered wildlife across the United States and around the world, including Arctic wildlife in general and the polar bear in particular. The NRDC has over 400,000 members nationwide.

22.     Plaintiff GREENPEACE, INC. ("Greenpeace") is a California non-profit corporation with offices in San Francisco and elsewhere. Its mission is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future. There are approximately 250,000 current Greenpeace members in the United States. Since the 1980's, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to advocate for serious cuts in greenhouse gas emissions through local, national and global action. For the past decade, Greenpeace has campaigned on the causes and impacts of climate change in the Arctic, including the impacts on polar bears and other species which are threatened by continued Arctic warming.

23.     Plaintiffs' members and staff include individuals with varying interests in polar bears and their habitat ranging from scientific, professional, and educational to recreational, aesthetic, moral, and spiritual interests. Further, Plaintiffs' members and staff enjoy, on an on-going basis, the biological, scientific, research, education, conservation, recreational and aesthetic values of the Arctic region inhabited by this species. Plaintiffs' staff and members observe and study polar bears and their habitat, and derive professional, scientific, educational, recreational, aesthetic, inspirational, and other benefits from these activities and have an interest in preserving the possibility of such activities in the future. An integral aspect of the Plaintiffs' members' use and enjoyment of polar bears is the expectation and knowledge that the species is in its native habitat. For this reason, the Plaintiffs' use and enjoyment of polar bears is entirely dependent on the continued existence of healthy, sustainable populations in the wild. Plaintiffs bring this action on their own behalf and on behalf of their adversely affected members and staff.

24.     Defendant KEN SALAZAR, United States Secretary of the Interior, is the highest

ranking official within the Department of Interior and, in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to the polar bear, and for compliance with all other federal laws applicable to the Department of the Interior. He is sued in his official capacity.

25.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("the Service") is a federal agency within the Department of Interior authorized and required by law to protect and manage the fish, wildlife and native plant resources of the United States, including enforcing and implementing the ESA.   The Service has been delegated authority by the Secretary of Interior to implement the ESA for the polar bear, including responsibility for making decisions and promulgating regulations, including proposed and final listing decisions and the processing of petitions for such actions.

## IV.    LEGAL BACKGROUND

### A.      The Endangered Species Act

26.     The ESA is a federal statute enacted to conserve endangered and threatened species and the ecosystems upon which they depend.  16 U.S.C. § 1531(b).  The ESA "is the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978).  The Supreme Court's review of the ESA's "language, history, and structure" convinced the Court "beyond a doubt" that "Congress intended endangered species to be afforded the highest of priorities."  Id. at 174. As the Court found, "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  Id. at 184.

27.     The ESA protects species listed as either "endangered" or "threatened" by the Secretary.   A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species within the foreseeable future."  16 U.S.C. § 1532(20).

28.     The term "species" is defined broadly under the ESA to include "any subspecies of fish or wildlife or plants and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532 (16).

29.     A distinct population segment ("DPS") of a vertebrate species can be protected as a "species" under the ESA even though it has not formally been described as a "species" in the scientific literature.  A species may be composed of several DPSs, some or all of which warrant listing under the ESA.

30.     The Secretary has published a policy for the recognition of DPSs for the purposes of listing, delisting, and reclassifying species under the ESA. Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996). Under this policy, once a population segment is found to be both "discrete" and "significant," then it is deemed a separate "species" for the purposes of the ESA and may be considered for listing under the Act.

31.     Under the Secretary's DPS policy a population segment of a vertebrate species is discrete if it satisfies either of the following conditions:

1. It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors.

2. It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

61 Fed. Reg. 4722, 4725.

32.     The Secretary's DPS policy requires that once a population is established as discrete, then the biological and ecological significance is next considered. Each population segment's significance must be analyzed on a case-by-case basis.  This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique to this taxon.

2. Evidence that loss of the discrete population would result in a significant gap in the range of a taxon.

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historical range.

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

61 Fed. Reg. 4722.

33.    For a species comprised of multiple DPSs, in certain instances, some DPSs of the species may warrant protection as "endangered" while others only warrant listing as "threatened."

34.    None of the protections of the ESA come into force until a species is officially listed as threatened or endangered under the statute.

35.    In order to ensure the timely protection of species, Congress set forth the listing process described below.  The process includes mandatory, non-discretionary deadlines for the three required findings that the Secretary must meet, so that species in need of protection do not languish in administrative purgatory.  The three required findings, described below, are the 90-day finding, the 12-month finding, and the final listing determination.

36.    Any interested person can begin the listing process by filing a petition to list a species with the Secretary.  16 U.S.C. § 1533 (b)(3)(A); 50 C.F.R. § 424.14(a).

37.    Upon receipt of a petition to list a species, the Secretary has 90 days "to the maximum extent practicable," to make a finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C § 1533 (b)(3)(A); 50 C.F.R. § 424.14 (b)(1).  If the Secretary finds that the petition presents substantial information indicating that the listing may be warranted, the Secretary then publishes in the Federal Register a "90 day finding and commencement of status review."  16 U.S.C. § 1533(b)(3)(A).

38.    Upon issuing a positive 90-day finding, the Secretary must then conduct a full review of the status of the species.  50 C.F.R. § 424.14.  Upon completion of this status review, and within 12 months from the date that he received the petition, the Secretary must make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but presently precluded by other pending proposals for listing species, provided certain circumstances are present.   16 U.S.C. § 1533(b)(3)(B); 50

C.F.R. § 424.14 (b)(3).  This second determination is known as a "12-month finding."

39.     If the Secretary finds in the 12-month finding that the listing of the species is warranted, then he must publish in the Federal Register a proposed rule, for public comment, to list such species as endangered or threatened.  16 U.S.C. § 1533(b)(5).

40.     Within one year of the publication of a proposed rule to list a species, the ESA requires the Secretary to publish a final listing determination in the Federal Register.  16 U.S.C. § 1533(b)(6)(A).  At such time, the Secretary must either list the species or withdraw the proposal.  16 U.S.C. § 1533(b)(6)(A)(i).

41.     Once a species is listed, an array of statutory protections applies.  For example, Section 7 requires all federal agencies to "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of its "critical habitat."  16 U.S.C. § 1536(a)(2).

42.     Additionally, ESA Section 9 and its regulations prohibit, among other things, "any person" from intentionally "taking" listed species or "incidentally" taking listed species without a permit from the Service.  16 U.S.C. §§ 1538(a)(1)(B) & 1539; 50 C.F.R § 17.31.

43.     "Take" is defined broadly under the ESA to mean to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  "Harm" is defined as "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R § 17.3.

44.     There are two primary mechanisms to gain an exemption from Section 9's take prohibitions.  First, Section 10 of the ESA permits a non-federal entity to "take" listed species incidental to an otherwise lawful activity only after obtaining an incidental take permit.  16 U.S.C. § 1539.  Second, a federal agency may take listed species only in accordance with an incidental take statement issued pursuant to a Section 7 consultation.  16 U.S.C. §§ 1536(b)(4) and 1536(o)(2).  In either case, the Service must first conclude that the taking will not jeopardize the species and must set forth terms and conditions that must be followed to minimize and

mitigate the impacts of the taking.    16 U.S.C. §§ 1536(b)(4) and 1539(a).

45.    There are several other exceptions to Section 9 that are relevant to the polar bear. First, Section 10(e) of the ESA exempts Alaska Natives from the take prohibition "if such taking is primarily for subsistence purposes."  16 U.S.C. §§ 1539(e).

46.    Additionally, Section 11 creates a defense to civil and criminal liability under the ESA if the person committing the taking had "a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual, from bodily harm from any endangered or threatened species."  16 U.S.C. §§ 1540(a)(3) & (b)(3); see also 50 C.F.R. § 17.21(c)(2) ("any person may take endangered wildlife in defense of his own life or the lives of others.").

47.    The Secretary has also promulgated regulations authorizing take of listed species for the benefit of the species or to remove animals that may pose a threat to human safety. Under these regulations, federal and state conservation agents may take a listed species without need for permit, if such action is necessary to:

> (i) Aid a sick, injured or orphaned specimen; or . . .
> (iv) Remove specimens which constitute a demonstrable but nonimmediate threat to human safety, provided that the taking is done in a humane manner; the taking may involve killing or injuring only if it  has not been reasonably possible to eliminate such threat by live-capturing and releasing the specimen unharmed, in a remote area.

50 C.F.R. §§ 17.21(c)(3)(i) & (iv); see also 50 C.F.R. § 17.31(b) (authorizing state and federal conservation agents to take threatened species to carry out conservation programs).

48.    The primary regulatory distinction between the "threatened" and "endangered" listing classifications relates to the applicability of Section 9's prohibition on take.  The ESA directly applies Section 9's prohibitions only to species listed as "endangered."  16 U.S.C. § 1538.  However, Section 4(d) requires the Secretary to promulgate "protective regulations" where the agency deems them "necessary and advisable to provide for the conservation of such species," including regulations that apply any or all of the prohibitions of Section 9 to species listed as "threatened."  16 U.S.C. § 1533(d).

49.    Shortly after the ESA was enacted, the Secretary promulgated a blanket

regulation pursuant to Section 4(d) that, absent a separate species-specific rule, extended all of Section 9's protections for endangered species to all threatened species. 50 C.F.R. § 17.31(a). Because of this, the prohibitions of Section 9 and the processes for exemption from such prohibitions through an incidental take permit or an incidental take statement generally apply to both threatened and endangered species.

50.     The Secretary has, however, in some instances, such as with the polar bear in this case, promulgated species-specific Section 4(d) rules exempting certain activities from the general take prohibition contained in 50 C.F.R. § 17.31(a). Activities that are permitted by a Section 4(d) rule are deemed to not violate Section 9 and 50 C.F.R. § 17.31(a), even though they may harm, injure, or even kill a threatened species, and no incidental take permit or take authorization pursuant to an incidental take statement is required. Section 4(d) Rules are only available to species listed as "threatened." If the species is listed as "endangered," otherwise prohibited take can only be permitted through an incidental take permit or incidental take statement.

### B.      The Administrative Procedure Act

51.     The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., provides general rules governing the issuance of proposed and final regulations by federal agencies. Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency publish as a proposal any rule that it is considering adopting and allow the public the opportunity to submit written comments on the proposal. 5 U.S.C. § 553.

52.     A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4).

53.     Specifically, the APA provides that all federal agencies must give "general notice" of any "proposed rule making" to the public by publication in the Federal Register. The publication must, at a minimum, include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed;

and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).

54.    In addition, the APA requires that "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

55.    An agency may only short-circuit the public notice and comment requirements of the APA if it finds, "for good cause," that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

### C.    The National Environmental Policy Act

56.    NEPA is "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It was enacted in 1970 to put in place procedures to insure that, before irreversibly committing resources to a project or program, federal agencies "encourage productive and enjoyable harmony between man and his environment," "promote efforts which will prevent or eliminate damage to the environment," and "enrich understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

57.    Fundamentally, NEPA seeks to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decision making process and the implementation of that decision.  See, e.g. 40 C.F.R. § 1500.1.

58.    NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ") require that all federal agencies must prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1501.4.

59.    The fundamental purpose of an EIS is to force the decision-maker to infuse the

policies and goals defined in NEPA into the actions of the federal government.   40 C.F.R. § 1502.1. An EIS analyzes the potential environmental impacts, alternatives and mitigation opportunities for major federal actions.

60.    An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(C).

61.    An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.   NEPA also requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7 & 1508.8.   In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action.  40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

62.    An agency may first prepare a detailed Environmental Assessment ("EA") to determine whether the project <u>may</u> significantly affect the environment and requires a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.  An EA is "a concise public document" that serves, among other things, to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  <u>Id.</u>  As with any document prepared under NEPA, an environmental assessment is intended to "ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

63.    Significance is based upon the "intensity" and "context" of the action.  40 C.F.R. § 1508.27.  "Context" refers to the geographic and temporal scope of the agency action and the interests affected.  <u>Id.</u> at § 1508.27(a).  "Intensity" addresses the severity of the impacts.  <u>Id.</u> at §

1508.27(b).  Factors relevant to intensity include: the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; the presence of "uncertain impacts or unknown risks;" whether the action is "related to other actions with individually insignificant but cumulatively significant effects;" and whether the project "threatens a violation" of other laws.  Id. at § 1508.27(b).

64.    If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI."  40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

## V.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Polar Bears in a Warming Arctic

65.    There are nineteen currently-recognized polar bear populations.  These populations are distributed widely throughout the Northern Hemisphere, but only occur in areas where sea ice can be found for substantial portions of the year.  73 Fed. Reg. 28212-3, 28215. These populations fall within the jurisdiction of five countries:  the United States (in Alaska), Canada, Denmark (in Greenland), Norway, and Russia.  73 Fed. Reg. 28212, 28216 (Figure 1). Polar bears tend to occur in highest densities where they have the greatest access to seals: sea ice located over the shallow continental shelf and other areas of high biological productivity as compared to deep water regions.  73 Fed. Reg. 28212, 28213.  Worldwide polar bear abundance was most recently estimated at 20,000-25,000 bears.  73 Fed. Reg. 28212, 28215.

66.    Polar bears are marine mammals and are completely dependent upon Arctic sea ice as their primary habitat for survival.  73 Fed. Reg. 28212, 28214, 28219, 28255.  Polar bears need sea ice as a platform from which to hunt their primary prey of ice-dependent seals, to make seasonal migrations between the sea ice where they feed and their terrestrial denning areas, and to find mates.  73 Fed. Reg. 28212, 28214, 28219, 28255.  Some polar bears even give birth to their cubs in snow dens on top of the drifting sea ice.  73 Fed. Reg. 28212, 28214, 28219, 28255. Because polar bears can only hunt effectively when on the ice, when forced onto land either by

the seasonal retreat of the sea ice in some areas or to give birth to their cubs, polar bears undergo a time of partial or complete fasting and nutritional stress.  73 Fed. Reg. 28212, 28259.

67.    The Earth's climate is warming due to society's production of greenhouse pollution, primarily from the combustion of fossil fuels for energy.  73 Fed. Reg. 28212, 28244. The primary greenhouse pollutants include carbon dioxide, methane, nitrous oxide, halocarbons, and black carbon.  73 Fed. Reg. 28212, 28244.  Increasing concentrations of greenhouse gases cause the earth's atmosphere to retain a greater proportion of the sun's energy, warming the earth's climate much like the interior of a greenhouse.  73 Fed. Reg. 28212, 28244.  The increase in temperatures around the globe over the past century can be explained only by the unprecedented increase in atmospheric greenhouse gas concentrations.  73 Fed. Reg. 28212, 28245.

68.    For a number of reasons, the Arctic has experienced greater and more rapid warming than the temperate regions.  Average Arctic air temperatures have been increasing at almost twice the rate of the rest of the world in the past 100 years.  73 Fed. Reg. 28212, 28224. Over the past three decades, portions of the Arctic have warmed at 10 times the world average. 73 Fed. Reg. 28212, 28270.  Even using moderate projections of future greenhouse gas emissions levels, average temperatures in the Arctic are projected to increase an additional 9º F by the end of this century.  73 Fed. Reg. 28212, 28230.  That average temperature increase masks even greater warming in the autumn and winter than in the summer.  73 Fed. Reg. 28212, 28228.  Winter temperatures are projected to increase by 18 º F over the Arctic Ocean by the end of the century.

69.    As a result of this warming, as well as changes in atmospheric and oceanic circulation patterns, Arctic sea ice is melting very rapidly.  73 Fed. Reg. 28212, 28220-28225. In September 2007 the minimum Arctic sea-ice extent hit a new record minimum, fully one million square miles below the average minimum sea-ice extent between 1979 and 2000.  73 Fed. Reg. 28212, 28220-1.  There was less ice in the Arctic in September, 2007 than more than half of the world's leading climate models project for 2050.  73 Fed. Reg. 28212, 28233 (Figure 7).  The sea-ice extent in the winter is also declining, as is the age and thickness of the ice that

remains.  73 Fed. Reg. 28212, 28222.  The length of the sea ice melt season is increasing.  73 Fed. Reg. 28212, 28223.

70.     Because of their specialized habitats and life history constraints, polar bears are particularly susceptible to negative population impacts from sea ice loss resulting from climate change.  73 Fed. Reg. 28212, 28270.  Polar bears cannot survive without "large and accessible seal populations and vast areas of ice from which to hunt."  73 Fed. Reg. 28212, 28262.  For decades scientists have predicted an array of adverse impacts to polar bears from climate change including adverse effects on denning, food chain disruption, and changes in prey availability.  73 Fed. Reg. 28212, 28256.  Canadian researchers were the first to document changes in polar bear parameters such as declining body condition, lowered reproductive rates, and reduced cub survival in the Western Hudson Bay population throughout the late 1980's and early 1990's.  73 Fed. Reg. 28212, 28256; 28267.  Over the next decade and beyond, polar bear experts have continued to document the relationships between climate, sea ice, and polar bear physiological and demographic parameters. 73 Fed. Reg. 28212, 28256. Even short of complete disappearance of sea ice, polar bears have experienced, and will continue to experience, a cascade of impacts from global warming that will affect virtually every aspect of the species' existence, in most cases leading to reduced body condition and consequently reduced reproduction or survival. These affects include:

a.      A reduction in the hunting season caused by delayed ice formation and earlier break-up will mean reduced fat stores, reduced body condition, and therefore reduced survival and reproduction.  73 Fed. Reg. 28212, 28261.

b.      Increased travel distances between sea ice and preferred denning sites on land, resulting in reduced denning success and population size.    73 Fed. Reg. 28212, 28263-28265, 28264-5.

c.      More larger open water areas that must be traversed, which increases the risk of drownings during long distance swimming or swimming under adverse weather conditions, as well as the risk of hypothermia for young cubs not yet able to withstand submersion in ice water.  73 Fed. Reg. 28212, 28262; 28266.

d.      Reductions in sea-ice thickness and concentration, which will increase the energetic costs of traveling, as moving through fragmented sea ice and open water is more energy intensive than walking across consolidated sea ice.  73 Fed. Reg. 28212, 28257.

e.      Reductions in the availability of ice-dependent prey such as ringed seals, as prey numbers decrease or are concentrated on ice too far from land for polar bears to reach. 73 Fed. Reg. 28212, 28259-60.

f.      Increased human/bear interactions, as greater portions of the Arctic become more accessible to people and as polar bears are forced to spend more time on land waiting for ice formation.  Increased human/bear interactions will almost certainly lead to increased polar bear mortality.  73 Fed. Reg. 28212, 28279-80.

The combined effects of these impacts of global warming on individual bears' reproduction and survival ultimately translate into impacts on polar bear populations.  Impacts will be most severe on female reproductive rates and juvenile survival.  In time, reduction in these key demographic factors will translate into population declines and extirpations.  73 Fed. Reg. 28212, 28257.

71.      Many polar bear populations are already suffering these impacts.  73 Fed. Reg. 28212, 28274-28275.  The Western Hudson Bay polar bear population has declined by 22% — from 1,194 bears in 1987 to 935 bears in 2004 – due to the combined impact of global warming and overharvest.  73 Fed. Reg. 28212, 28257, 28267.  Researchers now believe that Western Hudson Bay polar bears will no longer be able to successfully reproduce sometime in the next 4-25 years.  73 Fed. Reg. 28212, 28266.

72.      The Southern Beaufort Sea population is also now considered in decline due to global warming.   73 Fed. Reg. 28212, 28268.  The population was estimated at 1,800 bears in 1986 and at 1,526 bears between 2001 and 2006.  73 Fed. Reg. 28212, 28268.  The Southern Beaufort Sea population has also experienced statistically-significant declines in cub survival, cub skull size, and adult male weight and skull size, the same types of changes observed in Western Hudson Bay prior to the population decline there.  73 Fed. Reg. 28212, 28268.

73.      Global warming is also causing increased instances of unusual polar bear deaths

which "suggest mechanisms by which a changing sea ice environment can affect polar bear demographics and population status." 73 Fed. Reg. 28212, 28268. In the spring of 2006, researchers found at least three bears in the Southern Beaufort Sea population that had starved to death. 73 Fed. Reg. 28212, 28268. During the winter and spring of 2004, researchers recorded three observations of polar bear cannibalism due to food stress, also in the Southern Beaufort Sea population, the first such observations in that region in decades of research. 73 Fed. Reg. 28212, 28268. Several instances of polar bears drowning have also been documented. 73 Fed. Reg. 28212, 28263. Researchers with the U.S. Minerals Management Service observed the carcasses of four bears that had drowned in the Beaufort Sea during a period of high winds and rough seas in September 2004, and believe that more bears drowned during this same event but were not observed. 73 Fed. Reg. 28212, 28263. Another drowning was reported from Svalbard in 2006. 73 Fed. Reg. 28212, 28263. The evidence suggests that drowning will become an increasing source of mortality for polar bears as the sea ice continues to melt. 73 Fed. Reg. 28212, 28263.

74.     Scientists interpret these observations as a prelude to mass polar bear mortality events in the future. 73 Fed. Reg. 28212, 28275 ("As changes in habitat become more severe and seasonal rates of change more rapid, catastrophic mortality events that have yet to be realized on a large scale are expected to occur.")

75.     Not surprisingly, given the serious impacts polar bears are already suffering, the future is bleak for this species overall. The U.S. Geological Service ("USGS"), a branch of the Department of Interior, conducted a number of studies addressing the future status of polar bears in a warming world. The USGS divided the world's polar bears into four ecological regions based on sea-ice conditions as follows: (1) the seasonal ice ecoregion which includes Hudson Bay, and occurs mainly at the southern extreme of the polar bear range, (2) the archipelago ecoregion in the high Canadian Arctic, (3) the divergent ice ecoregion where ice is formed and then advected away from near-shore areas, and (4) the convergent ice ecoregion where sea ice formed elsewhere tends to collect against the shore. 73 Fed. Reg. 28212, 28271, 28217-28218 (Figure 2). The USGS found that under a "business as usual" greenhouse gas emissions scenario, polar bears will most likely be extinct in the seasonal ice and divergent ice ecoregions

by 2050.  73 Fed. Reg. 28212, 28274.  These areas support two-thirds of the world's polar bears, and all of the bears in Alaska.  While the USGS found that polar bears may persist until the end of the century in the Canadian archipelago ecoregion, it nonetheless concluded that polar bears faced a 40% chance of being extirpated in this region as well.  73 Fed. Reg. 28212, 28274.

76.    As the USGS itself acknowledged, its models may be overly optimistic, because the climate model projections on which they are based all project a much slower melting trend for sea ice than what has actually been observed.  73 Fed. Reg. 28212, 28274.  None of the climate models projected the record low minimum sea-ice extent in 2007, and in fact there was less ice in the Arctic in 2007 than more than half of the models project for 2050.  73 Fed. Reg. 28212, 28274, 28233 (Figure 7).

77.    Despite all of the evidence of imminent peril to the polar bear, anthropogenic greenhouse gas emissions grow larger each year, and that rate of increase is itself still growing.  73 Fed. Reg. 28212, 28287.  While there are some existing regulatory mechanisms to address anthropogenic climate change, "there are no known regulatory mechanisms in place at the national or international level that directly and effectively address the primary threat to polar bears – the rangewide loss of sea ice habitat."  73 Fed. Reg. 28212, 28288.

78.    Polar bears are threatened by factors other than global warming as well.

79.    For example, excessive harvest due to overhunting and poaching exacerbate the effects of habitat loss in several populations.  73 Fed. Reg. 28212, 28280, 28257.  Selective harvesting of large male polar bears, in particular, may subject some populations to sudden reproductive collapse.

80.    Additionally, oil and gas development is proliferating in polar bear habitat:  the Minerals Management Service estimated the risk of a major oil spill from one large lease sale in the Chukchi Sea at 33 to 51 percent.  73 Fed. Reg. 28212, 28289.  Polar bears are particularly vulnerable to oil spills due to their inability to effectively thermoregulate when their fur is oiled, and due to poisoning that results when they groom themselves in an effort to remove the oil.  73 Fed. Reg. 28212, 28288.  There is no way to effectively clean up spilled oil in broken-ice conditions during the fall and spring, and the release of oil spilled under the ice in the winter

could be "catastrophic" during spring break-up if bears were present.   73 Fed. Reg. 28212, 28289.

81.     Because of their position as an apex predator, polar bears are also threatened by exposure to toxic chemicals, particularly persistent organic pollutants, such as organochlorine (OC) compounds.   73 Fed. Reg. 28212, 28290.   Polar bears "have some of the highest concentrations of OCs of any Arctic mammals."   Id.   Recent studies have also shown steep increases in the contamination of East Greenland polar bears with perfluoroalkyl (PFCs).

82.     Many of these threats interact with global warming in cumulative and synergistic ways, further heightening the threat to polar bears.   73 Fed. Reg. 28212, 28256.   ("[P]olar bears today contend with harvest, contaminants, oil and gas development, and additional interactions with humans that they did not experience in [the past]…. Thus, both the cumulative effects of multiple stressors and the rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears….").

**B.     The Polar Bear Listing Process**

83.     Plaintiffs' Petition to list the polar bear as a threatened or endangered species was submitted on February 16, 2005 and received by the Secretary on February 17, 2005.   The 154-page Petition detailed the ways in which global warming and other factors threaten the polar bear with extinction.   The Petition specifically requested that the Secretary analyze whether the species as a whole warranted listing as threatened or endangered, as well as whether any of the populations or population clusters of polar bears warranted such listing as distinct population segments.

84.     Section 4(b)(3) of the ESA and its implementing regulations required the Secretary to respond to the Petition by making an initial determination within ninety days of receiving the petition "to the maximum extent practicable." 16 U.S.C § 1533 (b)(3)(A).

85.     The Secretary did not respond to the Petition within 90 days as required by law. When the Secretary had still not responded after ten months, Plaintiffs filed an action on December 15, 2005 to compel a response.   Center for Biological Diversity v. Norton, No. 05-5191 JSW (N. Dist. Cal.).

86.     Subsequently, the Secretary issued a 90-day finding on the Petition to list the polar bear on February 9, 2006.  Endangered and Threatened Wildlife; Petition to List the Polar Bear as Threatened, 71 Fed. Reg. 6745 (Feb. 9, 2006).  In the 90-day finding, the Secretary found that the Petition presented substantial information showing that listing of the polar bear may be warranted under the ESA, initiated a status review for the species, and solicited public comment for a period of 60 days. Id.

87.     Because the Secretary delayed the 90-day finding until nearly one year had passed from receipt of the Petition, the Secretary then failed to meet the one-year deadline for issuance of the 12-month finding.  A consent decree was subsequently entered requiring the Secretary to issue a 12-month finding for the polar bear by December 27, 2006.

88.     On December 27, 2006, the Secretary announced a proposed rule to list the polar bear throughout its range as a threatened species.  The proposed rule was published in the Federal Register on January 9, 2007.  Endangered and Threatened Wildlife and Plants; 12-Month Petition Finding and Proposed Rule to List the Polar Bear (Ursus maritimus) as Threatened Throughout Its Range, 72 Fed. Reg. 1064-1099 (Jan. 9, 2007).  The Secretary did not publish a proposed critical habitat designation with the proposed listing rule.

89.     The publication of the proposed listing rule in the Federal Register on January 9, 2007 triggered a requirement that a final listing determination be published no later than January 9, 2008.  16 U.S.C. § 1533(b)(6).  The final listing determination was not published in the Federal Register on January 9, 2008.  Plaintiffs filed this action on March, 10, 2008 in the Northern District of California to compel the issuance of a final rule, and moved for summary judgment on April 2, 2008.

90.     On April 28, 2008, the Court issued an order granting Plaintiffs' Motion for Summary Judgment, finding the Secretary in violation of the ESA for failing to publish a final listing decision for the polar bear by January 9, 2008.  The Court directed the Secretary to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3). Id. at 10.

C.      **The Final Listing Determination**

91.      On May 15, 2008, the Secretary published the Final Listing Rule, listing the polar bear as a threatened species throughout its range.   73 Fed. Reg. 28212.

92.      In the over three years between Plaintiffs' Petition seeking protection of the polar bear under the ESA and the Final Listing Rule, the plight of the polar bear worsened significantly.   Impacts that had been predicted to occur by mid-century were already being documented.   The two best-studied populations were shown to be declining due to global warming, while three others known to be declining due to overhunting.   Several others were determined to be likely declining.   Scientists published papers documenting polar bears drowning, starving, and even resorting to cannibalism as global warming transformed the Arctic. In September 2007, sea ice retreated to record lows, reaching levels that most climate models predicted would not occur until mid-century or later.

93.      In September 2007, the same month that sea ice reached its record low, the USGS issued a series of reports, prepared at the request of the Secretary, assessing the future status of the polar bear, the substance of which is described above.

94.      Following the release of the USGS reports, the Secretary requested further public comments on the then-pending proposal to list the polar bear as a "threatened" species.   In light of the new sea-ice data and the USGS reports, Plaintiffs reiterated that polar bears were more properly classified as "endangered" rather than "threatened."   Similarly, the Marine Mammal Commission recommended that polar bears in the two ecoregions projected by the USGS to be extinct by 2050 should be listed as "endangered."

95.      Ultimately, the Secretary ignored the request by Plaintiffs, the Marine Mammal Commission, and other scientists that the polar bear be listed as "endangered" in at least some portions of its range.

96.      A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).   The Secretary concluded that the polar bear was not in danger of extinction throughout its range.   The Secretary also concluded that the polar bear was not in danger of extinction in any significant portion of its range.   Both of these

conclusions were arbitrary and unlawful.

97.     The Secretary evaluated the 19 polar bear populations recognized by the world's experts on polar bears, the Polar Bear Specialist Group, to determine whether any of these populations qualified as distinct population segments eligible for separate listing as "endangered."  The Secretary found that none of these polar bear populations were "discrete" according to the Secretary's DPS policy and therefore none were eligible for separate listing as a distinct population segment.  This conclusion was arbitrary and unlawful.

98.     In failing to list the polar bear as an endangered species in all or parts of its range, the Secretary failed to use the best available science as required by the ESA, failure to properly apply the DPS policy, and failed to properly consider the risks of extinction the bear faces in a significant portion of its range.

99.     Had the Secretary listed the polar bear as an endangered, rather than a threatened species on May 15, 2008, all of the protections of Section 9 would have been applied to the polar bear, and the Secretary would not have had the option to attempt to reduce those protections via a special Section 4(d) regulation.

**D.      The 4(d) Rule**

100.    Having classified the polar bear as a threatened, rather than an endangered species, the Secretary issued a regulation pursuant to Section 4(d) of ESA, which authorizes activities that would otherwise be prohibited by Section 9 of the ESA and its implementing regulations.  40 C.F.R. § 17.40(q).  These regulations were first promulgated as an "interim final" rule concurrently with the Final Listing Rule, 73 Fed. Reg. 28306-28318 (May 15, 2008) ("Interim 4(d) Rule"), and subsequently issued in a slightly-modified form as a final rule. 73 Fed. Reg. 76249-76269 (December 16, 2008); ("Final 4(d) Rule").  Neither the Interim nor Final 4(d) Rule provide for the conservation of the polar bear, as required by the ESA.

101.    The Secretary's authority to promulgate a 4(d) rule authorizing take of polar bears is constrained by the requirement that the measures specified by the rule be "necessary and advisable" to provide for the "conservation" of the species.

102.    While stating that issuing a 4(d) rule is "necessary and advisable to provide for

the conservation of the polar bear," 73 Fed. Reg. 76249, 76262, in reality, the Final 4(d) Rule undermines the conservation of the polar bear.

103.    Under the ESA "conservation" is defined as follows:

> The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter       are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532(3).

104.    The Final 4(d) Rule includes a blanket exemption for all activities occurring outside the current range of the species.  73 Fed. Reg. 76249, 76254-55; 50 C.F.R. § 17.40(q)(4) ("None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within the United States, except for any incidental taking caused by activities in areas subject to the jurisdiction or sovereign rights of the United States within the current range of the polar bear.")

105.    The ESA and its implementing regulations, explicitly apply the Section 9 take prohibitions that would otherwise apply to the polar bear in the absence of the 4(d) Rule to all areas within the United States, in the territorial sea of the United States, and in the high seas.  16 U.S.C. § 1538(a)(1)(A),(B),(C); 50 C.F.R. § 17. 31.

106.    By reducing the scope of activities regulated under Section 9 to those occurring in the current range of the species, the Secretary exempts whole classes of activities that are harming the polar bear from ESA protections.

107.    For example, the majority of contaminants, ranging from petroleum hydrocarbons, persistent organic pollutants, and heavy metals that negatively impact polar bears come from outside the current range of the species.  73 Fed. Reg. 28212, 28290 ("These compounds are transported via large rivers, air, and ocean currents from the major industrial and

agricultural centers located at more southerly latitudes.").

108.    Moreover, while greenhouse gas emissions related to, and occurring as a consequence of Alaska's fossil fuel industry in the current range of the polar bear, are substantial, and themselves make an appreciable contribution to national and international greenhouse gas emissions, the majority of greenhouse gas emissions sources subject to U.S. jurisdiction are outside of the current range of the species.  Such emissions are the primary threat to the continued existence of the polar bear.  The Final 4(d) Rule's exemption of all greenhouse emissions outside of the current range of the polar bear from potential regulation under Section 9 is not consistent with the conservation of the polar bear.

109.    Finally, the 4(d) Rule purports to exempt all activities, regardless of where they occur, from the ESA's take prohibitions as long as the activity is "authorized or exempted" under the MMPA. 50 C.F.R. § 17.40(q)(2).  While the MMPA provides important protections to the polar bear, its take provisions are not identical to the ESA, and the Secretary has provided no defensible rationale for depriving the polar bear of the additional protections of the ESA it would otherwise receive.

110.    A primary difference in the two regulatory schemes is the absence of the term "harm" in the MMPA's definition of "take."  Compare 16 U.S.C. § 1532(19) with 16 U.S.C. § 1362(13).   Under the ESA, the "harm" prohibition has been interpreted to include habitat modification, which significantly impairs "essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R § 17.3.  As such, this prohibition against "harming" listed species has been an effective mechanism to protect the habitat of imperiled species.  The 4(d) Rule contains no analysis whatsoever on how eliminating the "harm" prohibition for polar bears will contribute to the conservation of the species.

111.    Additionally, unlike the ESA, the MMPA provides no citizen-suit provision, so enforcement of the protections it does provide is left entirely to the discretion of the Secretary, meaning, unfortunately for the polar bear, that the MMPA's protections remain largely unimplemented and unenforced on the ground (and ice). See, e.g. Marine Mammals, Incidental Take During Specified Activities, 71 Fed. Reg. 43926 at 43927 (Aug. 2, 2006) ("A lapse in

authorization occurred from March 29, 2005, until publication of this rule, during which industry was liable for take of any polar bear and walrus.")  During this lapse in take authorization, the Secretary did not prosecute any violations of the MMPA even though such violations almost certainly occurred.

112.    Section 4(d) requires the Secretary to provide for the "conservation" of the polar bear, which includes the use of "all methods and procedures which are necessary to" the recovery of the polar bear. 16 U.S.C. § 1532(3) (emphasis added). Eliminating the applicability of the "harm" provision of the ESA, as well as citizen enforcement of take prohibitions, is not consistent with this mandate.

113.    In short, the 4(d) Rule adds no additional protections for the polar bear, but only exempts most or all of the protections otherwise provided by Section 9 and 50 C.F.R. § 17.31 for the species.  Thus, it cannot be considered "necessary and advisable" for the conservation of the polar bear.

## VI.   CLAIMS FOR RELIEF

### First Claim for Relief

### (Failure to Classify the Polar Bear as an Endangered Species)

### [Violations of the ESA and the APA]

114.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

115.    The Secretary is required to list a species as "endangered" if it "is in danger of extinction throughout all or a significant portion of its range," based on consideration of the ESA's five listing factors. 16 U.S.C. § 1532(6), 1533.

116.    On May 15, 2008, the Secretary published the Final Listing Rule, listing the polar bear as a threatened species throughout its range.   73 Fed. Reg. 28212.

117.    The Secretary violated the ESA by failing to list the polar bear as "endangered" in all or parts of its range.

118.    The Secretary's failure to list the polar bear as "endangered" in all or parts of its range was arbitrary, capricious, and inconsistent with the law because the Secretary failed to

utilize the best available scientific data as required by the ESA. 16 U.S.C. § 1533(b)(1)(A).

119.    The Secretary's failure to list the polar bear as "endangered" in all or parts of its range was arbitrary, capricious, and inconsistent with the law because the Secretary applied the wrong legal standards in making his determination.

120.    The Secretary's failure to list the polar bear as "endangered" in all or parts of its range was arbitrary, capricious, and inconsistent with the law because the Secretary relied upon factors in making his listing determination, including political considerations, beyond those allowed by the ESA. 16 U.S.C. § 1533(b)(1)(A).

121.    The Secretary's failure to list the polar bear as "endangered" in all or parts of its range was arbitrary, capricious, and inconsistent with the law because the Secretary failed to properly consider and address whether the polar bear is "endangered" throughout a "significant portion of its range," and whether one or more distinct population segments of the polar bear should be listed as "endangered."

122.    The Secretary's failure to list the polar bear as "endangered" in all or parts of its range is arbitrary, capricious, and an abuse of discretion, in excess of statutory jurisdiction, authority or limitations, and without observance of procedure required by law.  The Secretary's violation of the ESA is subject to judicial review under the ESA, 16 U.S.C. § 1540(g)(1)(C), and the APA, 5 U.S.C. §§ 701 through 706.

**Second Claim for Relief**

**(Issuance of an Unlawful Section 4(d) Rule)**

**[Violations of the ESA and the APA]**

123.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

124.    The Secretary violated the ESA in promulgating the 4(d) Rule, 50 C.F.R. § 1540(q), authorizing take of polar bears.  16 U.S.C. § 1533(d).

125.    The Secretary's promulgation of the 4(d) Rule authorizing take of polar bears was arbitrary, capricious, and inconsistent with the law because the Secretary failed to comply with the non-discretionary requirements imposed by the ESA, including the requirement to

promulgate regulations that are "necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).

126.    The Secretary's promulgation of the 4(d) Rule authorizing take of polar bears was arbitrary, capricious, and inconsistent with the law because the Secretary failed to articulate any lawful rationale for exempting all activities outside of the current range of the species from the take prohibitions of the ESA.

127.    The Secretary's promulgation of the 4(d) Rule authorizing take of polar bears was arbitrary, capricious, and inconsistent with the law because the Secretary failed to articulate any lawful rationale for exempting all activities that are authorized or exempted by the MMPA and CITES from the take prohibitions of the ESA.

128.    The Secretary's promulgation of the 4(d) Rule authorizing take of polar bears was arbitrary, capricious, and inconsistent with the law because the Secretary failed to apply the appropriate legal standard when exempting activities from the take prohibitions of the ESA.

129.    The Secretary's promulgation of the 4(d) Rule was arbitrary, capricious, and inconsistent with the law because the 4(d) Rule fails to foster the conservation of the polar bear.

130.    The Secretary's promulgation of and application of the 4(d) Rule authorizing take of the polar bears is arbitrary, capricious, and an abuse of discretion, in excess of statutory jurisdiction, authority or limitations, and without observance of procedure required by law.  The Secretary's violation of the ESA is subject to judicial review under the ESA, 16 U.S.C. § 1540(g)(1)(C), and the APA, 5 U.S.C. §§ 701 through 706.

## Third Claim for Relief

### (Failure to Provide for Proper Notice of and Comment on the 4(d) Rule)
### [Violations of the APA]

131.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

132.    The Interim and Final 4(d) Rules each constitute a "rule" within the meaning of §§ 551 and 553 of the APA.

133.    The Secretary's issuance of the Interim 4(d) Rule, was, contrary to the

requirement of §§ 553 (b) and (c) of the APA, conducted without any publication of a general notice of proposed rule making in the Federal Register and without any opportunity for interested persons to participate in the rulemaking process prior to the rule going into effect.

134.    The Secretary's determination that advanced publication of a proposed rule, and providing the public with an opportunity to participate in the rulemaking process prior to the Interim 4(d) Rule going into effect, was either impracticable, unnecessary, or contrary to the public interest was arbitrary, capricious, and not in accordance with law, as required by § 706(2) of the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701 through 706.

135.    The Secretary's subsequent solicitation of public comment on the Interim Final 4(d) Rule, only after such rule had taken effect, cannot cure the requirement of § 553 of the APA, and consequently renders the issuance of both the Interim and the Final 4(d) Rule arbitrary, capricious, and not in accordance with law.  5 U.S.C. §§ 701 through 706.

**Fourth Claim for Relief**

**(Failure to Prepare an Environmental Impact Statement or Environmental Assessment for the 4(d) Rule)**

**[Violations of NEPA and APA]**

136.    Plaintiffs reallege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

137.    The Secretary's promulgation of the 4(d) Rule, 50 C.F.R. § 1540(q), authorizing take of polar bears is a major federal action significantly affecting the quality of the human environment.

138.    The Secretary's failure to prepare an EA or an EIS for the promulgation of the 4(d) Rule authorizing take of polar bears is a violation of NEPA, 42 U.S.C. § 4321 et seq.

139.    The Secretary's failure to prepare an EA or an EIS for the promulgation of the 4(d) Rule authorizing take of polar bears as required by NEPA is arbitrary, capricious, and not in accordance with law as required by Section 706(2) of the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701 through 706.

140.    The Secretary's failure to prepare an EA or an EIS for the promulgation of the

4(d) Rule authorizing take of polar bears as required by NEPA constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by § 706(1) of the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701 through 706.

## VII.    PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully requests that the Court grant the following relief:

1.    Declare that the Secretary's failure to list the polar bear as an endangered species in all or portions of its range, or adequately explain why it declined to do so, violated the ESA, and is unlawful;

2.    Remand the Final Listing Rule to the Secretary for an adequate finding that complies with all requirements of the ESA by a date certain, with the threatened listing left in place during the remand;

3.    Declare that the 4(d) Rule fails to provide for the conservation of the polar bear and was issued in violation of the ESA, and is unlawful;

4.    Declare that the Secretary's promulgation of the 4(d) Rule violated the procedural requirements of the APA, and is unlawful;

5.    Declare that the Secretary's failure to prepare an Environmental Assessment or Environmental Impact Statement analyzing the potential environmental impacts of, and alternatives to, the 4(d) Rule violated NEPA, and is unlawful;

6.    Vacate the 4(d) Rule and remand it to the Secretary until such time as the Secretary has conducted review in compliance with NEPA and has complied with all requirements of the ESA and the APA;

7.    Award Plaintiffs their costs of litigation, including reasonable attorneys fees under the citizen suit provision of the ESA and/or the Equal Access to Justice Act; and

8.    Grant Plaintiffs such other relief as the Court deems just and proper.

DATE: March 13, 2009                    Respectfully Submitted,

                                        By:   /s/ Brendan Cummings
                                        _____

                                        Brendan Cummings
                                        Kassia Siegel
                                        Center for Biological Diversity
                                        P.O. Box 549
                                        Joshua Tree, CA 92252
                                        Phone:   (760) 366-2232
                                        Facsimile: (760) 366-2669
                                        bcummings@biologicaldiversity.org
                                        ksiegel@biologicaldiversity.org

                                        Benjamin Longstreth (DC Bar # 974015)
                                        Andrew Wetzler
                                        Rebecca Riley
                                        Natural Resources Defense Council
                                        1200 New York Ave., N.W. Suite 400
                                        Washington, D.C. 20005
                                        Telephone: 202-289-6868
                                        Facsimile: 202-289-1060
                                        blongstreth@nrdc.org
                                        awetzler@nrdc.org
                                        rriley@nrdc.org

                                        Attorneys for Plaintiffs Center for Biological
                                        Diversity, Natural Resources Defense Council, and
                                        Greenpeace, Inc.