UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
IN RE POLAR BEAR ENDANGERED                   )
SPECIES ACT LISTING AND § 4(d)                )    Misc. Action No. 08-0764 (EGS)
RULE LITIGATION                               )    MDL Docket No. 1993
_____    )
                                              )
This Document Relates To:                     )
*Conservation Force, et al.  v.*              )
*Salazar, et al., No. 1:09-cv-245*            )
_____    )

**THE HUMANE SOCIETY OF THE UNITED STATES, INTERNATIONAL FUND
FOR ANIMAL WELFARE, AND DEFENDERS OF WILDLIFE'S
REPLY IN SUPPORT OF MOTION TO INTERVENE**

**INTRODUCTION**

Although all of the other parties to these consolidated multi-district ("MDL") cases have

stipulated to intervention in their lawsuits, see DN 33, and even though the plaintiffs in this case

(hereafter the "Conservation Force Plaintiffs") do not oppose the Center for Biological Diversity

and other conservation groups intervening as defendants in their case, see DN 40 ("Notice of No

Opposition To Proposed Intervention of CBD, NRDC, and Greenpeace") (Mar. 31, 2009), they

inexplicably oppose the motion to intervene by the Humane Society of the United States

("HSUS"), International Fund for Animal Welfare ("IFAW"), and Defenders of Wildlife

(hereafter "the HSUS Applicants").  See Plaintiffs' Opposition to the Proposed Intervention of

HSUS, IFAW and Defenders of Wildlife ("Pl. Opp.") (DN 39) (Mar. 30, 2009).  However, the

grounds for their opposition are as difficult to understand as the Claims presented in their

Complaint.

In short, while the Conservation Force Plaintiffs assert in their opposition that they are

not challenging the polar bear import-ban in this lawsuit, Pl. Opp. at 3, the Complaint strongly

suggests otherwise, see, e.g., Complaint at 58-59, and if, in fact, they do participate in briefing

on the import-ban, the HSUS Applicants seek to intervene to respond to their arguments during

this phase of the litigation.  On the other hand, if, as their brief in opposition to intervention

suggests, the Conservation Force Plaintiffs instead intend to inject issues concerning sport-

hunting into the listing and/or 4(d) Rule litigation, then the HSUS Applicants respectfully

request that they be permitted to intervene in this suit for the limited purpose of responding to

the Conservation Force Plaintiffs' sport-hunting related arguments in the listing and/or 4(d) Rule

phase of this MDL proceeding.

     As explained further below, since the HSUS Applicants plainly have standing to

participate in this case and all of the other elements for Rule 24(a) intervention are satisfied, the

Court should grant the motion to intervene as of right.  Fed. R. Civ. P. 24(a).  Alternatively, the

HSUS Applicants have no objection to the Court adopting the same approach taken with

intervention in the Safari Club import-ban litigation, where the Court simply granted permissive

intervention to all applicants under Rule 24(b).  See Safari Club Int'l v. Kempthorne, No. 08-881

(EGS) (D.D.C.), Minute Order of July 10, 2008.

## ARGUMENT

     Before disentangling the Conservation Force Plaintiffs' legal arguments, it is critical to

clarify the underlying factual predicate for the related lawsuits at play in this MDL proceeding.

In May 2008, the FWS listed the polar bear as a "threatened" species.  73 Fed. Reg. 28,212 (May

15, 2008).[1]  The Service also issued a separate regulation under Section 4(d) of the Endangered

---

[1]    The Conservation Force Plaintiffs' brief is replete with misstatements regarding the
HSUS Applicants' motion to intervene.  For example, the motion to intervene does not assert
that the polar bear was "listed as 'endangered'," as the Conservation Force Plaintiffs allege –
without citation – on the first page of their opposition.  See Pl. Opp. at 1 ("The polar bear is not

Species Act ("ESA"), 16 U.S.C. § 1533(d), that, <u>inter alia</u>, purports to authorize under the ESA

listing activities authorized under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C.

§ 1361, <u>et seq.</u> 73 Fed. Reg. 28,036 (May. 15, 2008); <u>see also</u> 73 Fed. Reg. 76,249 (Dec. 16,

2008) (amending 4(d) Rule).  Contrary to the Conservation Force Plaintiffs' repeated assertion,

there is no "<u>4(d) Rule</u> that prohibits the import of [polar bear] trophies . . .."  Pl. Opp. at 3

(emphasis added).  Instead, polar bear trophy imports are prohibited as a result of the ESA listing

of the polar bear because the MMPA prohibits the import of any species designated as

"depleted," and the MMPA defines a "depleted" species to include any species listed under the

ESA.  <u>See</u> 16 U.S.C. §§ 1371(a)(3)(B); 1362(13).

　　　A number of lawsuits have been filed challenging aspects of the ESA listing, as well as

the ESA 4(d) Rule – all of which have been consolidated into this MDL action.  <u>See</u> DN 20 (Feb.

26, 2009 Scheduling Order).  Several other suits now in the MDL proceeding specifically

challenge the propriety of the FWS's refusal to grant certain polar bear import permits – referred

to as the "import-ban" – now that the species has been listed under the ESA.  <u>See</u> <u>Safari Club</u>

<u>Int'l v. Salazar</u> ("<u>SCI</u> Suit"), 08-881 (EGS) (D.D.C.); <u>Hershey v. Salazar</u>, No. 08-4660 (E.D.

Pa.); <u>Kreider v. Kempthorne</u>, No. 08-4662 (E.D. Pa.).  The Court's initial Scheduling Order

provides that briefing on the import-ban will occur <u>separately</u> from the ESA listing and 4(d) Rule

litigation.  <u>See</u> Scheduling Order at 6.[2]

---

listed as 'endangered' as the Movants state").

[2]　　　The federal defendants previously moved to dismiss the <u>SCI</u> suit, and those briefs were
recently refiled in the MDL proceeding.  The Scheduling Order provides that merits briefing on
the import-ban issue will occur after that motion is resolved.  <u>See</u> Scheduling Order at 6.

On its face, the Conservation Force Plaintiffs' Complaint appears also to challenge the import-ban. The Conservation Force Plaintiffs include numerous businesses and associations with economic interests in sport-hunting, see Complaint, ¶¶ 18-29, and twenty other individual plaintiffs who recently killed polar bears and seek to import their body parts. Id. ¶¶ 30-50. The Complaint alleges an unconstitutional "taking" of property interests because of the impacts of the import-ban. Id. ¶¶ 135-39. Moreover, among the Conservation Force Plaintiffs' requests for relief are that the Court (a) "suspend[ ] the . . . rule prohibiting the importation of Canadian polar bear trophies, particularly those taken before the effective date of the listing in pre-approved areas"; and (b) "suspend[ ] restriction on trophy imports of bear on quota [sic] in FWS previously approved areas during" a Court-ordered remand period. Id. at 58-59. In light of these allegations and relief requests, the HSUS Applicants moved to intervene in this case in order to defend the FWS's import-ban vis-à-vis the claims and arguments to be made by the Conservation Force Plaintiffs. See HSUS Applicants' Motion to Intervene (Mar. 20, 2009).

However, in opposing the intervention motion, the Conservation Force Plaintiffs now claim that they are not challenging the import-ban. Pl. Opp. at 3 ("At no time do plaintiffs attack the [prohibition] on the import of trophies . . . .."); id. at 20 ("Plaintiffs don't question the legality of the [ ] trophy import ban at all."). Instead, they claim that they are only challenging the listing of the species under the ESA. Id. Therefore, the Conservation Force Plaintiffs assert, they will not be participating in the separate briefing the Court has established on the import-ban issue. Id. at 4.

Given the inconsistencies between the Conservation Force Plaintiffs' Complaint and their most recent filing, the HSUS Applicants remain concerned that, in fact, the Conservation Force Plaintiffs will seek to participate in the import-ban litigation, in which case the HSUS Applicants

4

seek intervention for the reasons discussed in their opening motion.  Nonetheless, assuming

arguendo that the plaintiffs in this suit only intend to address sport-hunting and import-ban

issues in the separately-briefed listing litigation, the HSUS Applicants respectfully request that

the Court permit intervention for the limited purpose of addressing those issues in that round of

briefing.  Contrary to the Conservation Force Plaintiffs' assertions, the HSUS Applicants are

plainly entitled to intervene under either scenario.

**A.**     **The HSUS Applicants Are Entitled To Intervention As of Right.**

The Conservation Force Plaintiffs' principal argument against the HSUS Applicants'

intervention as of right concerns Article III standing.  Pl. Opp. at 6-17.[3]

**1.**     **Injury-In-Fact**

As regards injury-in-fact, the Conservation Force Plaintiffs allege that the HSUS

Applicants' members have made "perjurous misrepresentations" concerning visits to polar bear

populations impacted by sport-hunting.  Pl. Opp. at 12.  These allegations are mistaken.  In fact,

sport-hunters are currently allowed to hunt polar bears from the severely depleted Western

Hudson Bay population and, until the species was listed under the ESA, sport-hunters were also

allowed to import those trophies into the United States.  See 50 C.F.R. § 18.30(i)(1).  That

population's range straddles the invisible political boundary between Manitoba and Nunavut,

and encompasses Churchill, Manitoba, where several of the HSUS Applicants' members enjoy

seeing polar bears.  See, e.g., Declaration of Carolyn Potts ("Potts Decl."), ¶¶ 4-7.  Accordingly,

---

[3]     The Conservation Force Plaintiffs cursorily assert that the HSUS Applicants lack a legally protectable interest, Pl. Opp. at 5-6, but in this Circuit that interest is demonstrated by showing Article III standing.  See, e.g., Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1988).  They also claim the HSUS Intervenors are adequately represented by the government, Pl. Opp. at 10, but entirely mischaracterize the lenient standard for that prong of the intervention test.  See HSUS Mot. at 12-14.

the polar bears that HSUS Applicants' members have seen, and will continue to visit in the future, come from populations <u>where hunting does occur</u>, and, consequently, Applicants' members will suffer a cognizable injury-in-fact should the protections afforded as a result of the ESA listing of the polar bear – including the ban on imports of sport-hunted trophies – be lifted.[4]

Indeed, the Conservation Force Plaintiffs' misstatements on this particular issue are symptomatic of many other misstatements, too numerous to address in full at this time.  For example, plaintiffs attack one declarant's use of the term "carcass," asserting that the "false declaration" claims that sport-hunters import the "meat and internal organs of the bear."  Pl. Opp. at 3.  Of course, the declaration says no such thing, but rather expresses the view of the declarant – an IFAW member living in Manitoba, Canada, Burns Decl. ¶¶ 2-4 – concerning the undeniable fact that sport-hunters "butcher[ ]" polar bear "carcasses" that they have killed in order to collect the body parts that they <u>do</u> import.  <u>Id.</u> ¶ 7.  Plaintiffs also claim that the Western Hudson Bay polar bear quotas have been reduced because of a higher likelihood of successful hunts by indigenous populations, Pl. Opp. at 16, when, in fact, they have been reduced because the Western Hudson Bay polar bear population is currently depleted and the risk of future depletion is very high.  <u>See</u> Rose Decl. ¶ 15; <u>see also</u> Margaret Munro, "Polar Bears Face Uncertain Future In Arctic," Canwest News Service, Jan. 5, 2009 ("The more southerly bear population in western Hudson Bay . . . is even more at risk.  Surveys show the size of population dropped 22 per cent between 1987 and 2004, which prompted the Nunavut government to

---

[4]      The Conservation Force Plaintiffs' claim that the Applicants have not demonstrated more than "some day" intentions to visit this area, Pl. Opp. at 7, is also inaccurate.  To the contrary, IFAW member Carolyn Potts explained she has taken multiple trips to Canada to observe polar bears as well as concrete plans to return, Potts Decl., ¶¶ 4, 7; <u>see also</u> Robert Laidlaw Declaration ¶¶ 3-6; Else Poulsen Declaration ¶¶ 5-8; Vicki Burns Declaration ¶¶ 4-5; Lorie Zerweck Declaration ¶¶ 6, 8.

severely restrict the hunt.  Its wildlife management board slashed the hunting quota for the

region to eight bears for 2008-2009, down from 38 bears last year and 56 the year before.").[5]

As for the HSUS Applicant organizations themselves, the Conservation Force Plaintiffs

similarly assert – with no citations – that HSUS is "an ideological advocacy organization with

little interest in the polar bear itself on the ground . . . ."  Pl. Opp. at 13.  This of course ignores

the detailed explanations of HSUS's conservation work described in HSUS's declarations.  See

Declaration of Naomi Rose and Andrew Page.  Indeed, it is highly ironic for a group of

organizations whose injury stems from no longer being permitted to kill polar bears and import

their body parts into the U.S. to claim that the HSUS Applicants have no legitimate injuries

because they – unlike the Conservation Force Plaintiffs – do not really care about the

preservation of the species.[6]

_____

[5]      Available at http://www.canada.com/Technology/Polar+bears+face+uncertain +future+Arctic/1120467/story.html (last visited April 6, 2009).  As for the Conservation Force Plaintiffs' own declarations, one particularly glaring inaccuracy concerns Dr. Mitch Taylor's assertion that none of the polar bear populations are depleted.  See Declaration of Dr. Mitch Taylor ¶ 1.  In fact, according to the International Union for Conservation Polar Bear Specialist Group, six polar bear populations are currently considered depleted, and most of the remainder are considered "reduced."  Aars, J. et al., "Polar bears: proceedings of the 14th Working Meeting of the IUCN/SSC Polar Bear Specialist Group," June 20-24, 2005, Seattle, Washington, USA" (2005) (available at http://pbsg.npolar.no/en/status/status-table.html#bottom) (last visited April 6, 2009).  Indeed, between 1987 and 2004, "the number of polar bears in the [Western Hudson Bay] subpopulation declined [by] . . . about 22%."  Id.  Similarly, while Dr. Taylor states that "harvest of males as practiced in Nunavut . . . does not reduce the reproductive potential of the harvested populations," Taylor Decl. ¶ 6, he ignores that targeting the largest and fittest bears, as sport-hunters do, is a serious problem for several reasons.  See Declaration of Dr. Naomi Rose ¶¶ 16, 19.

[6]      The Conservation Force Plaintiffs' aspersions on Dr. Naomi Rose, Pl. Opp. at 16-17, are similarly erroneous.  A Senior Scientist for Humane Society International, the international arm of HSUS, Dr. Rose is a Ph.D. marine mammal biologist who has done extensive reading in the polar bear scientific literature, regularly consults with polar bear specialists, and also works with the Marine Mammal Commission – the scientific entity tasked with providing guidance to the FWS on polar bear issues.  Rose Decl. ¶¶ 1-2.  Her statements about conservation plans are

2.    **Causation And Redressability**

As for causation and redressability, The Conservation Force Plaintiffs argue that the

same number of polar bears will be killed regardless of whether they can be imported, and that

as a result the outcome of this lawsuit will not impact HSUS Applicants' members' ability to

visit the species in the wild.  Pl. Opp. at 7-10.  This logic is flawed on several grounds.

First, if in fact the Conservation Force Plaintiffs are only challenging the listing of the

polar bear under the ESA, and thus the intervention relates only to the listing challenges, then the

HSUS Applicants' standing flows not simply from the impact of the listing on sport-hunting, but

rather from all of the conservation benefits derived from the species' new conservation status –

each of which is sufficient for standing purposes.  See Pl. Mot. at 11; see also Carlton v. Babbitt,

900 F. Supp. 526, 529, n.1 (D.D.C. 1995).[7]

Moreover, even as regards sport-hunting itself, the HSUS Applicants have explained that

a ban on imports is likely (a) to impact the number and types of polar bears that are killed

(including decreasing the mortality of the biggest and most fit males that are most frequently the

target of sport-hunts, with benefits to the species' genetics and reproductive success), Rose Decl.

¶¶ 11-20, 24-25, as well as (b) to concretely affect the steps that Canada and the Native

communities take for the conservation of the species.  Id. ¶¶ 30-31; 34-39.  These are also

---

entirely accurate, see supra at 8, n.7, as are her references to a Memorandum of Understanding
between the United States and Canada.  Rose Decl. ¶ 36.  As noted, see supra at 7, n.5, she was
similarly accurate in discussing the Western Hudson Bay polar bear population.  Id. ¶ 15.

[7]    The Conservation Force Plaintiffs' assertions that the FWS will not adopt a conservation
plan now that the species is listed, Pl. Opp. at 17, conflicts with the statute.  See 16 U.S.C. §
1383b(b).  Indeed, there already is an out-of-date Conservation Plan for the bear, which will
presumably be updated in light of the species' new conservation status.  See http://alaska.
fws.gov/fisheries/mmm/polarbear/pdf/THEFINALplan.pdf (last visited April 6, 2009).

sufficient bases for the HSUS Applicants' standing here.  See Pl. Mot. at 11, n.5 (citing cases).

Indeed, in this case the organizations themselves also have standing, both because of the

depletion of their resources associated with addressing the import issue in the absence of the

import-ban, see Pl. Mot. at 11-12; see also Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C.

Cir. 1990), as well as the additional information to which they are statutorily entitled as a result

of the listing.  Pl. Mot. at 11, n.6 (citing cases).

*         *         *

Accordingly, Rule 24(a) intervention as of right is plainly appropriate here.

**B.**     **Alternatively, The Court Should Grant Permissive Intervention.**

As noted, the HSUS Applicants have no objection to the Court avoiding the Rule 24(a)

inquiry entirely and granting permissive intervention pursuant to Rule 24(b).  Fed. R. Civ. P.

24(b).  As for the Conservation Force Plaintiffs' objections to permissive intervention, again,

they evince a fundamental misunderstanding of the various decisions being challenged in these

cases.  There is no "portion of the 4(d) special Rule that implements the fictional depletion of the

MMPA triggered by the ESA listing," as plaintiffs assert.  Pl. Opp. at 17.  Indeed, it is precisely

because the federal defendants claim that there is no discrete rule banning polar bear sport-

hunted trophy imports that they have moved to dismiss the Safari Club's import-ban lawsuit,

which challenges the results of the ESA listing under the MMPA (i.e., an import-ban due to the

species' "depleted" status).  See Fed. Def. Motion to Dismiss (DN 21) (Mar. 3, 2009).

Nonetheless, as noted, if in fact the Conservation Force Plaintiffs do not intend to

participate in the separate briefing on the import-ban issue, then permissive intervention for the

HSUS Applicants is not necessary for that phase of the MDL litigation.  However, in that event

the Applicants respectfully request that, at minimum, the Court grant permissive intervention in

9

this case for the limited purpose of the Applicants addressing sport-hunted polar bear import

issues that arise in the Conservation Force Plaintiffs' briefs in the polar bear <u>listing and/or 4(d)</u>

<u>Rule</u> litigation.  The movants have concrete interests in this issue, and since briefing in these

cases will be consolidated among aligned parties, the Conservation Force Plaintiffs' claim that

intervention will delay or prejudice their claims, Pl. Opp. at 21, is also specious – particularly

since they have not objected to the intervention of other conservation groups.[8]

**<u>CONCLUSION</u>**

For all of the foregoing reasons, the proposed intervenors' Motion to Intervene should be

granted.

Respectfully Submitted,

<u>/s/ Howard M. Crystal</u>
Howard M. Crystal (D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

April 6, 2009                    Attorney for Proposed-Intervenors

---

[8]     The Conservation Force Plaintiffs recognize that the Court need not conduct a standing
inquiry in order to grant permissive intervention.  Pl. Opp. at 21-22 (citing cases).