# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN RE POLAR BEAR ENDANGERED** | ) | |
| **SPECIES ACT LISTING AND § 4(d) RULE** | ) | **Misc. Action No. 08-0764 (EGS)** |
| **LITIGATION** | ) | **MDL DOCKET NO. 1993** |
| _____ | ) | |
| | ) | |
| **This Document Relates To Case:** | ) | |
| **08-1550 (Safari Club Listing)** | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## MOTION AND SUPPLEMENTAL MEMORANDUM OF
## POINTS AND AUTHORITIES BY SAFARI CLUB INTERNATIONAL
## AND SAFARI CLUB INTERNATIONAL FOUNDATION
## IN SUPPORT OF THEIR AND THE JOINT MOTION
## FOR SUMMARY JUDGMENT IN THE LISTING CASE

Douglas S. Burdin
D.C. Bar No. 434107
Anna M. Seidman
D.C. Bar No. 417091
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Tel:  (202) 543-8733
Facsimile:  (202) 543-1205
dburdin@safariclub.org
aseidman@safariclub.org

*Counsel for Plaintiffs*
*Safari Club International and*
*Safari Club International Foundation*

**Table of Contents**

TABLE OF AUTHORITIES ...................................................................................................................ii

MOTION ...........................................................................................................................................1

REQUEST FOR ORAL ARGUMENT ...............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

I.    INTRODUCTION .................................................................................................................1

II.   SAFARI CLUB INTERNATIONAL AND SAFARI CLUB INTERNATIONAL FOUNDATION'S INTERESTS ...............................................................................................................................3

III.  FACTUAL AND LEGAL BACKGROUND AND STANDARD OF REVIEW ...........................5

IV.   ARGUMENT .........................................................................................................................5

A.   The Service Failed to Properly Consider Using its Authority to Not List the Polar Bear in all Parts of its Range ................................................................................................................5

B.   Under the Guise of "Best Science Available," the Service Improperly Considered Predictions of Future Conditions to be Established Facts ............................................................................8

C.   The Service Disregarded Future Efforts to Reduce GHC Emissions in Assessing Future Threats to the Polar Bear.............................................................................................................9

D.   The Service Improperly Established 45 Years as the Foreseeable Future ..................................11

E.   Safari Club International and Safari Club International Foundation Have Standing to Bring Their Claims Because of Their Interests in Polar Bear Conservation and Importation .....................14

V.   CONCLUSION....................................................................................................................15

## TABLE OF AUTHORITIES

### Cases

*Bennett v. Spear,* 520 U.S. 154 (1997)...............................................................................................12

*Bldg. Indus. Ass'n of Northern California v. Norton,* 247 F.3d 1241 (D.C. Cir. 2001) .............................12

*Defenders of Wildlife v. Babbitt,* 958 F. Supp. 670 (D.D.C. 1997) .........................................................12

*Hunt v. Washington State Apple Advertising Comm'n.,* 432 U.S. 333 (1977)............................................14

### Statutes

16 U.S.C. § 1532 (6) ..........................................................................................................................7

*16 U.S.C. § 1532(20) .........................................................................................................................7

16 U.S.C. § 1533.................................................................................................................................7

16 U.S.C. § 1533(a)(1)(A) ...............................................................................................................10

16 U.S.C. § 1533(a)(1)(E).................................................................................................................11

16 U.S.C. § 1533(b)(1)(A)...................................................................................................................8

16 U.S.C. § 1540(g)(2) ......................................................................................................................15

### Other Authorities

Memorandum from the Department of the Interior's Office of the Solicitor, M-37013, dated March 16,
    2007 .......................................................................................................................................5

The American Heritage Dictionary of Idioms (1997)
    http://dictionary.reference.com/browse/in+the+near+future ...................................................12

### Rules

*Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its
    Range, Final Rule, 73 Fed. Reg. 28212-28303 (May 15, 2008), ARL 117215- 307 .......................*passim*

* Authorities principally relied on.

## MOTION

Plaintiffs Safari Club International and Safari Club International Foundation ("SCI and

SCIF") move for summary judgment on all counts of their complaint, which challenges the U.S.

Fish and Wildlife Service's listing of the polar bear as threatened throughout its worldwide

range.[1]  This motion is supported by the memorandum below, the Plaintiffs' Joint Memorandum

in Support of Summary Judgment filed by SCI and SCIF, Alaska, Conservation Force *et al.,* and

the California Cattlemen Association *et al.* ("Plaintiffs' Joint Memorandum"), and the attached

declarations.  For the reasons detailed in these documents, the Court should set aside the Final

Rule and remand it back to the agency.[2]

## REQUEST FOR ORAL ARGUMENT

SCI and SCIF request oral argument on their motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

The U.S. Fish and Wildlife Service ("Service") listed the polar bear as threatened

throughout its worldwide range despite the fact that current populations numbers are at or near

historic highs of 20,000-25,000.  Final Rule, ARL117219.  To do this, the Service had to look far

into the future, claiming that it could sufficiently foresee the future in 45 years to predict that

polar bears would be in danger of extinction in every population and area in which the polar bear

currently exists (and mostly thrives).  For this 45 year period, the Service claims to have

sufficiently mastered the science and art of predicting the nature and extent of global climate

---

[1] Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range, Final Rule, 73 Fed. Reg. 28212-28303 (May 15, 2008), ARL 117215- 307 ("Final Rule").

[2] SCI and SCIF will comply with the Court's Order (Dkt. 115) regarding filing requirements (*e.g.,* paper and disk copies) consistent with the timeframe set out in the Plaintiffs' Joint Memorandum.

change, the impact of any climate change on sea ice throughout the arctic region, and the impact

of any sea ice loss on a species that rebounded from recent population numbers as low as 6,000-

8,000 and historic warming periods.  The Service acknowledges the tremendous uncertainty in

all aspects of such projections.  The Administrative Record ("ARL") demonstrates that the

Service is *only* able to predict that polar bears will be *adversely impacted* by predicted climate

change and sea ice loss.   The Service has not and cannot determine with the requisite certainty

(admitted to be 67-90%) that the polar bear will be in danger of extinction in the chosen 45-year

foreseeable future, much less in a shorter, more justifiable foreseeable future.

Ironically, the listing of the polar bear as threatened throughout its range provides few if

any means of addressing what the U.S. government has identified as the main cause of the bear's

predicted future decline – reduced arctic sea ice caused by projected global warming.  Instead,

the listing has eliminated one of the most important polar bear conservation tools that was

previously available – sport hunting (and importation) by U.S. hunters.  As the Court is aware

from other cases in this multi-district litigation, the Service took two actions along with the

listing: (1) it issued a Section 4(d) special rule that removed the protections of the Endangered

Species Act ("ESA") in favor of already existing protections of the Marine Mammal Protection

Act ("MMPA"); and (2) it determined that with the listing, the existing authorization of imports

from approved populations in Canada under the MMPA no longer applied.  Without importation,

U.S. hunters are less likely to travel to Canada to hunt from approved populations.  Lost are the

infusion of cash into the arctic communities that co-exist with the polar bear and another

incentive for these communities to accept western-science based management (quota systems).

SCI and SCIF challenge the Final Rule in an effort to reverse its effect on the import of

polar bears legally hunted in Canada from approved populations and to reinstate the conservation

benefits from sustainable use hunting and subsequent imports of trophies into the United States.

Overturning the listing, and as a consequence, the import ban, will allow SCI members and

others to (1) import bears legally hunted in Canada before May 15, 2008; (2) make plans to hunt

polar bear in Canada with the knowledge they can import the trophy as they could before the

listing; and (3) contribute again to the conservation and management of polar bears through

sustainable use hunting and importation of polar bears from approved populations in Canada.

In this brief, SCI and SCIF supplement the arguments made in the Plaintiffs' Joint

Memorandum, filed today.  SCI and SCIF here will address the Federal Defendants' (1) failure

to properly consider whether to *not* list the polar bear in portions of its "range,"[3] (2) improper

reliance on speculative predictions as establishing concrete facts in the chosen "foreseeable

future," (3) disregard of current and future efforts to reduce greenhouse gas emissions in

assessing future threats to the polar bear; and (4) improper establishment of the foreseeable

future.  SCI and SCIF will also demonstrate that they have standing to bring their claims.  For the

reasons discussed in the Plaintiffs' Joint Memorandum, this Supplemental Brief, and the other

supplemental briefs, the Court should find the listing arbitrary and capricious and contrary to law

and should vacate the Final Rule and remand it back to the Service for further proceedings.

II.     **SAFARI CLUB INTERNATIONAL AND SAFARI CLUB INTERNATIONAL FOUNDATION'S INTERESTS**

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, represents

approximately 53,000 members worldwide and promotes the interests of millions of members of

the hunting/conservation community.  SCI's missions include the conservation of wildlife,

---

[3] SCI and SCIF adopt and incorporate the related arguments on distinct population segments ("DPS") and "taking into account" made by Plaintiffs Conservation Force, *et al.* in their supplemental brief.  The arguments made here (*i.e.,* in SCI and SCIF's brief) regarding range also support the DPS argument.

protection of the hunter, and education of the public concerning hunting and its use as a

conservation tool.  Declaration of Kevin Anderson, President Elect, Chairman of the Legal Task

Force of SCI, and member of the Executive Committee of SCI, ¶¶ 3-4, Exhibit 1.

Prior to the institution of the import ban, SCI members from the United States hunted

polar bears from approved populations in Canada.  The hunts supported the conservation and

management of polar bears through payment of funds to local native communities who provide

services for the hunt.  SCI members who wished to import their polar bears into the United States

made an additional payment of a $1,000 import permit fee to the United States for polar bear

research.  Over the years, those fees generated close to $1 million, solely for the benefit of polar

bears.  Anderson Decl., ¶ 5.  A number of SCI members hunted polar bears from approved

populations in Canada in the Spring of 2008 but were unable to import their trophies into the

United States before the Service instituted the import ban on May 15, 2008.  These bears sit in

cold storage in Canada.  Many other SCI members seek to hunt and import polar bears in the

future and thereby contribute to conservation and research.  See Section IV.E and accompanying

declarations.

Safari Club International Foundation is a nonprofit IRC § 501(c)(3) corporation.  Its

missions include the conservation of wildlife, education of the public concerning hunting and its

use as a conservation tool, and humanitarian services.  More specifically, the conservation

mission of SCIF is: (a) to support the conservation of the various species and populations of

game animals and other wildlife and the habitats on which they depend; and (b) to demonstrate

the importance of hunting as a conservation and management tool in the development, funding

and operation of wildlife conservation programs.  Anderson Decl., ¶ 6.  SCI and SCIF filed

comments on the listing on three occasions.  ARL 120688-95, 124918-36, 126378-93.

III.   **FACTUAL AND LEGAL BACKGROUND AND STANDARD OF REVIEW**

SCI and SCIF adopt and rely on the Background and Standard of Review sections in the

Plaintiffs' Joint Memorandum.

IV.   **ARGUMENT**

A.   **The Service Failed to Properly Consider Using its Authority to Not List the Polar Bear in all Parts of its Range**

The Service possesses the authority to *not* list the polar bears in portions of its range even

if it does list the bear in other portions of its range.[4]   Nonetheless, the Service failed to

meaningfully consider this option.  Instead, the Service only specifically considered whether any

portion of the polar bear's range should be listed as "endangered" instead of threatened.  Final

Rule, ARL117252 (Service concludes that polar bear is threatened throughout range, but not

endangered in any portion of range); 117299 ("To determine whether any portions of the range

of the polar bear warrant further consideration as possible endangered significant portions of the

range, . . . .").  SCI and SCIF present this argument in the alternative to their principle position

that the Service should not have listed the polar bear at all.

Lost in the Service's grand conclusion that polar bears are threatened throughout the

world is any focused analysis of whether polar bears, in any portion of their range, are not

currently "threatened" (*i.e.,* in danger of extinction within the chosen foreseeable future).  The

Service's own models demonstrate this failure.  The Services' polar bear carrying capacity model

reveals that at year 45, the carrying capacity for the Archipelago ecoregion is predicted to be -3

---

[4] *See* Memorandum from the Department of the Interior's Office of the Solicitor, M-37013, dated
March 16, 2007, ARL059064, 059076-79 (the Service possesses the authority to list only that
portion of the species' range which is threatened or endangered, leaving the rest of the range
unlisted); Final Rule, ARL117299 ("If the Service determines that the species is not threatened
or endangered in a portion of its range, the Service need not determine if that portion is
significant.").

to -14 and for the Convergent Ice ecoregion to be +4 to -24 compared to present.  Final Rule,

ARL117277.  Even using the discredited and speculative prediction by the U.S. Geological

Survey ("USGS") that its Bayesian modeling ("BM") suggests that if particular sea-ice future

scenarios occur, mid-century will bring the loss of two-thirds of the polar bears, the remaining

one-third represents a large number of surviving polar bears.  Amstrup et al., 2007, ARL082453;

Final Rule, ARL117277-79 (BM is "a first-generation prototype … that would benefit from

additional development," and noting "uncertainty inherent" in the BM).

Using a loss of two-thirds of current estimates of 20,000-25,000 polar bears worldwide,

Final Rule, ARL117219, would still leave 6,300-8,300 polar bears in the world in 45 years.

Again, according to the USGS, those bears would likely be concentrated (relatively speaking) in

the Canadian archipelago.  Amstrup et al*.,* 2007, ARL082479-80 ("our results suggest that a core

of polar bear habitat and some number of polar bears is likely to persist in and around the

Archipelago Ecoregion at least into midcentury.").  In other words, even the extreme and

unreliable analysis of the Service's sister agency, the USGS, demonstrates that polar bears in at

least some significant portions of its range will not be in danger of extinction in the (too long) 45

year  foreseeable future established by the Service.  If nothing else, these projections of

thousands of remaining bears and significant enduring habitat, as revealed in both models,

should have given the Service serious reasons to question its conclusion that the species is

threatened *throughout* its range.

The Service does not and cannot explain why the predicted existence of at least 6,000-

8,000 bears in a relatively concentrated portion of the bear's range, and much higher numbers

under the carrying capacity predictions, does not mean that at this time, the bears in that portion

of the range are not threatened.  The Service admits that "impacts on polar bear populations will

vary in their timing and magnitude, but all populations will be affected within the foreseeable

future."  Final Rule, ARL117253.  Based on the conclusion that all bears will be "affected"

within 45 years, the Service incorrectly determined that all bears are currently threatened.  The

USGS seriously questioned the Service's conclusions:

> We note that a careful reading of Amstrup et al (2007) might lead to a different
> conclusion than that reached by the Service, ….  Taken at face value, the
> outcomes from the Bayesian Network Modeling are that polar bear populations
> living in the Seasonal and Divergent ecoregions are most likely extinct within the
> foreseeable future ….  The fates of the populations living in the Convergent and
> Archipelago ecoregions are different, with a much smaller probability of being
> smaller than the present or extinct.

USGS Comments on Draft Final Rule, ARL080025.  Under the ESA, being "affected" within 45

years does not amount to threatened, that is, in danger of extinction, in that time period.  As a

matter of law, if the onset of the species "being in danger of extinction" is pushed past the

(already too long) 45 year foreseeable future, the species is not currently threatened.  *See* 16

U.S.C. § 1533, 16 U.S.C. §§ 1532 (6), (20).  In recognition of the disparate projected impacts,

the Service did a detailed analysis, but only about whether any of the polar bear populations are

currently "endangered."  Final Rule, ARL117299-301.  Missing, however, is the same type of

analysis whether *any* of the populations or eco-regions are *not*, in fact, threatened at this time.[5]

This failure undermines the entire listing, but in particular the conclusion that the polar

bear is currently threatened throughout all portions of its range.  This failure also requires a

remand for the Service to consider *not* listing the polar bear in at least some portion of its range.

Considering the Service's standard for "likely" and errors regarding the "foreseeable future"

(discussed in Plaintiffs' Joint Memorandum, Argument Section I.), a remand is particularly

---

[5] Ironically, the Service readily excluded many populations and eco-regions from its analysis of
whether any portion of the range is currently endangered, but failed to seriously look at the other
side of the coin—whether those excluded populations/eco-regions are not currently threatened.
*See* Final Rule, ARL117299.

necessary to allow the Service to list as threatened only those populations, if any, for which there is sufficient scientific certainty to justify such a listing.

**B.      Under the Guise of "Best Science Available," the Service Improperly Considered Predictions of Future Conditions to be Established Facts**

In looking 45 years into the future to determine whether the polar bear will be in danger of extinction within that time (and thus "threatened" now), the Service appears to have accepted *speculative predictions of future scenarios* as establishing what the conditions will actually be. The ESA requires the Service to base its listing determination "solely on the basis of the best scientific and commercial information available" (after taking account of conservation programs in foreign nations). 16 U.S.C. § 1533(b)(1)(A). But this mandate does not mean that the Service must accept as definitive "fact" speculative and uncertain predictions about the habitat and population status of the species in 45 years for purposes of making the listing determination today. A prediction or projection is just that, an uncertain statement of the way someone thinks things might be in the future. The best available science mandate of the ESA does not convert a prediction into something the Service must accept as true or certain to happen. Whether it is the "best" prediction available or not, a prediction remains uncertain and, before the agency can rely on it, must rise to the level of certainty demanded by the ESA.

The Service should have read the best available science directive in conjunction with the standard for listing a species as threatened. In short, the statutory standard requires some high level of certainty that the species will be in danger of extinction within the "foreseeable future," – that period of time into which the agency can peer and ascertain the status of the species, again, with some high level of certainty. Thus, instead of converting a prediction into a certain fact, the Service must apply the "likely" standard to its predictions. (This "likely" standard is 67-90% certain. See Plaintiffs' Joint Memorandum, Argument Section I.A.)

Here, the Service can conclude that the species may be in danger of extinction in some

portion of its range in 45 years *only* if certain speculative predictions about climate change and

sea ice loss, and the polar bear's ability to respond to a changing environment, come true.  It

cannot establish the high level of certainty the statute requires.  Thus, the best available science

establishes that the Service ***should not*** have listed the species due to insufficiently certain

"predictions" and models that merely suggest that the species may be in danger of extinction (at

least in some portion of its range) in the chosen foreseeable future.

The Service also erred by assuming that the nine new USGS Reports and other uncertain

predictions about climate change and impacts on sea ice and polar bears met the listing standard

for threatened species.  In other words, even assuming the information is the best available and it

*predicts* extinction (at least for certain populations) within the 45-year foreseeable future, it does

not necessarily meet the "likely" – high degree of certainty of occurring – standard demanded by

Sections 3 and 4 of the ESA.  The conclusions in the USGS Reports must meet this standard

regardless of whether the Reports constitute the best available science.  The Service erred by

according too much weight to these predictions and modeling.[6]

C.      **The Service Disregarded Future Efforts to Reduce GHC Emissions in
        Assessing Future Threats to the Polar Bear**

As the definition of a "threatened species" in Section 3 of the ESA requires the Service to

determine whether the polar bear is likely to be in danger of extinction within the foreseeable

future (inappropriately set at 45 years), the Service should have taken account or better account

of future events.  Here, the Service made predictions about the future without the benefit of all

---

[6] A team of forecasting experts from Wharton, Harvard, and Monash University (New Zealand)
prepared a paper severely criticizing the failure of the USGS Reports to use science-based
forecasting principles.  Armstrong et al., Polar Bear Population Forecasts:  A Public Policy
Forecasting Audit (Dec. 14, 2007), ARL097611-31; *Id.,* ARL097611 (Amstrup et al. (2007)
"violated 73 of the 90 forecasting principles we were able to rate.").

available relevant information.  The Service relied on models that at best only partially

considered efforts to limits GHG emission in the future (by using scenarios that try to predict

different future emission scenarios).  Final Rule, ARL117231 (the "scenarios include no

additional [emission] mitigation initiatives, ….").  The failure to fully account for future

emission reductions means that the Service predicted what will happen over the next 45 years

based largely on what is in place today.  At the same time, in the Final Rule, the Service states

that it "remain[s] optimistic that the future can be a bright one for the polar bear" and that "[w]ith

the world community acting in concert, we are confident the future of the polar bear can be

secured."  ARL117306.  This optimism went unaccounted for in the Final Rule listing

determination.

In 2008, the Service should have concluded that the governments of the world will

supplement the regulatory forces at work today with additional ones in the coming years.  SCI

Comments, ARL124928-32.  The widespread and massive attention being paid to this issue at

the time (and today) assures that the response will be significant and will affect future climate

change, and possible impacts on the arctic ecosystem and the polar bear.  Considering that the

definition of a "threatened species" requires the agency to look into the future (to the extent it is

foreseeable), it was arbitrary and capricious for the Service to ignore this likely development.

In addition, two of the listing factors of Section 4 of the ESA require the Service to

consider these future actions.  Under the first factor, the Service must consider the threatened

destruction of the polar bear's habitat or range.  16 U.S.C. § 1533(a)(1)(A).  As the concern is

the reduction of arctic sea ice caused by future warming, the Service must analyze the causes of

any future warming.  Thus, the Service must analyze all the factors that might cause or not cause

warming to occur and to what degree.  Certainly, mandated reductions in greenhouse gases (and

other actions taken to address global climate change) in the next 5, 10, 20 years and beyond will

impact the extent of any future warming.  *See* Status Review at 67, ARL047460 ("Hansen et al.

(2005) suggest that the warming trend would change considerably if actions were taken soon

enough to keep the atmospheric gases from increasing.").

Under the fifth factor, the Service must consider any "other natural or manmade factors

affecting [the species'] continued existence."  16 U.S.C. § 1533(a)(1)(E).  The projected human

response, in all its varied forms, to the issue of global climate change certainly is a factor that

will affect the extent and nature of any future climate and sea ice changes and, consequently, (in

the Service's own view) the continued existence of the polar bear.  The Service refused to

consider this issue because it concluded the fourth listing factor, existing regulatory mechanisms,

precluded it.  *See* Final Rule, ARL117251.  But any restrictions on the agency's consideration of

"existing regulatory mechanisms" to those currently being implemented does not affect the

analysis the agency must conduct under other listing factors.

**D.      The Service Improperly Established 45 Years as the Foreseeable Future**

The Plaintiffs' Joint Memorandum explains in detail how the Service arbitrarily and

capriciously established 45 years as the "foreseeable future" in which to determine whether the

polar bear will be in danger of extinction in all or a significant portion of its range.  Argument

Section I.B.  That Memorandum explains that the Service originally proposed a 45 year

foreseeable future based on biological factors (three polar bear life generations), then realized for

the Final Rule that this was an inappropriate basis for establishing the "foreseeable" future into

which the Service must peer.  Instead of taking a fresh look at the issue, however, the Service

tried to justify its already chosen 45-year period.  In fact, the Service refused to consider shorter

periods.  The Service rationalized that climate change and sea ice loss predictions were ***more***

11

reliable in the 45 year period than in longer (*e.g.,* 70-80 year) periods.  The Service also failed to

consider the foreseeability of the other listing factors (*i.e.,* other than projected habitat loss).  The

45 year period was simply too long in light of the inherent and acknowledged great uncertainty

involved in making predictions about future climate change, sea ice loss, and impacts to the

worldwide polar bear population.

In addition, the case law and legislative history reject such speculation in ESA matters

and suggest a limit on the reach of a threatened listing.  In a related context, the Supreme Court

explained, "The obvious purpose of the requirement that each agency 'use the best scientific and

commercial data available' is to ensure that the ESA not be implemented haphazardly, on the

basis of speculation or surmise."  *Bennett v. Spear,* 520 U.S. 154, 176 (1997); *see also Bldg.*

*Indus. Ass'n of Superior California v. Norton,* 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) ("The

Service may not base its listings on speculation or surmise . . . .").  An ESA listing case

discussed the legislative history behind adding a "threatened" status to allow the agencies to take

preventive action before a species is imminently endangered.  *Defenders of Wildlife v. Babbitt,*

958 F. Supp. 670, 680 (D.D.C. 1997).  The following passage indicates that Congress designed

this new authority to address a significant issue, but that this authority was not unlimited:

> [i]n approving this legislation, we will be giving authority for the inclusion of
> those species which … might be threatened by extinction in the ***near future***.

*Id.,* citing H.R. Rep. No. 412, 93d Cong., 1st Sess. (1973) (remarks of Rep. Gilman) (emphasis

added).  The American Heritage Dictionary of Idioms (1997) describes "in the near future" as:

"[v]ery soon, within a short time.  …  This term employs *near* in the sense of "close at hand," a

usage dating from about 1300."  http://dictionary.reference.com/browse/in+the+near+future.  In

its approach, the Service allowed speculative predictions about the fate of a currently robust

population to guide its setting of 45 years, far beyond the "near future," as the foreseeable future.

The Service also tries to fortify its conclusion that 45 years is the foreseeable future by claiming that peer reviewers and others did not object to 45 years. Final Rule, ARL117258. But the peer reviewers reviewed only the proposed rule, which selected 45 years based *solely* on biological factors (an approach, as discussed in the Plaintiffs' Joint Memorandum, the Service later repudiated as a valid method of establishing the foreseeable future). *Id.* The peer reviewers were never given the opportunity to review the Service' new justification for 45 years.[7] Despite relying primarily on climate change modeling and sea ice loss predictions to establish the foreseeable future, the Service baldly claims that "leading polar bear *biologists*" have recognized the reliability of data "out to 2050." *Id.,* ARL117244 (emphasis added). Biologists are generally not trained as experts on the reliability of predictions based on incredibly complex and uncertain climate/sea ice modeling.

A threatened determination requires a prediction with a 67-90% probability. The more complex and uncertain the set of factors affecting a species, the shorter the time period for predicting the future of that species must be. When the issue is as complex and uncertain as the nature, extent, and impact of future global climate change, the Service cannot conclude with any degree of certainty that an affected species is going to be in danger of extinction within 45 years, particularly a currently healthy species. The further into the future the agency decides to look, the greater its burden to explain how that future period remains "foreseeable," especially in the face of complexity and uncertainty. The Service has not satisfied this heavy burden.

---

[7] The same applies to the Polar Bear Specialists Group's reliance on a 45 year foreseeable future. Final Rule, ARL117258.

E.      **Safari Club International and Safari Club International Foundation Have Standing to Bring Their Claims Because of Their Interests in Polar Bear Conservation and Importation**

SCI and SCIF have standing to bring their claims.  The Plaintiffs' Joint Memorandum addresses the requirements for standing.  Background, Section III.  Both SCI and SCIF have strong interests in the hunting, importation, and conservation of the species.  See Anderson Declaration, ¶¶ 3-6, Exhibit 1.  SCI members in particular have an interest in importing the trophies of polar bears hunted before the species was listed and in importing polar bears harvested in future hunts that will be planned and undertaken if the listing and import ban are lifted.  See Declaration of Todd L. Block, ¶¶ 4-10 (hunted in April 2008; trophy in cold storage in Canada), Exhibit 2; Declaration of Thomas Alan Kooistra, ¶¶ 6-12 (hunted in April 2008; trophy in cold storage in Canada), Exhibit 3; Declaration of Steven Charles Bugbee, ¶¶ 5-9 (cancelled Spring 2008 hunt, would go again if listing and import ban lifted), Exhibit 4; Declaration of David L. Adams, Jr., ¶¶ 6-10 (cancelled Spring 2008 hunt, would go again if listing and import ban lifted), Exhibit 5.[8]

The listing of the polar bear causes injury to these concrete interests by (1) directly leading to the establishment of the import ban (as the Service interpreted the law); (2) undermining the conservation benefit of sustainable use hunting of the bear (including funds paid to native arctic communities that must co-exist with the bear and help support conservation and management efforts); and (3) eliminating the $1,000 import permit fee that supports polar bear research (almost $1,000,000 since 1994).  A Court order vacating the listing would redress these

---

[8] These declarants establish SCI's organizational standing by having standing to sue in their own right.  In addition, the interests at stake in this litigation are germane to SCI and SCIF's purpose of protecting hunting and promoting conservation, including of the polar bear.  Finally, the claims SCI and SCIF have asserted and the relief they request do not require the participation of individual members of SCI in the lawsuit.  *See Hunt v. Washington State Apple Advertising Comm'n.,* 432 U.S. 333, 343 (1977).

injuries by allowing the import authorization of the MMPA, and accompanying conservation benefits, to go back into effect.[9]

## V.    <u>CONCLUSION</u>

The listing of the polar bear as a threatened species was not warranted at this time because of the current uncertainty in the science about the future of the polar bear, especially a future that reaches out to 45 years.  The Service's knowledge at this time simply does not establish that the polar bear is "likely" (67-90% certain) to be in danger of extinction within 45 years, much less in a more appropriate foreseeable future.  For the reasons explained in the Plaintiffs' Joint Memorandum, this Supplemental Brief, and the other supplemental briefs, the Court should set aside the Final Rule and remand it to the agency.

Dated:  October 20, 2009.

Respectfully Submitted,

/s/ Douglas S. Burdin
Douglas S. Burdin (D.C. Bar No. 434107)
Anna M. Seidman (D.C. Bar No. 417091)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Tel:  (202) 543-8733
Facsimile:  (202) 543-1205
dburdin@safariclub.org
aseidman@safariclub.org

*Counsel for Plaintiffs*
*Safari Club International and*
*Safari Club International Foundation*

---

[9] SCI and SCIF submitted a 60-day notice letter to the Service more than 60 days prior to filing suit.  Compl., ¶ 12, Dkt. 1 (08-1550); Federal Defendants' Answer, ¶ 12, Dkt. 13 (08-1550).  *See* 16 U.S.C. § 1540(g)(2).