UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION** | Misc. Action No. 08-0764 (EGS) MDL Docket No. 1993 |
| **This Document Relates To:** *California Cattlemen's Association, et al. v. Salazar, et al.* **No. 1:08-cv-1689 (EGS)** **and** *State of Alaska v. Salazar, et al.* **No. 1:08-cv-1352 (EGS)** | **MOTION AND SUPPLEMENTAL MEMORANDUM OF CALIFORNIA CATTLEMEN'S ASSOCIATION AND CONGRESS OF RACIAL EQUALITY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT CHALLENGING THE LISTING RULE** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REQUEST OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Standing of California Cattlemen's Association . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.   Article III Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.   Associational Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.   Prudential Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        4.   Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.   Standing of Congress of Racial Equality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   Article III Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.   Associational Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.   Prudential Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.   Ripeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8, 12

*\*Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165 (D.D.C. 2008) . . . . . . . . . . 2, 4, 8, 10, 12

*\*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros.*,
    317 F.3d 334 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*\*Ass'n of Am. Physicians & Surgeons, Inc. v. Food & Drug Admin.*,
    539 F. Supp. 2d 4 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970) . . . . . . . . . . . . . . . . . . . . . . 7

*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Clinton v. City of New York*, 524 U.S. 417 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . 5, 10-11

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    539 F. Supp. 2d 331 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

*Valley Forge Christian Coll. v. Am. United for Separation
    of Church & State, Inc.*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

## Statutes

15 U.S.C. § 631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16 U.S.C. § 1532(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

    § 1532(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    § 1532(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

    § 1533(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    § 1536(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Page**

§ 1538(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

§ 1540(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

§ 1540(g)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Regulation**

50 C.F.R. § 17.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**United States Constitution**

U.S. Const. Art. III, § 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Miscellaneous**

3 Pierce, Richard, Administrative Law Treatise § 16.4 (4th ed. 2002) . . . . . . . . . . . . . . . . . . . 4

Press Release, *Congress of Racial Equality Says Opposition to Climate Change Proposals Rising Due to Unequal Impact on the Poor*, Apr. 22, 2008 . . . . . . . . . . . . . . . . . 10

SBA Office of Advocacy, *The Impact of Regulatory Costs on Small Firms* (Sept. 2005), *available at* http://www.sba.gov/advo/research/rs264tot.pdf (last visited Oct. 16, 2009) . . . . 9

**Attachments**

Declaration of Matt Byrne

Declaration of Roy Innis

## MOTION

Plaintiffs California Cattlemen's Association (CCA) and Congress of Racial Equality (CORE) move for summary judgment on all counts of their complaint, challenging the U.S. Fish and Wildlife Service's listing of the polar bear as threatened throughout its entire range.  This motion is supported by the memorandum below, the plaintiffs' joint and separate memorandums in support of summary judgment opposing the listing, and the attached declarations.  For the reasons detailed in these documents, the Court should set aside the listing rule and remand it back to the agency.

## REQUEST OF ORAL ARGUMENT

CCA and CORE request oral argument on their motion for summary judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

In accordance with this Court's scheduling order, this memorandum is submitted on behalf of CCA and CORE as a supplement to the plaintiffs' joint and separate memorandums in support of the motion for summary judgment challenging the listing of the polar bear as a threatened species. This supplement addresses standing and additional arguments on the merits.

## II.  FACTS

CCA and CORE adopt the statement of facts in the plaintiffs' Joint Memorandum.

## III.  STANDING

This Court has already granted the California Cattlemen's Association and Congress of Racial Equality plaintiff-intervenor standing in *Alaska v. Salazar*, No. 1:08-cv-1352, without objection by any party.  Nevertheless, this discussion is provided in support of CCA and CORE's claim of standing as plaintiffs in their original suit, *Cal. Cattlemen's Ass'n v. Salazar*, No. 1:08-cv-1689.

**A.  Standing of California Cattlemen's Association**

    **1.  Article III Standing**

Under Article III of the Constitution, U.S. Const. Art. III, § 2, cl. 1, plaintiffs must (1) establish "an 'injury in fact,'" (2) demonstrate causation whereby they show "a fairly traceable connection between" the plaintiffs alleged injury and the conduct of the defendant to which plaintiffs complain, and (3), show  "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  On motions for summary judgment, facts set forth by affidavit or other means "will be taken as true." *See  Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 175 (D.D.C. 2008).

The California Cattlemen's Association is a nonprofit association that represents California's ranchers and beef producers in legislative and regulatory matters. *See* Decl. of Matt Byrne ¶ 3.  CCA is a grassroots organization comprised of cattle-producing families who have been providing beef for generations and who determine the direction and policy of the organization.  *Id.*  CCA members are committed to producing safe, wholesome food while responsibly maintaining and improving wildlife habitat, preserving our natural resources, and protecting imperiled species. *Id.* ¶ 4.  CCA members are subject to substantial federal and state environmental regulations that impose, among other things,  mitigation fees, operational design changes, permit fees, and legal and consulting expenses. *Id.* ¶ 5.

The U.S. Fish and Wildlife Service listed the polar bear as a threatened species under the Endangered Species Act on the basis that greenhouse gas emissions are causing global warming, which, in turn, is causing the melting of arctic sea ice, thereby modifying and degrading habitat and harming the bear.  A number of agricultural and other anthropomorphic activities have been identified as a source of greenhouse gas emissions, and consumer demand for beef is being

challenged by animal rights and environmental activists who claim that the production of animal protein significantly contributes to climate change. *Id.* ¶ 8. The listing of the polar bear injures cattle growers by increasing the likelihood of such challenges. Under the citizen suit provision of the ESA any person may enjoin any activity that violates the Act. *See* 16 U.S.C. § 1540(g). Section 9 of the ESA prohibits the "take" of listed species. *Id.* § 1538(a)(1)(B). "Take" includes "harm." *Id.* at § 1532(19). "Harm" may include "habitat modification or degradation." 50 C.F.R. § 17.3. Therefore, even if not justified, the listing of the polar bear exposes CCA members to increased citizen suit liability. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Food & Drug Admin.*, 539 F. Supp. 2d 4, 19 (D.D.C. 2008) (recognizing an actual increase in risk of liability can be a cognizable injury). To defend against even a perceived threat in court is a costly enterprise. But that is not all.

CCA members engage in activities that require federal permits such as federal grazing permits under the Taylor Grazing Act or discharge permits under the Clean Water Act. *See* Decl. of Matt Byrne ¶ 5. Where the respective project, such as grazing on federal lands, may affect listed species Section 7 consultation under the ESA is required. 16 U.S.C. § 1536(a). These consultations can be both lengty and very costly and  include extensive studies, project modifications, and, where appropriate, substantial mitigation. Although, the Service's 4(d) rule appears to exempt activities in the lower 48 states from such consultations with respect to the polar bear, that rule has been challenged in these consolidated proceedings. Also, the Service's interpretation of significant impacts under the 4(d) rule is not binding on the courts nor does it prohibit citizen suits which can be used to compel Section 7 consultations.

In the process of obtaining permits for cattle-raising activities, CCA members are also subject to federal and state environmental laws such as the National Environmental Policy Act and the

California Environmental Quality Act that require an assessment of impacts on federally listed species.  To the extent these requirements are deemed to extend to greenhouse gas emissions from beef production and their effect on the polar bear, whether warranted or not, they impose a direct burden on CCA members in the way of evaluation, compliance and mitigation costs and fees.  The regulatory burdens and costs of doing business, including new risk assessments, for CCA members and others in agriculture are increased because of the polar bear's listing as a threatened species.  *See Am. Petroleum*, 541 F. Supp. 2d at 176-77 ("Regulatory influences on a firm's business decisions may confer standing when, as here, they give rise to cognizable economic injuries or even a 'sufficient likelihood' of such injuries.") (citing *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998)).  As the court in *American Petroleum Institute* noted, a leading treatise explains:

> "The [Supreme] Court routinely recognizes probable economic injury resulting from agency actions that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement] . . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of agency action satisfies this part of the standing test."

*Id.* at 177 (citing 3 Richard Pierce, Administrative Law Treatise § 16.4 at 1122 (4th ed. 2002)).

In response to the foregoing, and for the benefit of its members, CCA expends resources to track and evaluate legal developments that could affect cattle operations in the State of California, such as the listing of the polar bear.  Through its members, CCA has adopted a policy to "'oppose the listing of species or habitat under the federal Endangered Species Act . . . based primarily on climate change.'"  *See* Decl. of Matt Byrne ¶ 8 (quoting CCA 2008-2009 Policy Resolutions).  To correct "'defects in the ESA to the benefit of production agriculture within California and the nation,'" CCA has resolved to work with the National Cattlemen's Beef Association, of which CCA is an affiliate.  *Id.*  As a result of that work, the National Cattlemen's Beef Association submitted 21 pages of comments to the Service in opposition to the listing challenged here.  *See* ARL124864-

124885.  *Also, see Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 539 F. Supp. 2d 331,

339 (D.D.C. 2008) (To show injury in fact, a plaintiff association need only demonstrate that it has

expended money to inform its members and lobby against the administrative rule.).

The imposition of the regulatory burdens, additional costs, and increased liability discussed

above are actual or imminent injuries caused directly by the listing of the polar bear as a threatened

species.   If CCA is successful in overturning the listing, these injuries will no longer obtain.

Therefore, CCA has Article III standing to bring this listing challenge.

### 2.   Associational Standing

A plaintiff establishes associational standing by showing:  "(1) its members would otherwise

have standing to sue in their own right; (2) the interests it seeks to protect are germane to the

organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

participation in the law suit of each of the individual members."  *Hunt v. Wash. State Apple Adver.

Comm'n*, 432 U.S. 333, 343 (1977).

In this case, the injuries recounted above, occasioned by the polar bear listing, fall directly on

the members of the California Cattlemen's Association.  Individual members must bear the study

costs, mitigation fees, operational design changes, permit fees, legal, and consulting expenses

attendant to the listing of the polar bear as a threatened species.  Therefore, these members have

standing to sue in their own right.

The CCA is a nonprofit trade association representing California's ranchers and beef producers

in legislative and regulatory affairs.  *See* Decl. of Matt Byrne ¶ 3.  CCA staff directly deals with the

California State Legislature, Congress, and federal and state regulatory agencies on a wide range of

issues including, but not limited to:  food safety and inspection, federal and state endangered species,

animal handling, wildlife management, air quality, noxious weeds, land use, conservation programs, and federal lands grazing fees and regulation. *Id.* ¶ 6. CCA also maintains a political action committee to support cattle ranching interests. *Id.* ¶ 7. And, the CCA has adopted specific policies directing CCA staff to seek favorable changes to the ESA and to oppose listings or habitat designations based primarily on climate change, like the polar bear listing here. *Id.* ¶ 8. The objective of protecting California's cattle ranchers and beef producers from burdensome regulation generally, and severe ESA restrictions specifically, are clearly germane to CCA's purpose.

Like the other plaintiffs in these consolidated cases, CCA seeks to overturn the listing of the polar bear as a threatened species. This challenge is based on the claim that the Service listed the polar bear without regard for the best available science which shows a thriving species even in the face of melting sea ice. This listing challenge will be resolved by motions for summary judgment based entirely on the administrative record. All issues are legal, not factual, and do not involve or necessitate the participation of any individual CCA member. For these reasons, CCA has associational standing.

### 3. Prudential Standing

CCA claims have been brought under both the ESA and the Administrative Procedure Act (APA). Congress eliminated prudential standing requirements for direct ESA claims "by specifying that 'any person' may be a plaintiff." *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros.*, 317 F.3d 334, 336 (D.C. Cir. 2003). The ESA citizen suit provision requires a plaintiff to provide the defendant agency with 60 days notice of the claims before filing suit. 16 U.S.C. § 1540(g)(2)(A). CCA complied with this requirement on July 24, 2008.

For those claims brought under the APA, prudential standards apply. These standards include avoiding adjudicating claims based on "the legal rights or interests of third parties," refraining from

adjudicating "generalized grievances," and requiring the plaintiff to be within "'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).

The first concern is not at issue here because CCA has not raised nor implicated the rights or interests of third parties.  As for the second concern, adjudicating general grievances, that was addressed above where it was pointed out that beef producers have been specifically targeted both for litigation and regulation because of greenhouse gases emitted in cattle ranching operations.  As for the "zone of interests," the Supreme Court has explained that under the APA the court must look to the purposes of the substantive provision of the statute under which the plaintiff is suing.  *See Bennett v. Spear*, 520 U.S. 154, 163 (1997).

In this case, CCA complains that the Service violated Section 4 of the ESA.  That provision requires the Service to list a species as threatened or endangered "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b).  According to the U.S. Supreme Court, the "obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett*, 520 U.S. at 176.  The High Court held that "economic consequences are an explicit concern of the ESA," and that the protection of economic interests falls within the ESA's zone of interests.  *Id.* at 177.  This would include the economic interests of CCA members.

### 4.   Ripeness

The Ripeness doctrine prevents courts from "entangling themselves in abstract disagreements" and protects agencies from judicial interference before their administrative decisions are "felt in a

concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In considering a ripeness challenge the court must look at (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding judicial review. *Id.* at 149. "A dispute is generally fit for judicial review if it is legal in nature and no other institutional concerns militate in favor of withholding review." *Am. Petroleum*, 541 F. Supp. 2d at 178. "Under the 'hardship prong' a court must consider the plaintiff's interest in securing immediate review." *Id.*

In this case, the dispute is about whether the Service properly listed the polar bear as a threatened species. The issues are entirely legal and therefore presumptively reviewable. *Id.* Moreover, CCA and its members have considerable interest in immediate review. Without such review, CCA and its members will be foreclosed from any future listing challenge because multiple challenges to the polar bear listing have already been brought and consolidated in this action. As a consequence, no later listing challenge will be viable because this Court's judgment in these cases will be binding. This Court would gain nothing by making CCA members wait until they are actually sued to challenge the listing. Waiting would not clarify any of the issues, but it would deprive CCA and its members of any meaningful judicial review in the future. That fact provides another compelling reason why it is proper to allow CCA to litigate its listing claims in this suit.

## B.  Standing of Congress of Racial Equality

### 1.  Article III Standing

The Congress of Racial Equality satisfies all the requirements for Article III standing—injury, causation, and redressability. *See Steel Co.*, 523 U.S. at 102-03. CORE is a philanthropic human rights organization established to fight discrimination and encourage the economic and social independence of the poor and minorities. *See* Decl. of Roy Innis ¶ 3. CORE is headquartered in New York City and includes affiliates and chapters all across America, Africa, the Caribbean,

Europe, and Central and South America. *Id.* CORE was the first civil rights organization in this Country to receive nongovernmental consultative (NGO) status at the United Nations where it is assigned to two of the UN's most prestigious departments—the United Nations Department of Public Information and the United Nations Economic and Social Council. *Id.* ¶ 6. CORE members include the poor and minorities who are disproportionately harmed by the escalating costs of energy, housing, transportation, and food resulting from increased environmental regulation, including the polar bear listing. *Id.* ¶ 7. Members of CORE are engaged in or employed by various business enterprises that emit greenhouse gases that are deemed to cause or exacerbate global warming and melting sea ice. *Id.* Costs and regulatory burdens on such enterprises are likely to increase because of the polar bear's listing as a "threatened" species. *Id.*

The Small Business Act is animated by the fact that small businesses bear a disproportionate share of regulatory costs and burdens and that federal regulation should encourage poor and minority ownership. *See* 15 U.S.C. § 631. A study by the Small Business Administration concluded:

> The annual cost of federal regulations in the United States increased to more than $1.1 trillion in 2004. Had every household received a bill for an equal share, each would have owed $10,172, an amount that exceeds what the average American household spent on health care in 2004 (slightly under $9,000). While all citizens and businesses of course pay some portion of these costs, the distribution of the burden of regulations is quite uneven. The portion of regulatory costs that falls initially on businesses was $5,633 per employee in 2004, a 4.1 percent cost increase since 2000 after adjusting for inflation. Small businesses, defined as firms employing fewer than 20 employees, bear the largest burden of federal regulations, as they did in the mid-1990s and in 2000. Small businesses face an annual regulatory cost of $7,647 per employee, which is 45 percent higher than the regulatory cost facing large firms (defined as firms with 500 or more employees).

SBA Office of Advocacy, *The Impact of Regulatory Costs on Small Firms* at v (Sept. 2005), *available at* http://www.sba.gov/advo/research/rs264tot.pdf (last visited Oct. 16, 2009).

CORE identifies, evaluates, and tracks legal rules and laws that are likely to injure the poor and

minorities.  *See* Decl. of Roy Innis ¶ 5.  When such rules and laws are identified, CORE uses its resources to expose and oppose these acts.  *Id.*  CORE opposes burdensome regulations to address global warming, like the polar bear listing, because of their disproportionate impact on the poor.  *Id.* See attached CORE press release, *Congress of Racial Equality Says Opposition to Climate Change Proposals Rising Due to Unequal Impact on the Poor*, Apr. 22, 2008.  As noted above, a plaintiff association may show an injury in fact by demonstrating that it has expended money to inform its members and lobby against the administrative rule.  *Also, see Home Builders*, 539 F. Supp. 2d at 339.

Much like the CCA, discussed above, the listing also subjects CORE members who engage in greenhouse gas emitting business enterprises to an increased risk of citizen suits and agency enforcement actions under the Endangered Species Act and other federal and state laws which increases business costs.  *See* Decl. of Roy Innis ¶ 7.  In *American Petroleum Institute*, 541 F. Supp. 2d at 176-77, the court determined that regulatory influences on a firm's business decisions may establish standing when "they give rise to cognizable economic injuries or even a 'sufficient likelihood' of such injuries."

The imposition of the regulatory burdens, additional costs, and increased liability discussed above are actual or imminent injuries caused directly by the listing of the polar bear as a threatened species.  If CORE is successful in overturning the listing, the injuries caused by the listing will be alleviated.  Therefore, CORE has Article III standing to bring this listing challenge.

**2.  Associational Standing**

CORE satisfies the three-fold test for associational standing:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

Many CORE members own small, minority businesses.  Some of these emit greenhouse gas emissions which the Service found are contributing to global warming and causing harm to the polar bear.  The listing of the polar bear as a threatened species increases a risk of liability to these business owners from ESA citizen suits.  Aside from any potential costs of litigation, evaluating this risk itself increases the cost of doing business.  These are actual and imminent injuries that give individual CORE members standing to sue to overturn the listing.

As noted in more detail above, CORE exists to protect the poor and minorities from the disproportionate impacts of governmental regulation.  CORE has specifically identified regulatory responses to global warming, such as the listing of the polar bear, for CORE opposition because such responses are onerous and widespread.  It cannot be seriously denied that the listing of the polar bear has imposed additional costs on the oil and gas industry, at least in Alaska, and that increased costs of energy development are felt throughout the nation and drive up the price of food, travel, heating, cooling and housing, which affect the poor the most.  CORE employs its resources to expose and challenge rules and regulations of this kind.  The interests CORE seeks to protect are certainly germane to its purpose.

This case raises purely legal questions.  A successful challenge by CORE will result in invalidation of the listing rule and/or remand for further consideration.  Neither the claim asserted nor the relief requested requires the participation of individual CORE members in this lawsuit.  Therefore, CORE has associational standing.

### 3.  Prudential Standing

Prudential standing is satisfied when the plaintiff avoids adjudicating claims based on "the legal rights or interests of third parties," refrains from adjudicating "generalized grievances," and

shows that the plaintiff is within the statute's "zone of interests." *Valley Forge Christian Coll.*, 454 U.S. at 474-75.

As with the CCA, the first factor is not at issue here because CORE has not raised nor implicated the rights or interests of any third party. The second factor is also not an issue here. CORE has not sought to adjudicate "generalized grievances." CORE represents poor and minority populations that suffer disproportionally from the general population from the high cost of mounting governmental regulation. With respect to the third factor, the "zone of interests," the Supreme Court has explained that "economic consequences are an explicit concern of the ESA," and the protection of economic interests falls within the ESA's zone of interests. *Bennett v. Spear*, 520 U.S. at 177. CORE has established prudential standing.

### 4. Ripeness

Under long-established precedent, when a court addresses a ripeness challenge it must consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding judicial review. *Abbott Labs.*, 387 U.S. at 148-49. "A dispute is generally fit for judicial review if it is legal in nature and no other institutional concerns militate in favor of withholding review." *Am. Petroleum*, 541 F. Supp. 2d at 178. "Under the 'hardship prong,' a court must consider the plaintiff's interests in securing immediate review." *Id.*

In this case, the dispute is limited to the validity of the Service's listing decision. The issues raised are purely legal and satisfy the presumption of reviewability. No institutional concerns weigh in favor of withholding review. A delay in review until a member of CORE is actually sued or challenged because of the polar bear listing would not aid the court in any way in resolving the legal issues in this case. However, CORE and its members would suffer a severe hardship if immediate review were not granted. Without such review, CORE and its members will be foreclosed from any

future listing challenge because multiple challenges to the polar bear listing have already been brought and consolidated in this action.  This Court's decision in this case will be binding on any future listing challenge.  For these reasons, CORE should be allowed to litigate its suit at this time.

## IV.  ARGUMENT

This supplemental argument is provided to emphasize a single essential point; that the Service looked far beyond the "foreseeable future" to justify listing the polar bear as a threatened species.

Before a species receives full protection under the ESA, it must be listed as "threatened" or "endangered."  A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  In evaluating the status of the polar bear, the Service defined "foreseeable future" as 45 years and concluded that period "coincides with the timeframe within which climate model projections are most reliable."  Final Listing Rule, ARL 117214.  Therefore, it was the conditions existing at the end of that period which would dictate whether the polar bear should be listed.

The conditions that would exist 45 years out were predicted by sea ice models on which the Service relied.  According to those models, which the Service considered the "most reliable," the carrying capacity of the polar bear habitat would be reduced in the "foreseeable future" no more than 10-22%. Final Rule, ARL117277.  The Service equated this reduction in carrying capacity to an equal reduction in polar bear population.  *Id.*  The current population of the polar bear, range wide, is at a historic high, between 20,000 and 25,000 (Final Rule, ARL117219),  up from an estimated low of 8,000-10,000 in the 1960s (Final Rule, ARL062085).  Under the worst case scenario of a 22% reduction, this means that within the "foreseeable future" 78% of carrying capacity (or habitat)

would remain with a corresponding population count between 15,600 - 19,500.  Nevertheless, the Service concluded the polar bear would likely become endangered in the "foreseeable future" and listed the bear as a threatened species.

According to the Service, "[b]ecause of the habitat changes anticipated in the next 45-50 years, and the corresponding reductions in reproduction and survival, and, ultimately, population numbers, we have determined that the polar bear is likely to be in danger of extinction throughout all or a significant portion of its range by 2050."  Final Rule, ARL117214-117215.   But nowhere did the Service explain why the projected reductions in habitat and population put the polar bear at risk by 2050.  To arrive at that conclusion the Service had to look far past the "foreseeable future."

In its findings section of the Final Rule, the Service stated that the predicted trend is "worrisome" and that the listing is warranted because melting sea ice will "negatively affect" polar bear populations, perhaps resulting in "a steady decline in abundance."  Final Rule, ARL117279-117281.  This finding was the ultimate basis for the listing.  In effect, the Service concluded that listing was warranted not because of conditions that would exist 45 years into the future but because of an assumption that the "worrisome" trends would continue unabated to an indefinite time, well beyond the "foreseeable future."  This was a fatal flaw.  By looking beyond the statutory horizon of 45 years, the Service exceeded its authority in violation of section 4 of the ESA.

By the terms of the Act, defining a threatened or endangered species, once the Service determined that the polar bear habitat would decline by 10-22% over the next 45 years, the Service was required to decide if that condition constituted a likely risk of endangerment.  That is, the Service had to decide if a 10-22% decline in habitat or population was sufficient to maintain a viable polar bear population throughout all or a significant portion of its range.  *See* 16 U.S.C. § 1532(6) & (20).  This the Service did not do.  The Service never defined an at risk habitat or population.  That fact is determinative.  Unless the Service knows when a population is no longer viable, it cannot

determine when a species is likely to become in danger of extinction.  Without that determination neither the public nor a reviewing court can ascertain why the Service concluded the polar bear is threatened at this time.

Instead of making this necessary finding, the Service assumed a trend beyond the "foreseeable future" (*i.e.*, "a steady decline in abundance").  That approach transformed the listing analysis from an objective standard to a subjective standard devoid of any reference to numbers or time.  We are left, then, with the Service's bald conclusion that the polar bear will likely become extinct at some unknown time in the future and therefore the bear must be listed now.  This is arbitrary decisionmaking at its worst.

## CONCLUSION

The California Cattlemen's Association and Congress of Racial Equality have satisfied the requirements for standing and their suit is ripe for review.  On the merits, the listing should be overturned and the decision remanded to the agency.  The listing was arbitrary and capricious and contrary to law.

DATED:  October 20, 2009.

Respectfully submitted,

By     /s/ M. Reed Hopper
   M. REED HOPPER (Pro Hac Vice)
   THEODORE HADZI-ANTICH, D.C. Bar No. 251967
   DAMIEN M. SCHIFF (Pro Hac Vice)
     Pacific Legal Foundation
     3900 Lennane Drive, Suite 200
     Sacramento, California 95834
     Telephone:  (916) 419-7111
     Facsimile:  (916) 419-7747
     mrh@pacificlegal.org; tha@pacificlegal.org;
     dms@pacificlegal.org
   Attorneys for Plaintiff