JOHN J. JACKSON, III (DCBN 432019)
3240 S. I-10 Service Rd. W., Ste. 200
Metairie, LA 70001-6911
T: 504-837-1233
F: 504-837-1145
E: jjw-no@att.net

Attorney for CONSERVATION FORCE et AL.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
)
IN RE POLAR BEAR ENDANGERED          )
SPECIES ACT LISTING AND § 4(d)       )
RULE LITIGATION                      )       Misc. Action No. 08-764 (EGS)
)       MDL Docket No. 1993
)
—————————————————————)
)
)
This Document Relates To:            )
CONSERVATION FORCE et al. v.         )
KEMPTHORNE et al., No. 09-245 (EGS)  )
)
—————————————————————)

**MOTION AND SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES BY CONSERVATION FORCE; INUVIALUIT GAME COUNCIL; ARVIAT HUNTERS AND TRAPPERS ORGANIZATION; RESOLUTE BAY HUNTERS AND TRAPPERS ORGANIZATION; LOUIE NIGIYOK D/B/A/ ARCTIC HILLS TOUR COMPANY; NANUK OUTFITTING, LTD.; CANADA NORTH OUTFITTING, INC.; AMERI-CANA EXPEDITIONS, INC.; WEBB OUTFITTING NUNAVUT, LTD.; HENIK LAKE ADVENTURES, LTD.; AND JOSEPH VERNI D/B/A/ NATURA SPORT ET. AL. IN SUPPORT OF THEIR AND THE JOINT MOTION FOR SUMMARY JUDGMENT IN THE LISTING CASE**

## MOTION

Plaintiffs Conservation Force, et. al., move for summary judgment on all counts of their complaint, which challenges the U.S. Fish and Wildlife Service's listing of the polar bear as threatened throughout its worldwide range.  This motion is supported by the memorandum below, and the Joint Plaintiffs' memorandum.  For the reasons set forth below, this Court should vacate the listing Rule and remand it back to the Fish and Wildlife Service.

## REQUEST OF ORAL ARGUMENT

Conservation Force et. al. request oral argument on their motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

On May 15, 2008, the FWS decided to list the polar bear as threatened throughout its range, despite undisputed evidence that many populations of bear are healthy and increasing. The listing positioned the administrative needs of the FWS before the welfare of the polar bear in Canada. Although the listing grants FWS some power to assist the conservation and recovery of the bear in Alaska, the listing provides neither research funding nor recovery plans nor inter-agency section 7 consultations for the vast majority of bear, most of which are located in Canada.  This disregard constitutes a failure to interpret and implement FWS's responsibility under the ESA to "take into account" the conservation efforts of foreign nations in making the listing determination.  To "take into account" foreign conservation "efforts" and foreign conservation "practices" requires the FWS to employ all measures to ensure that it allows for the existence of foreign conservation programs when it lists a species because the Act is not and cannot be a substitute for a nation's own program and practices beyond the jurisdictional reach of the FWS. One such measure is the listing of the bear by exclusion of distinct population segments, thereby

conserving the Canadian government's primary tool to continue its conservation efforts.  The FWS was obligated to investigate listing the bear in only part of its range or by DPS, and if it had done so it would have found that listing the Canadian bear was premature and contrary to the intention of the Endangered Species Act.

This brief supplements arguments already set forth in the Joint Plaintiffs Brief.  It addresses 1) the FWS's failure to properly apply and construe its threshold obligation to "take into account" foreign nations' conservation programs and practices, 2) the FWS's failure, as a part of allowing for foreign nations' programs, to consider listing the bear in only part of its range and/or in Distinct Population Segments, 3) the FWS's failure to respond to Conservation Force's "substantive" or "significant" comments and 4) the prematurity of listing the bear, especially the Canadian bear, at this time.  For the reasons demonstrated in this and all Joint Briefs in this action, this Court should find that the listing was arbitrary and capricious and otherwise contrary to law, vacate the decision and remand it to the FWS for further consideration.

## Background

a.  Conservation Force, Inuvialuit Game Council, et. al.

Conservation Force represents not only itself, but many of the people most directly impacted by the FWS's decision to list the polar bear.  Among those represented by Conservation Force are the Inuvialuit Game Council, which is charged by treaty with the management of the bear in the entire western Arctic.  Also represented by Conservation Force are the Arviat Hunters and Trappers Organization, Resolute Bay Hunters and Trappers Organization, Louie Nigiyok d/b/a Arctic Hills Tour Company, Nanuk Outfitting, Ltd., Canada North Outfitting, Inc., Ameri-cana expeditions, Inc., Webb Outfitting Nunavut, Ltd., Henik Lake Adventures, Ltd., and Joseph

Verni d/b/a/ Natura Sport, and a number of individuals who have trophies trapped in Canada by the listing in.  Conservation Force was primarily formed to better direct hunting to be an even greater force for conservation, particularly conservation of the polar bear.  Its many constituent hunters represent a vital force in the conservation of the polar bear, because they provide such a high proportion of the funding that supports polar bear conservation and research.  The above named Plaintiffs are genuine stakeholders in the Canadian bear conservation program.  Together they represent the interests of the Inuvialuit in wildlife conservation, the individuals who guide sport hunters in the arctic, and others who are involved in the sport-hunting industry that is so vital to sustaining the economies of northern communities and providing the primary funding and incentives for polar bear conservation.  All of the plaintiffs suffered direct economic losses due to the polar bear listing.  U.S. trophy imports were the single largest source of revenue to many and gave the bear its highest value as a renewable resource.

b.  Facts

Plaintiffs Conservation Force adopts and relies upon the Statement of Facts in the Joint Plaintiffs' Brief.

c.  ESA Statutory Framework

A listing of "threatened" under the Endangered Species Act may be undertaken if the FWS considers certain specified factors.  Those factors are

> (A)      the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B)      overutilization for commercial, recreational, scientific, or educational purposes;
> (C)      disease or predation;
> (D)      the inadequacy of existing regulatory mechanisms; or
> (E)      other natural or manmade factors affecting its continued existence.  16 U.S.C. 1533(a)(1) ("Determination of Endangered Species and Threatened Species").

The ESA makes absolutely explicit that a Secretary may ONLY list a species based on these

criteria

> solely on the basis of the best scientific and commercial data available to him
> after conducting a review of the status of the species and <u>after taking</u>
> <u>into account</u> those efforts, if any, being made by any State or
> foreign nation, or any political subdivision of a State or foreign nation,
> to protect such species, whether by predator control, protection
> of habitat and food supply, or other conservation practices,
> within any area under its jurisdiction, or on the high seas. 16 U.S.C. 1533(b)(1)(A)
> ("*Basis for Determinations*"). [emphasis added]

This latter consideration becomes particularly vital during listing of foreign species. The ESA

listing criteria were implemented by the Secretaries of Commerce and the Interior at 50 C.F.R.

424.11, entitled "Factors for listing, delisting, or reclassifying species". The construction of the

implementing regulations track the statutory structure. In those regulations, "taking into

account" is listed as an independent criterion that must be considered *before* any species is listed,

delisted or reclassified. It is a mandatory not a discretionary obligation.

## Standard of Review

Section 706(2)(a) of the Administrative Procedure Act provides that a court sitting in

review of an agency action must "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." When a plaintiff has brought a claim alleging arbitrary or capricious

action by an agency that agency must prove it "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action." FCC v. Fox TV Stations, Inc., 129 S. Ct. 1800, 1810

(2009). The scope of review is, however, narrow and courts have been admonished not to

"substitute its judgment for that of the agency" and told to "uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned". Id. The reviewing court is nevertheless required to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). An agency has generally been arbitrary and capricious when it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

## Argument

i. Failure to Comply with Section 4 Listing Standards

It is Conservation Force et. al.'s contention that the FWS "relied on factors which Congress had not intended it to consider", "entirely failed to consider an important aspect of the problem" and "offered an explanation for its decision that runs counter to the evidence before the agency". The Joint Plaintiffs' points and authorities in support of their motion for summary judgment has made clear that the FWS has listed the bear without using the best available science, using a "forseeable future" that is not realistically forseeable, and disregarding a mandatory listing criterion. The listing is based on predictions of events more than 45 years in the future which rely on two premises: 1) the polar bear's habitat consists primarily of permanent and seasonal sea ice and 2) global warming will is projected to melt some of this ice and endanger this environmentally sensitive species. Proposed Rule (ARL053565; ARL053573-74). The difficulty with basing a listing on a large environmental phenomenon is obvious – neither the FWS nor any other human institution has the capacity to delay or eliminate climate change.

By its own admission, the FWS cannot avert the recession of sea ice, and the ESA "will not prevent sea ice loss". Press Release, (ARL117187-93). Moreover, the loss of ice and degree of impact on the bear is simply not quantifiable 45 years in advance.

By listing the bear in contravention of the requirements of section 4, the FWS has damaged those who actually have the responsibility for managing the bear on a daily basis, and thereby damaged the bear. In the words of a representative of the Environmental Ministry for the Territory of Nunavut,

> Nunavummiut (the people of Nunavut) support the reduction of green house gasses, and we are very much aware that the climate has generally warmed in most areas of the north over the past 15 years. However, we disagree that it is acceptable to use a species – and to distort the purposes of important legislation – to achieve a political goal. Even when we agree with the goal

> The status of polar bears should depend on how polar bears are doing, and not be based on the need for a "poster species" for a good cause. Polar bears may be an icon to some southern activists, but they are a part of our Inuit culture and our northern traditional economy. (ARL123503)

The FWS claims to have listed the bear because the listing would "subsequently lead to the development of a recovery plan", promote "conservation actions by Federal, State, and local individuals", and enable the FWS to "grant funds to the State of Alaska for management actions promoting the conservation of the polar bear." Proposed Rule, (ARL053599). The FWS fails utterly to mention that "most of the key conservation provisions of the ESA do not apply to foreign species." *Draft policy for enhancement-of-survival permits for foreign species listed under the Endangered Species Act*, 68 Fed. Reg. 49512 (Aug. 18, 2003). As Conservation Force stated at paragraph 55 of its complaint and in its comments, "in the case of foreign species, the ESA does not provide the same level or kind of benefits it does for domestic species within U.S. jurisdiction, i.e. no critical habitat designation ( 16 U.S.C. 1538, 1539), no habitat conservation

mechanisms, (16 U.S.C. 1534(2003)), no cooperative mitigation programs, no recovery planning, (16 U.S.C. 1533(f)(2003)), no funding, (16 U.S.C. 1535(d)(2003)), or most Section 7 consultations and Section 6 grant-in-aid programs".  In fact, the FWS has admitted that a foreign species "listing under the ESA may provide few, if any, additional benefits and may complicate the implementation of conservation initiatives under other international authorities, such as CITES." *Id.*[1]  For this reason "priorities for listing and delisting must by necessity <u>take into account</u> the conservation programs of other countries." *Final Listing Priority Guidance for Fiscal Years 1998 and 1999*, 63 Fed. Reg. 25502, 25510 (May 8, 1998), [emphasis added].  The FWS did complete this requirement before listing the polar bear.

ii.  Taking into Account

The Joint Plaintiffs' Memorandum of Points and Authorities addresses the Service's failure to accurately address or define the requirement to "take into account" foreign programs in their Final Rule.  This "taking into account" mandate is absolutely essential because ESA offers no benefits to foreign listed species and, in this case, harms two thirds of the species by depriving Canada of the sport-harvest revenue and incentive it needs to conserve polar bear population levels.  Before listing the polar bear, the FWS was required to take into account the conservation programs established by Canada and its territories and it was required explain its conclusions in light of that duty.  The FWS has done neither.

iii.  Meaning of "Taking into account"

Before determining the degree of the FWS's malfeasance, it is important to establish the meaning of "taking into account" foreign programs.  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language

---

[1]     The negative impact of the listing is reflected in the content of "substantive" comments to the Service.  Of 99 that were deemed to provide new information or questions, 50 opposed the listing, while only 38 supported it.

accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2347 (2009). According to the *American Heritage Dictionary*, to "take into account" means "to take into consideration; to allow for". Houghton Mifflin (4th Edition 2000). It is obvious and indisputable that Congress intended the FWS to consider and allow for the existence of foreign conservation programs. The breadth of this requirement is made evident by statutory construction and Congressional guidance.

It is an established principle that when construing a statute, a court should "give effect, if possible, to every clause and word of a statute". *Moskal v. United States*, 498 U.S. 103, 109 (1990). Though on its face "taking into account" could simply require that the FWS consider the existence and efficacy of foreign programs, that limited consideration is already required by listing factor D, which mandates an investigation into possible "inadequacy of regulatory mechanisms". The final rule consequently discussed factor D. In order to make a determination about the adequacy of Canada's programs, the FWS assessed the Canadian program and found that "existing regulatory mechanisms at the national and international level are adequate to address actual and potential threats to polar bears from direct take, disturbance by humans, and incidental or harassment take". Final Rule, (ARL117292). The fact that this issue of efficacy or adequacy was directly addressed by Congress in the Act can be taken as a statement of Congressional intent that "taking into account" be given a broader interpretation, because to give it that narrow interpretation would render the statute ineffectual and meaningless.

The House clearly elucidated its intent when it explained that

> the section requires the Secretary to give full consideration to efforts being currently made by any foreign country to protect fish or wildlife species within that country, in making a determination as to whether or not those species are endangered or threatened. There is provided ample authority and direction to the Secretary to consider the efforts of such countries in encouraging the maintenance of stocks of animals for purposes such as

trophy hunting.  *Id* at 150.

This explanation represents a consensus on the utility of conservation trophy hunting and a direct

link between the FWS's duty to "take into account" and their obligation to support the use of

trophy hunting to pursue conservation goals.  There is substantial evidence supporting the

proposition that the framers of the Endangered Species Act intended it to include the

preservation of foreign programs both because they have trade benefits for the nation responsible

for the species and because they afford the United States a greater degree of influence over the

actions of foreign nations. The father of the ESA and of the two acts which preceded it,

Congressman Dingell, explained that the Act had therefore

> been carefully drafted to encourage . . . foreign governments to develop healthy stocks of
> animals occurring naturally within their borders.  If these animals are considered valuable
> as trophy animals . . . they should be regarded as a potential source of revenue to the
> managing agency and they should be encouraged to develop to the maximum extent
> compatible with the ecosystem upon which they depend.  (ARL152657)

This statement was made with trophy hunting in mind.  By developing stocks for sport harvest –

a task at which Canada has proven exemplary – a nation exploits a natural resource but also

subjects itself more closely to the influence of other countries because it will almost inevitably

depend on foreign trophy hunters for revenue.

In order to use what influence it does possess, Congress intended that the US Government

cooperate with the international community in establishing a system by which international

consensus regarding endangered or threatened species could be brought to bear on any

noncompliant nation, primarily through trade.  They noted that

> Restrictions upon the otherwise unfettered trade in these plants and animals are a
> significant weapon in the arsenal of those who are interested in the protection of these
> species.  The recent international convention on International Trade in Endangered
> Species of Wild Fauna and Flora was directed primarily at this problem: most of the
> provisions of H.R. 37 [The Endangered Species Act of 1973] are also designed to deal

with this problem in one way or another. U.S. House. Committee on Commerce. *Endangered Species Act of 1973.* 93 H. Rept. 412 (1973). *Available at* http://training.fws.gov/EC/Resources/Advanced_Sec_7/ESA_Section_7_Legislative_History/CONTENTS.pdf (last visited 9/24/09).

The bill was therefore designed to allow the Secretary the authority to tailor his treatment of international endangered species to the needs of those responsible for its conservation. The legislative history of this Act makes clear, in short, that it intended to use trade to manage the actions of foreign individuals and nations, and to encourage the conservation of foreign species through any native program that proves functional and positive for the species.

When the kangaroo was listed, there were also difficulties facing the FWS in attempting to protect the species.  The judge noted that "application of the ESA to the kangaroo is necessarily collateral in nature, and the wellbeing of the species can only be ensured by the government of Australia." *Defenders of Wildlife v. Watt*, 1981 U.S. Dist. LEXIS 18548 (D.D.C. 1981).  .  Moreover, he acknowledged that "while [the FWS] have some resources at their disposal (e.g. import restrictions) to effectuate the ESA, the effectiveness of these resources depends on [the FWS's] ability to encourage Australia to protect the kangaroo." *Id*.  The FWS was not satisfied with Australian efforts even after the listing, and they enacted a ban on the import of kangaroo products and parts.  Offers to revoke the import ban were a central part of the negotiations between the parties. *Watt*, 1981 U.S. Dist. LEXIS 18548 at 4.  The US expressly used international trade to apply quid-pro-quo pressure to persuade the Australian Government into complying with American conservation standards.

The ESA defines "conservation" as "using all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Chapter are no longer necessary."  16 U.S.C. 1532(2).  The

ESA was designed as a flexible tool, established because Congressman Dingell felt that "present laws need to be made more flexible, to adapt themselves to the needs of the animals themselves". Generally speaking, the FWS does not impose an import ban on foreign species listed as "threatened".  Endangered Species Act §9(c)(2).  Yet it did so in the case of Australia to achieve a specific purpose. It met the imperative that "*all* methods and procedures" must be used to conserve or recover a species.  In order to truly "take into account" or allow for foreign conservation programs, the FWS must entertain all possible methods for achieving its conservation goals without compromising foreign conservation efforts.

iv.  Distinct Population Segments and Range

Two methods of distinguishing among bear populations which were raised repeatedly during the listing process, but which was dismissed as inconvenient by the FWS, are the designation of Distinct Population Segments and the listing of a species through only part of its range.  The FWS acknowledges distinct populations of polar bears.  In its proposed rule, it stated that the bears exist in "19 relatively discrete populations" that are based on "behavioral and ecological factors . . . developed from decades of intensive scientific study" and that "correspondence between genetic data and movement data reinforces current population designations".  Proposed Rule, (ARL053570).  The FWS concluded in the Proposed Rule that "while the polar bear can be delineated into 19 populations, and population specific interaction of various listing factors may affect these populations at different levels or rates", they did not feel it necessary to investigate the option of listing distinct populations because all bears would ultimately be affected by sea ice loss (though not necessarily within 45 years). Proposed Rule, (ARL053573).  The FWS also felt that its practical and fiscal considerations outweighed the interests of the Canadian bears.  In

their Proposed Rule they said that "[a] delay in the proceeding would result in significant expenditures of fiscal and other resources to collect additional data and conduct analyses. As such, we have (FWS) determined that proceeding with the listing of the polar bear (including all populations in Canada) at this time is a responsible use of our fiscal and other resources . . ." (ARL053598).

The FWS's preference for listing entire species rather than distinguishing among populations at risk and healthy populations is not new. One possible way of distinguishing among healthy and at risk populations is to divide the populations based on portions of the species' total range. In 1982, Congress conducted oversight hearings of the Endangered Species Act, and the Committee on Environment and Public Works raised the concern that "the Secretary has listed some foreign species as endangered throughout their entire range without considering whether their population status varies from country to country." Their instructions regarding this tendency were that

> there may be nations where a combination of a healthy population and effective management programs permit sport hunting of such species without adversely affecting its status. The failure to recognize this may result in the foreign nations being denied much – needed revenues derived from license fees that are used to fund their wildlife conservation and management programs.

> If the Secretary is in receipt of biological information from a foreign nation with respect to a resident game species listed as "endangered", he should evaluate the status of such species within the country in question. The evaluation should consider the effectiveness of management programs . . . and whether these programs permit sport hunting of a listed species in nations where it otherwise might be detrimental to the species. The evaluation should also determine whether the specific country in question has a management program for the species, whether the species population can sustain a sport hunting harvest, and whether the sport hunting enhances the survival of the species. If the Secretary determines that sport hunting in such a country will assist in the conservation of a listed species, he should issue appropriate regulations to facilitate the import of sport-hunted trophies of such specimens. The above-mentioned <u>criteria</u> should be <u>taken into account</u> in future listings of game species as well. U.S. Senate. Committee on Environment and Public Works. *Endangered Species Act Amendments of 1982.* 97 S.

Rept. 418. *Available at*
http://training.fws.gov/EC/Resources/Advanced_Sec_7/ESA_Section_7_Legislative_Hist
ory/CONTENTS.pdf [emphasis added].

Congressional guidance draws a direct link between the FWS's obligation to "take into account"
foreign programs and its obligation to consider portions of a species' range or distinct
populations separately if failing to do so might compromise a foreign nation's conservation
efforts and thereby compromise a species.  The issue of whether to list a species by considering
sections of its "range" is discussed at length in Safari Club International's supplemental brief,
and Conservation Force joins in that argument.  The FWS's obligation to address the possibility
of Distinct Population Segments for purposes of listing is addressed below.


        i.     Distinct Population Segments

In 1996, the FWS published guidelines for the establishment of Distinct Population
Segments in Vertebrates.  61 Fed. Reg. 4722 (February 7, 1996).  That policy establishes 3
criteria that a species must meet in order to be designated as a "distinct population segment".
Those criteria are "discreteness of population in relation to the remainder of the species to which
it belongs"; "significance of the population to the species to which it belongs"; and "conservation
status in relation to the Act's standards for listing".  *Id*. at 4726.

In order to be a discrete a population must fall within one of two classifications: 1) it
must be "markedly separated" from other populations for physiological, physical or behavioral
reasons or 2) it must be "delimited by international governmental boundaries within which
differences in control of exploitation, management of habitat . . . or regulatory mechanisms
exist" that are significant to listing factor D.  *Id*.  The polar bear meets both of these criteria.  The

best evidence on polar bear populations establishes that all but 4 of the world's 19 polar bear populations meet the behavioral and genetic criteria necessary to be designated as Management Units (MUs) or distinct populations of the sort envisioned by the DPS policy.  Paetkau, Amstrup et. al. *Genetic Structure of the World's polar bear populations*, (ARL155964).  They are therefore genetically, behaviorally and physically "discrete".  Polar bear management is also acknowledged as "delimited by international governmental boundaries" by the FWS's evaluation of Factor D in the Final Rule.  Its analysis is separated into national management practices by Alaska, Denmark/Greenland, Russia, Norway and Canada, and it acknowledges those management programs as distinct.  It establishes that there are 13 Canadian polar bear populations, that they occur in Inuit managed territories, and that they are managed using agreements among the communities, territories and federal government.  (ARL117289).  The polar bear is therefore also discrete according to the second aspect of "discreteness" evaluation.

The next question is whether individual populations of bear are "significant".  There are a number of considerations, including persistence of a population in an unusual ecological setting and whether loss of the population might leave a gap in the range of the species, but the FWS was expressly granted a great deal of discretion to establish the "significance" of a population. *Discrete Population Segments*, 61 Fed. Reg. at 4780.  The polar bear certainly meets one of those criteria – the ranges of individual populations cover hundreds of miles, and the disappearance of one population would certainly leave a large gap in the total range of the species. *Proposed Rule,* (ARL053571).  The significance of the bear is also demonstrated by the reasons for the listing itself.  Despite the fact that the majority of polar bear are thriving, the possible decline of two populations, Western Hudson Bay and Southern Beaufort Sea, has triggered the listing of the entire species. *Final Rule,* (ARL117271).  This "significance" factor also provides the Secretary

with the discretion to consider the utility of listing in light of the Endangered Species Act's limited benefits to foreign species.  As the FWS itself has said "it appears to be reasonable for national legislation, which has its principal effects on a national scale, to recognize units delimited by international boundaries when these coincide with differences in the management, status, or exploitation of a species."  61 Fed. Reg.  at 4726.  The FWS has ascribed incredible import to individual polar bear populations, and it is therefore appropriate to deem them "significant".  The FWS's listing which has obstructed Canada's program demonstrates the importance of treating individual polar bear populations as distinct.

There is precedent for the FWS treating different Canadian bear populations as distinct and individually manageable, and that precedent provides a perfect example of how trophy trade in Canadian polar bears allowed the U.S. to influence polar bear management in Canada before the FWS decided to abandon that influence.[2]  In 2006, there was some concern that the Western Hudson Bay population of polar bear might be declining and much criticism of the territory of Nunavut for their use of Traditional Ecological Knowledge (TEK) to increase polar bear quotas. In response, the FWS proposed a rule to disallow the importation of hunting trophies in the Western Hudson Bay population.  The Memorandum sent from the Acting Assistant Director for international affairs to the Director of the FWS perfectly illuminates how useful trophy trade can be in influencing foreign governments responsible for the polar bear.  He states quite plainly that "the proposed rule to close the Western Hudson Bay population will be designed to influence Nunavut as they continue to develop their new polar bear management program and encourage an acceptable common middle ground that will meet the requirements of our respective domestic laws."  (ARL022574).  He states furthermore that "the hope is that the proposed [rule revoking

---

[2]      Since 1994 the FWS has been treating the Canadian management units as distinct insofar as it has approved or deferred trophy imports from each separately.

Western Hudson Bay as an acceptable trophy hunting population] will convince the new

government to modify its management in line with the recommendations of the (IUCN) PBSG."

(ARL022575).  The Inuvialuit subsequently altered their quotas to accommodate western

science.  This memorandum also reveals that the American attempt to influence Nunavut through

trophy trade was the FWS's best method of doing so, in the face of enormous public interest and

pressure.  *Id.*  By listing the polar bear, the FWS abandoned their ability to influence Canadian

practices.

The same IUCN Polar Bear Specialist Group, though it concurs completely with the

FWS's scientific analysis of the status of the bear, maintains that

> there are only a few populations of the 19 populations of polar bears worldwide, where
> excessive harvest issues need to be addressed.  In populations where polar bear numbers
> are substantive and where sustainable harvest could be maintained, it would assist
> management and meet the intention of the International Agreement if the finding under
> the Endangered Species Act could permit continued harvest, including sport hunting by
> U.S. citizens, and importation of sport-harvested animals into the US.  The economic
> importance of this species to northern communities is fundamental to the long-term
> management of these populations.  (ARL061818)

At every turn the FWS has rejected the exhortations for consideration by those who live beside

the polar bear and are responsible for managing its welfare in favor of animal rights and

environmental activists who do not offer an alternative management program.  Yet even these

groups acknowledge that the polar bear exists in different populations that are managed

separately.

In their petition to list the polar bear, the Center for Biological Diversity (CBD)

explained the argument for distinct population segments in polar bears quite succinctly.  They

noted that

> Scientists . . . recognize twenty polar bear populations, each of which meets the criteria
> for designation as a distinct population segment under the ESA and FWS's "Policy

> Regarding the Reognition of Distinct Vertebrate Population Segments under the Endangered Species Act" [citation omitted].  Additionally and alternatively, four polar bear population "clusters" have been described based on genetic analyses, and each of these four populations also qualifies as a distinct population segment.  As such each of the 20 separate polar bear populations and, alternatively, each population cluster constitutes a "species" under the ESA.  (ARL006138)

This argument in the petition to list, and the CBD's request that the FWS "evaluate whether each of the 20 polar bear populations qualifies as a distinct population segment", ensured that the FWS was compelled to respond to the issue of distinct population segments.  They refused.

The FWS's proposed rule neglected the DPS issue completely, proving that just as it was unwilling to consider a listing's destructive impact on Canada's management program, it was likewise unwilling to consider even *whether* individual populations were managed differently and how that management might impact the propriety of a listing.  Although the FWS stated in a meeting of polar bear range nations that it "reviewed all available information on the population ecology and characteristics of polar bears, habitat characteristics, status of each of the world's 19 polar bear populations, and potential threats," (ARL077042), they claimed in the Proposed Rule that "we have not considered the petitioners' alternative of assessing whether listing of particular distinct population segments is warranted."  *12 Month Petition Finding and Proposed Rule to List the Polar Bear as Threatened Throughout its Range.* 72 Fed. Reg. 1064 (Jan. 9, 2007).  Such inconsistency and obfuscation cannot be tolerated.

The FWS and parties who supported *and* opposed the listing all agree that there are at least 19 polar bear populations.  Those populations meet the criteria for "discreteness" and "significance" as set forth in the FWS's policy on designating Distinct Population Segments. Both the 1982 congressional guidance instructing the FWS to avoid listing entire species if they interfere with trophy hunting programs and the original congressional guidance instructing the

FWS to take into account and allow for the existence of sustainable use programs require that the FWS consider listing individual polar bear populations instead of the species as a whole.  Having established that the polar bear is an appropriate candidate for treatment in Distinct Population Segments, it is also evident from the record that the populations in Canada should not be listed because no prediction suggests that they will be endangered in the "near" future, most will not be endangered within the next 45 years, and many have healthy and increasing populations.  Had the FWS adequately taken into account Canada's renowned conservation strategy it would have treated the management units as DPSs.


v.   Prematurity of Listing/Health of Canadian Bear

The listing of the polar bear is a controversial choice, because even the individuals who petitioned for the listing acknowledge that "most populations are currently reasonably healthy and the global population is not presently endangered".  (ARL120698).   The listing was demonstrably premature, especially for the bears of the Canadian Archipelago.  The decreases in the Western Hudson Bay and Southern Beaufort Sea are less than one fraction of once percent of the world's total polar bear population, and the loss has been offset by population increases elsewhere in Canada.  Although the FWS relied heavily on a relatively small decline in the Western Hudson Bay population of bear, much of their prediction that polar bears will experience a decline over the next 50 years is predicated on analyses of body condition.  Body condition is not, however a conclusive measure of population.  Even the actual decline that has been reported in WHB is misleading.

Experienced arctic researchers, like Dr. Mitchell Taylor head of wildlife for the territory of Nunavut, suggest that the decline in WHB is due to the fact that the area had an exceptional

*increase* during the 1980s and the ecological conditions which allowed for that aberrant increase are merely returning to normal.  Article by Dr. Mitchell Taylor (ARL152912).  In that sense, climate change is having an effect on the WHB bears, but of the 12 other populations in Canada, 11 are stable or increasing.  *Id*.  In fact, the Davis Strait population of polar bears has increased from an estimated population of 900 in the late 1970s to 2379 in 2006.  Government of Nunavut report, (ARL061379).  This population is significant not only because it is one of the most southern populations, but also because it has no summer sea ice, indicating that the FWS's assumption that bears will not adapt to sea ice loss is deeply flawed.  The north American wildlife authorities have an "active inter-jurisdictional research and polar bear management system that can detect declines from any cause within one polar bear generation".  (defined as 12 years in Canada)  *Id.*  Excluding the WHB and Southern Beaufort Sea populations, even the IPCC climate models predict that the bears of the Canadian Archipelago, currently about 11 or 12 thousand individuals, will have summer sea ice for at least the next 50 years.  (ARL061379).  That range and the distinct populations segments would not have been listed had the conservation of the bear and Canada's Conservation programs been adequately taken into account.

The Endangered Species Act defines endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range" and it defines a threatened species as "any species which is likely to become an endangered species within the foreseeable future".  16 U.S.C. 1532(6), (20).  The aforementioned assessments by those who actually live with and manage the bear establish that even if both populations that may be "declining" completely disappeared, the polar bear would be in robust health and occupy the vast majority of their historic range.  This listing was undertaken by groups seeking to use the polar bear as a

climate change "poster species". When a highly respected member of the Canadian management and research authority says "it is just silly to predict the demise of polar bears . . . based on media-assisted hysteria" one can no longer question the assertion that this listing was seriously premature. Taylor Article, (ARL152912).

vi. Failure to Respond to Significant Comments

Under 5 U.S.C. 553, the FWS must respond to "those comments which, if true, would require a change in the proposed rule." *Am. Mining. Cong. V. United States EPA*, 907 F.2d 1179 (D.C. Cir. 1990). In determining which comments qualify for such treatment, courts apply a "common sense rule", requiring responses only to those comments which are "sufficiently central" to the basis of the listing to make a failure to address them arbitrary and capricious. *ACLU v. FCC*, 823 F.2d 1554, 1581 (D.C.Cir. 1987). In listing the polar bear, the FWS failed to respond meaningfully to many comments which, if true, would have required a change in the proposed rule. Conservation Force raised the following concerns which have not been adequately addressed:

1. Conservation Force raised the issue that "sun spot cycles are a primary, not a secondary climate factor. We are 'currently entering sunspot cycle 24 and cycle 25 is predicted to be very low (cold)." Conservation Force Letter 4/5/2007, (ARL152655) The FWS has failed to address this reliable force for weather prediction and how its 11 year interruption of arctic warming might affect the polar bear.

2. The FWS failed to respond to the fact that the IPCC did not include the dynamics of solar irradiation in their climate models allegedly "because they were not in the literature to meet the deadline", when substantial work by Drs. Svensmark and Christiansen preceded the deadline. Report by Dr. Timothy Ball (*citing* E. Friis-Christiansen, 1997, Variation of

Cosmic Ray Flux and Global Cloud Coverage – a Missing Link in Solar-Climate

Relationships, *Journal of Atmospheric and Solar-terrestrial Physics*, Vol. 59, pp. 1225-

32).

3.   The Western Hudson Bay bear population's decline is less than one tenth of one percent

of the world population of polar bear and the alleged decline was greatly offset by

increases of thousands of bear in other areas south of Davis Strait and the Gulf of Boothia

during the same 17-year period.  The decline itself is questioned because "the 1987

survey showed a record high level after years of increasing" and the more recent survey

"did not include the entire summer retreat area used by the subpopulation in the open

water season, so it in fact missed part of the bear's known range and population."  Letter

from Conservation Force 4/5/2007, (ARL152660).  The FWS failed to explain why it

relied so heavily on WHB in light of these issues.

4.   The FWS did not use objectively reviewed data.  Instead the Secretary ordered that the

USGS develop reports for "USGS Science Strategy to Support U.S. Fish and Wildlife

Service Polar Bear Listing Decision".  *See*, e.g. USGS Reports for Southern Hudson Bay

(ARL082378).  FWS has not addressed why they did this and how biased data may have

affected their conclusions.

5.   The FWS found that the bear would be "impacted" by the recession of sea ice but did not

specify the degree of impact or the nature of the potential impact on all of the bear.

Conservation Force submitted comments to the effect that it was impossible to quantify

the degree of impact on the bear 45 or 50 years in advance.  (*See*, Plaintiffs' Complaint

pg. 206,207, 224)

6.   The FWS failed to address the fact that the decline in Western Hudson Bay "began in the

1980's during a particularly cold period" and explain why this decline is attributable to global warming.  Letter from Conservation Force 4/5/2007, (ARL152661).

7.  The FWS did not address why the bear "survived the warm temperatures prior to the Little Ice Age and the hot Arctic air temperatures in the 1920-1940 period.  Both were hotter than the present."  Letter by Conservation Force, 4/5/2007 (ARL152666).

8.  The FWS concluded in USGS reports that "if conditions over the past 2001-2005 remained constant they would lead to a nearly stationary population in Southern Beaufort Sea", and found "no correlation between demographic changes and ice melt".  Conservation Force questioned why the FWS relied so heavily on the SB population in its listing in light of this information.  (Plaintiffs' Complaint pg. 235)

9.   The FWS failed to respond to comments pointing out that even in the worst and most exaggerated negative projections, the very northernmost Arctic region will become better polar bear and prey habitat."  Letter From Conservation Force, 4/5/2007 (ARL152658).

The FWS did not respond to any of these concerns, and considering that "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public", the listing should be remanded for consideration in light of the concerns the FWS failed to address. *FCC v. Fox TV Stations, Inc.,* 129 S. Ct. 1800, 1837 (2009)(Breyer, J.).

vii. Standing

Plaintiffs Conservation Force adopt the standing section set forth in the Joint Plaintiffs' Brief. The requirements for standing under the ESA are less demanding than those under the APA, so Conservation Force will establish standing for both by conducting an APA analysis.  In order to have standing under the APA, a plaintiff must satisfy "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise".  *Warth v. Seldin*, 422 U.S. 490, 498

(1975).   To meet constitutional standards, a plaintiff must establish that he has suffered "'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561(1992).   To satisfy prudential requirements, the plaintiff's "grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit".   *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

Plaintiff Conservation Force represents both the Inuvialuit who co-manage the polar bears in Canada and the outfitters who make their living from tourist hunters north.   They have all lost their largest source of revenue.   Fred Webb, one of the outfitters represented by Conservation Force says American Hunters are nearly 100% of his business, and notes that the same problem affects Inuvialuit communities who guide polar bear hunts.   Outdoor Hunting Canada Article,  (ARL153192).   Furthermore, he notes that he will not be able to replace his American customers, and "anybody who says you can replace the Americans with Canadians or Europeans or Japanese or Saudis is whistling up their ass." *Id.*[3]   The plaintiff American hunters took bear before the listing and have been unable to bring them into the country because the listing was so immediate and skipped the usual 30 day notice and waiting period.   The polar bear listing triggered a clause in the MMPA, which automatically stopped imports of polar bear hunting trophies from Canada into the United States, disturbing conservation efforts.   In this instance, because the plaintiffs' livelihoods and property are the object of the regulations that are impeding the conservation efforts , there is "little question that [defendants'] action or inaction has caused [plaintiffs] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561.

---

[3]        The bear are still taken by resident hunters and harvest quotas therefore remain the same.

viii.    Relief

A formal order suspending the prohibition of the import of Canadian polar bear trophies should accompany the order from this Court vacating the invalid listing of the polar bear as a threatened species.   As a matter of law, the vacating of the listing suspends the prohibition. Subsequently, the suspension releases the trophies of nineteen individuals who lawfully participated in licensed hunts in areas preapproved by the FWS for trophy importation.

The May 2008 listing by the FWS had an instantaneous reverberating effect all over the world.   In Canada, as of April 2008, the polar bear management program had long been approved by the FWS as "adequate to address actual and potential threats to polar bears from direct take, disturbance by humans, and incidental or harassment take. Final Rule, (ARL117292). Just thirty days later, this long-established program was, in essence, negated as the import of polar bear trophies into the United States was consequently prohibited as a result of the May 2008 listing.   An order by this court vacating the listing should simultaneously end the prohibition of the import of polar bear trophies and allow those that had taken bear in preapproved areas before the listing to import their trophies.

In the alternative, if this Court orders a remand of this matter back to the FWS, the importation of the trophies into the United States should be ordered under the doctrine of promissory estoppel.   In order to succeed on a promissory estoppel claim petitioners must show: (1) the existence of a promise; (2) that the FWS expected petitioners to rely on the promise by taking definite and substantial action or forbearing from such action; (3) actual detrimental reliance by appellants; and (4) that the promise must be enforced to avoid injustice. *Reagan v. Robbins*, 780 F.2d 37 (C.A.D.C.   1985) (citing *Granfield v. Catholic Univ.*, 530 F.2d 1035

(D.C.Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976)).

At the time the U.S. Hunters engaged in the lawful hunting of the polar bear within Canada, they were all promised that they could import the trophies into the United States via the grant of permits for importation by the FWS.  The FWS obviously expected that the petitioners would rely on this promise as the goal of each was to acquire a trophy and import that trophy into the United States.  This is evidenced by their acquiring import permits prior to the participating in the hunt from the approved areas.  Further, each hunter relied on the validity of the importation permits to his or her detriment, as each paid between $30,000.00 and $50,000.00 to participate in the lawful hunt.   Lastly, if  the permits are not enforced, these individuals will not only suffer the injustice by being deprived of their lawfully gained trophies, they will also be penalized at a cost over two million dollars for lawfully and diligently following the FWS's procedures.

## Conclusion

For these and all the reasons enumerated in Plaintiffs' joint and supplemental briefs, this Court should vacate the listing of the polar bear and remand it to the Fish and Wildlife FWS for reconsideration in light of the factors they neglected and science they ignored.


DATED this 20th day of October, 2009,


Respectfully submitted,


_____/s/_____
John J. Jackson, III
3240 S I-10 Service Rd. W, Ste. 200

CONSERVATION FORCE SUPPLEMENTAL BRIEF
08-764

Metairie, LA  70001-6911
Phone: 504-837-1233
Fax: 504-837-1145
Email: jjw-no@att.net
D.C. Bar # 432019