## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION | ) ) ) ) | Misc. Action No. 08-764 (EGS) MDL Docket No. 1993 |
| This Document Relates To: | ) ) ) | |
| *Atcheson et al. vs. Salazar et al.* No. 1:09-CV-00941-EGS | ) ) ) ) | |

### <u>ATCHESON ET AL. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs, Atcheson et al., respectfully move, pursuant to Federal Rule of Civil Procedure 56, for Summary Judgment in this action.  In support of this Motion, Plaintiffs rely on the following Statement of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and the Administrative Record.  Pursuant to rule 7.1(c), a proposed order consistent with this motion is attached.

### <u>REQUEST OF ORAL ARGUMENT</u>

Plaintiffs Atcheson *et al.* request oral argument on their motion.

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ATCHESON ET AL. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**ENHANCEMENT PERMIT SUIT**

## I. Introduction

This action seeks to overturn the US Fish and Wildlife Service's denial of "enhancement" permits to import sport-hunted polar bear trophies from the Gulf of Boothia Polar Bear Management Unit in Canada.  On May 15, 2008 defendants listed the polar bear as "threatened" throughout its range.  This "threatened" listing triggered a clause under the MMPA that classifies all threatened or endangered listed species as "depleted" by operation of law, irrespective of actual population status.  The Service used this legal fiction of depletion to stop trophy imports which had been legalized by amendment to the MMPA in 1994.  Both the listing rule[1] and a contemporaneous solicitor's opinion[2] stated that conservation hunters might be able to use the MMPA's enhancement provision to import their trophies.  However, when plaintiffs submitted these applications for bear taken from the very best population, defendants invented unpublished standards by which to evaluate "enhancement" applications, ignored evidence supporting a finding of "enhancement", and ultimately made an arbitrary and capricious finding that conservation hunting does not "enhance" the survival of the polar bear.  These particular bear were taken from the Gulf of Boothia before the ESA listing.  That population is not projected to lose significant ice or suffer a significant polar bear decline in the foreseeable future.  (*see*

---

[1]     "For a depleted species, under section 101(a)(3)(B) of the MMPA only imports for purposes of scientific research or for the enhancement and survival of the species can be authorized or allowed."  *Special Rule for the Polar Bear*, 72 Fed. Reg. 76249, 76267 (December 16, 2008).

[2]     "Although I conclude that the limiting language of sections 101(a)(3)(B) and 102(b) means that threatened polar bear trophies sport hunted in Canada cannot be imported into the United States under section 104(c)(5), polar bear parts may continue to be imported under one of the exceptions listed in sections 101(a)(3)(B) and 102(b), provided that all legal standards are met."  (Legal implications Affecting the Importation of Sport-hunted polar bears from Canada Resulting from the Listing of the Polar Bear as a Threatened Species under the Endangered Species Act, AR333).

Freeman, Milton and Taylor, Mitchell, Gulf of Boothia Polar Bear Population, AR472)  This

court should therefore grant plaintiffs' permits forthwith or, in the alternative, remand this action

to the agency for further consideration in light of Congressional direction and their own

regulations.

## II. Statutory Framework

    **a.** Marine Mammal Protection Act, 16 U.S.C. 1361 et. seq. ("MMPA")

When the FWS listed the polar bear as "threatened" it was categorized as "depleted"

under the MMPA by operation of law.  Defendants maintain that because the bear is now

categorized as "depleted", the polar bear trophy importation reforms enacted in 1994 no longer

apply.  Although in the case of Gulf of Boothia polar bears "depletion" is a legal fiction, hunters

were left with the necessity of obtaining an "enhancement" permit to import their lawfully

acquired property.  Enhancement permits are provided for in section 104(c)(4)(A) of the MMPA,

which reads that:

> A permit may be issued for enhancing the survival or recovery of a species or stock only
> with respect to a species or stock for which the Secretary, after consultations with the
> marine mammal commission and after notice and opportunity for public comment, has
> first determined that –
>
> 1. Taking or importation is likely to contribute significantly to *maintaining*
>    or increasing distribution or numbers necessary to ensure the survival or
>    recovery of the species or stock; and
>
> 2. Taking or importation is consistent (I) with any conservation plan adopted
>    by the Secretary under section 115(b) of this title or any recovery plan
>    developed under section 4(f) of the Endangered Species Act of 1973 for
>    the species or stock, or *if there is no conservation or recovery plan in
>    place, with the Secretary's evaluation of actions required to enhance the
>    survival or recovery of the species or stock in light of the factors that
>    would be addressed in a conservation plan or a recovery plan.* [emphasis
>    added]  16 U.S.C. 1374(c)(4)(A).

One requirement for "enhancement" under the MMPA is therefore determined by the definition of "conservation plan". "Conservation" is defined by the MMPA as "collection and application of biological information for the purposes of increasing and maintaining the number of animals within species and populations of marine mammals at their optimum sustainable population." 16 U.S.C. 1362(2). Among the expressly enumerated methods used to achieve conservation goals is "regulated taking". *Id*. Conservation plans are defined in section 115(b)(2) of the MMPA, which is entitled "Conservation Plans: Preparation and Implementation". That section reads:

1. The Secretary shall prepare conservation plans . . .

2. *Each plan shall have the purpose of conserving and restoring the species or stock to its optimum sustainable population. The Secretary shall model such plans on recovery plans required under section 4(f) of the Endangered Species Act of 1973 (16 U.S.C. 1533(f)).* 16 U.S.C. 1385(b)(2).

Conservation Plans under the MMPA and recovery plans under the ESA are thus essentially the same thing and both conservation and recovery plans are created exclusively for domestic species. In evaluating a foreign program that does not have a U.S.-created plan, an agency should look to the criteria contained in section 4(f) of the ESA, which requires that:

The Secretary, in development and implementing recovery plans, shall, to the maximum extent practicable –
(B) incorporate in each plan –
i. *a description of such site-specific management actions as may be necessary to achieve a plan's goal for the conservation and survival of the species;*
ii. *Objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and*
iii. *Estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.* [emphasis added] 16 U.S.C. 1533(f).

**b.** Section 706 of the Administrative Procedures Act (APA)

This is a claim that defendants' decision to deny plaintiffs' enhancement permits was arbitrary and capricious.  The APA authorizes an individual to sue based on "agency action" where he "[suffers] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. §702.  The relevant statute is 5 U.S.C. 551, which defines agency action as "the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act."  *Norton v. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).  Section 706(2) of the APA authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions found to be— . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (B) contrary to constitutional right, power, privilege, or immunity; or (D) without observance of procedure required by law."

Agency Action is generally arbitrary and capricious when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When making any decision, an agency must "examine the relevant data and articulate a satisfactory explanation for its action."  *FCC v. Fox TV Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009).   A court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned".  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

c.  Rulemaking under the Federal Register Act and APA

Plaintiffs also claim that defendants relied on an improperly adopted and noticed rule in violation of the Federal Register Act and APA because the denials of plaintiffs' permit applications cited reasons that do not correspond to existing published law.  The Federal Register Act, found at 44 U.S.C. 1505, states in pertinent part that "there shall be published in the Federal Register – (3) documents or classes of documents that may be required so to be published by Act of Congress."  One of the types of documents Congress requires to be published is a rule promulgated by an executive agency.  The Administrative Procedures Act defines a rule as

> (4) the whole or a part of an agency statement of general or particular applicability  and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

> (5) "rule making" means agency process for formulating, amending, or repealing a rule;

When it enacted the APA, Congress created two different categories of rules that must be published in the federal register.  5 U.S.C. §553 imposes a duty to undertake notice – and – comment procedures when an agency has created a substantive rule –

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law

Under 5 U.S.C. §552, both substantive rules and interpretive and procedural rules must be published, for

   (a) Each agency shall make available to the public information as follows:

      1.  Each agency shall separately state and currently publish in the Federal Register for the guidance of the public –

         a.  Descriptions of its central and field organization and the established places at which, the employees (and in the case of the uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

         b.  Statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

         c.  Rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

         d.  Substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

         e.  Each amendment, revision, or repeal of the foregoing.

Furthermore, §552 ensures that "except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."

### III. Factual Background

#### a. Procedural History

Between April 18, 1999 and May 29, 2005 the individual plaintiffs in this action, Keith Atcheson, Keith Halstead, Ben Hamel, Marcus C. Hansen, Aaron Nielson, Kevin Wieczorek and Dennis Dunn each lawfully hunted a polar bear in the pristine and well managed Gulf of Boothia. The Gulf of Boothia management unit was on the verge of being approved for polar bear trophy imports when the polar bear listing petition was filed. On July 9, 2008, plaintiffs submitted applications for enhancement permits under section 104(c)(4)(A) of the Marine Mammal Protection Act. In those applications, submitted through Conservation Force, plaintiffs included information that detailed the utility of sport hunting as a conservation tool, the importance of sport hunters to the Canadian management program, and the unique status of the Gulf of Boothia population or stock and habitat.

On February 2, 2009, the defendants denied these permits. The denial letter characterized plaintiffs' supporting documents as "provid[ing] an argument that the financial benefits to local communities and native guides from sport hunting provide an incentive for sustainable use, therefore resulting in a reduction of the overall number of bears taken by subsistence hunters and leading to larger populations." (Denial Letter, AR435). Defendants incorrectly based their denial almost entirely on the idea that the applicants had not proven that sport hunting reduces the number of animals taken in a given year and that plaintiffs have therefore not proven that conservation hunting maintains or increases population. Defendants also erroneously maintained

the position that sustainable use hunting, such as conservation hunting, would not be a factor considered in a conservation or recovery plan.  Significantly, defendants wholly disregard the alternative "maintenance" basis for enhancement.

In response to Defendants' denial, plaintiffs submitted a Request for Reconsideration on March 18, 2009.  (AR464)  That request included a clarification of the distinction between maintenance and recovery for purposes of the polar bear, and further explanation of how conservation hunting contributes to the maintenance of the population.  Applicants attached expert explanations of the important benefits of sport hunting to polar bear conservation in Canada prepared by leading Canadian polar bear and cultural scientists.  The reports of Dr. Milton Freeman, project leader of the Circumpolar Institute, and Dr. Mitchell Taylor, member of the IUCN Polar Bear Specialist Group and recently retired leader of polar bear management for the territory of Nunavut, stated that "ignoring the views of local knowledge-holders and removing these economic incentives and will very likely compromise, if not destroy, current conservation programs in northern Canada (where about two-thirds of the global polar bear populations lives), whilst offering no improvement to the status of polar bears locally or globally, at a time when polar bears are currently at their highest population level in recent history." (AR 474)

Despite the overwhelming and uncontradicted evidence presented by the applicants, the defendants denied their Requests for Reconsideration on April 28, 2009.  The denial acknowledged that "the participation of U.S. hunters in Canada's sport-hunting program has generated funds that have provided conservation benefits to polar bear populations and supplied an incentive to Inuit hunters to support sustainable harvest quotas." (AR592).  Nevertheless, ignoring plaintiffs' alternative argument that conservation hunting helps maintain the bear,

Defendants concluded that the applicants "failed to clarify how the trophy importations actually maintain or increase populations and how the imports ameliorate the primary threat to polar bear populations – global warming and sea-ice melt." (AR593)  Defendants also accused the applicants of failing to explain how Canada's polar bear conservation plan is a "conservation plan" for the purposes of the MMPA.  *Id.*

> b.  Unique Nature of the Gulf of Boothia Population/Stock

Polar bear conservation in Canada is the responsibility of 9 different governing jurisdictions – the federal government, five provinces and three territories.  (*see* Expert Letter from Milton Freeman, AR477)  Those jurisdictions contain approximately 60% of the world's polar bears.  *Id*.  Those jurisdictions work together and govern polar bear management through the Polar Bear Administrative Committee.  That committee has voiced concerns that "an ESA listing of polar bears will have unintended implications for the conservation of polar bears in Canada."  *Id*.  This inevitable impact is now materializing because sport harvest of polar bears is unquestionably "an integral part of Canada's polar bear conservation plan".  *Id*.  Indeed a "rapid and significant deterioration in trust and cooperation has occurred since the U.S. finding that polar bears are to be listed as threatened".  (Conservation Hunting Briefing Note by Milton Freeman, AR480).  All of this is particularly applicable to the Gulf of Boothia stock.

The Gulf of Boothia is one of the healthiest populations of bear, and the harvest is sustainable, which made it an ideal test case of Defendants' willingness to re-establish trust.  The harvest at all relevant times was below quota and that management unit is not forecasted to lose significant ice habitat within the next 36 or 45 years.  "The Gulf of Boothia subpopulation of polar bears is estimated to number about 1528 bears . . . and to be increasing in size."  (Expert Comment on Permit Denials by Dr. Milton Freeman, PhD,  AR475).  The population is not in

fact depleted and is not likely to become depleted in the near future.  The Gulf of Boothia has a

limited conservation hunt every year, as determined by the local community, which is permitted

a certain quota for subsistence harvest.  Trophy hunters tend to take large male bears, while

subsistence hunters "tend to be more opportunistic." (Report on the Gulf of Boothia Population

by Dr. Milton Freeman, PhD, AR322). As a population that is growing and/or stable, it is

important to harvest the bears found in the Gulf of Boothia.  When polar bear are maintained

below carrying capacity it results in "individual animals being in better condition, close to or at

maximum rates of productivity, and exhibiting better survival outcomes for all sex, age, and

family status groups." *Id*.  Healthy animals are more able to cope with outside influences like

disease and climate change, and because "hungry animals . . . are more fearless and aggressive"

healthy animals are less of a danger to humans. *Id.*  Those healthy, well maintained animals will

also have little change to their habitat over the next 100 years.  According to the U.S. Geological

Survey, the polar bears of the Canadian Archipelago region, which consists of the Gulf of

Boothia and surrounding areas, will experience "more modest changes in habitat and polar bear

carrying capacity" than general predictions for other areas.  (USGS Survey, AR308).


IV. **Standard of Review**

In an action for summary judgment under rule 56 of the Federal Rules of Civil Procedure,

judgment should be granted in favor of the plaintiff where "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue  as to any

material fact and that the movant is entitled to judgment as a matter of law."  When evaluating a

motion for summary judgment, "evidence is viewed in the light most favorable to the party

opposing the motion . . . and that party is entitled to all favorable inferences which may

reasonably be drawn from the evidentiary materials." Beard v. Goodyear Tire & Rubber Co.,

587 A.2d 195, 198 (D.C. Cir. 1991).  However, "an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response, by

affidavits or as otherwise provided . . . , must set forth specific facts showing that there is a

genuine issue for trial." Minch v. District of Columbia, 952 A.2d 929, 936 (D.C. Cir. 2006).


## V.  Argument

### a.  Claims I & IV:  Misconstruction of the MMPA

Plaintiffs' claims I and IV challenge defendants' misinterpretation of the MMPA, and

allege that defendants' interpretation is arbitrary and capricious and not otherwise in accordance

with the law.  Defendants assert that applicants must "clarify how trophy importations actually

maintain or increase polar bear populations and how the imports ameliorate the primary threat to

polar bear populations – global warming and sea-ice melt."  Effectively they assert that in order

to receive an enhancement permit, an applicant must engage in activity that directly offsets the

effects of the threat for which a species was listed – in this case, forecasted global warming that

is projected to melt the ice habitat.  This is a misconstruction of the MMPA and a violation of the

basic principles of statutory interpretation.  "Statutory construction must begin with the language

employed by Congress and the assumption that the ordinary meaning of that language accurately

expresses the legislative purpose." *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2347 (2009).  The

plain language of this unambiguous statute reveals that Defendants invented reasons for denying

plaintiffs' permits do not relate to Congressional intent.  The requirements an applicant must

meet in order to obtain an enhancement permit are twofold.  First, he must prove that "taking or

importation is likely to contribute significantly to "maintaining or increasing distribution or

numbers" necessary to ensure the survival or recovery of the species or stock. Secondly, "if there is no conservation or recovery plan in place", the applicant's actions are consistent "with the Secretary's evaluation of actions required to enhance the survival or recovery of the species or stock in light of the factors that would be addressed in a conservation plan or recovery plan." None of the above statutory language states that an enhancement permit may only be granted if the applicant participates in an activity that directly offsets the threat for which a species was listed as endangered or threatened or depleted particularly in a population that is not in fact depleted or expected to become depleted. Defendants' conduct in denying plaintiffs' applications for enhancement permits was arbitrary and capricious and contrary to law because it acted outside of the statutory mandate handed down by Congress.

    1.    Prong 1: "Contribute significantly" to "Maintaining or Increasing Distribution or Numbers"

When interpreting a statute, it is important to "give effect, if possible, to every clause and word of a statute". *Moskal v. United States*, 498 U.S. 103, 109 (1990). The first prong of the two-pronged evaluation faced by an applicant for an enhancement permit requires that the take be "likely to contribute significantly" to "maintaining *or* increasing distribution *or* numbers" necessary to the "survival *or* recovery" of the species. Congress's choice of the word *or* rather than the word *and* intentionally includes the possibility that take could be necessary to maintain population so that a species might survive. Plaintiffs need not prove that they are contributing to the "recovery" of the polar bear from the threat of sea ice but rather that their take was necessary to *maintain numbers or distribution* necessary to the *survival* of the species. Congress chose not to require that an enhancement permit under the MMPA have a relationship to the reason why a species was listed under the ESA or designated as "depleted" under the MMPA. Congress could

have required that enhancement permits be granted only for take that ameliorates the source of endangerment upon which an ESA listing is based.  Instead, Congress created flexible standards which can be applied to any enhancement activity that *contributes significantly to maintaining numbers or distribution necessary to the survival of the species*.  MMPA 16 U.S.C. 1374(c)(4)(A)(i).

It is undisputed that sport hunting of Canadian polar bear contributes significantly to the "maintenance" of their numbers and distribution.  In the final rule listing the polar bear as "threatened" under the ESA, defendants themselves said that "we recognize the important contribution to conservation that scientifically based sustainable use programs can have" and that "we further recognize the past significant benefits to polar bear management in Canada that have accrued as a result of the 1994 amendments to the MMPA that allow U.S. citizens who legally sport-harvest a polar bear from an MMPA-approved population in Canada to bring their trophies back into the United States." *Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range; Final Rule*, 73 Fed. Reg. 28212, 28236 (May 15, 2008). Defendants' above stated recognition regarding the significance of sport harvest in Canada has been confirmed by applicants' expert reports.  Dr. Milton Freeman, the retired Chairman and fellow at the Circumpolar institute at the University of Alberta, explained that

> the adaptive (co)management decisions affecting each sub-population's sustainability are both accepted and complied with by local hunters because, among other considerations, respectful attention is given to the local expertise provided by Inuit hunters. . . At the present time, and in accordance with the legally and constitutionally-established rights of Inuit to hunt and participate in management decision making, polar bear conservation in the Canadian Arctic is widely acknowledged to be well served.  However, this situation could quickly deteriorate if the views of local experts are ignored and those of non-local researchers with contradictory opinions are used to overrule the considered views of those observing regional bear populations and their dynamic and changing environment on a long term and continuous basis.  (Report by Drs. Freeman and Taylor on the Gulf of Boothia, AR473)

Dr. Freeman's expert concern about Inuit reactions to the American Import ban goes to the heart of why the sport harvest is so important in Canada.  Not only does the harvest keep the bear within carrying capacity and fund research, the sport harvest supports communities who have a constitutional right to hunt polar bears, and who follow quotas only because it benefits them and their views are respected.  By denying enhancement permits to polar bear hunters, defendants succeed only in damaging delicate management agreements that are essential to Canada's renowned management strategy.  By sport harvesting polar bears, hunters like plaintiffs are helping to maintain current numbers and distribution of bears and also helping to keep the Inuit invested in the coordinated management of polar bear populations, a fact which the Service itself has acknowledged.  ("we recognize that hunting provides direct economic benefits to local native communities that derive income from supporting and guiding hunters . . .", Final Rule, AR494).  Additionally, 30% of the bear allocated to sport hunts are not taken.  These bears would otherwise be taken as allowed by the quota and this fact, in addition to the fact that sport hunters take bear in a 33.33% to 66.66% male to female ratio, demonstrates the manner in which sport hunters contribute to the maintenance and increase of polar bear populations.

2. Prong 2: Applicant's action must be consistent "with the Secretary's evaluation of actions required to enhance the survival or recovery of the species or stock in light of the factors that would be addressed in a conservation plan or recovery plan.

The MMPA's second requirement for an enhancement permit is that the Secretary conclude that take is "consistent with any conservation plan adopted by the Secretary" under the ESA and MMPA.  Where, as here, the permit application is for a foreign species for which the ESA does not provide authorization to create a recovery plan, the Secretary must "evaluat[e]

actions required to enhance the survival or recovery of the species or stock in light to the factors that would be addressed in a conservation plan or a recovery plan." 16 U.S.C. 1374(c)(1)(A). The directive that the Secretary must evaluate a wildlife management system "in light of" these factors indicates that Congress did not intend to instruct the Secretary to apply these factors strictly to foreign programs.  To make a decision "in light of" a given factor is to make an evaluation "in consideration of" or "in relationship to" a factor.  *The American Heritage Dictionary of the English Language*, Houghton Mifflin (4th Edition 2000).  In other words, Congress instructed the Secretary to decide what activities would "enhance" the survival of a given species as part of a management system while keeping in mind the criteria Congress created to guide the production of a conservation or recovery plan.

Recovery plans under the ESA are created for domestic listed species in order to give the Service particular goals and criteria elucidating how they might wish to bring about the recovery of a listed species.  The guidelines for recovery plans under the ESA were also adopted as the bases for conservation plans under the MMPA.  The factors considered when the Service creates a recovery plan or a conservation plan are

> 1) describe such site specific management actions as may be necessary to achieve the plan's goal for the conservation *and* survival of the species; 2) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list;  3) estimates of the time required and the cost to carry out these measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal. 16 U.S.C. 1533(f).

When considering an application for an enhancement permit under the MMPA, the Secretary must evaluate the nature of the applicant's take "in light of" these factors.  It is therefore instructive to present plaintiffs' argument with reference to the factors considered by the agency when creating recovery plans.

  i. Factor 1: "describe such site specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species"

The Canadian management of the polar bear constitutes an effective conservation plan by any measure, and conservation hunting is, by any measure, one of the most important actions used to perpetuate that management system.  The entire Canadian conservation management plan for polar bears depends, in many ways, on hunting.  The Inuit have an inalienable right to subsistence hunting under both constitutional and statutory Canadian law.  The only way to ensure that they comply with quotas that the rest of the world might prefer they adhere to is to give them some incentive to do so.  Thus far, Canada has established a hugely successful system of co-management.  That system is fragile, however, and there is no question that depriving the Inuit of a source of quite substantial income will jeopardize quota adherence at the very least.  In fact, since the polar bear was listed as "threatened" in the United States, there has been "a rapid and significant deterioration in trust and cooperation" among conservation partners. (Conservation hunting brief, Dr. Milton Freeman, AR480).

When the defendants denied plaintiffs' applications, they stated that "it is not evident that sport hunting actually reduces the number of bears taken from the set quota, nor provide a means to contribute significantly to maintaining or increasing the number of polar bears necessary for the survival or recovery of the species."  (Denial Letter , AR614)  This is a bizarre construction of the statutory language and indeed of the nature of conservation initiatives.  When evaluating a conservation plan for whether take "enhances" the survival of the species, the Secretary first looks at "site specific management actions as may be necessary to achieve the plan's goal for conservation and survival of the species."  16 U.S.C. 1533(f).  Canada's management program

has a very specific goal – to maintain polar bear populations at the optimum level both for numerosity and health of the animals.  One of the ways in which Canada and its co-management partners achieve their goal is by establishing hunting quotas to keep each population of bear at a certain level and to incentivize the local people to act as stewards of the bear populations among them.

Defendants' conclusion that take should "reduce[] the number of bears taken from the set quota", displays a fundamental misunderstanding of how maintenance, as opposed to recovery, of wildlife populations is achieved. (Denial Letter, AR457-458)  Regardless, defendants' erroneous conclusion that plaintiffs' sport hunts did not reduce the number of animals taken is incorrect.  The Gulf of Boothia polar bear population is not "considered to be depleted, nor is the current population in need of recovery efforts."  (Freeman, Milton and Taylor, Mitchell. *Gulf of Boothia Polar Bear Population*, AR472).  Hunting is only one of many factors which contribute to fluctuations in carrying capacity, and "when hunting quotas are decided, the extent to which environmental changes affect the sustainability of a given quota is taken into account to ensure the hunting removals do not cause the population to decline." *Id.*  The Gulf of Boothia population is intentionally maintained below maximum carrying capacity, because it results in better condition in individual animals and in greater survival rates.  *Id*.  When animals are in better condition and are maintained below carrying capacity "they are less likely to be infected by disease, and are more resilient to environmental fluctuations (such as climate change or variability) or other stressors."  *Id.*

The Gulf of Boothia therefore has a limited sport harvest, as allocated by local hunters. Among other contributions, trophy hunters "selectively hunt large male bears . . . result[ing] in a greater than anticipated reproductive potential for that particular regional subpopulation."

(Freeman; Taylor at 473).  A certain number of polar bear will be taken each year for subsistence hunting whether conservation hunting is permitted or not.  Taking large males instead of females – who produce the offspring – leads to higher production of young with "increase providing immigrant bears to adjacent populations and/or increasing the number of bears in the Gulf of Boothia population."  (Freeman; Taylor, Gulf of Boothia Population, AR473).  Drs. Freeman and Taylor go on to say that "such potential for increase resulting from the selective hunting associated with sport hunts will be beneficial if polar bear recovery programs are required in the future."  *Id.*  Defendants appear to address the issue of hunters "increasing" numbers or distribution as if the MMPA had prevented hunting altogether.  This is simply incorrect; polar bears will be hunted in Canada according to quotas no matter what the United States says or does.  Utilizing the advantages of sport hunting over native hunting will ensure that those populations are larger and retain greater reproductive potential than they otherwise would have.

The Canadian Management strategy for the polar bears is established and effective, and hunting is the primary method used to manage and maintain polar bear populations.  They utilize conservation hunting as a method of preserving reproductive capacity and ensuring increases in population numbers through sex-selective harvest.  Canada also uses conservation hunters to create effective and consistent co-management agreements with the Inuit, who are almost entirely responsible for the day to day management of the bear.  The anger and frustration of Inuit hunters is justified in light of the fact that both the MMPA and the ESA exempt native Alaskan take of polar bear/marine mammals.  16 U.S.C. 1371(b); 16 U.S.C. 1539(e).  The United States is making a mistake in ignoring that frustration, because 2 of the most experienced arctic polar bear researchers, Milton Freeman and Mitchell Taylor, have said that "ignoring the views of local knowledge-holders and removing these economic incentives and will very likely

compromise, if not destroy, current conservation programs in northern Canada . . . whilst offering no improvement to the status of polar bears locally or globally at a time when polar bears are currently at their highest population level in recent history" speaks for itself.  *Id.*

      ii.  Factor 2: a plan must have "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list"

The second factor considered when making recovery plans under section 4(f) of the ESA does not apply to plaintiffs' applications for three reasons: 1) because it specifically requires recovery actions and this species, and particularly the Gulf of Boothia stock is not in fact depleted, will not be depleted, and does not need to be recovered, 2) because that criterion was designed as part of the development of recovery plans for listed *domestic* species, 3) in the listing even the defendants said that the listing would not prevent the underlying cause, global warming. Whether a person agrees with the listing of the polar bear as "threatened" or not, there is no dispute that the "threat" that provoked the listing does not yet exist and does not apply to this particular population/stock.  The criteria of a recovery plan under the Endangered Species Act were designed to address depleted domestic populations that needed to recover numbers or area of habitat which they had lost.  The polar bear as a species occupies its full historical range, and only 2 of 19 populations, if that,  have even potentially been impacted by global warming – the threat that provoked the listing of the polar bear.  The Secretary has discretion to consider the polar bear's management needs "in light of" ESA recovery plan criteria – no part of the statute suggests that those criteria must be strictly met.  To the contrary, section 4(f) grants the Secretary the authority to refrain from creating a recovery plan altogether if he "finds that such a plan will not promote the conservation of the species."  16 U.S.C. 1533(f).  Given such discretion it is

nonsensical to suggest that in order for an individual to obtain an enhancement permit, he must demonstrate that he is contributing to the *recovery* of a species that is not even *depleted* according to responsible scientists.  (*see* AR472)

Consideration of the second criterion should be omitted for a second reason – because the criteria outlined at 16 U.S.C. 1533(f) were never intended to apply to foreign species. Defendants have acknowledged that "most of the key conservation provisions of the ESA do not apply to foreign species." *Draft Policy for enhancement-of-survival permits for foreign species listed under the Endangered Species Act*, 68 Fed. Reg. 49512 (Aug. 18, 2003) To suggest that a foreign program should be designed to manage a species so as to have it removed from the American Endangered or Threatened species list is preposterous.  This case is particularly problematic because the defendants admit that the ESA listing itself will not correct global warming or its effect on polar bears.  It is inconsistent to require other nations to create plans to combat a phenomenon that no nation has the capacity to truly control.  Given the numerosity of polar bears at this time and the inapplicability of this provision to foreign species, it is clear that consideration of whether an individual has met "enhancement" requirements for taking a polar bear in Canada does not involve this factor.  Basic logic dictates that Defendants should not exclude an individual from proving enhancement on the basis of a factor for a provision of the ESA that does not protect foreign species or apply to the Gulf of Boothia stock/population.

    iii.  Factor 3: a plan must include "estimates of the time required and the cost to carry out these measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal"

The Canadian authorities have, as stated above, a concrete goal to maintain healthy populations of bear throughout the Canadian Arctic.  In order to achieve that goal, they have a

highly organized scientifically based management system that is renewed on a yearly basis.

Firstly, they have the Polar Bear Technical Committee (PBTC), which consists of biologists and

meets annually to recommend management approaches based upon research data.  (Dr. Lee

Foote, PhD, Regional Chair of the Sustainable Use Specialist Group of IUCN, *Sport Hunting as*

*a Sustainable Use of Wildlife*, AR143).  The Polar Bear Administrative Committee (PBAC) then

meets annually "to respond to recommendations made by the PBTC and to draft changes in

regulations.  *Id*.  That group is composed of the heads of wildlife management organizations

from each province and territory.  Finally, Hunters and Trappers' Associations are consulted

about changes in regulations so that indigenous knowledge is incorporated into scientific

conclusions.  *Id*.  This management system has been highly successful in responding to and

correcting declines or increases in individual polar bear populations.  As defendants have

acknowledged, "existing regulatory mechanisms at the national and international level are

adequate to address actual and potential threats to polar bears from direct take, disturbance by

humans, and incidental or harassment take."  *Final Rule*, 73 Fed. Reg. 28212.  The Canadian

system is designed so that management strategies to combat any threat, including global

warming, will be created by the most experienced specialists in the world as soon as that threat

begins to affect Canadian polar bear populations.  The Secretary has baldly acknowledged that,

"while the legal standards under the ESA compel me to list the polar bear as threatened, I want to

make clear that this listing will not stop global climate change or prevent any sea ice from

melting."  Press Release "Secretary Kempthorne Announces Decision to Protect Polar Bears

under Endangered Species Act",  May 14, 2008, found at

http://www.doi.gov/news/08_News_Releases/080514a.html.  Canada's fully established and

responsive system re-evaluates on a yearly basis the best way to achieve its goal of maintaining

healthy polar bear populations.  It is the best and most carefully formulated system in place to protect the bear from global warming when sea ice recession begins to affect a given population. No reasonable construction of "enhancement" could possibly suggest that contributing to Canada's program does not enhance the chances for survival of the species.

Any claim that sport hunters like plaintiffs do not enhance the survival of the polar bear represents a straightforward denial of reality.  Hunting of polar bears is a constitutional and statutory right of indigenous northern peoples under Canadian law.  By 1991, 7 of Canada's 13 polar bear populations were declining due to over harvest, largely due to the improved technology and success rate of Inuit hunting expeditions.  (Taylor, Mitchell. *The Role of the Tourist-Hunter in the Management of Canada's Polar Bear Populations*, AR204).  In 1992 in response to this threat, Northwest Territories Department of Renewable Resources "began an initiative designed to incorporate local hunters into a more active management process for polar bears."  *Id*.  This initiative lowered quotas across the Northwest Territories and brought the harvest to sustainable levels.  One of the motivating factors behind Inuit communities' willingness to lower quotas and restrict themselves to a sustainable yield was the prospect of being certified for importation of sport hunted polar bear trophies under the MMPA.  . "Considerable social and cultural importance is accorded to polar bears and bear hunting in Inuit [Eskimo] societies."  (Freeman, Milton. *Culture, Commerce, and International Cooperation in the Global Recovery of Polar Bears*, AR230).  Persuading Inuit hunters to comply with quotas is a significant conservation goal for anyone wishing to conserve the Canadian polar bear.  No authority disputes that financial incentives to preserve the bear figure largely in achieving compliance.  Plaintiffs therefore represent in themselves the very method by which the co-management agreements are held together.  That is, by any definition, a "significant"

contribution to the conservation of the Canadian polar bear.  Defendants' denial of plaintiffs'

enhancement permit applications was arbitrary and capricious because when it denied plaintiffs'

permits, Defendants  "offered an explanation for its decision that runs counter to the evidence

before" it and that explanation is also "so implausible that it could not be ascribed to a difference

in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.


     b. Claim II:  Failure to follow proper rulemaking procedures

   Claim II alleges a violation of the rulemaking procedures of the APA and Federal

Register Act.  When it evaluated plaintiffs' applications, Defendants created a rule that in order

to obtain an MMPA enhancement permit, an applicant must prove not only that his actions have

significantly contributed to maintaining the survival of the species, but also that his actions have

in some way combated the threat identified by Defendants when it listed the species in question.

As plaintiffs' argument under Claim I demonstrates, this requirement is not discussed or even

hinted at anywhere in the MMPA.   This policy is a substantive rule made by the agency because

it affects the rights of others and because there is no adequate legislative basis for Defendants'

additional requirements to obtain an enhancement permit.  Under the APA and Federal Register

Acts, all substantive rules must be published in the Federal Register and subjected to notice and

comment procedures.  Furthermore, even if this rule were not substantive, it would remain an

"interpretive" rule under the APA and interpretive rules must also be published in the Federal

Register.  Defendants have not published its policy that enhancement permits may only be

granted to those who take animals in such a manner as to offset the threat for which a species is

listed.  This rule cannot therefore apply to plaintiffs and their applications must be re-evaluated

without this extraneous and unjustifiable requirement.

### 1. Substantive Rules

The rule that Defendants have applied to plaintiffs' enhancement applications is effectively an unauthorized legislative revision of the Marine Mammal Protection Act of 1988.  The D.C. Circuit has established that "a rule is 'legislative' (i.e. substantive) if any one of these conditions are satisfied: 1) that without the rule, the agency lacks an 'adequate legislative basis' for its action, . . . 2) that the agency published the rule in the Code of Federal Regulations or 3) that 'the rule effectively amends a prior legislative rule." *American Mining Congress v. Mine safety and Health Administration,* 99 F.2d 1106, 1112 (D.C. Cir. 2003).  This rule falls squarely under prong 1 of that test.  Defendants' action in this case was the denial of plaintiffs' enhancement permit applications.  Plaintiffs have already demonstrated that this action was "arbitrary and capricious" and that it lacks legislative basis.  No part of the MMPA links the granting of an enhancement permit with the basis for a listing under the ESA.  Defendants denied plaintiffs' permits based on a rule that was not legislatively authorized.  A rule is also substantive when it "effect[s] a change in existing law or policy or . . . affect[s] individual rights and obligations." *Paralyzed Veterans of Am. V. West*, 138 F.3d 1434, 1436 (Fed. Cir. 2001).  This rule has changed existing law *and* policy and has also affected the rights of individuals who wish to participate in Canadian conservation hunts.  By tying enhancement provisions under the MMPA to listing decisions under the ESA, Defendants have also – without congressional authorization – created a system whereby animals which are listed are treated differently, and afforded fewer potential enhancement activities, than species which have not been listed.

When such a rule is, as here, substantive, the APA requires that "General notice of proposed rule making shall be published in the Federal Register" and that the notice include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the

legal authority under which the rule is proposed; and (3) either the terms or substance of the

proposed rule or a description of the subjects and issues involved." 5 U.S.C. 553(b).  After the

notice is published "the agency shall give interested persons an opportunity to participate in the

rule making through submission of written data, views, or arguments".  5 U.S.C. 553(b).  Rules

that are interpretive or procedural are not required to be subjected to a notice and comment

procedure and therefore must be distinguished from substantive rules.  However, while "the

distinction between rules or statements which are subject to the notice and comment

requirements of §553 and rules or statements which are exempt form those procedures is

notoriously 'hazy'," the D.C. Circuit has "been careful to construe §553(b)(A)'s exceptions to

the rulemaking requirements narrowly."  *American Hospital Ass'n v. Bowen,* 834 F.2d 1037,

1045 (D.C. Cir. 1987).  This does not fall into one of the narrow exceptions to the requirement

for notice and comment procedures.  If Defendants suggests that this is an 'interpretive' or

'procedural' rule, it is doing so merely to avoid notice and comment, and "it is well established

that an agency may not label a substantive change to a rule an interpretation simply to avoid the

notice and comment requirements."  *Paulsen v. Daniels*, 413 F.3d 999 (D.C. Cir. 2005).

## 2.   Interpretive Rules

Even if this is not a "substantive" rule, it is still an interpretive rule.   "An interpretive rule

'simply indicates an agency's reading of a statute or a rule.  It does not intend to create new

rights or duties, but only reminds affected parties of existing duties."  *Coalition for Common

Sense in Gov't Procurement v. Sec'y of Veterans Administration*, 464 F.3d 1306, 1317 (Fed. Cir.

2006).  Nevertheless, when implementing a statute "at the very least [an agency] will explain its

interpretation in order to permit the parties before the agency to understand its decision."

*Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993).  Defendants have provided no

explanation or legal authority to support their position.  Moreover, Defendants are required

under 5 U.S.C. 552(a)(1)(B) to publish in the federal register "statements of the general course

and method by which its functions are channeled and determined, including the nature and

requirements of all formal and informal procedures available."  Defendants have not published

anything regarding their interpretation of the relationship between enhancement permits under

the MMPA and bases for ESA listing in the Federal Register.  It has therefore violated the

rulemaking procedures outlined in both the APA and the Federal Register Act, which mandates

that all rules be published in the federal register if another statute requires it.  The APA also

provides that "a person may not in any manner be required to resort to, or be adversely affected

by, a matter required to be published in the Federal Register and not so published."  5 U.S.C.

552(a)(1).  Plaintiffs permits should therefore be granted or, alternatively, remanded for

reconsideration without reference to Defendants' unpublished rule.

> c. Claim III: Failure to consider new information on appeal in violation of Due
>
> Process and Proper Rulemaking Procedures

Defendants disregarded the information provided to it with plaintiffs' petition for

reconsideration in violation of a regulatory imperative instructing applicants to provide further

information on reconsideration and administrative appeal, and that this disregard is a violation of

due process.  Appeal procedures for applications for enhancement permits under the MMPA are

governed by the general permitting procedures at 50 C.F.R. 13.29, *Review Procedures*.  That

regulation requires that any request for reconsideration "shall state the decision for which

reconsideration is requested, the reasons why it should be reconsidered, *including presenting any*

*new information* or facts pertinent to the issue(s) raised by the request for reconsideration."

[emphasis added]  50 C.F.R. 13.29(b)(3) *Method of Requesting Reconsideration*.  Defendants

offered contradictory instructions in their denial letter, informing plaintiffs that "should you supply new information that changes the content of your original application, a new application will need to be submitted to this office before such information can be considered." (Denial of permit application, AR456) Defendants' provision of contradictory information to plaintiffs rendered any administrative hearing meaningless and constitutes a "failure to follow proper procedure required by law" within the meaning of 5 U.S.C. 706(2)(C). It is also an unpublished procedural rule in violation of 5 U.S.C. 552(a)(1)(C) and it is a violation of due process because it deprives plaintiffs of their lawfully acquired property without a fair and reasonable hearing.

      i.   "failure to follow proper procedure" under 706(2)(B)

50 C.F.R. 1329(b)(3) says very clearly that an applicant is permitted to submit new information that might further clarify his position or offer proof that he had not previously submitted. Indeed even if plaintiffs had chosen to appeal their petitions for reconsideration, they still would have been permitted to submit "any additional evidence or arguments . . . to support an appeal." 50 C.F.R. 13.29(e). Despite these absolutely unambiguous statements of regulatory intent, defendants were likewise incredibly clear in their statement, presented in bold typeface that if any new information is submitted with a request for reconsideration "a new application will need to be submitted to this office before such information can be considered". (Denial of permit application, AR456). Defendants then attached a copy of 50 C.F.R. 1329(b)(3) to their contradictory letter stating that no new information would be considered. Defendants have clearly failed to follow proper procedures within the meaning of 5 U.S.C. 706(2)(B) because they have actively outlined a procedure that is contrary to duly published regulations.

      1.   Failure to follow proper rulemaking procedures under 5 U.S.C.

          552(a)(1)(C)

Just as defendants failed to publish the substantive rule it created linking enhancement permits with listing factors under the ESA, it also failed to publish this procedural rule. Although Defendants are not required to provide notice and comment procedures for procedural rules, 5 U.S.C. 552(a)(1)(C) does require that it publish "rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations."  Although other interpretations of and amendments to 50 C.F.R. 13.29 have been published in the federal register, no mention has ever been made of this requirement that a whole new application be filed if, on a petition for reconsideration, the applicant has more information he would like to submit as the issues evolve. Defendants have never published this rule and plaintiffs are therefore, as demonstrated above, not subject to it.  The process under which their applications were reconsidered was therefore defective and the permit applications must be remanded for reconsideration in light of the additional information provided by plaintiffs with their petition for reconsideration.

### 2.   Violation of Procedural Due Process

Plaintiffs have now demonstrated that there are two reasons for this Court to conclude that Defendants had no justification whatsoever for telling plaintiffs that their additional information would not be considered and then for disregarding that information which was submitted. Plaintiffs' due process rights were violated when Defendants refused to consider additional evidence submitted by plaintiffs to support their petitions for reconsideration.  Apparently, they were not afforded meaningful consideration.  It is a well established principle that "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner." *United States v. E-Gold, Ltd.*, 521 F.3d 411, 415 (D.C. Cir. 2008).  In

this case, plaintiffs have a guaranteed right to an appeal of their initial hearing and a further right to answer any concerns raised by the denial of their applications with *new information*.

Plaintiffs' right to due process protection is predicated on their protected property interest in their trophies.  A protected property interest exists when "existing rules or understandings that stem from an independent source such as state law" recognize it as such.  *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 222 (1985).  Plaintiffs acquired their trophies through the purchase of a hunting license and permit, the terms of which gave them ownership of their trophies once the bear were taken.  The law of contract is recognized as a legitimate source of property interests by the law of every state.  A claim of deprivation of property under the due process clause of the 5th amendment succeeds when "1) the claimant [has been] deprived of a protected property interest; 2) the deprivation [is] due to some government action; and 3) the deprivation [is] without due process."  *Cospito v. Heckler*, 742 F.2d 72, 80 (3rd Cir. 1984).  The plaintiffs have a protected property interest, and they are being deprived of the enjoyment of their property by defendants because defendants have continued to deny them a fair hearing.  By refusing to consider new information *provided in response to Defendants' concerns* Defendants failed to comply with its own procedures, and thereby failed to afford defendants with the appropriate process due to them.

## VI. Conclusion

Defendants' decision to deny plaintiffs' enhancement permits was arbitrary and capricious because it ran counter to evidence before the agency, it was contrary to the MMPA, it relied on unpublished rules, and it violated plaintiffs' due process rights.  Defendants also sidestepped the fact that enhancement alternatively includes "survival" instead of "recovery, which is more appropriate to the Gulf of Boothia that is not currently and is not expected to become depleted in

the foreseeable future.  Defendants have narrowly defined the concept of "enhancement" so as to exclude conservation hunting, despite the fact that the definition of "conservation" under the MMPA expressly includes "regulated take", 16 U.S.C. 1362, and despite the fact that the primary source of Canada's opposition to the US listing was the concern that a U.S. listing would compromise the Canadian management strategy by reducing revenue and local incentives arising from conservation hunting.  Defendants have provided no adequate explanation for their behavior, and this court should censure them for their manifold breaches of procedural and substantive law.

Respectfully submitted,

/s/  John J. Jackson, III
JOHN J. JACKSON, III
DCBN  432019
Attorney for Plaintiffs Atcheson et al.
3240 S. I-10 Service Rd. W., Ste. 200
Metairie, LA 70001-6911
T:  504-837-1233
F:  504-837-1145
E:  jjw-no@att.net