**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION** |

**Misc. Action No. 08-0764 (EGS)**
**MDL Docket No. 1993**

**This Document Relates To:**

**No. 1:08-cv-2113,** *Center for Biological Diversity, et al. v. Kempthorne, et al.*

**No. 1:09-cv-153,** *Defenders of Wildlife v. United States Dep't of the Interior*

**PLAINTIFFS DEFENDERS OF WILDLIFE and CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL AND GREENPEACE, INC.'S MOTIONS FOR SUMMARY JUDGMENT**
<u>**REGARDING THE § 4(d) RULE**</u>

Pursuant to Federal Rule of Civil Procedure 56 and the Court's August 21, 2009 Order (Dkt. #115), Plaintiffs Defenders of Wildlife, and Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. move for summary judgment on their respective Section 4(d) Rule claims in No. 1:08-cv-2113 and No. 1:09-cv-153 in this consolidated proceeding.

This joint motion is supported by the accompanying Memorandum of Points and Authorities, the pleadings, records, and files in this action, and other such documentary and oral evidence that may be supplied at the hearing.

Wherefore, Plaintiffs Defenders of Wildlife, Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. respectfully request that summary judgment be entered on their § 4(d) Rule claims.

DATE: December 4, 2009.

Respectfully submitted,

By:      /s/ Jason C. Rylander

Jason C. Rylander  (D.C. Bar No. 474995)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
202.772.3245 (telephone)
202.682.1331 (fax)
jrylander@defenders.org

Attorney for Defenders of Wildlife

By:      /s/ Brendan R. Cummings

Brendan R. Cummings
Kassia R. Siegel
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232
Facsimile: (760) 366-2669
bcummings@biologicaldiversity.org
ksiegel@biologicaldiversity.org

Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Rebecca Riley
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868
Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org
rriley@nrdc.org

Attorneys for Plaintiffs Center for Biological
Diversity, Natural Resources Defense
Council, and Greenpeace, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION** | **Misc. Action No. 08-0764 (EGS)** **MDL Docket No. 1993** |

**This Document Relates To:**

No. 1:08-cv-2113, *Center for Biological Diversity, et al. v. Kempthorne, et al.*

No. 1:09-cv-153, *Defenders of Wildlife v. United States Dep't of the Interior*

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS DEFENDERS OF WILDLIFE and CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL AND GREENPEACE, INC. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................... 1

II.  STANDARD OF REVIEW ............................................................................ 4

III.  STATUTORY FRAMEWORK ..................................................................... 5
  A.  The Endangered Species Act ................................................................... 5
  B.  The Marine Mammal Protection Act ....................................................... 8
  C.  The National Environmental Policy Act ................................................. 9

IV.  STATEMENT OF FACTS ........................................................................... 11
  A.  Polar Bears in a Warming Arctic ........................................................... 11
  B.  Other Factors Compound the Threat of Sea-Ice Loss to the Polar Bear ................. 15
  C.  Procedural History ................................................................................. 19
  D.  The Interim and Final 4(d) Rules .......................................................... 23

V.  ARGUMENT ................................................................................................ 26
  A.  The Section 4(d) Rule Fails to Meet the Conservation Mandate of the ESA ........... 26
    1. The Secretary's Authority to Issue Section 4(d) Regulations Is Limited by the Duty to Conserve Listed Species ................. 28
    2. The Secretary Cannot Use Section 4(d) to Exempt the Primary Identified Threat to the Polar Bear from ESA Regulation ................. 32
    3. The Section 4(d) Rule's Exemptions for Activities Originating Outside the Range of the Polar Bear Are Impermissibly Overbroad ................. 34
    4. The Conservation Benefits of the 4(d) Rule Are Illusory ....................................... 36
      a.  The MMPA Does Not Provide the Same Protections to the Polar Bear as the ESA. ................. 37
      b.  The Secretary Fails to Identify a Valid Conservation Benefit to the Polar Bear From the 4(d) Rule ................. 38
      c.  There is No Rational Connection between the 4(d) Rule's Exemptions and the Purported Benefit it Provides to Bears. ................. 40
    5. The Secretary Cannot Exempt Activities from the ESA Simply Because Regulatory Mechanisms May Overlap ................. 41
  B.  The Secretary Violated NEPA in issuing the 4(d) Rule ........................ 42
    1.  Congress Requires NEPA Compliance to "the Fullest Extent Possible" ............... 43
    2.  No Statutory Conflict Exists Preventing the Secretary's Compliance with NEPA .. ................. 45
    3.  The Secretary's Process for issuing the 4(d) Rule is not the Functional Equivalent of NEPA ................. 48
    4.  The Secretary's Authorization of Otherwise Prohibited Take through the Polar Bear 4(d) Rule Triggers NEPA ................. 49

VI.  CONCLUSION ........................................................................................... 51

# TABLE OF AUTHORITIES

**Cases**

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) .................................................................. 4

*Associated Gas Distribs. v. FERC*,
   824 F.2d 981 (D.C. Cir. 1987) .................................................................. 4

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971) ................................................................ 11

*Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv.*,
   75 F.3d 1429 (10th Cir. 1996) .................................................................. 47

*Center for Biological Diversity v. Kempthorne*,
   Civ. No. 08-1339 (N. Dist. Cal) .......................................................... 22, 44

*Center for Biological Diversity v. Kempthorne*,
   No. 05-5191 JSW (N. Dist. Cal.) ............................................................. 19

*Center for Biological Diversity v. USFWS*,
   No. 04-4324 (N.D. Cal. 2005) .................................................................. 48

*Chevron U.S.A. Inc., v. NRDC*,
   467 U.S. 837 (1984) ................................................................................ 5

*Connor v. Andrus*,
   453 F. Supp. 1037 (W.D. Tex. 1978) ....................................................... 32

*Continental Airlines Inc. v. DOT*,
   843 F.2d 1444 (D.C. Cir. 1988) ................................................................ 5

*Ctr. for Biological Diversity v. Norton*,
   240 F. Supp. 2d 1090 (D. Ariz. 2003) ..................................................... 42

*Defenders of Wildlife v. Administrator, EPA*,
   882 F.2d 1294 (8th Cir. 1989) ................................................................. 35

Defenders of Wildlife v. Andrus,
   428 F. Supp. 167 (D.D.C. 1977) .............................................................. 31

*Demby v. Shweiker*,
   671 F.2d 507 (D.C. Cir. 1981) ................................................................. 32

*Douglas County v. Babbitt,*
    48 F.3d 1495 (9th Cir. 1995) ............................................................................. 47

*EDF v. EPA,*
    489 F.2d 1247 (D.C. Cir. 1973) ............................................................... 11, 44, 48

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,*
    426 U.S. 776 (1976)....................................................................... 11, 43, 44, 45

*Forest Conservation Council v. Rosboro Lumber Co.,*
    50 F.3d 781 (9th Cir. 1995) ............................................................................. 37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
    528 U.S. 167 (2000).......................................................................................... 28

*Fund for Animals, Inc. v. Turner,*
    1991 U.S. Dist. LEXIS 13426 .......................................................................... 33

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
    378 F.3d 1059 (9th Cir. 2004) .......................................................................... 30

*Humane Soc'y of the U.S. v. Kempthorne,*
    579 F. Supp. 2d 7 (D.D.C. 2008).......................................................................... 5

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986).......................................................................................... 28

*Jones v. Gordon,*
    792 F.2d 821 (9th Cir. 1986)............................................................................. 50

*Louisiana, ex rel. Guste v. Verity,*
    853 F.2d 322 (5th Cir. 1988) ............................................................................ 29

*Marbled Murrelet v Pac. Lumber Co.,*
    83 F.3d 1060 (9th Cir. 1996) ............................................................................ 37

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc, v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, 43 (1983)............................................................................ 4, 41, 42

*Nat'l Mining Ass'n v. Babbitt,*
    172 F.3d 906 (D.C. Cir. 1999)........................................................................... 36

*Northpoint Technology Ltd. v. FCC,*
    412 F.3d 145 (D.C. Cir. 2005) ............................................................................ 5

*NRDC v. U.S. Dep't of the Interior,*
  113 F.3d 1121 (9th Cir. 1997) ........................................... 42

*Pacific Legal Found. v. Andrus,*
  657 F.2d 829 (6th Cir. 1981) ........................................... 46

*Palila v. Hawaii Dep't. of Land & Natural Res.,*
  852 F.2d 1106 (9th Cir. 1988) ...................................... 24, 37

*Portland Cement Ass'n v. Ruckelshaus,*
  *486 F.2d 375 (D.C. Cir. 1973)*.................................... 44, 48

*PPL Wallingford Energy LLC v. FERC,*
  419 F.3d 1194 (D.C. Cir. 2005)......................................... 36

*Ramsey v. Kantor,*
  96 F.3d 434 (9th Cir. 1996) ............................................ 50

*Sec'y of Labor, Mine Safety & Health Admin. v. Nat'l Cement Co. of Cal., Inc.,*
  494 F.3d 1066 (D.C. Cir. 2007) .......................................... 5

*Sierra Club v. Clark,*
  577 F. Supp. 783 (D. Minn. 1984), *aff'd in part and rev'd in part by* 755 F.2d 608, 611 (8th
  Cir. 1985) ................................................................ 31

*Sierra Club v. Clark,*
  755 F.2d 608 (8th Cir. 1985) ............................... 29, 30, 32, 33

*Sierra Club v. United States Fish & Wildlife Serv.,*
  245 F.3d 434 (5th Cir. La. 2001) ....................................... 30

*Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt,*
  1 F.3d 1 (D.C. Cir. 1993), *modified on other grounds on reh'g,* 17 F.3d 1463 (D.C. Cir. 1994),
  *rev'd on other grounds,* 515 U.S. 687 (1995)........................... 30

*TVA v. Hill,* 437 U.S. 153, 185 (1978)................................. 1, 28

## Statutes

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq* ................................. passim

The Endangered Species Act, 15 U.S.C. §§ 1531 et seq. ("ESA") ...................................... passim

The Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361, *et seq.* ......................... passim

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*........................... passim

**Other Authorities**

115 Cong. Rec. 39703 (1969) ........................................................................... 11, 44

40 C.F.R. § 1500 et seq. ................................................................................... 9, 10

50 C.F.R § 17.3 et seq.................................................................................... passim

50 C.F.R. § 17.40(q) ............................................................................................. 8

50 C.F.R. § 18.22 ............................................................................................. 9, 39

40 Fed. Reg. 44412 (September 26, 1975) ...................................................... 7, 29

48 Fed. Reg. 49244 (October 25, 1983).............................................................. 46

71 Fed. Reg. 43926 (August 2, 2006).................................................................. 38

71 Fed. Reg. 71102 (December 14, 2007) ........................................................... 47

74 Fed. Reg. 23822 (May 21, 2009) ................................................................... 48

Conf. Rep. No. 930740, 93rd Cong., 1st Sess. 23 (1973).................................. 32

S. Rep. No. 93-307, 93d Cong., 1st Sess. 8 (1973) .......................................... 31

## I.     INTRODUCTION

The listing of a species under the Endangered Species Act (ESA) is not simply a declaration that the species is threatened or endangered.  It is a call to action to protect the species and bring it back from the brink of extinction.  A listing marshals the full resources of the federal government to protect and recover the species before it is too late.  In this way, the ESA represents an "explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *TVA v. Hill*, 437 U.S. 153, 185 (1978).

On May 15, 2008, the Secretary of the Interior listed the polar bear as a threatened species throughout its range.  73 Fed. Reg. 28,212 (May 15, 2008); ARL117215.[1]  The Secretary determined that by mid-century two-thirds of the world's polar bears would likely disappear due to the range-wide loss of sea ice habitat in the foreseeable future.  The Secretary also identified other threats to polar bear populations, such as overharvest and the chemical contamination of the Arctic.  Unless declining trends in sea ice coverage are reversed, the polar could very well be globally extinct in the wild within 100 years.

While the Secretary's official recognition of the grave risks that climate change poses to the survival of the polar bear is significant, the ESA requires more.  The "plain intent of Congress in enacting this statute was to halt and reverse the trend toward extinction whatever the cost." *TVA v. Hill*, 437 U.S. at 184.  Listing the polar bear should have automatically triggered a host of federal protections designed to stem the species' decline and recover the species.  Instead, the Secretary issued, along with the listing decision, a special regulation that *withholds* from the polar bear some of the most critical protections the statute offers.

Under the ESA, "endangered species" are afforded by statute the full protections of the

---

[1] Citations to the administrative record are abbreviated "ARL" for citations to the record prepared for the Listing Rule and "AR4D" for citations to the record prepared for the 4(d) Rule.

Act, including Section 9's prohibition against "taking" individual bears without a permit.  While Section 9's take prohibition does not automatically apply to "threatened species," Section 4(d) of the ESA provides that the Secretary "shall" issue special rules extending Section 9's take prohibitions to threatened species as "necessary and advisable to *provide for the conservation*" of the species.  16 U.S.C. § 1533(d) (emphasis added).  In 1975, the Department of the Interior issued a blanket regulation extending full Section 9 protections to all threatened species, unless the Secretary issues a specific rule under Section 4(d) of the ESA defining which measures will be directed to aid the species.  50 C.F.R. § 17.31(a).  The Secretary's discretion to craft 4(d) rules is not without limit.  As courts have repeatedly found, any rule issued pursuant to Section 4(d) must be consistent with the ESA's overarching obligation to "conserve" the species—that is, to use "all methods and procedures which are necessary to bring any endangered species or threatened species back to the point at which the measures provided are no longer necessary," 16 U.S.C. § 1532(3).

The validity of regulations issued under Section 4(d) thus must be judged on whether they seek to remedy the problems that led to the species' threatened status.  In the case of the polar bear, the final 4(d) Rule contains sweeping and unprecedented exemptions from the Act's usual protections that do not in any way aid in the conservation of the species.

*First*, the 4(d) Rule exempts any incidental taking caused by activities outside the current range of the polar bear.  The effect of this exemption is profound.  As the Secretary himself found when he listed the polar bear, the single overwhelming factor driving polar bears towards extinction is the decline of Arctic sea ice brought about by global warming.  By entirely exempting the release of greenhouse gases from Section 9 of  the ESA, the Secretary has thus reduced protections for the polar bear from the very threat that most imperils the species.  As the

record and common sense demonstrate, this exemption is not meant to, and under any reasonable interpretation could not possibly, "provide for the conservation" of the polar bear as the ESA requires. Rather, the record shows the rule was designed and premised entirely on improper political and policy considerations, as opposed to the needs of the polar bear.

The 4(d) Rule is also arbitrarily overbroad. By exempting not just greenhouse gas emissions but, without explanation, *all* activities outside the polar bear's range, the 4(d) Rule also excludes other threats to polar bears, such as the discharge of chemicals that contaminate the Arctic, from Section 9's reach. Many of these chemicals are known to cause mortality, reproductive effects, and physical injury to bears.

*Second*, within the polar bear's range, the 4(d) Rule eliminates all take protections from any activity otherwise authorized or exempted under the Marine Mammal Protection Act (MMPA). Yet the MMPA's take prohibition is different from the ESA's take prohibition in important respects and fails to provide for citizen enforcement of its provisions.

In short, the 4(d) Rule does nothing for the polar bear but reduce the protections it would ordinarily receive under the ESA and its implementing regulations. Section 4(d) of the Act requires more. It requires the Secretary only to issue 4(d) Rules "necessary" to "provide for the conservation" of the polar bear. But the Section 4(d) rule in this case does not advance the purposes of the ESA. Rather, it expressly avoids addressing greenhouse gas emissions—the one issue most responsible for the species' imperilment.

The Secretary also violated the National Environmental Policy Act (NEPA) when issuing the 4(d) Rule. It is undisputed that the Secretary made no effort to comply with NEPA in this case. Rather, he asserts that the issuance of a 4(d) rule under the ESA is exempt from NEPA's requirements. The Secretary is wrong. Neither the regulations issued by the Council on

Environmental Quality, nor the tests articulated by the Supreme Court or this Circuit, allowed the Secretary to brush aside NEPA's mandate that he take a "hard look" at the environmental consequences of the 4(d) Rule's sweeping reduction in polar bear protections before he issued the rule.

This Court should vacate the Section 4(d) Rule and remand the rule to the Secretary with instructions to provide adequate protections for the polar bear that are consistent with both science and law.

## II.    STANDARD OF REVIEW

Plaintiffs bring this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, which provides the standard of review. *See, e.g., Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008). A reviewing court must hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc, v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

An assertion that agency conduct was arbitrary and capricious "requires the court to explore the links between that conduct and the agency's statutory authority." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1016 (D.C. Cir. 1987). When an agency's interpretation of a statute that the agency is charged with administering is at issue, the court applies the two-step

analytical framework of *Chevron U.S.A. Inc., v. NRDC*, 467 U.S. 837 (1984).  Using "traditional tools of statutory construction," *id.* at 843 n.9, the court must determine if Congress directly spoke to the precise question at issue.  *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 12 (D.D.C. 2008).  If the court concludes that "the statute is silent or ambiguous with respect to the specific issue …, [the court] move[s] to the second step and defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'" *Sec'y of Labor, Mine Safety & Health Admin. v. Nat'l Cement Co. of Cal., Inc.*, 494 F.3d 1066 at 1074 (D.C. Cir. 2007) (quoting *Chevron U.S.A.*, 467 U.S. at 843)).

In the D.C. Circuit, *Chevron* step-two review requires that the agency provide a "'reasonable' explanation of how an agency's interpretation serves the statute's objectives." *Northpoint Technology Ltd. v. FCC,* 412 F.3d 145, 151 (D.C. Cir. 2005) (citations omitted). "'Reasonableness' in this context means … the compatibility of the agency's interpretation with the policy goals … or objectives of Congress." *Continental Airlines Inc. v. DOT*, 843 F.2d 1444, 1452 (D.C. Cir. 1988).  If a rulemaking is clearly contrary to statute, or if the agency fails to provide a reasonable explanation of its interpretation of a statute, courts should vacate the rule and remand it to the agency.  *Humane Soc'y*, 579 F. Supp. 2d at 12.

### III.    STATUTORY FRAMEWORK

### A.    The Endangered Species Act

The ESA establishes a comprehensive statutory program for the protection and conservation of imperiled species and their ecosystems.  16 U.S.C. § 1531(b).  The ESA empowers the Secretary of the Interior, through the U.S. Fish and Wildlife Service, to determine whether a species is "endangered" or "threatened."  Only species formally listed as endangered or threatened receive the protections of the Act.  16 U.S.C. § 1533(a).  A species is "endangered"

if it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. §

1532(6).  A species is "threatened" if it "is likely to become an endangered species within the

foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

Once a species is listed, an array of statutory protections applies.  Most relevant to the

claims at issue here, Section 9 of the ESA and its regulations prohibit, among other things, "any

person" from intentionally "taking" listed species or "incidentally" taking listed species without

a permit from the Secretary.  16 U.S.C. §§ 1538(a)(1)(B) & 1539; 50 C.F.R § 17.31.

"Take" is defined under the ESA to mean to "harass, harm, pursue, hunt, shoot, wound,

kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §

1532(19).  "Harm" is defined as "an act which actually kills or injures wildlife.  Such act may

include significant habitat modification or degradation where it actually kills or injures wildlife

by significantly impairing essential behavioral patterns, including breeding, feeding or

sheltering." 50 C.F.R § 17.3.

There are two primary mechanisms to gain an exemption from Section 9's take

prohibitions.  First, Section 10 of the ESA permits a non-federal entity to "take" listed species

incidental to an otherwise lawful activity after obtaining an incidental take permit.  16 U.S.C. §

1539.  Second, a federal agency may take listed species only in accordance with an incidental

take statement issued pursuant to a Section 7 consultation.   16 U.S.C. §§ 1536(b)(4);

1536(o)(2).  In either case, the Secretary must first conclude that the taking will not jeopardize

the species and must set forth terms and conditions to be followed that minimize and mitigate

the impacts of the taking.  16 U.S.C. §§ 1536(b)(4) and 1539(a).[2]

---

[2] There are several other exceptions to Section 9 that are relevant to the polar bear.  First, Section
10(e) of the ESA exempts Alaska Natives from the take prohibition "if such taking is primarily
for subsistence purposes."  16 U.S.C. § 1539(e).  Additionally, Section 11 creates a defense to

The primary regulatory distinction between the "threatened" and "endangered" classifications relates to the applicability of Section 9's prohibition on take. The ESA directly applies Section 9's prohibitions only to species listed as "endangered." 16 U.S.C. § 1538. However, Section 4(d) requires the Secretary to promulgate "protective regulations" where he deems them "necessary and advisable to provide for the conservation of such species," including regulations that apply any or all of the prohibitions of Section 9 to species listed as "threatened." 16 U.S.C. § 1533(d).

The term "conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species back to the point at which the measures provided are no longer necessary." 16 U.S.C. § 1532(3). Any regulations issued pursuant to Section 4(d) must meet this conservation standard. 16 U.S.C. § 1533(d).

Shortly after the ESA was enacted, the Secretary promulgated a blanket regulation pursuant to Section 4(d) that extended all of Section 9's protections for endangered species to all threatened species, absent a separate species-specific rule. 40 Fed. Reg. 44412 (September 26, 1975), *codified* at 50 C.F.R. § 17.31(a). Because of this, the prohibitions of Section 9 and the processes for exemption from such prohibitions, generally apply to both threatened and endangered species.

However, in some instances, such as with the polar bear in this case, the Secretary has

---

civil and criminal liability under the ESA if the person committing the taking had "a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual, from bodily harm from any endangered or threatened species." 16 U.S.C. §§ 1540(a)(3) & (b)(3); *see also* 50 C.F.R. § 17.21(c)(2) ("any person may take endangered wildlife in defense of his own life or the lives of others."). The Secretary has also promulgated regulations authorizing take of listed species for the benefit of the species or to remove animals that may pose a threat to human safety. 50 C.F.R. §§ 17.21(c)(3)(i) & (iv); *see also* 50 C.F.R. § 17.31(b) (authorizing state and federal conservation agents to take threatened species to carry out conservation programs).

promulgated species-specific Section 4(d) rules exempting certain activities from the general take prohibition contained in 50 C.F.R. § 17.31(a).  *See* 50 C.F.R. § 17.40(q) (4(d) Rule for polar bear).  Activities that are permitted by a Section 4(d) rule are deemed not to violate Section 9 and 50 C.F.R. § 17.31(a), even though they may harm, injure, or even kill a threatened species, and no incidental take permit or take authorization pursuant to an incidental take statement is required.  Section 4(d) Rules are only available to species listed as "threatened."  If the species is listed as "endangered," otherwise prohibited take can only be permitted through an incidental take permit or incidental take statement.

**B.     The Marine Mammal Protection Act**

Congress enacted the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361, *et seq.*, in order to preserve and replenish marine mammal populations.  16 U.S.C. § 1361(2).  To this end, like the ESA, the MMPA imposes a general moratorium on the "take" of marine mammals.  16 U.S.C. § 1371(a).  Under the MMPA, unlike the ESA, the term "take" is defined to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13).  Thus, in contrast to the ESA definition of "take," the MMPA's definition does not include the word "harm."

Similar to the ESA, the MMPA provides several exceptions to the moratorium on takings.  Among these are an exception for takings by Alaska Natives for subsistence purposes and an exception for takings in self-defense or in defense of others in situations of immediate danger.  16 U.S.C. §§ 1371(b) & (c).  The MMPA also allows take of marine mammals by government officials and other individuals and entities designated by the Secretary for the protection or welfare of the animal, the protection of the public health and welfare, or the non-

lethal removal of nuisance animals.  16 U.S.C. § 1379(h)(1); 50 C.F.R. § 18.22.[3]

To ensure all decisions related to marine mammals are made on the basis of the best scientific information, Congress established the United States Marine Mammal Commission and charged it to make recommendations to the Secretary on matters related to marine mammals.  16 U.S.C. § 1401. Any deviation from the Marine Mammal Commission's recommendations must be explained in detail.  16 U.S.C. § 1402(d).

## C.    The National Environmental Policy Act

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., is "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It was enacted in 1970 to put in place procedures to insure that federal agencies "encourage productive and enjoyable harmony between man and his environment," "promote efforts which will prevent or eliminate damage to the environment," and "enrich understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

Fundamentally, NEPA seeks to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decisionmaking process and the implementation of that decision.  *See, e.g.*, 40

---

[3] Another provision of the MMPA provides for the non-lethal deterrence of marine mammals to protect property and public safety.  16 U.S.C. § 1371(a)(4)(A).  Such deterrence is only available "so long as such measures do not result in the death or serious injury of a marine mammal."  *Id.* Moreover, such deterrence measures must be consistent with guidelines promulgated by the Secretary after notice and opportunity for comment.  16 U.S.C. § 1371(a)(4)(B).  The Secretary has never published guidelines for use in safely deterring any marine mammal, including the polar bear.  Pursuant to a settlement of claim seven of Plaintiffs Center for Biological Diversity et al.'s Second Amended Complaint, the Secretary must publish such guidelines by March 31, 2010.

C.F.R. § 1500.1.

NEPA and its implementing regulations, promulgated by the Council on Environmental Quality (CEQ), require "to the fullest extent possible" that all federal agencies prepare an environmental impact statement (EIS) for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4. Major federal actions include "new or revised agency rules, regulations, plans, policies, or procedures." 40 C.F.R. § 1508.18(a).

The purpose of an EIS is to force the decision-maker to infuse the policies and goals defined in NEPA into the actions of the federal government. 40 C.F.R. § 1502.1. An EIS analyzes the potential environmental impacts, alternatives, and mitigation opportunities for major federal actions. An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C).[4]

As Congress noted in requiring federal agencies to adhere to NEPA "to the fullest extent possible," 42 U.S.C. § 4332, the exceptions to compliance with NEPA's environmental review

---

[4] An agency may first prepare a detailed Environmental Assessment (EA) to determine whether the project may significantly affect the environment and requires a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. An EA is "a concise public document" that serves, among other things, to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

requirements are narrow.

> The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in . . . [42 U.S.C. § 4332(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible . . . . Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in [42 U.S.C. § 4332(2)] . . . . [N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

115 Cong. Rec. 39703 (1969), *quoted in Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1114-15 (D.C. Cir. 1971).  NEPA compliance is excused only "where a clear and unavoidable conflict in statutory authority exists," *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788 (1976), and where the conflicting statute ensures functional equivalence with NEPA.  *EDF v. EPA*, 489 F.2d 1247, 1256-1257 (D.C. Cir. 1973).

## IV.   STATEMENT OF FACTS

### A.   Polar Bears in a Warming Arctic

Polar bears are found only in the Arctic and sub-Arctic, where sea ice occurs for substantial portions of the year.[5]  ARL 117216-7.  Polar bears need sea ice as a platform from which to hunt ice-dependent seals, their primary food source; to make seasonal migrations between the sea ice where they feed and their terrestrial denning areas; and to find mates.  ARL 117259.  Because polar bears can only hunt effectively when on the ice, they undergo partial or complete fasting and nutritional stress when forced onto land either by the seasonal retreat of the sea ice or to give birth to their cubs.  ARL 117263, 117280.

---

[5] The polar bear's total reliance upon Arctic sea-ice habitat for survival is described in detail in Plaintiffs Center for Biological Diversity et al.'s Opening Memorandum of Points and Authorities in Support of Summary Judgment on the Listing Rule. Dkt. # 125.  A synopsis of such information, relevant to the 4(d) Rule, is included here, extracted largely from the regulatory preamble of the final Listing Rule.  ARL 117215-117307.

Since 1850, the global average air temperature has increased by about 0.76º C (1.37º F). ARL 151197.  The pace of warming is also accelerating, with the rate over the past 50 years nearly twice that of the past 100 years.  *Id.*  For a number of reasons, the Arctic experiences greater and more rapid warming than temperate regions.  ARL 153416.  Average Arctic air temperatures have increased at almost twice the rate of the rest of the world in the past 100 years, and some areas have warmed at 10 times the world average over the past three decades.  ARL 117228, 117274.  Even using "middle-of-the-road" projections of future greenhouse gas emissions levels, average temperatures in the Arctic are projected to increase an additional 5º C (9º F) by the end of this century.  ARL 117234.  Winter temperatures are projected to increase over the Arctic Ocean by up to 10º C (18º F) by the end of the century.  ARL 153403.

As a result, Arctic sea ice is melting very rapidly.  ARL 117224-8.  In September 2007, the Arctic sea-ice extent hit a new record minimum that was 23% lower than the previous record low in 2005, 39% lower than the long term average from 1979-2000, and 50% below sea-ice conditions of the 1950s-1970s.  ARL 117224-5, ARL 152650, 160255 (NASA images depicting Arctic sea ice in September 1979 and 2007).  The sea-ice extent in the winter is also declining, as is the age and thickness of the ice that remains.  ARL 117226-7.  The length of the sea ice melt season is increasing.  ARL 117227.

The Arctic sea ice is melting far faster than projected by scientific models, with 2007 ice extent falling far below what any of the models projected for that year.  ARL 117237 (Figure 7).  Perhaps of most concern, there was less ice in the Arctic in September 2007 than more than half of the models project for 2050.  *Id.*  (showing 2007 ice extent below model "ensemble mean" for 2050).

Because of their specialized habitats and life history, polar bears are particularly

vulnerable to sea ice loss.   ARL 117274.   Polar bears cannot survive without "large and accessible seal populations and vast areas of ice from which to hunt."   ARL 117266.   Even short of complete disappearance of sea ice, polar bears will experience a cascade of impacts that reduce reproduction and survival and cause population declines.   ARL 117270-1.

These impacts are not just future predictions; they have already been documented.   The populations on which the most extensive research has been conducted, Western Hudson Bay in Canada and the Southern Beaufort Sea in Alaska, are both known to be in decline due to the impact of global warming and sea-ice loss.[6]   ARL 117242, 117221, 117272.

Incidences of polar bears drowning, starving, and resorting to cannibalism due to food stress are also increasing, and will continue to increase as global warming transforms the Arctic. ARL 117267, 117272, 159157, 159161, 160284, 160256 (photo).   Agency scientists interpret these observations as a prelude to mass polar bear mortality events:   "As changes in habitat become more severe and seasonal rates of change more rapid, *catastrophic mortality* events that have yet to be realized on a large scale *are expected to occur*."   ARL 117279 (emphasis added).

Given the serious impacts polar bears are already suffering, the future is bleak for this species.   The U.S. Geological Service (USGS), an Interior Department scientific agency, conducted a number of studies addressing the future status of polar bears in a warming world. ARL 58950.   To carry out this analysis, the USGS divided the world's polar bears into four ecological regions based on sea-ice conditions (Seasonal Ice, Divergent Ice, Convergent Ice, and Archipelago Ecoregions).   The USGS concluded that the most likely outcome for polar bears within 45 years in the Seasonal and Divergent Ice Ecoregions is extinction.   ARL 161332,

---

[6] Less definitive trend information is available for other polar bear populations.   At the time of listing, scientists considered five of the world's polar bear populations as "declining," six as "data deficient," five as "stable," two as "increasing" (both recovering from severe overhunting), and one as "unclassified."   ARL 117221, *see also* 53203-4 (PBSG status table).

161376-7 (Table 8), 161401 (Figure 10).  By the end of the century, extinction becomes the most likely outcome for the Convergent Ice Ecoregion, as well as the "dominant" outcome in the Archipelago Region, with extinction risk 88.15%, 83.89%, 77.30% and 41.07% for the Seasonal, Divergent, Convergent and Archipelago Ecoregions, respectively.  ARL 161376-7, 161401.[7]

The USGS found that within the Seasonal and Divergent Ice Ecoregions the negative impact of sea-ice loss is so overwhelming that even removing all other threats to polar bears cannot significantly decrease their risk of extinction.  ARL 161343.  In other words, conservation of the bear in these areas is *entirely* dependant upon reducing the causes of sea-ice loss, i.e. greenhouse gas emissions and the consequent global warming.  In the Convergent Ice Ecoregion, management of other threats could increase the polar bear's chance of survival through mid-century, though by the end of the century extinction once again becomes the dominant outcome regardless of other management actions.  ARL 161344.  In the Archipelago Region, controlling other threats can improve the polar bear's chance of survival through the end of the century. ARL 161344.

Greenhouse gas emissions grow larger each year, which "underscores the current deficiencies of regulatory mechanisms in addressing root causes of climate change."  ARL 117291.  As the U.S. Marine Mammal Commission noted in urging an endangered listing for polar bears in the Seasonal and Divergent Ice Ecoregions, bears in these areas "already are in

---

[7] As dramatic as it is, the projections likely *underestimate* the extinction risk to polar bears for two main reasons.  First, the climate model projections on which the USGS projections are based all project a much slower melting trend for sea ice than what has actually been observed.  ARL 117278, 147118.  There was less ice in the Arctic in 2007 than more than half of the models project for 2050.  ARL 117237 (Figure 7).  Second, the USGS projections were based on assumptions about future greenhouse gas emissions that underestimate current trends.  The USGS utilized the Intergovernmental Panel on Climate Change's (IPCC) mid-range "A1B" scenario.  ARL 147118, 161357.  As it turns out, carbon dioxide emissions have increased far faster than anticipated by the IPCC, and today actual emissions exceed what is projected by even the *highest* IPCC scenario.  ARL 105018-9, 160231, 160232 (Figure 1).

danger of extinction unless the declining trends in sea ice coverage observed in recent years are somehow reversed.  There is no present reason to expect such a reversal."  ARL 126309-10.

**B.**      **Other Factors Compound the Threat of Sea-Ice Loss to the Polar Bear**

In addition to global warming, several other factors, including overharvest, industrial development in polar bear habitat, and toxic chemical contamination adversely affect polar bears; these impacts are likely to be exacerbated as the species declines in the face of global warming.  *See, e.g.* ARL 117284 ("We have determined that harvest is likely exacerbating the effects of habitat loss in several populations. In addition, polar bear mortality from harvest and negative bear-human interactions may in the future approach unsustainable levels for several populations, especially those experiencing nutritional stress or declining population numbers as a consequence of habitat change."); ARL 117296 ("[I]ncreased exposure to contaminants has the potential to operate in concert with other factors, such as nutritional stress from loss or degradation of the sea ice habitat or decreased prey availability and accessibility, to lower recruitment and survival rates that ultimately would have negative population level effects.").

While each of these threats is discussed at some length in the Listing Rule, given the 4(d) Rule's regulatory impact (intended or otherwise) on the management of contaminants affecting the polar bear, a summary of the effects of such contaminants on the bear is provided here.  As the Listing Rule notes, three types of contaminants pose the greatest threat to polar bears: petroleum hydrocarbons (e..g., crude and refined oil and natural gas), persistent organic pollutants (compounds that do not break down readily in the environment through chemical or biological processes), and heavy metals (e.g., mercury).  ARL 117292.

Of particular note is the threat posed by persistent organic pollutants or "POPs."  POPs include chemicals such as polychlorinated biphenyls (PCBs), chlordanes (CHL), DDT and its

metabolites, perfluoro-octane sulfonates (PFOsS) and polybrominated diphenyl ethers (PBDEs). *See* ARL 117294-95.  Because POPs do not readily degrade in the natural environment, they tend to bioaccumulate—that is, concentrations of POPs are higher in animals as one moves up the food chain from, for example, fish, to seals, to polar bears.  ARL 117294.  Species in the Arctic are particularly vulnerable to bioaccumulation because of the ecosystem's relatively simple food chain and because animals in the Arctic, such as the polar bear, tend to be long-lived, slow to reproduce, and have high levels of body fat.  *Id.*  All of these factors can result in increased concentrations of POPs in an organism's tissue and an increased chance that these POPs may interfere with reproductive success.

Most POPs do not originate in the Arctic. Rather, they are produced by industrial and agricultural activities farther to the south. ARL 117294.  POPs migrate to the Arctic in high concentrations, however, because of strong river, air, and ocean currents.  *Id.*

The Listing Rule and other evidence in the record reveal that POP contamination of the Arctic food chain can have serious consequences for some polar bear populations.  The Listing Rule acknowledges that, based on observed "reproductive impairment in females and males, lower survival of cubs, and increased mortality of females," high PCB concentrations in Svalbard, Norway, "may have contributed to population level effects in the past."  ARL 117295.

Additionally, polar bears have some of the highest tissue concentrations of organochlorine compounds, another group of POPs, of any Arctic mammal. ARL 117294.  *See also* ALR 103425-6 (Memorandum from FWS to Associate Solicitor, Division of Parks and Wildlife).  Such "high concentrations of organochlorines may also affect the immune system, resulting in a decreased ability to produce antibodies." ARL 117295. Exposure to organohalogens may also be a co-factor in the occurrence of renal lesions and other

histopathologies in polar bear livers. ALR 120107-120112. Organochlorines may also alter hormone production in both male and female polar bears, and modeling indicates that even low levels of chronic exposure to these chemicals can impair the reproduction and immune system function of polar bear offspring. ALR 120268-120291.

Organohalogens, another category of POPs, which includes PBDEs, have been shown to adversely affect the male and female genitalia of East Greenland polar bears, reducing their size and robustness and potentially compromising reproduction in these animals. ALR 120303-09.

Moreover, while some POP concentrations in the Arctic have declined from historic levels, "[o]verall, the relative proportion of the more recalcitrant compounds, such as PCB 153 and β-HCH, appears to be increasing in polar bears." ARL 117294. In addition, "newer compounds … have been recently found in polar bears (Braune et al. 2005, p. 5). Of this relatively new suite of compounds, there is concern that both PFOsS, which are increasing rapidly, and PBDEs are a potential risk to polar bears." ARL 117295. Additionally, a Canadian study found that contaminant loads of one of these newer POPs, perfluoroalkyls, which is associated with fetal toxicity and other effects in mice and rats, have risen exponentially in polar bears from two disparate locations in the North American Arctic. ALR 141221-141225.

As the Listing Rule acknowledges, the changes wrought by global warming to the Arctic are only likely to make the problem of POP exposure to polar bears worse:

> Climate change may increase long-range marine and atmospheric transport of contaminants (Macdonald et al. 2003, p. 5; Macdonald et al 2005, p.15). For example, increased rainfall in northern regions has increased river discharges into the Arctic marine environment. Many north-flowing rivers originate in heavily industrialized regions and carry heavy contaminant burdens (Macdonald et al. 2005, p. 31).

ARL 117294. Exposure to toxic compounds such as POPs may also act synergistically with nutritional stress brought on by climate change, to compound the effects of each. ARL 117296;

AR4D 2036 (noting the potential of "increased stress from contaminants compounded with nutritional stress" to affect bears).

Exposure to mercury and other heavy metals may also affect polar bears.  Mercury is potentially toxic at low concentrations and bioaccumulates over time. ARL 117295.  The Arctic is particularly susceptible to mercury deposition due to unique prevailing winds and increased ultraviolet radiation at the poles.  ALR 136584 (noting that "[w]ith the increase of UV radiation at polar sunrise $Hg^0$ [mercury] is converted to reactive gaseous mercury (RGM )…The RGM thus formed is very effectively removed from the atmosphere by particles/snow.").  Both the Viscount Melville population (Canada) and the Southern Beaufort Sea population (United States/Canada) have bodily mercury concentrations close to the biological threshold levels for marine mammals.  ARL 117295.

As with POPs, global climate change is apt to make this situation worse: "With warming will come the loss of permafrost causing altered hydrology, potentially more wetland, and enhanced fluxes of soil and organic carbon to rivers, lakes and estuaries…These two factors together suggest that episodic, large releases of organically-bound Hg [mercury] (of both anthropogenic and natural origin) may become a dominant feature accompanying permafrost degradation." ALR 136585.

In sum, contaminants present a significant impediment to the conservation of the polar bear.  However, the origin of these contaminants is almost entirely from outside the current range of the polar bear, and as such, as described below, activities causing the release of these chemicals into the environment are exempted from regulation under the ESA as a consequence of the polar bear 4(d) Rule.

**C.      Procedural History**

Plaintiffs Center for Biological Diversity, et al.'s, petition to list the polar bear under the ESA was submitted to the Secretary on February 16, 2005.  ARL 4040-4209.[8]  The status of the polar bear under the ESA was evaluated by a team of U.S. Fish and Wildlife Service Region 7 (Alaska) Marine Mammals Management personnel.  This team spent the better part of a year assessing the status of the polar bear, and compiled its findings in a document entitled *Range-Wide Status Review of the Polar Bear* (*Ursus maritimus*).  ARL 139236.  The Status Review formed the basis for the Proposed Rule to list the species range-wide as "threatened" that was released by the Secretary on December 26, 2006, and published in the Federal Register on January 9, 2007.  ARL 59985-60021.  The Proposed Rule found that, due to projected sea-ice loss, the polar bear was likely to become an endangered species in the foreseeable future, defined by the Secretary as 45 years, and therefore warranted listing as "threatened" under the statute. *Id.*

On September 7, 2007, the USGS released a series of reports predicting the loss of two-thirds of the world's polar bears by mid-century, and a significant chance of complete global extinction for the species by century's end. ARL 82124, 147118.  Following the release of the USGS reports, the Secretary re-opened the comment period on the Proposed Rule to allow for further public comment on this significant new information.   ARL 117239.  Among the

---

[8] Under the ESA, the Secretary was required to issue an initial finding stating whether Plaintiffs' petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted," within 90 days.  16 U.S.C § 1533 (b)(3)(A); 50 C.F.R. § 424.14 (b)(1).  Nevertheless, the Secretary did not take any action on the petition until Plaintiffs filed an action in District Court in December 2005.  *Center for Biological Diversity v. Kempthorne*, No. 05-5191 JSW (N.D. Cal. 2005).  On February 9, 2006, the Secretary published a 90-day finding. ARL 5597-8.  The parties then settled the case with a consent decree requiring the Secretary to issue the 12-month finding by December 27, 2006.  *Center for Biological Diversity*, No. 05-5191 JSW, Dkt. #32.

numerous comments received were those of the U.S. Marine Mammal Commission, which urged

an endangered listing for bears in the Seasonal and Divergent Ice Ecoregions.  ARL 126309.

On December 14, 2007 the Alaska Office of the Service transmitted the draft final lsiting

rule to the Washington Office.  ARL 96925.  Around the same time that the draft final rule left

the polar bear science team, the Secretary and the Director of the Fish and Wildlife Service, prior

to any review by the agencies' scientific staff, decided to issue a 4(d) rule for the polar bear.

AR4D2804 (December 11, 2007 email from Doug Krofta, chief of the Service listing branch, to

other Service staff stating "We received direction today from Bryan Arroyo concerning drafting

a 4(d) rule for the polar bear.  This direction came from a conversation with the Director and

Secretary….").

The 4(d) Rule was not drafted by the agency's polar bear biologists, but was instead

prepared by the Washington, D.C. Office.  AR4D 3290, 4422.  The polar bear science team was

given a chance to review the rule, and the record reflects that the Alaska office could find

nothing in the rule of conservation benefit to the bear.  On January 24, 2008, Charles Hamilton

wrote of the 4(d) Rule:

> …in a nutshell – it still has problems, it doesn't include our concerns [on] the four
> points previously discussed, it is very confusing, in the end I don't really know
> what it does*, are they protected under the ESA or not?  A brief call to DC
> indicates there were a lot of problems and people were rushed/pushed to get it
> done….pushing on something like this and rushing is not in our or polar bear
> conservations' best interest in my estimation.  Ultimately, we (I?) could do the
> 4(d) for sea otters, if somewhat tenuously, on the idea that we might get some
> information on why otters were declining through [encouraging] partnership with
> Alaska Natives and what they were learning from harvested animals, and this
> might be able to help us better understand the decline.  *This is not the case with
> the polar bear, we know why we are listing, and we know what needs to be done,
> or at least we have a good idea, on protective measure… I really don't see how
> this rule meets the requirements of the Act.*
> *Well one thing it does do is clarify the issue on sport hunted trophies – but this
> should really be done in my opinion in the final rule response to comments….

AR4D 3724 (emphasis added).

The Alaska regional office remained so concerned about the 4(d) Rule that they refused

to be listed as the contact for further information on the rule, writing on January 31, 2008,

> We have [struck] out the Service's Marine Mammal Management office in Anchorage, Alaska, regarding the contact/comments section and in the Public Comments Solicited section of this proposed rule. This initiative has been developed by various Divisions in Arlington and as such it would be better served if they continue to have the lead on issues that may be raised directly through the comments process.

AR4D 4422.

In 2008 Service Director Dale Hall began memorializing his meetings with Interior

Secretary Kempthorne and others.  On February 13, 2008, he wrote

> After recounting issues on strength and dependence of General Circulation Models, legal discussion of "foreseeable future", and other topics that had been discussed at previous meetings, I informed the Secretary that I could not and would not surname or sign any decision document that found listing of the polar bear as not warranted.  I explained that my professional and scientific integrity would not allow me to support any decision except a listing.
> After discussion, the Secretary stated that he could not support a decision that was opposed by "his" USGS and Fish and Wildlife Service Directors, so the decision was to list the species as threatened throughout its range *and to support a 4(d) rule identifying activities that had been shown not to be a threat to the species*….

ARL 106058 (emphasis added).

On February 22, 2008, Hall's notes from a meeting with Kempthorne and other high level

officials state, "all agreed the listing package and 4(d) rule proposal were completed.  Following

that meeting, I surnamed as the Service's final decision document the proposed rule to list the

polar bear as threatened throughout its range and delivered the rule to Assistant Secretary Lyle

Laverty."  ARL 107318.[9]

---

[9] Despite the fact that by this time the Secretary was already in violation of the January 9, 2008 statutory deadline to issue a final listing determination for the polar bear, the Secretary did not immediately proceed with the listing decision.  Instead, the record reflects little activity between

Yet between the February 22 meeting and the first week in May, the Secretary changed

his mind, and decided *not* to list the polar bear.  Dale Hall wrote:

> On Friday May 2, as I was preparing to leave Honolulu to return home, I received
> a call from Lyle Laverty saying the Secretary had decided NOT to list the polar
> bear.  He was not pleased with the decision, nor was I.  But we both accepted that
> it was his decision to make if he chose to do so. I informed Lyle that I could not
> assist in, nor have my staff assist in, writing a document to go against all the
> scientific information at our disposal….

ARL 113225.  On May 3rd, Kenneth Stansell wrote to Dale Hall: "They want us to ignore all

modeling data and just use observed data for bears and make the decision to not list accordingly.

I am getting ready to tell them your surnamed copy is our best effort and FWS can't help with

another rewrite."  ARL 113214.  Dale Hall responded "That's the right answer."  *Id.*

The record reflects that the Secretary and others were concerned with political, rather

than scientific, factors.  Notes from a meeting held April 22, 2008, list such topics as "Lawsuits

Climate [change] Not examine Sufficiently" and "Offense vs. Defense" for discussion.   ARL

112032.  Notes from a May 14, 2008 meeting list topics such as "Courts, 9th Circuit, Future

Administrations" as reasons "for or against" the listing decision, and state "Bottom line: with

listing, we are in driver's seat to shape policy/legal context."   ARL 116781.   It was this

argument, that with a threatened listing the administration could "shape policy/legal context"

through issuance of a 4(d) Rule, that apparently helped sway the Secretary back from his May 2,

2008 decision not to list the polar bear to the issuance of the rangewide "threatened" listing,

---

February 22, 2008 and April 28, 2008, when Judge Wilken issued an order directing the
Secretary to publish a final listing determination for the polar bear in the Federal Register by
May 15, 2008.  April 28, 2008 Order Granting Motion for Summary Judgment in *Center for
Biological Diversity v. Kempthorne*, Civ. No. 08-1339 (N. Dist. Cal.).

along with the 4(d) Rule reducing protections for the polar bear issued on May 15, 2008.[10]

The record thus reflects a high-level political battle over whether the polar bear would be listed at all. The 4(d) Rule, which allowed the Secretary to "shape the legal/policy context," allowed the listing to go forward in the final hours. The end result was the issuance of a 4(d) Rule, which, although required to "provide for the conservation" of the polar bear, in reality provided no conservation benefit to the species. Instead the rule stripped the bear of protections that it would otherwise receive, thereby "shaping the legal/policy context" as desired by the Secretary, but in the process, violating the ESA.

**D.      The Interim and Final 4(d) Rules**

Concurrently with his final listing of the polar bear as threatened throughout its range, the Secretary issued the "Interim Final" 4(d) Rule on May 15, 2008.   AR4D 8104-8117.   In announcing the rule, the Secretary acknowledged that, in part, the intent of Interim 4(d) Rule was to avoid the possibility of the ESA being used to address the primary threat to the polar bear, greenhouse gas emissions.  The Secretary stated, "The most significant part of today's decision is

[10] The White House was also clearly involved in the final deliberations.  Shortly after the final decision was made, Lynne Scarlett, Assistant Secretary of Interior, was given the following instructions from the White House:

> Make pre-press conference calls to Heritage and CEI [right-wing advocacy organizations] so they're [sic] initial comments to the press are less negative.
> Explain that this decision was unavoidable, and that by the Administration listing the polar bear we have minimized the impact of listing.  In contrast, waiting for litigation to forcibly list the polar bear would have resulted in a much worse outcome in the following ways….
> Quickly compile and distribute to conservatives and talk radio all of the negative comments made by the environmental groups about today's decision ("weak-kneed, inadequate, half-baked, etc.")
> Be ready to answer the question: why not let the courts force you to list the polar bear?
> Explain in detail the impact of the 4d decision
> Get the Chamber ready to say something nice (or not so hateful) about the 4d provision.

ARL 116782.  Scarlett replied "ok."  *Id.*

what President Bush observed about climate change last month.  President Bush noted that 'The Clean Air Act, the Endangered Species Act and the National Environmental Policy Act were never meant to regulate climate change.' The President is right." ARL 117204.

The Interim 4(d) Rule sought to exclude the applicability of the ESA to greenhouse gas emissions in three ways.  First, the rule exempted from the take prohibition of the ESA any activity adversely impacting the polar bear that originates outside of Alaska.  AR4D 008117. Second, for activities occurring in Alaska, the rule exempted from the ESA's take prohibition any activity that is conducted in a manner consistent with the MMPA or CITES.[11]  *Id.*  While the MMPA contains many strong provisions, in contrast to the ESA, the MMPA's definition of take does not include "harm." *Compare* 16 U.S.C. § 1532(19) *with* 16 U.S.C. § 1362(13).  The prohibition against "harming" listed species is one of the primary mechanisms by which a species' habitat can be protected.  *See, e.g., Palila v. Hawaii Dep't. of Land & Natural Res.,* 852 F.2d 1106 (9th Cir. 1988).[12]  Third, the regulatory preamble for the Interim 4(d) Rule included a section asserting that consultation under Section 7 of the ESA need not address greenhouse gas emissions.  AR4D 8111-8112.

To justify the Interim 4(d) Rule, the Secretary "determined that requiring additional authorization to carry out activities that are already strictly regulated under the MMPA and

---

[11] CITES regulates the trade in endangered species.  The CITES exemption in the 4(d) Rule is an apparent remnant from earlier versions of the 4(d) Rule which attempted to circumvent the import restrictions to sport-hunted polar bears that ultimately resulted from ESA listing.  The CITES exemption has no direct relevance to the question of the ESA's role in regulating the "take" of polar bears in the United States.

[12] While the MMPA's prohibition against "harassing" marine mammals could reasonably be read to prohibit activities that destroy a marine mammal's habitat, to date the Secretary has never interpreted or enforced this provision so as to protect marine mammals from habitat destruction. The absence of a citizen suit provision in the MMPA has prevented citizens from attempting to enforce this provision in such circumstances as they have been able to do with the harm provision of the ESA.

CITES would not increase protection for polar bears."  AR4D 8114.  In the Secretary's own words, the Interim 4(d) Rule allowed "with limited exceptions, for the maintenance of the status quo regarding activities that had previously been authorized or exempted under the MMPA." AR4D 8116.

The Secretary also made the Interim 4(d) rule effective immediately, without issuing a proposed regulation as required by the ESA and the APA.  AR4D 8105.  Nor did the Secretary prepare either an environmental assessment or an environmental impact statement under NEPA before issuing the rule.  AR4D 8116.

To justify its interim rule, the Secretary asserted that the immediate exemption of the standard ESA take prohibitions would benefit the polar bear, as it would allow nonlethal deterrence of bears from people.

> [T]he interim special rule has the advantage of providing a conservation benefit to polar bears that is unavailable under the general threatened species provisions in section 17.31 and 17.32.  Under the interim special rule, the Service can continue to authorize nonlethal measures to deter polar bears under appropriate situations and therefore avoid interactions with people. In the past these steps have proven successful in preventing injury and death to both people and polar bears. The general threatened species provisions in sections 17.31 and 17.32 would not allow such protection for either people or bears.

AR4D 008114-8115.  As explained below, this justification is entirely disingenuous.

Upon issuing the Interim 4(d) Rule, the Secretary opened a 60-day *post facto* comment period.  Among the many comments were those of the U.S. Marine Mammal Commission. AR4D 13305.  The Commission's comments noted how the Interim 4(d) Rule did not provide for the conservation of the polar bear.

> When read as a whole, the interim rule does little to add protection to polar bears beyond those already provided under the MMPA and CITES….we do not concur with the Service's conclusion that its 36-year history of implementing the MMPA and 33-year history of implementing CITES demonstrate that these laws "provide appropriate regulatory protection to polar bears for activities that are regulated by

these laws."   To the contrary, applying the historical perspective clearly demonstrates that relying solely on the provisions of the MMPA and CITES has been inadequate to provide protection to polar bears sufficient to avoid the need to list them under the ESA. *As such, the Commission does not see how perpetuating these same management regimes without any supplementation satisfies the mandate of section 4(d) of the ESA that these protective regulations provide for the conservation of polar bears....*

AR4D 13306-13307 (emphasis added).   The Commission recommended that the Secretary issue a new 4(d) Rule "that includes provisions tailored to the specific conservation needs of polar bears and the threats they face, including ongoing and projected loss of sea ice habitat."  AR4D 13305.

The Secretary did not heed the Commission's advice. On December 16, 2008, the Secretary replaced the Interim 4(d) Rule with the 4(d) Rule that is in effect today.  AR4D 12925.

The final 4(d) Rule is substantially similar to the Interim 4(d) Rule.  It maintains the sweeping exemptions from the ESA's take prohibitions for actions conducted in compliance with the MMPA or CITES.  The exemption for activities outside of Alaska was modified to exempt activities occurring outside "the current range of the polar bear."  AR4D 012945.  Some of the justification for the rule in the regulatory preamble was modified, but the core elements of the rule remained the same: no provisions were included to address the primary threat to the polar bear -- the loss of its sea-ice habitat due to global warming.  Instead, the rule was specifically crafted with the intent of excluding the take prohibitions of the ESA from application to that threat.  As explained below, the Secretary's issuance of the 4(d) Rule violates the requirement of the ESA that it provide for the conservation of the polar bear.

## V.      ARGUMENT

### A.      The Section 4(d) Rule Fails to Meet the Conservation Mandate of the ESA

In issuing the 4(d) Rule for the polar bear, the Secretary violated the plain language and

clear Congressional intent of Section 4(d) in three ways.

*First*, the validity of a Section 4(d) rule must be judged on whether it is intended and reasonably likely to "provide for the conservation" of the polar bear by actually addressing the conditions responsible for the species' decline.  By designing the 4(d) Rule to exempt from Section 9 of the ESA the single greatest threat to the species' continued existence—the melting of sea ice caused by greenhouse gas emissions—the Secretary has failed to meet this standard.  A rule designed to ignore the single greatest threat to a species is not even arguably one meant to "provide for [its] conservation."  Whatever the broader policy and political goals this exemption was meant to accomplish, they have nothing whatsoever to do with conserving the polar bear and are therefore beyond the Secretary's statutory authority.

*Second*, even if the Secretary's decision to exclude greenhouse emissions from coverage under the 4(d) Rule could somehow be deemed to be within his discretion, the 4(d) Rule is still arbitrarily broad in that it exempts without rational explanation not just greenhouse gas pollution, but *any* actions outside of the range of the polar bear that result in polar bear "takes."  Thus, for example, the polar bear receives no protection against the release of chemical contaminants outside its current range even if the contamination has a direct impact on individual members of the species.

*Third*, the 4(d) Rule also exempts from the ESA's prohibitions all activities that are consistent with the MMPA, including activities that could harm or kill polar bears.  Although the Secretary suggests such protections are equivalent, in fact the MMPA provides neither the substantive nor procedural protections of the ESA.  The definition of "harm' in the MMPA is narrower than that of the ESA, and the MMPA does not contain a citizen suit provision, which is often essential to effective species conservation.   Regardless, the presence of equivalent

protections to a species in another statute cannot justify a 4(d) Rule that wholly defers to that statute without a showing that such deference provides a conservation benefit to the polar bear. The Secretary has failed to make that showing here.

The 4(d) Rule should be struck down and remanded to the agency.  By exempting from regulation the very classes of activities most likely to cause harm to the species, and by relying on alternative statutes that do not provide equivalent protections, the Secretary has not issued a rule "necessary and advisable to provide for the conservation of the polar bear."  He has instead prioritized political expediency over the needs of the polar bear, and in so doing has violated the ESA.[13]

**1.    The Secretary's Authority to Issue Section 4(d) Regulations Is Limited by the Duty to Conserve Listed Species**

The first stated purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be *conserved*." 16 U.S.C. § 1531(b) (emphasis added).  As the Supreme Court has noted: "In shaping [the ESA], Congress started from the finding that 'the two major causes of extinction are hunting and destruction of natural habitat.' S. Rep. No. 93-307, p.2 (1973).  Of these twin threats, Congress was informed that the greatest was destruction of natural habitats."  *TVA v. Hill*, 437 U.S. at 179.

By statute, endangered species are entitled to the fullest protections of the ESA, including

---

[13] Plaintiffs have standing to bring this action.  Plaintiffs are conservation organizations, each with a mission to protect wildlife populations and preserve their natural habitat.  *See* Declarations of Melanie Duchin, Kieran Suckling and Jenny Ross filed with Center for Biological Diversity et al., Motion for Summary Judgment Regarding the Listing Rule, Dkt. # 125.  *See also* Declarations of Karla Dutton and Nick Jans filed concurrently. Plaintiffs' members visit, observe and enjoy polar bears and their habitat.  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).  Plaintiffs will suffer injuries in fact, those injuries are traceable to Defendants' actions, and they would be redressed by a favorable decision of this Court setting aside Defendants' arbitrary and unlawful actions. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180-84 (2000).

Section 9's prohibition of take.   While the take prohibition does not automatically apply to threatened species, the ESA requires the Secretary to tailor the statute's take protections to help recover the species before it becomes endangered.   For threatened species, Section 4(d) of the ESA directs that the Secretary "shall issue such regulations as he deems necessary and advisable to provide for the *conservation* of such species."   16 U.S.C. § 1533(d) (emphasis added).   The term "conservation" is defined as

> the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.

16 U.S.C. § 1532(3).   In other words, "conservation" equates to the actions necessary to reduce the threats facing a given species such that its future can be assured and listing under the ESA is no longer warranted.

Thus, while the plain language of Section 4(d) gives the Secretary the authority to determine by special rule the degree to which specific protective measures are necessary, the Act's plain language also provides a strict standard against which to judge the Secretary's decision making.   *See, e.g., Sierra Club v. Clark*, 755 F.2d 608, 612-13 (8th Cir. 1985) (holding that Secretary's discretion to issue regulations under ESA Section 4(d) "is limited by the requirement that the regulations he is to issue must provide for the *conservation* of threatened species" (emphasis in original)); *Louisiana, ex rel. Guste v. Verity*, 853 F.2d 322, 332-33 (5th Cir. 1988) (describing the Secretary's obligation to promulgate section 4(d) rules that provide for the conservation of the species as a "mandatory duty").

Indeed, in furtherance of this conservation mandate, the Secretary issued a regulation in 1978 extending the full Section 9 take prohibitions to all threatened species.   40 Fed. Reg. 44412 (September 26, 1975), *codified* at 50 C.F.R. § 17.31(a).   With this rule, FWS "established a

regime in which the prohibitions established for endangered species are extended automatically to all threatened species by a blanket rule and then withdrawn as appropriate, by special rule for particular species." *Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993), *modified on other grounds on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds*, 515 U.S. 687 (1995). Thus, for more than 30 years, it has been FWS policy and administrative practice to extend the ESA's full protection against take to threatened species as the most effective approach for ensuring their conservation.   Any departure from this longstanding position must have a valid conservation purpose.

The conservation obligation goes beyond merely sustaining an imperiled population; the Secretary must affirmatively attempt to recover the species.  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (*quoting Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 441-42 (5th Cir. La. 2001) ("'Conservation' is a much broader concept than mere survival. The ESA's definition of 'conservation' speaks to the recovery of a threatened or endangered species.").  In other words, the Secretary's authority to issue Section 4(d) rules authorizing take of polar bears is limited to those measures that are "necessary and advisable" to provide for the survival and recovery of the species.[14]  In *Defenders of Wildlife v. Andrus*, the court construed the relationship between section 4(d) and the ESA's conservation definition, stating:

> It is clear from the face of the statute that the Fish and Wildlife Service, as part of Interior, must do far more than merely avoid the elimination of a protected species.  It must bring these species back from the brink so they may be removed from the protected class, and it must use all methods necessary to do so.  The Service cannot limit its focus to what it considers the most important management tool available to it to accomplish this end. … [T]he agency has an affirmative

---

[14]  Indeed, Section 4(d) has been read narrowly as to permit regulated taking *only* in the "extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." *Sierra Club v. Clark*, 755 F.2d 608, 611 (8th Cir. 1985).

duty to increase the population of protected species."

428 F. Supp. 167, 170 (D.D.C. 1977).

That Congress intended the Secretary to use Section 4(d) of the Act to affirmatively protect threatened species and their habitats is made clear not only by the statutory text, but by the ESA's legislative history.  The Senate Report states:

> [The section] requires the Secretary, once he has listed a species of fish or wildlife as a threatened species, to issue regulations to *protect* that species.  Among other protective measures available, he may make any or all of the acts and conduct defined as "prohibited acts" … as to "endangered species" also prohibited acts as to threatened species.

S. Rep. No. 93-307, 93d Cong., 1st Sess. 8 (1973) (emphasis added).  The issue of how much protection to afford to threatened species was considered in hearings in both the House and Senate.  "It was the firm intent of both the House and Senate that the purpose of the Act was to restore the population of a threatened species." *Sierra Club v. Clark*, 577 F. Supp. 783, 788 (D. Minn. 1984), *aff'd in part and rev'd in part by* 755 F.2d 608, 611 (8th Cir. 1985) (citations omitted).

The final Conference Report accompanying the Act demonstrates further that the ESA's definition of "conservation" also limits the Secretary's ability to permit taking of threatened or endangered species.

> In view of the varying responsibilities assigned to the administering agencies in the bill, the term [conservation and management] was redefined to include generally the kinds of activities that might be engaged in to improve the status of the endangered and threatened species so that they would no longer require special treatment.  The concept of conservation covers the full spectrum of such activities: from total "hands-off" policies involving protection from harassment to a careful and intensive program of control.  In extreme circumstances, as where a given species exceeds the carrying capacity of its particular ecosystem and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species.  To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur – it is just to say that the

authority exists in the unlikely event that it ever becomes needed.

Conf. Rep. No. 930740, 93rd Cong., 1st Sess. 23 (1973), U.S.C.C.A.N 1973, at 2989, 3002. This language "clearly indicates an intent to limit the Secretary's discretion to permit the taking of threatened species." *Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985) ("Because a 'conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." (*citing Demby v. Shweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981)).

The Secretary's authority to issue Section 4(d) rules thus is constrained by the text and history of the ESA.  Such rules must have a valid conservation purpose.

**2.      The Secretary Cannot Use Section 4(d) to Exempt the Primary Identified Threat to the Polar Bear from ESA Regulation**

As discussed above, the Secretary has an obligation to prevent the taking of a threatened species if such a taking is related to the causes of its population depletion.  *Connor v. Andrus*, 453 F. Supp. 1037 (W.D. Tex. 1978) (striking down a regulation as insufficiently related to the protection of the species).   The Secretary's affirmative duty to increase protected species populations "is not met by promulgating. . . . regulations which do not attack the cause or causes of population depletion of a species." *Id.* at 1041.

In listing the polar bear, the Secretary determined that the animals "are reliant on sea ice as a platform to hunt and feed on ice-seals, to seek mates and breed, to move to feeding sites and terrestrial maternity denning areas, and for long-distance movements."   ARL 117296.   The Secretary found that rapid loss of sea ice in the Arctic, which is "unequivocal and extensively documented in scientific literature" and "projected by the majority of state of the art climate models," threatens the polar bear throughout its range.  *Id.*

Despite these findings, the Secretary issued a polar bear 4(d) Rule that not only fails to

address the principle threat to the species' continued existence, but actually departs from the baseline regulations that apply to all threatened species in order to specifically exempt greenhouse gas emissions from the reach of the ESA. In so doing, the Secretary has failed to comply with the ESA's mandate that regulations promulgated under Section 4(d) "must provide for the conservation of threatened species." *Sierra Club v. Clark*, 755 F.2d at 614. ("Section 1533(d), when read in conjunction with the definition of 'conservation' in section 1532, limits the Secretary's discretion as to threatened species."); *see also Fund for Animals, Inc. v. Turner*, 1991 U.S. Dist. LEXIS 13426 (D.D.C. Sept. 27, 1991) (enjoining 4(d) rule because its purpose did not fall within the narrow ESA definition of "conservation").

The final 4(d) Rule violates this statutory standard because the Secretary has failed to establish that a valid "conservation" purpose exists to justify this dramatic and unprecedented departure from the general take prohibitions of Section 9 and 50 C.F.R. § 17.31. Indeed, reading the Secretary's 4(d) Rule and the administrative record, it appears that the rule's true purpose is not to recover the species but rather to relieve the Interior Department, and industry, of the challenges of addressing greenhouse gas emissions.

The record reflects that officials at the Interior Department were preoccupied with the potential policy impacts of a listing decision. ARL 112032, 116781. Notes from a May 14, 2008 meeting focused on the litigation risks of a listing decision and stated: "Bottom line: with listing we are in driver's seat to shape policy/legal context." ARL 116781. The legal and policy context in this case is significantly defined by the effect of the ESA's take prohibitions.[15]

---

[15] As detailed in Center for Biological Diversity et al.'s opening brief regarding the Listing Rule, the desire to issue a 4(d) Rule may have driven the Secretary's decision to list the polar bear as threatened instead of endangered. Had the Secretary listed any polar bear populations as endangered, he could not have issued a 4(d) Rule effectively exempting whole categories of activities from the reach of the ESA.

The 4(d) Rule reflects a considered and documented policy decision to limit the reach of the ESA.  *See, e.g.* ARL 117204 (Secretary Kempthorne statement regarding intent of 4(d) to exclude greenhouse emissions to reach of ESA).  While the Secretary may not want the ESA to cover greenhouse gas emissions, once he recognized such emissions as the primary threat to the conservation of the polar bear, he may not exempt such emissions from the reach of the Act through a regulation that is required to "provide for" that species' conservation.[16]

### 3.   The Section 4(d) Rule's Exemptions for Activities Originating Outside the Range of the Polar Bear Are Impermissibly Overbroad

As demonstrated above, the Secretary's decision to exclude the very threat that resulted in the polar bear being listed under the ESA – greenhouse gas emissions – from regulation under the Act exceeds the discretion granted to him by Section 4(d), as such an exclusion does not "provide for the conservation" of the species.  16 U.S.C. § 1533(d).  Even if such an exemption were a permissible exercise of the Secretary's discretion, however, the actual *manner* in which the Secretary exempted such emissions is arbitrary and capricious.  The 4(d) Rule exempted all activities that occur outside of the current range of the polar bear from the "take" prohibitions of the ESA.  While it is clear that the intent of the provision was to exclude greenhouse gas emissions in the lower 48 states from the potential reach of the ESA, the effect of the 4(d) Rule is far more broad.

As discussed above, the ESA's implementing regulations explicitly apply the Act's take

---

[16] In the regulatory preamble to both the Interim and final 4(d) Rules, the Secretary goes to great effort to argue that it would be impossible to establish that an action emitting greenhouse gases was the cause of a "take" as that term is defined under the ESA.  *See* AR4D 8111-8112, 12941-2. If this were truly the case, there would be no need to explicitly exempt such activities from the reach of the ESA's take prohibitions as the Secretary has done with the 4(d) Rule.  In any event, whether and how such a violation would be proved is not before the court; rather it is the Secretary's poorly-supported decision to completely close the door on such enforcement that is at issue.

prohibitions to all threatened species.  In the absence of the 4(d) Rule, these prohibitions would apply to the polar bear.  50 C.F.R. § 17.31(a).  By reducing the scope of activities regulated under the ESA to those occurring in the current range of the species, the Secretary exempts not just greenhouse emissions but *all* activities outside the polar bear's range that may result in take of bears.

For example, as discussed above, the majority of contaminants that negatively impact polar bears, including persistent organic pollutants such as PCBs and heavy metals such as mercury, come from outside the current range of the species.  ARL 117294 ("These compounds are transported via large rivers, air, and ocean currents from the major industrial and agricultural centers located at more southerly latitudes.").  Many of these chemicals are well-known to cause harmful effects on polar bears, including increased mortality of adult females and cubs, reproductive impairment, impairment of immune system function, renal lesions, and alteration of polar bear genitalia.  *See* ARL 117294; ALR 120107-120112; ALR 120303-12309.  Moreover, the concentration of several persistent organic pollutants in the Arctic is rapidly increasing.  ARL 117294; ALR 141221-141225.

It is also well-established that the use of organic pollutants, such as pesticides, that adversely affect listed species can be found to constitute a take of such species under the ESA. *See, e.g., Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294 (8th Cir. 1989) (finding take violation for approval of pesticides that harmed listed species).  Yet, with no discussion whatsoever, the 4(d) Rule eliminates any possible regulation of these chemicals outside the range of the polar bear under Section 9 of the ESA, even if their use can be traced directly to adverse impacts on individual bears.  The 4(d) Rule provides no rational justification for eliminating such protections, and doing so cannot be construed as "necessary and advisable" to provide for the

survival and recovery of the polar bear.   Accordingly this Court should "have no difficulty concluding that this regulation is both arbitrary and capricious because it is irrationally overbroad."  *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999).[17]

It is black letter law that agencies are required to provide a reasoned basis for their rulemaking decisions.  5 U.S.C. § 553(c) (an agency shall incorporate in rules it adopts a concise general statement of their basis and purpose); *see also, e.g., PPL Wallingford Energy LLC v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005) (agency must "articulate a satisfactory explanation" of its decision).  The Secretary does not discuss anywhere in the preamble to the 4(d) Rule his reasons for depriving the polar bear of protection against all incidental take arising from activities outside the species' current range, no matter what its source.  The Secretary's failure to provide a reasoned basis for adoption of this portion of the rule thus squarely violates the APA and Section 4(b)(4) of the ESA, 16 U.S.C. § 1533(b)(4).

### 4.   The Conservation Benefits of the 4(d) Rule Are Illusory

Within the polar bear's range, the essence of the Secretary's argument for withholding ESA protections from the polar bear is that existing provisions of the MMPA are equivalent or better than those provided by the ESA, and that therefore there would be no conservation benefit to additional ESA protections.  This position is both factually wrong and legally untenable. Because the polar bear is a marine mammal, activities impacting polar bears were already regulated by the MMPA prior to the ESA listing.  Almost by definition, then, the MMPA does

---

[17] Nor was the wide reach of the 4(d) Rule necessary.  One early draft of the 4(d) Rule did not contain the sweeping language of the current rule—whose collateral effects were never even addressed by the Secretary.  Rather, that early draft simply provided: "Subsection 17.40q1 and 17.31 shall not prohibit effects incidental to the emission of any greenhouse gas from any source subject to regulation under the Clean Air Act 42 U.S.C 7401-7671q."  AR4D 2030.  While, for the reasons discussed above, such a 4(d) rule still would have been impermissible, its rejection highlights the arbitrary and overbroad nature of the current rule.

not adequately provide for the conservation of the polar bear; if it did, the ESA listing would not have been necessary.   In significant respects the MMPA is less protective than the ESA. However, even the existence of substantial overlap in protections between the two statutes, as well as the few instances where the MMPA is more restrictive than the ESA, still do not provide a legally valid rationale to *reduce* the protections that would be afforded the polar bear under the ESA absent the 4(d) Rule.

### a.   The MMPA Does not Provide the Same Protections to the Polar Bear as the ESA.

While there are similarities between the prohibitions and exemptions provided by the take provisions of the ESA and MMPA, these provisions are not interchangeable.   A primary difference in the two regulatory schemes is the absence of the term "harm" in the MMPA's definition of "take."   *Compare* 16 U.S.C. § 1532(19) *with* 16 U.S.C. § 1362(13).   Under the ESA, the "harm" prohibition has been interpreted to include habitat modification which significantly impairs "essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R § 17.3.   As such, this prohibition against "harming" listed species has been an effective mechanism to protect the habitat of imperiled species.   *See, e.g., Marbled Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995); *Palila v. Hawaii Dep't. of Land & Natural Res.,* 852 F.2d 1106 (9th Cir. 1988).   The Secretary has identified habitat loss due to global warming as the primary threat to the polar bear, yet the 4(d) Rule reduces the regulatory protection that habitat would receive in the absence of the 4(d) Rule by rendering the "harm" prohibition inoperative.

Additionally, unlike the ESA, the MMPA provides no citizen-suit provision, so enforcement of the protections it does provide is left entirely to the discretion of the Secretary, meaning that the MMPA's protections remain largely unimplemented and unenforced on the

ground (and ice). *See, e.g.* 71 Fed. Reg. 43926 at 43927 (August 2, 2006) (MMPA regulations governing take of polar bears in the Beaufort Sea) ("A lapse in authorization occurred from March 29, 2005, until publication of this rule, during which industry was liable for take of any polar bear and walrus."). During this lapse in take authorization the Secretary did not prosecute any violations of the MMPA even though such violations almost certainly occurred.

      **b.**    **The Secretary Fails to Identify a Valid Conservation Benefit to the Polar Bear From the 4(d) Rule**

The bulk of the regulatory preamble for the Interim and final 4(d) Rules is spent attempting to demonstrate that ESA protections are not necessary for the polar bear because the provisions of the MMPA are largely similar.  Nevertheless, because Section 4(d) requires the Secretary to point to some conservation benefit from a species-specific 4(d) rule, the Secretary ultimately attempts to justify the 4(d) Rule on the grounds that it actually provides specific conservation benefits to the polar bear.  Specifically, the Secretary states that, "Under the interim special rule, the Service can continue to authorize nonlethal measures to deter polar bears under appropriate situations and therefore avoid interactions with people." AR4D 8114-8115. However, a closer examination of this claim shows that the 4(d) Rule does not itself provide this or any other conservation benefit to the polar bear.

Both the ESA and the MMPA contain exemptions for "take" (including lethal take) of polar bears in defense of human life.  AR4D 8108; 16 U.S.C. § 1540(a)(3) & (b)(3); 50 C.F.R. 17.21(c)(2) ("Notwithstanding paragraph (c)(1) of this section, any person may take endangered wildlife in defense of his own life or the lives of others."); 16 U.S.C. § 1371(c) ("It shall not be a violation of this chapter to take a marine mammal if such taking is imminently necessary in self-defense or to save the life of a person in immediate danger….").

Both the ESA and the MMPA also contain provisions for the non-lethal take (or

"hazing") of polar bears by wildlife management officials in situations that are not life threatening, in order to scare the bears away from humans and human settlements and prevent situations that could result in the death or injury of a human or a bear.   The ESA provides that federal or state officials may haze polar bears as necessary to "(i) Aid a sick, injured or orphaned specimen; or…(iv) Remove specimens which constitute a demonstrable but nonimmediate threat to human safety." 50 C.F.R. 17.21(c)(3).   Similarly, the MMPA provides that officials may take marine mammals so long as the taking is for: "(A) the protection or welfare of the mammal, (B) the protection of the public health and welfare, or (C) the non-lethal removal of nuisance animals." 16 U.S.C. § 1379(h)(1); 50 C.F.R. § 18.22.

As the Secretary acknowledges, the ESA and MMPA provisions are thus essentially identical with regard to take of polar bears in the interest of human safety.   AR4D 8108 ("The MMPA regulations at 50 C.F.R. 18.22 provide the specific requirements of the exception.   The ESA regulations at 50 C.F.R. 17.21(c)(3) are similar…").   Nevertheless, the Secretary still asserts that somehow the MMPA allows him to authorize take of polar bears for the benefit of the species in a manner that the default take provisions of the ESA would preclude: "The general threatened species provisions in sections 17.31 and 17.32 would not allow such protection for either people or bears."   AR4D 8115.   Such an assertion is contradicted by the plain language of the two statutes and their implementing regulations, as well as by other statements by the Secretary himself elsewhere in the 4(d) Rule.

In the 4(d) Rule, the Secretary also points to additional non-lethal deterrence measures purportedly available pursuant to section 101 of the MMPA.   Section 101(a)(4)(A) of the MMPA provides that the MMPA's prohibition on the take of a marine mammal "shall not apply to the use of measures" to deter marine mammals from damaging fishing gear, private property,

personal safety, or public property, "so long as such measures do not result in the death or serious injury of a marine mammal." 16 U.S.C. § 1371 (a)(4)(A).

Importantly, however, this exemption is only available after the publication of guidelines by the Secretary, *including specific guidance for marine mammals listed under the ESA*.  16 U.S.C. 1371 (a)(4)(B). Yet the Secretary has never published guidelines for use in safely or nonlethally deterring any marine mammal, including the polar bear.

In short, the Secretary premises his claim that the MMPA is a more beneficial statutory mechanism to conserve the polar bear on a provision of the MMPA that is not effective because he has utterly failed to implement it.  This was true at the time the 4(d) Rule was issued and it remains true today.  The Secretary simply cannot rest his 4(d) Rule on a provision of law that cannot, by definition, "provide for the conservation" of the polar bear in the absence of necessary implementing action to make that law effective.[18]  The alleged conservation benefit to the polar bear from the 4(d) Rule is entirely illusory.

           **c.**       **There is No Rational Connection between the 4(d) Rule's Exemptions and the Purported Benefit it Provides to Bears.**

Finally, even assuming that the Secretary's interpretation of the interaction of the MMPA and ESA were correct, the 4(d) Rule would still fail to provide an overall conservation benefit to the species.  Fundamentally, in order to provide a conservation "benefit" to the polar bear, the benefits to the polar bear from the 4(d) Rule must outweigh the benefits of any protections polar

---

[18] In an even less convincing section of the 4(d) Rule, the Secretary also points to the purported benefits the polar bear will receive from the "Good Samaritan" exemption in the MMPA, which provides that take for the purpose of disentangling a marine mammal from fishing gear or debris shall not violate the statute.  16 U.S.C. § 1371(d).  The Secretary's attempt to justify the 4(d) Rule is extraordinarily weak, because the Secretary has stated in the same rulemaking that there is currently no interaction between commercial fisheries and polar bears.  AR4D 008111 ("At present, polar bear stocks in Alaska have no direct interaction with commercial fisheries activities, and we know of no instances where a take is likely to occur.").

bears would enjoy in the absence of a 4(d) Rule.  Here, the Secretary has eliminated protections for polar bears over vast swaths of their habitat and from a wide variety of industrial activities both inside and outside its range, while describing a relatively narrow benefit.  If the Secretary truly believed that additional authorization of nonlethal take beyond that provided by the ESA was necessary for the conservation of the polar bear, the Secretary could have promulgated a 4(d) rule that explicitly authorized that form of take.  However, the Secretary cannot rationally bootstrap an exemption of all other forms of take, including take from oil company operations in polar bear habitat, and from greenhouse gas and toxic chemical emissions elsewhere, simply because he concludes that more flexibility in nonlethal deterrence is necessary.  In this instance, not only does the 4(d) Rule fail to provide an overall benefit to the species, but there is no rational connection between the facts found by Secretary in the 4(d) Rule (i.e., the need to allow for additional flexibility for nonlethal hazing) and the choices made by the rule.  *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").  In short, the Secretary's approach in the 4(d) Rule is both ill-advised and illegal.

**5.      The Secretary Cannot Exempt Activities from the ESA Simply Because Regulatory Mechanisms May Overlap**

The Secretary does not explain how depriving the polar bear of the statutory protections generally afforded by the ESA provides for the conservation of the polar bear.  Other attempts by the Secretary to rely on the existence of alternative management schemes that provide similar, but not identical, protection to listed species as an excuse for not applying ESA protections have

been roundly rejected as inconsistent with the intent and purpose of the Act.  *Cf. Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1100 (D. Ariz. 2003) (holding that the "existence of other habitat protections does not relieve the [Secretary] from designating critical habitat"); *id.* at 1099 ("So long as they are useful, the more protections the better."); *see also NRDC v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997) ("Neither the [ESA] nor the implementing regulations sanctions nondesignation of habitat when designation would be merely *less* beneficial to the species than another type of protection.") (emphasis in original). Here, as in these prior cases, the Secretary has wholly failed to demonstrate why the particular protections afforded by the ESA should not be added to any protections provided under other statutory schemes.

The Secretary asserts that maintaining full ESA protections would "require an unnecessary overlay of redundant authorization processes." AR4D 012938.  As demonstrated above, however, the ESA's protections are not redundant with those provided by the MMPA. Moreover, the convenience of parties who would otherwise be subject to the take prohibitions of the Act is not a permissible factor in the Secretary's promulgation of a 4(d) rule.  To the extent that the Secretary has based a decision to withhold statutory protections from the polar bear for the convenience of regulated parties, his decision is fundamentally arbitrary and unlawful, particularly when, as here, such action is counter to the conservation of the species.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

**B.    The Secretary Violated NEPA in issuing the 4(d) Rule**

As demonstrated above, the 4(d) Rule fails to meet the substantive requirement of the ESA that any such rule provide for the conservation of the polar bear.  While this Court can and must strike down the 4(d) Rule due to its substantive infirmities, the Secretary's failure to

comply with the procedural requirements of the National Environmental Policy Act (NEPA) provides an independent ground for setting aside the flawed rule.

It is undisputed that the Secretary did not follow NEPA procedures when promulgating the 4(d) Rule.  *See, e.g.* AR4D 12944 ("This rule is exempt from NEPA procedures.").  What is disputed is whether the Secretary's claim of exemption falls within the narrow statutory confines for such exemption articulated by Congress and the courts.  As demonstrated below, it does not.

### 1.    Congress Requires NEPA Compliance to "the Fullest Extent Possible"

To implement NEPA's purposes of environmentally-informed decisionmaking and public participation, NEPA and its implementing regulations require that all federal agencies prepare an environmental impact statement (EIS) for all "major federal actions significantly affecting the quality of the human environment."   42 U.S.C. § 4332 (2)(C); *see also* 40 C.F.R. § 1501.4.  Major federal actions include "new or revised agency *rules*, *regulations*, plans, policies, or procedures."  *Id*. at § 1508.18(a) (emphasis added).  The promulgation of the 4(d) Rule for the polar bear clearly falls within the definition of a "major federal action" as it is a "rule" or "regulation."  Absent some exemption, compliance with NEPA procedures when issuing the rule was required.

> As the Supreme Court noted in clarifying the limited nature of exceptions to NEPA,
>
> NEPA's instruction that all federal agencies comply with the impact statement requirement - and with all the other requirements of § 102 – "to the fullest extent possible," 42 U.S.C. § 4332, is neither accidental nor hyperbolic.  Rather, the phrase is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle.

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 787 (1976).

Congress, in adding the "to the fullest extent possible" language, intended that non-compliance with NEPA procedures would rarely be excused.

> The purpose of the new language is to make it clear that each agency of the Federal Government *shall comply* with the directives set out in . . . [42 U.S.C. § 4332(2)] *unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible* . . . . Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in [42 U.S.C. § 4332(2)]. . . . [N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

115 Cong. Rec. 39703 (1969), *quoted in Calvert Cliffs' Coordinating Comm.,* 449 F.2d at 1114-15 (emphasis added).

Prior to the Supreme Court's ruling in *Flint Ridge*, the D.C. Circuit articulated a "functional equivalence" test to excuse agencies from NEPA compliance in certain limited circumstances. In *Portland Cement Ass'n v. Ruckelshaus*, the court found "a narrow exemption from NEPA, for EPA determinations under section 111 of the Clean Air Act." 486 F.2d 375, 387 (D.C. Cir. 1973). The court based its holding on the conclusion that section 111 of the Clean Air Act requires the "functional equivalent" of a NEPA impact statement. *Id*. at 384. *EDF v. EPA* adopted the *Portland Cement* "functional equivalence" test and laid out the "five core NEPA issues" that must be carefully considered by an agency to meet the test: "the environmental impact of the action, possible adverse environmental effects, possible alternatives, the relationship between long- and short-term uses and goals, and any irreversible commitments of resources." 489 F.2d 1247, 1256 (D.C. Cir. 1973). The court stressed that for a statute to be exempt from NEPA it must be "functionally equivalent" to NEPA in both substance and procedure. *Id*. The court held that EPA had met the standard in the case at bar, but that the NEPA exemption was narrow. *Id*. at 1257.

In sum, in the D.C. Circuit, NEPA compliance is excused only "where a clear and unavoidable conflict in statutory authority exists," *Flint Ridge*, 426 U.S. at 788, or where a statute ensures functional equivalence with NEPA, *EDF*, 489 F.2d at 1256. The Secretary's

issuance of the 4(d) Rule meets neither of these requirements, and as such cannot be excused from NEPA.

> **2.      No Statutory Conflict Exists Preventing the Secretary's Compliance with NEPA**

The Supreme Court framed the test for reviewing an agency's exemption from NEPA succinctly: "the question we must resolve is whether, assuming an environmental impact statement would otherwise be required in this case, requiring the Secretary to prepare such a statement would create an irreconcilable and fundamental conflict with the Secretary's duties under the [competing statute]." *Flint Ridge*, 426 U.S. at 788.  In this case, no such conflict exists between the duties the ESA prescribes to the Secretary when issuing a Section 4(d) rule and the obligations of NEPA.

The Secretary justified his refusal to conduct a NEPA analysis for the polar bear 4(d) Rule by referring to a decision made by his predecessor in 1983 that purportedly excludes 4(d) rules from NEPA:

> In 1983, upon recommendation of the Council on Environmental Quality, the Service determined that NEPA documents need not be prepared in connection with regulations adopted pursuant to section 4(d) rules. A 4(d) rule provides the appropriate and necessary prohibitions and authorizations for a species that has been determined to be threatened under section 4(a) of the ESA. The NEPA procedures would confuse matters by overlaying its own matrix upon the section 4 decision-making process.

AR4D 12944.  This justification is flawed for at least two reasons.  First, the 1983 decision was limited to decisions made under Section 4(a) of the ESA, not regulations under Section 4(d). Second, the Secretary's justification for non-compliance is not consistent with the standards for disregarding NEPA as set forth by Congress and the Supreme Court as there is no "irreconcilable and fundamental conflict" between Section 4(d) of the ESA and NEPA.  *Flint Ridge*, 426 U.S. at 788.

The Secretary's 1983 Federal Register notice clearly states that it applies to decisions under Section 4(a), *not* Section 4(d) as asserted by the Secretary in the polar bear 4(d) Rule:

> The Fish and Wildlife Service has determined that Environmental Assessments, as defined by the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to *Section 4(a)* of the Endangered Species Act of 1973, as amended. These documents will no longer be prepared for such routine actions.

48 Fed. Reg. 49,244 (October 25, 1983) (emphasis added).[19]

Plaintiffs agree that decisions under Section 4(a) of the ESA are, and should be, exempt from NEPA.  As the Sixth Circuit noted in upholding the Secretary's decision to forgo NEPA with regard to listing decisions:

> [T]he statutory mandate of ESA prevents the Secretary from considering the environmental impact when listing a species as endangered or threatened. The Secretary is limited to using the best scientific and commercial data on the five factors listed in the statute. *See* 16 U.S.C.A. § 1533(b)(1). *The impact statement cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors.* As far as the determination to list a species is concerned, preparing an impact statement is a waste of time.

*Pacific Legal Found. v. Andrus*, 657 F.2d 829, 836-37 (6th Cir. 1981) (emphasis added).  The Secretary relied upon similar reasoning in the 1983 Federal Register notice to exempt listing decisions from NEPA.

> The Endangered Species Act Amendments of 1982 further support this action by requiring listing decisions under the Endangered Species Act to be based solely upon biological grounds and not upon consideration of economic or socioeconomic factors.

48 Fed. Reg. 49,244.

A listing decision under Section 4(a) is a yes or no decision based *solely* on factors that do not allow consideration of the environmental, social or economic effects of the listing.  This

---

[19] Elsewhere in the final 4(d) Rule the Secretary seems to acknowledge that the 1983 Federal Register notice addressed only Section 4(a), not 4(d).  *See* AR4D 12945.

plainly meets the standard articulated by the Supreme Court in *Flint Ridge*, for "a clear and unavoidable conflict in statutory authority exists" between the ESA's listing factors and NEPA's environmental impact analysis requirement. 426 U.S. at 788. No NEPA analysis is therefore required for a listing decision.[20]

In contrast, there is no such conflict between NEPA and the analysis conducted in promulgating a 4(d) rule. While the Secretary's discretion to fashion a 4(d) rule is constrained by the requirement that any such rule provide for the conservation of the species, the Secretary is not prohibited by the language of Section 4(d) (as he is with Section 4(a)) from considering the collateral effects of a contemplated 4(d) rule, nor of considering a full range of alternative rules. NEPA review of the 4(d) Rule would thus not require the Secretary to take into account conflicting or impermissible criteria. Section 4(d) does not limit the Secretary to specific factors outlined in the statute, but, instead, requires the agency to issue regulations that he "deems necessary and advisable to provide for the conservation" of the listed species. 16 U.S.C. § 1533(d). The requirements of NEPA and the ESA thus do not conflict in the context of Section 4(d) but instead work together to promote the conservation of the polar bear.

Finally, that there is no "irreconcilable and fundamental conflict" between Section 4(d) of the ESA and NEPA is further highlighted by the fact that the Secretary of Commerce, who has jurisdiction under the ESA for certain marine species, routinely carries out NEPA analysis when issuing 4(d) rules. *See, e.g.,* 71 Fed. Reg. 71102, 71103 (December 14, 2007) (Proposed 4(d)

---

[20] Whether the Secretary can forgo NEPA when designating critical habitat under Section 4(a) is less clear. The Ninth Circuit in *Douglas County v. Babbitt*, 48 F.3d 1495, 1502-1507 (9th Cir. 1995) found NEPA inapplicable to critical habitat designations. In contrast, the Tenth Circuit in *Catron County Bd. of Comm'rs v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1436-1439 (10th Cir. 1996) found that NEPA did in fact apply to critical habitat designations. Regardless, only the applicability of NEPA to actions under Section 4(d) is before the Court in the instant case.

Rule for Elkhorn and Staghorn Corals) ("In addition, we are announcing the availability of an environmental assessment (EA) that analyzes the impacts of promulgating these regulations."); 74 Fed. Reg. 23822, 23823 (May 21, 2009) (Proposed 4(d) Rule for Green Sturgeon) ("We announce the availability of a draft environmental assessment (EA) that analyzes the environmental impacts of promulgating these proposed 4(d) regulations for the Southern DPS."). If the Secretary of Commerce can and does carry out NEPA review when promulgating Section 4(d) rules under the ESA, the Secretary of Interior cannot credibly claim that his doing so with regard to the polar bear would be "impossible" or create "irreconcilable conflict" between the two statutes. The Secretary's failure to comply with NEPA when issuing the polar bear 4(d) Rule was unjustified, and hence unlawful.[21]

### 3.       The Secretary's Process for issuing the 4(d) Rule is not the Functional Equivalent of NEPA

The Secretary attempts to further justify his failure to carry out NEPA review on the polar bear 4(d) Rule by asserting that the "opportunity for public comment, one of the goals of NEPA, is also readily provided through the rulemaking procedures." AR4D 12944. Given the Secretary originally promulgated the 4(d) Rule without *any* public comment, a defect barely cured by the subsequent final rule, the Secretary's claim of NEPA-like participation in the rulemaking rings hollow. In any event, a public comment period, without more, falls far short of the "functional equivalent" test set out in *Portland Cement* and *EDF*. Under the Secretary's

---

[21] In *Center for Biological Diversity v. USFWS*, No. 04-4324 (N.D. Cal. 2005), referenced by the Secretary in the regulatory preamble to the polar bear 4(d) Rule (*see* AR4D 12944), the district court upheld the Secretary's failure to undertake NEPA review of a Section 4(d) rule at issue in that case. That case is not binding in this district, nor did the Court analyze the Secretary's decision in light of the "irreconcilable conflict" standard in *Flint Ridge* or the "functional equivalence" test under D.C. Circuit law. Moreover, the court in that case struck down the Secretary's downlisting of the species at issue from "endangered" to "threatened" and reinstated the previous "endangered" listings, rendering the 4(d) rule holding largely immaterial. This Court should not adopt its holding.

logic, *any* rulemaking properly carried out under the APA could be deemed to have satisfied the NEPA equivalence test, because, absent narrow exceptions, the APA *always* requires the opportunity for public comment before finalizing a rule.  *See* 5 U.S.C. § 553.  NEPA cannot be so easily displaced.

As the court in *EDF* noted, a "functionally equivalent" process must address the "five core NEPA issues," namely, "the environmental impact of the action, possible adverse environmental effects, possible alternatives, the relationship between long- and short-term uses and goals, and any irreversible commitments of resources."  489 F.2d at 1256.  The Secretary addressed none of these factors when issuing the polar bear 4(d) Rule, nor does the rule itself even pretend to do so.  While the Secretary is likely to argue that various statements in the regulatory preamble somehow constitute an analysis of the environmental effects of the rule, this Court need look no further than the fact that the Secretary utterly failed to look at or discuss *any* alternatives to the polar bear 4(d) Rule to find that the rulemaking process was not the "functional equivalent" of NEPA.  The alternatives analysis is the "heart" of the NEPA process, 40 C.F.R. § 1502.14, and failure to examine reasonable alternatives to a proposed action is at odds with the purpose and letter of the statute.  Absent a showing of a true and fair consideration of alternatives to the 4(d) Rule, the Secretary cannot reasonably claim that the rulemaking was the "functional equivalent" of NEPA.

### 4.    The Secretary's Authorization of Otherwise Prohibited Take through the Polar Bear 4(d) Rule Triggers NEPA

The polar bear 4(d) Rule on its face falls far outside the narrow exceptions to compliance with NEPA allowed by Congress and the Courts.  However, this Court need not find that the issuance of *every* Section 4(d) rule triggers NEPA to find the Secretary in violation of NEPA in *this* particular instance.  Absent the specific polar bear 4(d) Rule at issue in this case, the default

prohibitions and protections of 50 C.F.R. § 17.31(a) would apply to the polar bear.  The 4(d) Rule by design and impact thus *reduces* the protections the polar bear would otherwise receive. As such, it clearly has an impact on the environment subject to NEPA review and analysis.

In some circumstances courts have held that NEPA can be waived for actions that *increase* the protections to a species or the environment.  *See, e.g. Douglas County v. Babbitt*, 48 F.3d at 1505, 1506 (noting that "[w]hen we consider the purpose of NEPA in light of Supreme Court guidance on the scope of the statute, we conclude that an EA or an EIS is not necessary for federal actions that conserve the environment" and "[w]hen a federal agency takes an action that prevents human interference with the environment, it need not prepare an EIS.").  However, the converse is not true and actions that impact the environment or change the status quo almost always trigger NEPA.  *Id*.  Such is the case here.

Courts have also held that NEPA compliance is necessary whenever a federal agency authorizes an activity with adverse impacts on the environment that would otherwise be prohibited in the absence of the authorization.

> We conclude that the incidental take statement in this case is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement. Accordingly, we hold that the issuance of that statement constitutes major federal action for purposes of NEPA.  For the above reasons, we conclude that the National Marine Fisheries Service, the federal agency that issued the incidental take statement, was required by law to comply with the requirements of NEPA before issuing the statement.

*Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996); *see also Jones v. Gordon*, 792 F.2d 821, 826-7 (9th Cir. 1986) (holding take authorization process of the Marine Mammal Protection Act was not in conflict with NEPA under *Flint Ridge* and therefore NEPA compliance required prior to take authorization).

Issuance of the 4(d) Rule authorizing take of polar bear is directly analogous to the

situation in *Kantor* as the 4(d) Rule authorizes activities causing take that would otherwise be prohibited absent the promulgation of the rule. The Secretary routinely complies with NEPA when issuing incidental take authority under Sections 7 and 10 of the ESA. There is no reason why authorizing incidental take pursuant to Section 4(d) should be any different. The Secretary's promulgation of the 4(d) Rule substantially decreased the protection afforded the polar bear. Decreasing protection to an ESA listed species and authorizing activities that may further its decline clearly has adverse environmental impacts triggering the need for NEPA review. The Secretary's failure to comply with NEPA cannot stand.

## VI.   CONCLUSION

For all of the foregoing reasons the Court should grant Plaintiffs' Motions for Summary Judgment and declare that the Secretary violated the ESA, NEPA, and the APA in promulgating the 4(d) Rule for the polar bear. The Court should vacate and remand the 4(d) Rule to the Secretary, and reinstate the general protections applicable to the polar bear pursuant to 50 C.F.R. § 17.31(a) pending completion of any such remand and promulgation of a new and lawful 4(d) Rule.

DATE: December 4, 2009.

Respectfully submitted,

By:      /s/ Jason C. Rylander

Jason C. Rylander  (D.C. Bar No. 474995)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
202.772.3245 (telephone)
202.682.1331 (fax)
*jrylander@defenders.org*

*Attorney for Defenders of Wildlife*

By:      /s/ Brendan R. Cummings

Brendan R. Cummings
Kassia R. Siegel
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252
Phone: (760) 366-2232
Facsimile: (760) 366-2669
bcummings@biologicaldiversity.org
ksiegel@biologicaldiversity.org

Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Rebecca Riley
NATURAL RESOURCES DEFENSE COUNCIL
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868
Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org
rriley@nrdc.org

*Attorneys for Plaintiffs Center for Biological*
*Diversity, Natural Resources Defense*
*Council, and Greenpeace, Inc.*