# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION | )<br>)<br>)<br>)  Misc. Action No. 08-764 (EGS)<br>)  MDL Docket No. 1993<br>) |
| | ) |
| This Document Relates To: | )<br>) |
| California Cattlemen's Ass'n, et al. v. Salazar, et al., No. 1:08-cv-1689;<br>Center for Biological Diversity, et al., v. Salazar, et al., No. 1:08-cv-2113;<br>Conservation Force, et al. v. Salazar, et al., No. 1:09-cv-245;<br>Safari Club Int'l, et al. v. Salazar, et al., No. 1:08-cv-1550;<br>State of Alaska v. Salazar, et al., No. 1:08-cv-1352. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FEDERAL DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, GREENPEACE, INC., STATE OF ALASKA, SAFARI CLUB INTERNATIONAL, ET AL., CONSERVATION FORCE, ET AL., AND CALIFORNIA CATTLEMEN'S ASSOCIATION, ET AL.'S MOTIONS FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON LISTING RULE CLAIMS AND INCORPORATED STATEMENT OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

**PAGE**

CROSS-MOTION FOR SUMMARY JUDGMENT ....................................................................1

STATEMENT OF POINTS AND AUTHORITIES..................................................................1

I.     INTRODUCTION ..........................................................................................................1

II.    STATUTORY BACKGROUND....................................................................................6

III.   PROCEDURAL HISTORY............................................................................................8

IV.   FACTUAL BACKGROUND.......................................................................................11

      A.     The Population Status and Range-Wide Distribution of Polar Bears ........................11

      B.     The Polar Bear's Biology and Dependence on Sea Ice ...........................................12

      C.     Observed Arctic Sea-Ice Declines ...........................................................................13

      D.     Likely Continuation of Arctic Sea-Ice Declines.......................................................14

      E.     The Impact of Sea-Ice Declines on the Polar Bear ...................................................17

V.    STANDARD OF REVIEW .........................................................................................18

VI.   ARGUMENT...............................................................................................................20

      A.     Plaintiffs Alaska, CCA, CORE, and CF Lack Standing ...........................................20

            1.     Alaska has failed to demonstrate standing.....................................................21

            2.     CCA and CORE have failed to demonstrate standing ...................................23

            3.     CF has not met its burden to demonstrate standing .......................................26

      B.     The Service's Listing Determination is Rational, Consistent with the Mandates of the ESA, and Supported by the Best Available Scientific Information.................26

            1.     The Service Rationally Considered Each of the ESA's Listing Factors and the Current Status of the Polar Bear...........................................27

                  a.     Factor A: The Present or Threatened Destruction, Modification, or Curtailment of Habitat or Range ..................................................27

(i) The Polar Bear Depends on Sea Ice for its Primary Habitat....................................................................29

(ii) Extensive Sea-Ice Declines Have Been Recorded And Are Very Likely To Continue For The Foreseeable Future ................................................................30

(iii) Sea-Ice Declines Are Likely to Continue to Have Negative Impacts on the Polar Bear and to Cause Population Declines ..............................................................31

(iv) The Polar Bear Is Threatened Throughout its Range .........................................................................34

(v) The Polar Bear Is Not Likely to be Able to Adapt to the Projected Sea-Ice Declines ...................................................37

b. Factor D:  the Inadequacy of Existing Regulatory Mechanisms .......39

c. Other Factors – Overutilization (Factor B); Disease and Predation (Factor C); and Other Natural or Manmade Factors (Factor E) ........40

d. Current Status of the Polar Bear ......................................................41

2. The Service Rationally Applied the ESA's Definitions of Endangered and Threatened and Articulated a Rational Connection Between the Available Scientific Information and Its Listing Determination....................................43

C. Plaintiffs Have Not Demonstrated That the Service's Listing Determination Is "Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law."  5 U.S.C. § 706(2)(A)..............................................................................49

1. CBD and Joint Plaintiffs Distort the Statutory Standards for Determining Endangered and Threatened Status................................................................49

a. CBD .................................................................................................49

b. Joint Plaintiffs .................................................................................54

(i) The ESA Does Not Contain Quantitative Risk Thresholds for Listing, and Service Did Not Adopt Any Such Thresholds for the Polar Bear ......................................54

(ii) The ESA Does Not Require Absolute Scientific Certainty

iii

for Listing.............................................................................58

(iii)   Listing Under The ESA Does Not Require Demonstrated
Population Declines ...........................................................62

(iv)   The Service Is Not Required to Demonstrate that an ESA
Listing Will Benefit the Species ...........................................66

2.   The Service's Interpretation of the Foreseeable Future is Rational,
Supported by the Administrative Record, and Entitled to Deference...........67

a.   CBD's Claims ...................................................................71

b.   Joint Plaintiffs' Claims ...................................................72

3.   The Service's Listing Determination Is Well Supported by the Record and
the Best Available Climate and Polar Bear Science ......................................78

a.   Joint Plaintiffs Mischaracterize the Nature and Extent of
"Uncertainty" in the Available Climate Modeling Data and Fail to
Identify Any Superior Climate and/or Polar Bear Science ..............80

b.   The Service Properly Considered the USGS Polar Bear Population
Models ................................................................................84

c.   Contrary to CBD's Argument, The Service Was Not Required to
Find As Fact the Numerical Probabilities of Future Extinction in
the Bayesian Model ........................................................91

d.   Joint Plaintiffs Distort The Facts Regarding The Southern Beaufort
Sea Population  ................................................................94

4.   The Service Reasonably Found That the Polar Bear Was Threatened
Throughout Its Range ..................................................................102

a.   The Service Reasonably Found No Polar Bear Distinct Population
Segments ...........................................................................102

b.   The Service Reasonably Found That No Populations or Ecoregions
Were Endangered..............................................................109

c.   The Service Reasonably Found That the Polar Bear Is Threatened
Throughout Its Range ...................................................115

5.   Plaintiffs' Claims of Procedural Irregularities Are Unfounded....................120

iv

a.      The State of Alaska's Section 4(i) Claim is Unreviewable, and, In Any Case, Without Merit.................................................................120

      (i)     Background of Compliance with Section 4(i) ......................120

      (ii)    The Written Justification is Not Final Agency Action ..........122

      (iii)   The Substance of the Written Justification is Committed to Agency Discretion by Law, and Thus Not Reviewable........123

      (iv)   Even if the Written Justification Were Reviewable, it is Rational and in Full Compliance with the Requirements of Section 4(i)..........................................................................125

      (v)    Section 4(i) Does Not Support Alaska's Requested Remedy of Setting Aside the Service's Listing Determination ..........127

b.      The Secretary's Decision to List as Threatened is Consistent with the Position of Service Biologists, and Was Not an Improper Political Decision.............................................................................128

c.      The Service Adequately Responded to CF's Comments ..................133

6.      The Service Adequately Considered the Inadequacy of Existing Regulatory Mechanisms.................................................................................137

7.      Joint Plaintiffs' Claim that the Service Failed to Take Into Account Foreign Nations' Conservation Programs Is Unfounded .............................139

VII.    CONCLUSION...................................................................................................142

## TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.,
  429 F.3d 1136 (D.C. Cir. 2005) ........................................................................ 76, 77

American Bioscience v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001) .................................. 91-93

American Lands Alliance v. Norton, No. Civ. A. 00-2339 (RBW),
2004 WL 3246687 (D.D.C. June 2) ...................................................................... 57

*American Wildlands v. Kempthorne, 478 F. Supp. 2d 92 (D.D.C. 2007) ........................... 18, 19

*American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002) ................... 60, 62, 80, 137

Animal Legal Def. Fund v. Glickman, 204 F.3d 229 (D.C. Cir. 2000) ............................... 93, 100

Appalachian Power Co. v. EPA, 135 F.3d 791 (D.C. Cir. 1998) ................................. 89

Appalachian Power Co. v. EPA, 249 F.3d 1032 (D.C. Cir. 2001) ........................................ 89, 93

*Baltimore Gas Co. v. NRDC, 462 U.S. 87 (1983) ............................................................. passim

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) ........................................................ 122

Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23 (D.D.C. 1996) ....................... 63

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281 (1974) ...................... 18

*Building Indus. Ass'n of Superior Cal. v. Norton, 247 F.3d 12411246 (D.C. Cir. 2001) ... passim

Califano v. Sanders, 430 U.S. 99 (1977) ................................................................. 129

Camp v. Pitts, 411 U.S. 142 (1973) .................................................................. 20

Center for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223 (W.D. Wash. 2003) ................. 52

Center for Biological Diversity v. Lohn, 511 F.3d 960 (9th Cir. 2007) ........................................ 52

Center for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466 (D.C. Cir. 2009) ..... 22

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984) ......................... passim

*City of Las Vegas v. Lujan, 891 F.2d 927 (D.C. Cir. 1989).....................................66-67

*City of Portland, Oregon v. EPA, 507 F.3d 706 (D.C. Cir. 2007)...............................89

City of Waukesha v. EPA, 320 F.3d 228 (D.C. Cir. 2003) .................................. passim

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)........................ passim

Cohen v. Obama,  No. 08-2150, 2008 WL 5191864 (D.D.C. 2008)...........................24

Common Cause v. Federal Election Comm'n, 108 F.3d 413 (D.C. Cir. 1997) ............20

Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 22 (D.D.C. 2001)..............128

*Defenders of Wildlife v. Babbitt, 958 F. Supp. 670 (D.D.C. 1997) ..................... passim

Defenders of Wildlife v. Norton, 258 F.3d 1136 (9th Cir. 2001) ................................65

Department of Transp. v. Public Citizen, 541 U.S. 752 (2004)..................................76

*Environmental Def. Fund, Inc. v. Costle, 657 F.2d 275 (D.C. Cir. 1981).............18, 26

*Ethyl Corp. v E.P.A., 541 F.2d 1, 36 (D.C. Cir. 1976)......................................... passim

Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158 (N.D. Cal. 2000) ..............73

Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C. Cir. 1991)..................................127

Florida Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996).............................21

Friends of Wild Swan, Inc. v. USFWS, 12 F. Supp. 2d 1121 (D. Or. 1997)...........53-54

Fund for Animals, Inc. v. Norton, 322 F.3d 728 (D.C. Cir. 2003) .............................23

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) ...............................................21

Grassroots Recycling Network v. EPA, 429 F.3d 1109 (D.C. Cir. 2005) ...................25

Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183 (D.D.C. 2008) .......90

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)...............................................20

Heckler v. Chaney, 470 U.S. 821 (1985)..................................................................123

Home Box Office, Inc. v. FCC, 567 F.2d 9 (D.C. Cir. 1977)....................................133

*Home Builders Ass'n v. USFWS, 529 F. Supp. 2d 1110 (N.D. Cal. 2007)................................ 65

Huls Am., Inc. v. Browner, 83 F.3d 445 (D.C. Cir. 1996) ......................................................... 93

International Fabricare Inst. v. EPA, 972 F.2d 384 (D.C. Cir. 1992).......................................... 19

Kern County Farm Bureau v. Allen, 450 F.3d 1072 (9th Cir. 2006)........................................... 59

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ....................................... 20, 23, 26

Maine v. Norton, 257 F. Supp. 2d 357 (D. Me. 2003)........................................................... 23, 58

*Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989).................................. 18, 75, 77, 78

Massachusetts v. EPA, 549 U.S. 497 (2007) .............................................................................. 22

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) ............. 19, 66

National Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007) ..................... 65

National Wildlife Fed'n v. EPA, 286 F.3d 554 (D.C. Cir. 2002)........................................... 61, 89

Natural Res. Def. Council v. E.P.A., 571 F.3d 1245 (D.C. Cir. 2009)........................................ 69

Natural Res. Def. Council v. Lujan, 768 F. Supp. 870 (D.D.C. 1991)...................................... 123

*Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) ....................... 123-124

New Mexico Cattle Growers Ass'n v. USFWS, 248 F.3d 1277 (10th Cir. 2001) ..................... 140

Northern Spotted Owl v. Hodel, 716 F. Supp. 479 (W.D. Wash. 1988) ..................................... 44

Northwest Airlines, Inc. v. FAA, 795 F.2d 195 (D.C. Cir. 1986) ......................................... 21, 25

Occidental Eng'g Co. v. INS, 753 F.2d 766 (9th Cir. 1985)........................................................ 20

Oregon Natural Res. Council. v. Daley, 6 F. Supp. 2d 1139 (D. Or. 1998) ........................ 63, 140

San Luis & Delta-Mendota Water Auth. v. Salazar,
   Civ. No. 09-407, 2009 WL 3428487, at * 19 (E.D. Cal. Oct. 15) ............................................ 85

San Luis v. Badgley, 136 F. Supp. 2d 1136 (E.D. Cal. 2000) ................................................... 127

Save Our Springs v. Babbitt, 27 F. Supp. 2d 739 (W.D. Tex. 1997).......................................... 140

Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002) ........................................................ 26

Sierra Club v. Morton, 405 U.S. 727 (1972) ............................................................... 25

Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506 (D.C. Cir. 1983)............... 89

*Southwest Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58 (D.C. Cir. 2000) ............. passim

Southwest Ctr. for Biological Diversity v. Norton,
    Civ. No. 98-934 RMU/JMF, 2002 WL 1733618, *9 (D.D.C. July 29) .................................... 59

State of New York v. Reilly, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992).................. 19, 61, 88, 119

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) ......................................... 22

Town of Orangetown v. Ruckelshaus, 579 F. Supp. 15 (S.D.N.Y. 1984).................................. 129

Trout Unlimited v. Lohn, 559 F.3d 946 (9th Cir. 2009).................................... 44, 55, 62

Trout Unlimited v. Lohn, 645 F. Supp. 2d 929 (D. Or. 2007)............................ 56-57, 59

U.S. Air Tour Ass'n v. FAA, 298 F.3d 997 (D.C. Cir. 2002) ...................................... 88

U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20 (D.C. Cir. 2000) ................ 21

United States v. Chemical Found., 272 U.S. 1(1926)................................................. 129

United Transp. Union v. ICC, 891 F.2d 908 (D.C. Cir. 1989) .............................. 21, 25

Van Valin v. Locke, Civil Action No. 09-961, 2009 WL 4068028, at * 5 (D.D.C. Nov. 23)...... 85

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) ........................... 135-137

Western Watersheds Project v. Foss, No. CV 04-168-MHW,
2005 WL 2002473 (D. Idaho Aug. 19)....................................................................... passim

Wilderness Soc'y v. Griles, 824 F.2d 4 (D.C. Cir. 1987) ............................................ 26

Wisconsin Valley Improvement v. FERC, 236 F.3d 738 (D.C. Cir. 2001)................................ 77

ix

**STATUTES**                                                **PAGE**

5 U.S.C. § 551 .................................................................................................... 70

5 U.S.C. § 553(c) ............................................................................................... 133

5 U.S.C. § 701(a)(2) ........................................................................................... 123

5 U.S.C. § 702 .................................................................................................... 122

5 U.S.C. § 706 ...................................................................................................... 18

5 U.S.C. § 706(2)(A) ............................................................................... iii, 18, 49

16 U.S.C. § 1379(a) .............................................................................................. 23

16 U.S.C. § 1531 ..................................................................................................... 6

16 U.S.C. § 1531(b) ............................................................................................. 6-8

16 U.S.C. § 1532(15) ...................................................................................... passim

16 U.S.C. § 1532(20) ...................................................................................... passim

16 U.S.C. § 1532(6) ......................................................................................... 3, 43

16 U.S.C. § 1533 ................................................................................................. 140

16 U.S.C. § 1533(a) ..................................................................................... 129, 131

16 U.S.C. § 1533(a)(1) ..................................................................................... 3, 114

16 U.S.C. § 1533(a)(1)(A) ............................................................................. passim

16 U.S.C. § 1533(a)(1)(B) ............................................................................. passim

16 U.S.C. § 1533(a)(1)(D) ............................................................................. passim

16 U.S.C. § 1533(a)(1)(E) ............................................................................. passim

16 U.S.C. § 1533(b)(1)(A) ............................................................................. passim

16 U.S.C. § 1533(b)(3)(A) ..................................................................................... 9

16 U.S.C. § 1533(b)(3)(B) .................................................................................... 9

16 U.S.C. § 1533(b)(7) ......................................................................................... 66

16 U.S.C. § 1533(c)(2) .......................................................................................... 53

16 U.S.C. § 1533(d) ............................................................................................... 8

16 U.S.C. § 1533(i) ......................................................................................... passim

16 U.S.C. § 1538 ................................................................................................... 8

16 U.S.C. §§ 1361-1423h ...................................................................................... 22

## <u>TABLE OF ACRONYMS</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| ARL | Administrative Record for the Listing Rule |
| AR4D | Administrative Record for the 4(d) Rule |
| CBD | Center for Biological Diversity |
| CCA | California Cattlemen's Association |
| CF | Conservation Force |
| CORE | Congress of Racial Equality |
| DPS | Distinct Population Segment |
| EA | Environmental Assessment |
| ESA | Endangered Species Act |
| ESCA | Endangered Species Conservation Act of 1969 |
| GCM | General Circulation Model |
| GHG | Greenhouse Gas |

xi

| | |
|---|---|
| IPCC | Intergovernmental Panel on Climate Change |
| IUCN | International Union for the Conservation of Nature |
| LR | Listing Rule |
| MMC | Marine Mammal Commission |
| MMPA | Marine Mammal Protection Act |
| NMFS | National Marine Fisheries Service |
| NRDC | Natural Resources Defense Council |
| PBSG | Polar Bear Specialist Group |
| PECE Policy | Policy for Evaluation of Conservation Efforts When Making Listing Decisions |
| PMG | Petition Management Guidance |
| SBS | Southern Beaufort Sea |
| SCI | Safari Club International |
| SDM | Structured Decision Making |
| SPR | Significant Portion of the Range |
| SRES | Special Report on Emissions Scenarios |
| TEK | Traditional Ecological Knowledge |
| UNEP | United Nations Environment Programme |
| USGS | United States Geological Survey |
| WHB | Western Hudson Bay |
| WMO | World Meteorological Organization |

## CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to LCvR 7(h) and the Court's August 21, 2009 Order (Doc. #115) Defendants U.S. Department of the Interior, Ken Salazar, in his official capacity as the United States Secretary of the Interior, U.S. Fish and Wildlife Service, and Sam D. Hamilton, in his official capacity as Director of the U.S. Fish and Wildlife Service (collectively referred to as "Federal Defendants"), hereby move for summary judgment on all listing rule claims.

## STATEMENT OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In May 2008, the U.S. Fish & Wildlife Service (hereinafter, the "Service") determined, following notice and comment rulemaking, that the polar bear (*Ursus Maritimus*) is a "threatened" species within the meaning of the Endangered Species Act ("ESA"), 16 U.S.C. § 1532(20).   See 73 Fed. Reg. 28212 (May 15, 2008) (hereinafter the "Final Rule").   The administrative record demonstrates that, before reaching this conclusion, the Service conducted an extraordinarily comprehensive and meticulous analysis of the best scientific and commercial information available regarding the status of the polar bear and the potential threats facing the species within the foreseeable future, precisely as the ESA requires.   The Service's rulemaking process was transparent and the result was objective and balanced.   The proposed rule was made available for public review and comment and also underwent extensive peer review by 14 impartial experts in the fields of polar bear biology, climatology, toxicology, seal ecology, and traditional ecological knowledge.   As the Final Rule demonstrates, the Service's threatened determination represents a consensus scientific view.

Although the Service's comprehensive analysis spans nearly 100 pages in the Federal Register and includes discussion of some of the world's most sophisticated, state-of-the-art

climate models, ultimately the rationale underlying the Service's determination is fairly straightforward.  With respect to ESA listing Factor A, "the present or threatened destruction, modification, or curtailment of its habitat or range," 16 U.S.C. § 1533(a)(1)(A), there is scientific consensus that global temperatures have been rising, causing sea-ice levels to decline throughout the polar bear's range.  Unprecedented sea-ice declines were recorded in September 2007 and adverse impacts to polar bears attributed primarily to the effects of climate change have been recorded in several populations.  This warming trend is very likely to continue at least until mid-century throughout the species' range due to the long persistence time of certain greenhouse gases ("GHGs") in the atmosphere, the current and projected patterns of GHG emissions over the next few decades, and interactions among other natural and anthropogenic climate processes. There are no known regulatory mechanisms in place, or any that could be put in place, at the national or international level, that directly and effectively would address the range-wide loss of sea-ice habitat within that time period, and thus existing regulatory mechanisms are inadequate within the meaning of ESA listing Factor D, 16 U.S.C. § 1533(a)(1)(D).  Because the polar bear is a highly specialized species that depends on sea ice for critical life functions such as resting, breeding, and hunting, it is particularly susceptible to loss of sea ice.  The loss of sea ice, the polar bear's principal habitat, likely will affect the polar bear negatively throughout its range, causing populations to decline by mid-century.  The projected loss of sea ice and resulting population declines are not expected to be realized immediately, however, but rather are likely to build gradually over the course of the proceeding decades.  Indeed, there is no evidence in the administrative record that the polar bear currently is experiencing a precipitous decline in population numbers, or that a precipitous decline is imminent.  At present, the polar bear is

2

relatively abundant, with estimated numbers at 20,000-25,000 worldwide, and continues to occupy the entirety of its historical range.

Given that the best scientific information available shows no current or imminent precipitous decline in polar bear numbers, but that a decline throughout its range is likely within the foreseeable future, the Service determined that the polar bear is not currently "endangered" (i.e., in danger of extinction), but is "threatened" (i.e., likely to become an endangered species within the foreseeable future).   16 U.S.C. § 1532(6), (20).   The Service's "threatened" determination for the polar bear conformed precisely to the plain language of the ESA and Congressional intent, and was based on a rational analysis of the ESA's listing standards, 16 U.S.C. § 1533(a)(1), in light of the best scientific information available.

Despite the overwhelming evidentiary support for the Service's determination in the administrative record and the exhaustively thorough and objective analysis of the available information presented in the Final Rule, two Plaintiff-groups contend that the Service's threatened determination should be set aside for entirely contradictory reasons.   On the one hand, Plaintiffs Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace (collectively referred to herein as "CBD") argue that it was arbitrary and capricious for the Service not to list the polar bear as endangered in some fashion, either across its entire range, a significant portion of its range, or within a distinct population segment ("DPS").   On the other hand, Plaintiffs State of Alaska, Safari Club International et al. ("SCI"), Conservation Force, et al. ("CF"); and California Cattlemen's Association, et al. ("CCA") (collectively referred to as "Joint Plaintiffs"), argue that it was arbitrary and capricious for the Service to bestow any protection whatsoever upon the polar bear under the ESA.

As explained herein, both Plaintiff-groups' claims are meritless.  As an initial matter, Plaintiffs State of Alaska, CCA, the Congress of Racial Equality ("CORE"), and CF lack standing to challenge the Final Rule, and their claims should be dismissed accordingly. Furthermore, under the law of this Circuit, the Service's listing determination is presumed valid and must be upheld as long as it meets minimal standards of rationality.  The Service's threatened determination for the polar bear is patently rational, and therefore is entitled to deference. CBD and Joint Plaintiffs both fail to acknowledge, let alone overcome, the highly deferential standard of review in favor of upholding the Service's determination.  While CBD and Joint Plaintiffs attempt to mount a number of specific attacks on the Final Rule, each group's case is based on a fundamentally incorrect legal standard for determining endangered and threatened status.  CBD's case, at bottom, is based on the flawed notion that if a species' ultimate extinction risk anytime in the future is sufficiently certain, that species by definition is endangered.  CBD ignores the plain definition of the threatened category, which is intended to apply to a species such as the polar bear that is not currently in danger of extinction, but is likely to become endangered within the foreseeable future.  Joint Plaintiffs, on the other hand, have based their case on the flawed notion that the ESA requires absolute scientific certainty before a species can be listed, which is directly contrary to the plain language of the ESA and the law of this Circuit, which holds that the ESA does not require perfect or conclusive evidence before a species can be listed.  In fact, Joint Plaintiffs' theory of their case is contrary to the fundamental premise of administrative law that reviewing courts are at their most deferential when, as in this case, an agency is making predictions within the area of its special expertise, at the frontiers of science.  Any scientific and technological uncertainty entitles an agency to greater deference, not

less.  Because CBD and Joint Plaintiffs each begin with a fundamentally flawed legal premise, their cases fail for that reason alone.

Moreover, not only do CBD and Joint Plaintiffs distort the applicable legal standards, both Plaintiff-groups fail to engage the actual factual basis for the Service's threatened determination.  In particular, Joint Plaintiffs incorrectly attempt to pigeonhole the Service's determination as being based wholly on data from two polar bear population models, namely the carrying capacity and Bayesian network models found in Armstrup, et al. (2007).  Joint Plaintiffs argue it was arbitrary and capricious for the Service to afford these models any weight at all, while CBD argues that the Bayesian Model compelled an endangered listing.  Of course, CBD's and Joint Plaintiffs' views cannot be reconciled, and neither is correct.  First, contrary to Joint Plaintiffs' portrayal, the Service's listing determination is not based wholly or principally on any two models, but rather on the totality of the evidence and scientific consensus.  The Service's determination is grounded first on a body of observed facts, including global and Arctic warming over the past century, decades of Arctic sea-ice declines, and documented negative impacts of sea-ice declines on individual polar bear populations.  The Service's determination also is based on extensive scientific literature establishing that polar bears biologically depend on sea ice for critical life functions and are susceptible to population declines from sea-ice loss.  In addition to this information, the Service relied on credible, mainstream climate model projections of future Arctic sea-ice declines and considered the carrying capacity and Bayesian models of the impact of the projected sea-ice declines on polar bear numbers.  In doing so, the Service considered the best available modeling information, which is all that the ESA requires.  16 U.S.C. § 1533(b)(1)(A).

At their core, CBD's and Joint Plaintiffs' claims are nothing more than each group's policy disagreement with the Service's reasoned weighing of the available evidence. Neither CBD nor Joint Plaintiffs point to any evidence superior to that considered by the Service, rather they review the very same evidence the Service considered and ask this Court to substitute their weighing of the evidence for that of the Service. While CBD and Joint Plaintiffs clearly would have preferred a different outcome, it is the Service, as the expert agency responsible for making listing decisions under the ESA, that Congress has charged with weighing the available evidence and making reasonable predictions based on that evidence to determine if a species is endangered or likely to become an endangered species within the foreseeable future. A reviewing court is not empowered to substitute a plaintiff's preferred conclusion for that reached by the Service. Because CBD and Joint Plaintiffs have fallen far short of showing the Service's determination lacks a rational basis, the Service is entitled to summary judgment on all claims.

## II.    STATUTORY BACKGROUND

The ESA, 16 U.S.C. §§ 1531 et seq., was enacted in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b). Section 4 of the ESA directs the Secretary[1] to determine which species should be listed as endangered or threatened. Id. at § 1533(a)(1). An endangered species is "in danger of extinction throughout all or a significant portion of its range"

---

[1] Section 4 divides the responsibility for listing species between the Secretary of the Interior, who generally is responsible for terrestrial species, and the Secretary of Commerce, who generally is responsible for marine species. 16 U.S.C. §§ 1532(15), 1533(a)(2). These Secretaries have delegated their responsibilities to the Service in the case of Interior and to the National Marine Fisheries Service ("NMFS") in the case of Commerce. The Secretary of the Interior has jurisdiction over the polar bear. See 50 C.F.R. § 402.01(b).

while a threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(6), (20).

A species may be "listed" as endangered or threatened under the ESA in one of two ways, either on the initiative of the Secretary through the "candidate process," or as a result of a petition submitted by an "interested person." Id. at § 1533(b)(3)(A). The ESA requires the Secretary to determine if a species is endangered or threatened based on any one the following five listing factors:

(A)     the present or threatened destruction, modification, or curtailment of its habitat or range;
(B)     overutilization for commercial, recreational, scientific, or educational purposes;
(C)     disease or predation;
(D)     the inadequacy of existing regulatory mechanisms; or
(E)     other natural or manmade factors affecting its continued existence.

Id. at 1533(a)(1).

The Secretary must make his decision whether to list a species:

[S]olely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

Id. at § 1533(b)(1)(A).

If the Secretary determines that listing or delisting is warranted, he must publish a notice in the Federal Register that includes the complete text of a proposed rule to implement the action. Id. at § 1533(b)(3)(B)(ii). The Secretary must act on a proposed rule within one year of the date of its publication. Id. at § 1533(b)(6)(A). At that point, the Secretary may promulgate a final rule, withdraw the proposed rule if he finds that there is not sufficient evidence to justify it, or extend the one-year period for consideration by not more than six months if he finds that there

is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned . . . ." Id. at § 1533(b)(6)(B)(i).

Once a species is listed as endangered or threatened, it is afforded certain legal protections. For example, the ESA prohibits any illegal or unauthorized "taking" of an endangered or threatened fish or wildlife species. Id. at § 1538(a)(1).[2] In addition, a Federal agency must consult with the Service whenever any action authorized, funded, or carried out by the agency "may affect" a threatened or endangered species, to ensure that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. Id. at § 1536(a)(2); 50 C.F.R. § 402.14(a).

## III. PROCEDURAL HISTORY

On February 17, 2005, CBD filed a citizen petition requesting that the Service list the polar bear as a threatened species throughout its range.[3] ARL000037, 004040, 004048.[4] On February 7, 2006, the Service made a preliminary finding pursuant to ESA Section 4(b)(3)(A),

---

[2] Although the take prohibition of ESA Section 9, 16 U.S.C. § 1538, applies only to endangered species, the Service's regulations extend to threatened species virtually all of the protections of endangered species, including the prohibition on "take" of endangered fish or wildlife species pursuant to ESA Section 9. See 50 C.F.R. § 17.31. Pursuant to ESA Section 4(d), the Service has discretion to adopt "special rules" for threatened species, which replace the general Section 9 prohibitions. 16 U.S.C. § 1533(d) (Secretary "shall issue such regulations as he deems necessary and advisable to provide for the conservation of" species listed as threatened). Here, the Service issued a rule pursuant to this section ("4(d) Rule"), which will be the subject of separate briefing in these consolidated cases. See AR4D012925-12945.

[3] CBD's petition later was joined by NRDC and Greenpeace.

[4] In this brief, citations to the administrative record supporting the listing rule are in the form of ARL123456. Citations to the Final Rule itself are followed by "(LR)." Citations to the administrative record for the 4(d) rule are in the form of AR4D123456.

16 U.S.C. § 1533(b)(3)(A), that the petition presented substantial scientific information indicating that the petitioned action may be warranted, and the Service commenced a review of the status of the species.  <u>See</u> 71 Fed. Reg. 6745 (Feb. 9, 2006).  On December 27, 2006, the Service issued a secondary finding pursuant to ESA Section 4(b)(3)(B), 16 U.S.C. § 1533(b)(3)(B), that the petitioned action was warranted, which was accompanied by a proposed regulation listing the polar bear as threatened throughout its range.  <u>See</u> 72 Fed. Reg. 1064 (Jan. 9, 2007) ("Proposed Rule").  The Proposed Rule was made available for a 90-day public review and comment period.  As part of the comment period, the Service contacted appropriate Federal and State agencies, Alaska Native Tribes and tribal organizations, governments of polar bear range countries (Canada, Russia, Denmark (Greenland), and Norway), city governments, scientific organizations, peer reviewers, and other interested parties to request comments.  In response to requests from the public, the Service held public hearings in Washington, D.C. on March 5, 2007, in Anchorage, Alaska on March 1, 2007, and in Barrow, Alaska on March 7, 2007, which were attended by a total of over 300 individuals.  72 Fed. Reg. 7381 (Feb. 15, 2007).

At the time that the proposed rule was announced, the Secretary of the Interior asked the U.S. Geological Survey ("USGS") to perform additional scientific analyses to aid the Service's final listing decision. ARL117239 (LR).  The USGS issued its analyses in the form of nine administrative reports, which the Service received on September 7, 2007.  <u>Id.</u>  The Service reopened the public comment period for 15 days to allow for comment on the USGS reports and later extended the renewed comment period by an additional 17 days to accommodate public requests, including those from the State of Alaska.  <u>See</u> 72 Fed. Reg. 56979 (Oct. 5, 2007).  All told, during the public comment periods, the Service received approximately 670,000 comments

including letters and postcards (43,513), e-mail (626,947), and public hearing testimony (75). The Service received comments from Federal agencies, foreign governments, State agencies, Alaska Native Tribes and tribal organizations, Federal commissions, local governments, commercial and trade organizations, conservation organizations, nongovernmental organizations, and private citizens.

In accordance with Service policy (59 Fed. Reg. 34270 (July 1, 1994)), the Service submitted the Proposed Rule for peer review by 14 impartial experts in the fields of polar bear biology, climatology, toxicology, seal ecology, and traditional ecological knowledge ("TEK"). The selected polar bear specialists included scientists from all polar bear range countries, who work in both academia and government.  The selected climate scientists all are active in research and have published in Arctic climate systems and sea-ice dynamics.   The Service sought expertise in TEK from internationally recognized native organizations.  Thirteen of the fourteen peer reviewers found that, in general, the proposed rule represented a thorough, clear, and balanced review of the best scientific information available from both published and unpublished sources of the current status of polar bears.  In addition, the peer reviewers stated that the information as presented in the Proposed Rule justified the conclusion that polar bears face threats throughout their range.  The Service issued the Final Rule listing the polar bear as a threatened species on May 15, 2008.  See 73 Fed. Reg. 28212.  The Final Rule includes a careful and comprehensive response to the comments received from the peer reviewers as well as from the general public, grouped by issue.  See generally ARL117238-117256 (LR).  In addition, in a separate 76-page document, the Service responded to comments on the USGS reports. ARL110103-178.

## IV.    FACTUAL BACKGROUND

### A.    The Population Status and Range-Wide Distribution of Polar Bears

The polar bear is widely distributed throughout most ice-covered seas of the Northern Hemisphere, and occurs within the jurisdictions of the United States, Canada, Denmark (Greenland), Norway, and Russia.  ARL117216-17 (LR).  As the Final Rule explains, prior to the 1973 Agreement on the Conservation of Polar Bears, many polar bear populations were declining "due to severe overharvesting" (i.e., hunting); however, polar bear numbers in some previously depressed populations have grown during the past 30 years as a result of the hunting controls put in place under the 1973 Agreement.  ARL117242 (LR).  Worldwide, the polar bear population currently is estimated to be 20,000–25,000.  ARL117219 (LR).

The international Polar Bear Specialist Group ("PBSG") has identified 19 polar bear populations of varying sizes.  ARL117219-21 and Figure 1 (LR).  Two of the 19 populations have been identified as increasing in numbers (Viscount Melville Sound and M'Clintock Channel); six populations as stable (Northern Beaufort Sea, Southern Hudson Bay, Davis Strait, Lancaster Sound, Gulf of Bothia, Foxe Basin); five populations as declining (Southern Beaufort Sea, Norwegian Bay, Western Hudson Bay, Kane Basin, Baffin Bay); and six populations as data deficient (Barents Sea, Kara Sea, Laptev Sea, Chukchi Sea, Arctic Basin, East Greenland) with no estimate of trend available.  ARL117220-21 (LR).

The USGS grouped the 19 populations (plus an additional one it created) into four "ecoregions" –Seasonal Ice, Divergent Ice, Convergent Ice, and Archipelago – based on patterns of ice formation and ablation (melting or evaporation), how polar bears respond to those patterns, and future sea-ice projections.  ARL117221-22 and Figure 2 (LR).

11

B.        The Polar Bear's Biology and Dependence on Sea Ice

Polar bears are evolutionarily adapted to, and completely reliant on, sea ice for their survival and primary habitat.  ARL117216, 117218 (LR).  Polar bears depend on sea ice for a number of critical functions, including hunting and feeding on ice-dependent seals (their primary food source), seeking mates and breeding, moving to land-based maternity denning areas and sometimes for maternity denning, and making long distance movements.  ARL117218-19, 117223, 117259 (LR).

In essence, polar bears live and depend on the sea ice.  Over most of their range, they remain on the ice year-round or spend only short periods on land.  ARL117217 (LR).  In some areas, such as Hudson Bay, polar bears remain on land when the sea ice retreats in the spring and they fast for several months (up to eight months for pregnant females) before fall freeze-up.  ARL117218 (LR).  Other populations, such as those in the Chukchi and Beaufort Seas where the sea ice also seasonally reduces or disappears, move north each summer on the persistent pack ice. Id.; ARL082455.  Polar bears summering on the pack ice quickly move back into the near shore, shallow water areas where seals are located as soon as new ice forms in the autumn.  ARL082456.  Because polar bears spend most of their time on the sea ice and rely on it for essential life functions, scientists have described the polar bear as an "ice-obligate" species.  ARL117223, 117259 (LR); ARL130884.

In part because of their reliance on ice-dependent seals (also called "ice seals") as a food source, polar bears show a strong preference for certain sea-ice locations, characteristics, and concentrations.   ARL117217 (LR).   Polar bears need sea ice located over and near the continental shelf because of the higher biological productivity and greater access to ice seals and

other prey in those areas compared to deep-water regions located farther offshore.  ARL117217, 117260 (LR).

### C.    Observed Arctic Sea-Ice Declines

There has been an undeniable and unprecedented decline in Arctic sea ice over the past several decades.  ARL117224-27 and Figure 3 (LR).  One study estimated that, from 1979 to 2006, there has been a decline in minimum September sea-ice extent[5] of 8.6% per decade. ARL117224 (LR).  The rate of decrease appears to have accelerated in recent years.  For instance, in each of the years between 2002 and 2007, the previous record lows in September sea-ice extent were exceeded.  Id.  In addition, the summer/fall ice melt season in the Arctic has lengthened by approximately two weeks per decade over the period from 1979 through 2005. These changes have significant negative impacts on polar bears.  ARL117227 (LR).    In particular, access to ringed seals is seasonal for most polar bear populations, resulting in cycles of weight gain and weight loss.  ARL117265 (LR).   A reduction in September sea-ice extent and lengthening of the summer melt season increases the period that polar bears do not have access to seals.  Id.; see also ARL082477.  In addition to diminishing September sea ice, scientists have observed declines in the maximum (i.e., winter) sea-ice extent, the cumulative annual sea-ice extent, and sea-ice thickness across the Arctic.  ARL117226-27 (LR).

These Arctic sea-ice changes have been attributed to global warming driven by GHG emissions and changes in atmospheric and oceanic circulation that exacerbate sea-ice losses caused by GHGs.  ARL117227-29 (LR).  That warming is occurring globally and in the Arctic is beyond dispute.  ARL117228 (LR).  In the last century, warming has occurred in two phases,

---

[5] Sea ice is typically at its maximum extent in March and at its minimum extent in September. ARL117223 (LR).

from the 1910s to the 1940s (an increase of 0.35° Celsius ("C")), and more markedly from the 1970s to the present (a further increase of 0.55°C).  ARL151295.  The rate of warming has increased over the last 25 years, with 11 of the 12 warmest years on record having occurred in the past 12 years.  Id.  Warming has been the greatest at higher northern latitudes.  ARL117228 (LR); ARL151312.  Over the past 100 years, average Arctic temperatures have been increasing at almost twice the rate of the rest of the world.  ARL117228 (LR).

Evidence that GHGs have driven global warming and the resulting sea-ice declines comes largely from computer climate models (also called "general circulation models" ("GCMs")). ARL117229-30 (LR).  The models typically are begun at a point in the past, and are broadly successful in simulating historical and recent climate change.  ARL117231 (LR); ARL128805, 128807, 128820; ARL151312.  However, as the Final Rule explains, the climate model outputs do not correspond to the observed sea-ice declines (or increases in global temperatures) unless observed GHGs that have been emitted into the atmosphere are incorporated into the models (i.e., the computer models are "forced" by GHGs).  ARL117229 (LR); ARL151312.  Thus, these climate models provide strong evidence that GHG loading is causing global warming and sea-ice declines.  ARL117230 (LR).

In addition to declines in sea-ice extent, other climate-related changes in the Arctic have been observed, including decreased snow cover and increased rain-on-snow events, which negatively affect polar bear dens and cub survival and damage or eliminate snow-covered pupping lairs of ringed seals (the polar bear's principal prey).  ARL117230 (LR).

### D.    Likely Continuation of Arctic Sea-Ice Declines

As the Final Rule explains, the best available scientific information shows that the downward trend in Arctic sea-ice extent is very likely to continue for the foreseeable future,

14

driven by continued GHG-induced global warming. ARL117231, 117232-35, 117241, 117279 (LR). While the Service based this finding on a wide array of climate change information and literature, it relied in significant part on the Fourth Assessment Report ("AR4") of the Intergovernmental Panel on Climate Change ("IPCC"), which represents the views of hundreds of international climate change scientists. Id; ARL151183.[6] The Final Rule explains that the state-of-the-art climate models included in the IPCC AR4 unanimously project that temperatures will continue to rise throughout the 21st century under the influence of GHG emissions, that the warming will be largest in the high northern latitudes, and that the GHG-forced warming will be accompanied by large reductions in Arctic sea ice, particularly in minimum September sea-ice extent. ARL117231, 117237 (Figure 7) (LR); ARL128805, 128841; see also IPCC AR4 at ARL152436.

The projections produced by climate models vary depending on which GHG emissions scenarios are used. GHG scenarios are based on different assumptions on how societies, economies, and energy technologies are likely to evolve. ARL117231 (LR). The most commonly-used scenarios are the B1, A1B, and A2 scenarios. ARL117231 (LR). The A1B scenario is a "middle-of-the-road" or "business as usual" scenario. ARL117231, 117248 (LR). These scenarios include no additional, specific climate change mitigation initiatives, such as the emission targets of the Kyoto Protocol. ARL117231 (LR). While different emissions scenarios lead to different climate projections, the loading of GHGs in the atmosphere has considerable

---

[6] The IPCC was established by the United Nations Environment Programme ("UNEP") and the World Meteorological Organization (WMO) "to provide an authoritative international statement of scientific understanding of climate change." ARL151183. As stated in the AR4, the IPCC's "periodic assessments of the causes, impacts and possible response strategies to climate change are the most comprehensive and up-to-date reports available on the subject, and form the standard reference for all concerned with climate change in academia, government and industry worldwide." Id. See also ARL151189.

lags in its response, so that what already has been emitted and what can be extrapolated to be emitted in the next 15–20 years will have impacts out to 2050 and beyond.  ARL117248 (LR). Long-lived GHGs account for the fact that the climate models based on B1, A1B, and A2 scenarios show a similar trend in global warming out to approximately the mid-21st century. ARL117233 and Figure 5 (LR).[7]  Thus, as the Final Rule explains, "climate changes for the next 40-50 years are already largely set."  ARL117279 (LR) (citing, inter alia, IPCC AR4 at 749, ARL152082).  In addition, further climate change is committed due to natural, positive feedback mechanisms, such as the sea-ice albedo feedback effect.[8]  Because of such processes, GHG-induced warming and ice melt bring further warming and ice melt.  ARL117229, 117279 (LR).

In finding that Arctic sea-ice declines are very likely to continue, the Service also relied on a USGS analysis of an "ensemble" of the ten IPCC AR4 climate models that most accurately corresponded to historical sea-ice declines.  ARL117236-37 (LR); ARL128823-24.  This ten-model ensemble (driven by the A1B "business as usual" emissions scenario) projects a future decline in September Arctic sea-ice extent of over 30% by the mid-21st century, while four of ten models projected declines in excess of 80% by that time.  ARL117237 (LR).  The Service noted that these projections may understate the future declines, given that the record-breaking low sea-ice extents observed this decade have outpaced model projections.  ARL117275, 117278, 117280 (LR).

---

[7]  Beyond that point and through the end of the century, the projections based on different emissions scenarios diverge.  Id.; see also IPCC AR4 at 749, ARL152082.

[8] The sea-ice albedo feedback effect is the result of a reduction in the extent of brighter, more reflective sea ice or snow, which reflects solar energy, and a corresponding increase in the extent of darker, more heat-absorbing water or land.  ARL117229 (LR).  In other words, ice melt begets more ice melt.

### E.      The Impact of Sea-Ice Declines on the Polar Bear

Fundamentally, the Service found that the polar bear is a sea-ice dependent species threatened by the continued decline of its primary habitat resulting from ongoing climate change. The Service found that declines in sea ice negatively impact polar bears by increasing the energetic demands of movements on sea ice, causing seasonal redistribution into marginal ice or terrestrial habitats with limited values for feeding, diminishing hunting success, increasing hazardous open water swimming and other risks, reducing access to maternal denning areas and otherwise impairing reproductive success, and increasing the polar bear's susceptibility to other stressors.  ARL117279-80 (LR).

In particular, the Service found that changes in sea ice will reduce the abundance and accessibility of most ice seal species.  ARL117279; 117263-65 (LR).  The Service found that seals likely will remain distributed in shallower, more productive southerly areas that are losing their seasonal sea ice and becoming characterized by vast expanses of open water in the spring-summer-fall period.  ARL117279, 117265 (LR).  As a result, seals will remain unavailable as prey to polar bears during critical times of the year.  Id.  As the Service explained, all of these factors "will, in turn, result in a steady decline in the physical condition of polar bears, which has proven to lead to population-level demographic declines in reproduction and survival."  ARL117279 (LR); see also ARL117265 (LR).  The Service noted that polar bears in regions of the Arctic already are being affected by climate change, particularly in the Western Hudson Bay in Canada, Southern Hudson Bay, and Southern Beaufort Sea off the Alaskan coast.  ARL117260, 117270-73 (LR).

## V.      STANDARD OF REVIEW

The Service's decision to list the polar bear as threatened is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides a right to judicial review of certain final agency action.  The APA provides that a court may set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."  Environmental Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, inter alia, Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971)); see also American Wildlands v. Kempthorne, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), aff'd 530 F.3d 991 (D.C. Cir. 2008) ("Under the APA's standard of review, there is a presumption of validity of agency action").  A reviewing court is forbidden from "substituting its judgment for that of the agency."  Environmental Def. Fund, 657 F.2d at 283 (citing, inter alia, Overton Park, 401 U.S. at 416).  Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree."  Costle, 657 F.2d at 283 (citations omitted).  An agency's treatment of the evidence need not be a "paragon of clarity," but rather what is required is that the reviewing court be able to discern a "rational basis" for the agency's treatment of the evidence. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 289-90 (1974).

Reviewing courts are to be at their "most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science."  Baltimore Gas Co. v. NRDC, 462 U.S. 87, 93, 96, 103, 105-106 (1983); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 375-77 (1989) (where analysis "requires a high level of technical expertise," court must defer to informed discretion of agency).  As the D.C. Circuit noted in

Ethyl Corp. v E.P.A., 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc), the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."  This Court has explained that:

> [w]ith regard to FWS decisions in particular, "[g]iven the expertise of the [Service] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [Service]." . . . .  In addition, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."

American Wildlands, 478 F. Supp. 2d at 96 (internal citations omitted).  The D.C. Circuit is "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information."  State of New York v. Reilly, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992); see also American Wildlands v. Kempthorne, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("'[I]n an area characterized by scientific and technological uncertainty[,] this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives'"), quoting International Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C. Cir. 1992).

A reviewing court may reverse under the arbitrary and capricious standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  In the APA context, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency

could reasonably have found the facts as it did."  Occidental Eng'g Co. v. INS, 753 F.2d 766,

770 (9th Cir. 1985).  A reviewing court should determine agency compliance with the law solely

on the record on which the decision was made.  Overton Park, 401 U.S. 402; Camp v. Pitts, 411

U.S. 138, 142 (1973).

## VI.    ARGUMENT

### A.    Plaintiffs Alaska, CCA, CORE, and CF Lack Standing

To meet their burden of establishing standing, plaintiffs must demonstrate that: (1) they

have "suffered an 'injury-in-fact'" to a legally protected interest that is both "concrete and

particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical;" (2) there

is a "causal connection between the injury and the conduct complained of;" and (3) it is "likely"

– not merely "speculative" – "that the injury will be 'redressed by a favorable decision.'"  Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  At the summary judgment stage, a

plaintiff may not rest on "'mere allegations,' but must 'set forth' by affidavit or other evidence

'specific facts,'. . . ." supporting standing.  Id. at 561.

Organizational plaintiffs must show either that they have "representational standing,"

which is contingent upon the ability of at least one of its members to bring suit, or that they have

"organizational standing," which turns instead on whether the organization itself has suffered an

injury-in-fact.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-379 (1982).  If suing on

behalf of their members, organizations must show that their members meet these threshold

requirements for standing.  Common Cause v. Federal Election Comm'n, 108 F.3d 413, 417

(D.C. Cir. 1997) (citation omitted).  The burden of establishing these requirements rests squarely

on Plaintiffs, and Plaintiffs must meet that burden by alleging facts that "affirmatively" and

"clearly" demonstrate standing.  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990); see

also U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

### 1.    Alaska Has Failed To Demonstrate Standing

Alaska has submitted no evidence to demonstrate that it has standing, asserting instead

that its standing is "self-evident."  Alaska's Mem. at 5.[9]  Alaska claims that its standing is "self-

evident" because listing of the polar bear will result in decreased commercial activities that

would lead to reduced taxes and royalty revenues to the State and municipal governments.  Id. at

4.  Alaska also asserts that unspecified "regulatory measures" resulting from the listing will

interfere with municipalities' planning and regulatory activities.  Id.  There are at least three

defects in Alaska's argument.  First, Alaska's highly generalized allegations neither demonstrate

particularized injury, nor establish that such injury is "imminent."  See Florida Audubon Soc'y v.

Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).  "Where there is no current injury, and a party relies

wholly on the threat of future injury," such as Alaska does in this case, "the fact that the party

(and the court) can 'imagine circumstances in which [the party] could be affected by the

agency's action' is not enough."  Northwest Airlines, Inc. v. FAA, 795 F.2d 195, 201 (D.C. Cir.

1986) (citation omitted).  See also United Transp. Union v. ICC, 891 F.2d 908, 912 (D.C. Cir.

1989) (court may "reject as speculative allegations of future injuries. . .").

Second, to the extent Alaska relies on possible harm to its citizens based on loss of

commercial activities, employment opportunities, or subsistence harvest, these injuries do not

---

[9] This brief refers to Joint Plaintiffs' October 20, 2008 memorandum in support of their joint motion for summary judgment (Dckt, No. 127) as "JP's Mem."; CBD's joint memorandum (Dckt. No. 125) as "CBD's Mem."; SCI's supplemental brief (Dckt. No. 123) as "SCI's Mem."; CF's supplemental brief (Dckt. No. 126) as "CF's Mem."; CCA/CORE's supplemental brief ((Dckt. No. 124) as "CCA's Mem.; and Alaska's supplemental brief (Dckt. No. 128) as "Alaska's Mem."

demonstrate standing on behalf of the State.  Alaska may not sue to protect its citizens from the operation of the ESA, but may protect only its own sovereign interests.  See Massachusetts v. EPA, 549 U.S. 497, 520, n.17 (2007).  See also Center for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466, 477 (D.C. Cir. 2009) ("As the [Supreme] Court has long recognized, only the United States, and not the states, may represent its citizens and ensure their protection under federal law in federal matters.").

Third, even if Alaska's alleged injuries were sufficient to demonstrate injury-in-fact, it has not adequately established causation.  To establish standing, a plaintiff must allege "a fairly traceable connection between [its] injury and the complained-of conduct of the defendant."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998).  The polar bear already is subject to extensive protections under the Marine Mammal Protection Act ("MMPA"), which places regulatory burdens on the state and private parties.  See 16 U.S.C. §§ 1361-1423h.  Alaska fails to show or even address how the ESA listing of the polar bear is likely to cause an additional regulatory burden – above and beyond the restrictions on state and private activities already resulting from the MMPA.  Notably, as the polar bear 4(d) rule explains, because the standard for incidental take authorization under the MMPA is set at "negligible impact" to the affected marine mammal species or stock, any MMPA-compliant authorization is expected to meet the ESA Section 7(a)(2) standard of avoiding jeopardy to the species.  73 Fed. Reg. 76,249, 76,254 (Dec. 16, 2008) (polar bear 4(d) rule).  The 4(d) rule adds, "[t]o the extent that any Federal actions are found to comport with the standards for MMPA incidental take authorization, we fully anticipate that any such section 7 consultation under the ESA would result in a finding that the proposed action is not likely to jeopardize the continued existence of the polar bear."  Id.  In asserting that its standing is "self-evident," Alaska does not even mention the 4(d) rule or the

protections afforded the polar bear under the MMPA, and fails to explain how any alleged injuries would be fairly traceable to the ESA listing.[10]

In sum, Alaska's standing is not "self-evident" and it has failed to demonstrate that it is likely to suffer a concrete, particularized, and imminent injury caused by the conduct complained of (i.e., the ESA listing) that would be redressed by a favorable decision. Lujan, 504 U.S. at 560-61. Accordingly, Alaska's lawsuit should be dismissed.

### 2.      CCA and CORE Have Failed To Demonstrate Standing

Plaintiffs CCA and CORE also have failed to demonstrate that they have standing in this case because neither group has shown that it is likely to suffer any concrete, particularized injury-in-fact that is fairly traceable to the Final Rule.  Rather, both groups rely on vague allegations of future harm.[11]

---

[10] In asserting that its standing is self-evident, Alaska relies on Fund for Animals, Inc. v. Norton, 322 F.3d 728 (D.C. Cir. 2003), and Maine v. Norton, 257 F. Supp. 2d 357, 373-374 (D. Me. 2003).  However, in both of these cases, the government plaintiff established standing based on injuries traceable to the listing decision.  Fund for Animals, 322 F.3d 273-74; Maine, 257 F. Supp. 373-74.  Alaska does not explain how the listing of the polar bear under the ESA in any way adds an additional burden on Alaska that does not already exist from the MMPA.  In addition, in those two cases, standing was found where the state or foreign government had resource management authority over the species.  Id.  In this case, Alaska cannot show injury based on its role as manager of the polar bear as a natural resource, because the State has not had responsibility for managing polar bears within its borders since the enactment of the MMPA in 1972.  See 16 U.S.C. § 1379(a) ("No State may enforce, or attempt to enforce, any State law or regulation relating to the taking of any species . . . of marine mammal within the State unless the Secretary has transferred authority for the conservation and management of that species . . . to the State under subsection (b)(1) of this section.").  Alaska has not requested transfer of management authority for the polar bear under the MMPA.

[11]    CCA and CORE must demonstrate standing to raise their claims, whether they are participating as plaintiffs in their original lawsuit, California Cattlemen's Ass'n, et al. v. Salazar, No. 08-1689, or as plaintiff-intervenors in State of Alaska v. Salazar, No. 08-1352.  See Fund for Animals, 322 F.3d at 732-733 (an intervenor, like any party, must show injury-in-fact, causation, and redressability).

Like Alaska, CCA and CORE attempt to show injury by making generalized claims that the polar bear ESA listing potentially could increase the cost of doing business and increase future litigation costs.  CCA's Mem. at 2-5, 9-11.  CORE asserts that it is "a philanthropic human rights organization established to fight discrimination and encourage the economic and social independence of the poor and minorities."  CCA's Mem. at 8.  CORE's website states that the organization's mission "is to bring about equality for all people regardless of race, creed, sex, age, disability, sexual orientation, religion or ethnic background," and "expose acts of discrimination in the public and private sectors of society."[12]  There is no reasonable connection between the polar bear listing rule and CORE's stated mission.  CORE's vague, unsupported allegations that the polar bear listing will lead to increased costs of energy development, which in turn drive up the price of consumer goods and services, impacting the poor, is simply too attenuated to establish a concrete, particularized injury.  See CCA's Mem. at 11; see also Cohen v. Obama,  No. 08-2150, 2008 WL 5191864 (D.D.C. 2008) (no injury-in-fact where alleged harm to plaintiff too vague and attenuated and raises generally-available grievance).  Similarly, CCA asserts that it is "a nonprofit association that represents California's ranchers and beef producers in legislative and regulatory matters."  CCA's Mem. at 2.  The mere existence of CCA's "policy to 'oppose the listing of species . . . based primarily on climate change'" (CCA's Mem. at 4), is insufficient to demonstrate concrete injury arising from the Final Rule.  While "an organization whose members are injured may represent those members in a proceeding for judicial review . . . a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to

---

[12] See What is CORE?, available at  http://www.core-online.org/Features/what-is-core.htm (visited Dec. 4, 2009).

render the organization 'adversely affected' or 'aggrieved.'"   Sierra Club v. Morton, 405 U.S.

727, 739 (1972) (internal citation omitted).

CCA's and CORE's alleged injuries not only are vague, but are entirely conjectural, and

rely on "future actions to be taken by third parties."  See United Transp. Union, 891 F.2d at 912.

See also Grassroots Recycling Network v. EPA, 429 F.3d 1109, 1112 (D.C. Cir. 2005).

Specifically, CCA and CORE appear to rely on allegations that their members generate

greenhouse gases that may one day be regulated under Section 7 of the ESA to avoid further

decline of polar bear habitat.  See CCA's Mem. at 4, 9.  However, the Service clarified in the

Final Rule that the emission of GHGs from a facility in the lower 48 States would not, in and of

itself, trigger formal Section 7 consultation, stating that:

> [T]he best scientific data available today are not sufficient to draw a causal
> connection between GHG emissions from a facility in the conterminous 48 States
> to effects posed to polar bears or their habitat in the Arctic, nor are there sufficient
> data to establish that such impacts are "reasonably certain to occur" to polar bears.
> Without sufficient data to establish the required causal connection – to the level of
> "reasonable certainty" – between a new facility's GHG emissions and impacts to
> polar bears, section 7 consultation would not be required to address impacts to
> polar bears.

ARL117304 (LR).  The Service reiterated this view in the final rule under ESA Section 4(d)

providing measures for the conservation of the polar bear.  73 Fed. Reg. 76,249, 76,266 (Dec. 16,

2008) ("4(d) Rule"), AR4D012942.

CCA's and CORE's speculative allegations that the polar bear listing will subject

members to increased citizen suits and agency enforcement actions, increasing their costs of

doing business, fail to demonstrate an injury that is "'certainly impending'" as is required where

a party relies on the threat of future injury.  See Northwest Airlines, 795 F.2d at 201 (quoting

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  Furthermore, CCA

and CORE have failed to demonstrate that their alleged injuries are "dependent upon" the Final

Rule.  See Wilderness Soc'y v. Griles, 824 F.2d 4, 18 (D.C. Cir. 1987).

Because CCA and CORE's claims of harm are vague and hinge on speculation regarding

the future actions of the Service and third parties, they have failed to establish standing to

challenge the Final Rule, and their lawsuit should be dismissed.

### 3. CF Has Not Met Its Burden To Demonstrate Standing

CF has failed to submit evidence demonstrating each element of standing.  "Mere

allegations" of harm are insufficient; rather, CF must provide evidence of "specific facts"

establishing injury-in-fact, causation, and redressability.  See Lujan, 504 U.S. at 561.  CF states

that it represents entities that manage polar bears in Canada, enterprises that outfit hunters, and

individuals who have taken polar bears in Canada and are unable to import their trophies as a

result of the listing.  See CF's Mem. at 3-4.  However, CF fails to offer a single declaration from

any of these entities to demonstrate that any Plaintiff meets the three-prong test for Article III

standing.  The only "evidence" provided is a quote from a magazine article attributed to an

outfitter who states that hunters from the United States make up nearly 100% of his customers.

Id. at 24.  This falls far short of the required evidence of specific facts demonstrating concrete

and particularized injury resulting from the Final Rule.  Sierra Club v. EPA, 292 F.3d 895, 899

(D.C. Cir. 2002).  Because CF wholly has failed to meet its burden to prove standing, its lawsuit

should be dismissed.

### B. The Service's Listing Determination is Rational, Consistent with the Mandates of the ESA, and Supported by the Best Available Scientific Information

As noted above (supra § V), under the law of this Circuit, the Service's listing decision is

presumed valid, Environmental Def. Fund, 657 F.2d at 283 (citation omitted), and must be

upheld as long as it meets "minimal standards of rationality," Ethyl Corp., 541 F.2d at 36. The Service's polar bear listing decision easily meets minimal standards of rationality. The Final Rule makes clear that the Service exhaustively reviewed the best scientific data available and made rational choices based on that data. As explained below, the Service analyzed each of the five ESA listing factors and provided a rational explanation of its finding with respect to each factor. The Service's ultimate conclusion following that analysis – that the polar bear meets the definition of a "threatened" species, but not that of an "endangered" species – is reasonable and should be upheld.

  **1. The Service Rationally Considered Each of the ESA's Listing Factors and the Current Status of the Polar Bear**

    **a. Factor A: The Present or Threatened Destruction, Modification, or Curtailment of Habitat or Range**

As previously explained, in deciding whether a species qualifies as endangered or threatened, the Secretary is required to consider five factors, any one of which may support listing. See supra § II. First among the factors is "the present or threatened destruction, modification, or curtailment of its habitat or range." 16 U.S.C. § 1533(a)(1)(A). Analyzing Factor A in this case, the Service reached a very rational and understandable decision based on five findings: (1) the polar bear as a species depends on its sea-ice habitat; (2) sea-ice habitat in the Arctic is decreasing at an unprecedented rate due to climate change and very likely will continue to diminish within the foreseeable future; (3) this loss of sea-ice habitat will have undeniable negative effects on the species and lead to population declines; (4) while impacts on polar bear populations will vary in their timing and magnitude, all populations are likely to become endangered within the foreseeable future given the range-wide nature of the sea-ice loss;

and (5) the rate and magnitude of the predicted changes in sea ice will make adaptation by polar bears unrealistic.  ARL117216, 117253, 117259-81, 117296-97 (LR).

While the basic reality underlying the Service's decision is easy to understand, the Service did not rely on simple intuition.  As part of a very thorough and comprehensive analysis of Listing Factor A and information pertinent to that factor, the Service, inter alia:

(1)  examined how polar bears depend on sea ice during all aspects of their life history  (ARL117216-19, 117223, 117279 (LR));

(2)  examined nearly 30 years of data showing the unprecedented rate and extent of observed sea-ice declines and other climate-related changes that already have occurred in the Arctic (ARL117223-30, 117279-80 (LR));

(3)  examined the best available science regarding future global warming, including the IPCC AR4 and its "state-of-the art" climate models that unanimously project continued warming and Arctic sea-ice declines (ARL117230-38 (LR));

(4)  examined how sea-ice declines negatively affect polar bear movements, hunting and feeding, reproductive success, and survival rates, and increase other risks to polar bears (ARL117260-69, 117270-71, 117279-80 (LR));

(5)  examined the negative effects of sea-ice declines and poor sea-ice conditions that currently are impacting individual polar bear populations such as those in Western Hudson Bay and Southern Beaufort Sea (ARL117270-74, 117280 (LR));

(6)  examined the best available scientific modeling that projects range-wide declines in polar bear numbers during the 45-year foreseeable future (ARL117275-79, 117280 (LR)); and

(7)  examined whether polar bears are likely to be able to adapt to the future sea-ice declines given the unprecedented changes occurring and the existence of other stressors today such as hunting (ARL117264-66, 117280, 117284-85 (LR)).

After completing this rigorous and exhaustive examination of the science and evidence, the Service found that the polar bear is likely to become an endangered species within the

foreseeable future, based on the five findings noted above and discussed more fully below. ARL117253, 117279-81, 117296-97 (LR).

**(i)**     **The Polar Bear Depends on Sea Ice for its Primary Habitat**

First, the Service found that polar bears are evolutionarily adapted to utilize Arctic sea ice and rely on sea ice for their survival and primary habitat.  ARL117216-19, 117259, 117279 (LR).  As the Service noted, polar bears depend on sea ice for a number of critical, life-sustaining functions, including hunting and feeding.  ARL117218, 117264, 117266 (LR).  Polar bears are carnivorous and prey heavily throughout their range on ice-dependent seals, principally "ringed" seals, and, to a lesser extent, "bearded" seals.  ARL117218, 117266 (LR).  Polar bears rarely can catch seals on land or in open water; rather, they consistently catch seals and other marine mammals at the air-ice-water interface.  ARL117264 (LR); ARl082454.  While polar bears have been observed eating land-based food, the Service found that land-based food sources do not provide the high fat, high caloric food source that seals do.  ARL117263, 117265-66 (LR).  The polar bear's inefficient locomotion on land and large size (relative to other bears) also may limit the viability of land-based food.  ARL117263, 117266 (LR).  Thus, as the Service explained, "[p]olar bear survival and maintenance at sustainable population sizes depends on large and accessible seal populations and vast areas of ice from which to hunt."  ARL117266 (LR).

The physical characteristics and location of the sea ice also are important to polar bears. Polar bears prefer sea ice located over shallow water closer to shore, such as over the continental shelves, likely due to the higher biological productivity in those areas and greater access to prey. ARL117217-18 (LR).  Even where prey is abundant in these near shore zones, if sea-ice conditions are poor or there is insufficient concentration of sea ice relative to open water, polar bears experience reduced hunting success.  ARL117264 (LR).  As the Service concluded, citing

29

two of the USGS reports and three other scientific studies, "[t]he importance of sea ice to polar bear foraging is supported by documented relationships between the duration and extent of sea ice and polar bear condition, reproduction, and survival that are apparent across decades . . ." Id.

In addition to providing a platform for hunting, female polar bears also critically rely on sea ice to access maternity denning areas for reproduction. ARL117218-19 (LR). Across the range, most polar bear dens occur on land, relatively near the coast. ARL117219 (LR). Accordingly, pregnant females must adjust their movements on sea ice in order to access land at the appropriate time (fall to early winter). ARL117218-19 (LR). Polar bears also rely on sea ice to seek mates and make long distance movements. ARL117218, 117223, 117259 (LR). In sum, the Service found that "[p]olar bears have evolved in a sea ice environment that serves as an essential platform for which they meet life functions." ARL117279 (LR).

### (ii)    Extensive Sea-Ice Declines Have Been Recorded, and Are Very Likely To Continue For The Foreseeable Future

Second, as supported by the overwhelming consensus view of a large number of climate scientists from around the world and the use of the best available computer climate modeling, the Service determined that the unprecedented rate and extent of Arctic sea-ice declines due to climate change are very likely to continue for the foreseeable future. ARL117223-38, 117253, 117279, 117296 (LR); see also IPCC AR4 at ARL152436. As the Service explained, due to the long persistence time of certain GHGs in the atmosphere, the current and projected patterns of GHG emissions over the next several decades, and interactions among climate processes, climate changes for the next 40-50 years "are already largely set." ARL117279 (LR) (citing IPCC AR4 at 749), ARL152082; J. Overland, NOAA, in litt. to the Service, (2007), ARL000244.

As shown in Figure 7 in the Final Rule, September minimum sea-ice extent has fallen dramatically, and the IPCC AR4 models all project that these declines will continue through mid-century.  ARL117237 (LR).  See also IPCC AR4 at ARL151207 ("Sea ice is projected to shrink in both the Arctic and Antarctic under all SRES [Special Report on Emissions Scenarios] scenarios.")  In addition, the USGS examined a ten-model ensemble of the IPCC AR4 models that best replicate historical sea-ice extent, which projected a future decline in September Arctic sea-ice extent of over 30% by the mid-21st century, while four of ten models projected declines in excess of 80% by that point.  ARL117236-37 (LR).  As the Service noted, many of the climate models project a seasonally ice-free (i.e., in summer) Arctic is by the middle of the 21st century. ARL117296 (LR).

(iii)     **Sea-Ice Declines Are Likely to Continue to Have Negative Impacts on the Polar Bear and to Cause Population Declines**

Third, the Service found that sea-ice declines and other climate-related changes have had, and in the foreseeable future are likely to have, profound negative impacts on polar bears, such as: (1) increasing the energetic demands of movements on sea ice (ARL117260-61 (LR)); (2) forcing polar bears to seasonally adjust to greater time spent on land or less productive deep water areas, causing nutritional stress from lack of adequate food (ARL117261-63 (LR)); (3) causing reduced prey (seal) productivity and availability, and thus greater competition between bears for limited food (ARL117263-64 (LR)); (4) causing reduced seal hunting success even when seals are present (due to poor ice concentrations and conditions) (ARL117266-67 (LR)); (5) increasing hazardous open water swimming by polar bears (ARL117267 (LR)); and (6) reducing access to maternal denning areas and otherwise impairing reproductive success (ARL117267-69 (LR)); see also ARL117279-80, 117296 (LR).

31

The Service determined that these and other adverse impacts are likely to translate to a steady decline in the physical condition of the polar bear throughout its range, leading to declines in polar bear reproduction and survival, and ultimately, a decline in numbers within the foreseeable future.   ARL117260, 117265-66, 117270-71, 117279, 117296-97 (LR).   This determination is supported squarely by the best scientific information available.   In particular, the Service cited literature predicting that declines in the physical condition of polar bears related to lower hunting and feeding success likely will initially affect female reproductive rates and juvenile survival.   ARL117270 (LR); see also ARL117271-74.   The Service also noted the extensive literature documenting the well established relationship between the physical condition of adult females and factors affecting population growth rates, such as the age of first reproduction, litter sizes, cub body weight, and cub survival rates.   ARL117270-71 (LR); see also ARL117265 (LR) (citing literature regarding the negative impacts of a lengthened ice-free season on polar bear condition, reproduction, survival and population size).

The Service also notes that, in the scientific literature, habitat loss "has been implicated as the greatest threat to the survival [of] most species" and that "[e]xtinction theory suggests that the most vulnerable species are those that are specialized (Davis et al. 2004) [(ARL134261)], long-lived with long generation times and low reproductive output (Bodmer et al. 1997) [(ARL133951)], and carnivorous with large geographic extents and low population densities (Viranta 2003, p. 1,275) [(ARL140575)]." ARL117274 (LR)  The Service found that, "[b]ecause of their specialized habitats and life history constraints (Amstrup 2003, p. 605) [(ARL133663-86)], polar bears have many qualities that make their populations susceptible to the potential negative impacts of sea ice loss resulting from climate change." Id.

Further, the Service's prediction that sea-ice declines are likely to lead to population declines is not just theory – it is already happening.  Researchers first observed warning signs, such as declining body condition, lowered reproductive rates, and reduced cub survival, in polar bears in Western Hudson Bay ("WHB"), which they attributed to a changing ice environment. ARL117260, 117271 (LR).  Researchers also identified a statistically significant decline in the weights of lone and suspected pregnant adult female polar bears between 1988 and 2004.  Id. Researchers later established a statistically significant causal link between climate change in WHB, reduced ice presence, and observed declines in polar bear physical and reproductive parameters, including body condition (weight) and natality (birthrate).  ARL117260 (LR).  These declines in physical condition have since contributed to a population decline of 22%. ARL117271 (LR).

This same pattern of reduced biological conditions presaging a likely future population decline also appears to be developing for the Southern Hudson Bay population.  ARL117271-72 (LR); ARL110118, 110122, 110145-46.   There, researchers identified a declining trend in condition for all age and reproductive classes of polar bears since the mid-1980s.  ARL117271 (LR).  The Service notes that "the decline has been greatest for pregnant females and subadult bears – trends that will likely have an impact on future reproductive output and subadult survival."  Id.

Similarly, the Southern Beaufort Sea ("SBS") population off the Alaskan coast has experienced declines in a number of measures of polar bear vitality and reproductive success, including reduced cub survival and declines in skull sizes and/or body lengths of sub-adult and adult males and females. ARL117242, 117272-73 (LR).   While the declines had not yet translated into a statistically significant decline in polar bear numbers in the population through

2006 (ARL117242, 117272 (LR)), the USGS predicted a statistically significant population decline for the Southern Beaufort Sea population, based on a projected increased number of ice-free days in the Southern Beaufort Sea using the IPCC AR4 climate models.  ARL117276 (LR); ARL082309-10.  The Service also noted several recent unusual mortality events in the Southern Beaufort Sea population that indicate nutritional stress and increased risks from open water, including observation of polar bear cannibalism, drownings, and apparent deaths from starvation. AR 117272 (LR).

### (iv) The Polar Bear Is Threatened Throughout Its Range

Fourth, the Service found that, while impacts on polar bear populations will vary in their timing and magnitude, all populations are likely to become endangered within the foreseeable future.  ARL117279-80 (LR).  With respect to the southerly populations of the "Seasonal Ice" ecoregion that includes Western Hudson Bay and Southern Hudson Bay, the Service noted that polar bears "already experience stress from seasonal fasting due to early sea ice retreat, and have or will be affected earliest."  ARL117280 (LR); supra § VI.B.1.a.iii.  In the "Divergent Ice" ecoregion, where ice is formed and then drawn away from near-shore areas, the Service found that populations such as those in the Southern Beaufort Sea "will, or are currently, experiencing initial effects of changes in sea ice."  Id.; see also ARL117274-75 (LR); ARL129019, 129039, 129053, 129057 (noting a decline in optimal polar bear habitat in the Divergent Ice ecoregion and projecting a further decline through the mid-21[st] century); supra § VI.B.1.a.iii.  Against this backdrop of observed and projected declines in polar bear habitat and physical condition in the Divergent Ice ecoregion, the Service found that populations in this ecoregion "are vulnerable to large-scale dramatic seasonal fluctuations in ice movements, decreased abundance and access to prey, and increased energetic costs of hunting."  ARL117280 (LR).

34

The Service found that polar bear populations inhabiting the two more northerly ecoregions – the "Convergent Ice" ecoregion, where ice accumulates from offshore, and the central island archipelago of Canada ("Archipelago" ecoregion) – may be affected later by sea-ice declines than in the other two ecoregions, but will experience declines in demographic parameters similar to those observed in the Western Hudson Bay.  ARL117244-45, 117280 (LR). The Service noted that changes in sea ice and precipitation already are occurring in these ecoregions.  In 2007, sea-ice losses in the Archipelago and the Convergent Ice ecoregions were the largest observed to date.  ARL117275 (LR).  In addition, seal productivity is lower in these more northerly areas, making populations there more susceptible to future sea-ice declines. ARL117244-45 (LR).  In finding the polar bear to be threatened throughout its range (i.e., including these two ecoregions), the Service also relied on the fact that the ongoing Arctic sea-ice declines and other changes are unprecedented in their extent and rate, are showing an accelerating trend, and are outstripping model projections.  ARL117224, 1172780, 117296-97 (LR).

For consideration by the Service in making its listing determination, the USGS also conducted two modeling exercises on the impact of the projected sea-ice declines on polar bear numbers (in Amstrup et al. 2007, ARL082446).  The Service found that these exercises provide further scientific evidence that sea-ice declines threaten the polar bear range-wide and in each ecoregion, consistent with other record evidence.  ARL117278, 117280, 117300 (LR).  In the first exercise, a simpler "Carrying Capacity Model," the USGS applied current population densities (i.e., estimated numbers of bears per unit of sea-ice habitat) to annual sea-ice projections to estimate the possible future numbers of bears.  ARL117276-77 (LR); ARL082463. The second approach, a more complex "Bayesian Network Model" ("Bayesian Model")

calculated probabilities of certain population outcomes (e.g., smaller, rare, same as now, extinct) for each ecoregion.  ARL117277-79 (LR).  Unlike the Carrying Capacity Model, the Bayesian Model incorporated the "spatial and temporal" (i.e., seasonal) availability of sea ice, which is an important factor for polar bears.  ARL117276-77, 117265 (LR); ARL082476-78,  ARL082486-87.  The Bayesian Model also incorporated population stressors other than sea-ice extent, which were not incorporated in the Carrying Capacity Model.  ARL117276-78 (LR); ARL082476-78, ARL082486-87.

        In both exercises, polar bears within the four ecoregions were not uniformly impacted, but populations within all four ecoregions generally declined within the 45-year foreseeable future.  ARL117277 (Table 1), 117278 (LR).  The Carrying Capacity Model – described by the Service as a "conservative view" because it did not incorporate seasonal ice extent and stressors other than sea-ice loss – showed a 7 to 10% decline in the Seasonal Ice ecoregion, a 3 to 14% decline in the Archipelago ecoregion, a 19 to 35% decline in the Divergent Ice ecoregion, and between a decline of 24% to an increase of 4% for the Convergent Ice ecoregion.  ARL117277 and Table 1 (LR).  The Bayesian Model projected that extinction is the most probable outcome in the Seasonal Ice and Divergent Ice ecoregions at year 45 (which represents the potential loss of approximately two-thirds of the world's current polar bears).  ARL117278 (LR).  In the Convergent Ice ecoregion, a population "smaller in numbers" or "rare" was the predominant outcome at year 45, while in the Archipelago ecoregion, the most probable outcome at year 45 was a smaller population.  Id.  As explained infra § VI.C.3.b, the Service recognized that the Bayesian Model was a first-generation prototype and accordingly focused on the general direction and magnitude of the model outcomes, which the Service found consistent with other

record evidence, as opposed to the specific numerical outputs.   ARL117278, 117280 and ARL117300 (LR); ARL110164-65, 110167-68.

In finding polar bears threatened throughout their range, the Service also relied on the input and critical review of the professional community of polar bear experts, including the scientific peer reviewers of the proposed rule and members of the international PBSG of the International Union for the Conservation of Nature ("IUCN").[13]   ARL117279 (LR).   For the rule itself, the Service solicited expert peer opinion from 14 individuals, including climatologists and scientists with broad Arctic scientific expertise.   ARL117239 (LR).   Of the 14 peer reviewers, only one Canadian Inuit peer reviewer opposed the Service's proposal to list the polar bear as threatened throughout its range. See ARL077911, 061239, 064215, 077025.   The Service also noted that the IUCN, based on the PBSG's assessment, reclassified polar bears as a "vulnerable" species range-wide because of the projected change in sea ice and the likely negative effects on polar bear physical condition, reproduction, survival, and ultimately, numbers.   ARL117279, 117286 (LR).

### (v)        The Polar Bear Is Not Likely to be Able to Adapt to the Projected Sea-Ice Declines

Fifth, the Service found that the rate and magnitude of the observed and predicted declines in sea ice make adaptation by polar bears unrealistic.   ARL117240, 117243, 117253, 117264-66, 117280 (LR).   As the Service noted, while some short-lived species have exhibited micro-evolutionary responses to climate change, the relatively long generation time and low genetic variation of polar bears, combined with the relatively rapid rate of change for sea ice that

---

[13] The IUCN is an international environmental organization headquartered in Switzerland that, among other things, maintains a Red List of Threatened Species.

is projected, suggest that adaptation through natural selection will be too limited to provide a means for the polar bear to avoid becoming endangered.  ARL117264-5 (LR).

Further, while bears as a genus display a high degree of behavioral flexibility, polar bears evolved to be the largest of the bear species by specializing on a calorically dense, carnivorous diet that differs from all other bear species.  ARL117265 (LR).   As the Service noted, polar bears depend on feeding on high fat content seals (principally, ringed seals).  Id.  Access to ringed seals is seasonal for most polar bear populations, resulting in cycles of weight gain and weight loss.  Id.  The most important seal foraging periods occur during the spring, early summer, and following the open-water period in the fall.  Id.  A reduction in sea ice thus can extend the summer/fall open water period in which bears have minimal or no access to prey.  Id.  As the Service explained, the effects of a lengthened ice-free season during this time period have been associated in the scientific literature with declines in polar bear condition, reproduction, survival, and population size, which strongly indicate that behavioral adaptation to the ongoing and projected changes in sea ice is not feasible.  Id.  This science provides substantial support for the Service's conclusion that the species is likely to become endangered within the foreseeable future due to the rate and magnitude of sea-ice declines.

The Service found that polar bears today experience multiple stressors (e.g., harvest through hunting, contaminants, oil and gas development, and additional interactions with humans) that were not present during past and less rapid historical warming periods when polar bears may have adapted.  ARL117243, 117260 (LR).  As the Service concluded, there is little evidence to support a finding or even speculation that polar bears will be able to adapt to the unprecedented ongoing declines happening today in their sea-ice habitat, on which they depend for multiple, essential life functions.  ARL117240, 117243, 117253, 117264-66, 117280 (LR).

38

In sum, based on the five findings set forth above and the record as a whole, the Service properly determined that the polar bear is likely to become endangered throughout its range during the foreseeable future due to the ongoing decline of its sea-ice habitat.

### b.      Factor D: the Inadequacy of Existing Regulatory Mechanisms

As noted previously (supra § II), listing Factor D requires the Service to determine if a species is endangered or threatened due to the "inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D).  In this case, the Service methodically, and in detail, considered all existing regulatory mechanisms directed at managing threats to polar bears, both domestically and within the range countries of Canada, Russia, Norway, and Denmark/Greenland, as well as international agreements such as the 1973 Agreement on the Conservation of Polar Bears (ARL139478) and bilateral agreements between the United States and Russia and the Inuvialuit and Inupiat.  See generally ARL117285-92 (LR).  The Service concluded that "potential threats to polar bears from direct take, disturbance by humans, and incidental or harassment take are, for the most part, adequately addressed through international agreements, national, State, Provincial or Territorial legislation, and other regulatory mechanisms."  ARL117292 (LR).  This, the Service explained, is evidenced at least in part by the polar bear's recovery from "over-hunting pressures of the mid 20th century."  ARL117251 (LR).

However, with respect to the primary threat to the survival of the polar bear – loss of sea-ice habitat due to climate change – the Service found that, "although there are some existing regulatory mechanisms to address anthropogenic causes of climate change, there are no known regulatory mechanisms in place at the national or international level that directly and effectively address" the threat within the foreseeable future.  ARL117292 (LR).  The Service noted that this inadequacy of existing regulatory mechanisms to address climate change effectively is

demonstrated by evidence that "indicates [] the growth rate of atmospheric carbon dioxide ($CO_2$), the largest anthropogenic source of GHGs, is increasing rapidly," above forecasted levels.  ARL117291 (LR); ARL125623 (Canadell (2007) finding that emission levels since 2000 have exceeded even the worst-case SRES emission scenario developed by the IPCC).  As the Final Rule explains, because GHG loading in the atmosphere has a considerable lag effect on climate, the effects from what already has been emitted are largely set within the 45-year foreseeable future.  ARL117292 (LR); see also ARL117233 (LR) (Figure 5 demonstrating a similarity among climate model projections of warming trends based upon low, medium, and high SRES emissions scenarios out to approximately 2050).  The Service's determination under Factor D that existing regulatory mechanisms are inadequate to address the threat of global warming is rational and supported by the administrative record, which shows that the goals of existing regulatory mechanisms have not been met.  See, e.g. ARL125623 (Canadell (2007)); ARL139371 (status assessment); ARL151215 (IPCC AR4 showing an increase in GHG emissions over the last 250 years).

> ### c.   Other Factors – Overutilization (Factor B); Disease and Predation (Factor C); and Other Natural or Manmade Factors (Factor E)

In addition to Factors A and D, the Final Rule demonstrates that the Service carefully considered the remaining listing factors set forth in ESA Section 4(a)(1) – overutilization for commercial, recreational, scientific, or educational purposes (Factor B); disease and predation (Factor C); and other natural or manmade factors affecting the polar bear's continued existence (Factor E) – and rationally concluded that the polar bear is not currently threatened by any of those factors, either singularly or cumulatively.  16 U.S.C. § 1533(a)(1)(B), (C) & (E); ARL117284-85, 117296 (LR).  At the same time, the Service recognized that these factors may

become more significant threats in the future.  ARL117284-85, 117296 (LR).  In particular, the Service noted that polar bear mortality from harvest and increased bear-human interactions may approach unsustainable levels for several populations in the future, especially those experiencing nutritional stress or declining population numbers due to habitat change.  ARL117284 (LR).

### d.   Current Status of the Polar Bear

In addition to the five listing factors, the Service considered the current status of the polar bear throughout its range in making its listing determination.  16 U.S.C. § 1533(b)(1)(A).   As noted above, the international PBSG has identified 19 polar bear populations worldwide.  Of those 19 populations, the Service identified two populations as increasing in numbers (Viscount Melville Sound and M'Clintock Channel); six populations as stable (Northern Beaufort Sea, Southern Hudson Bay, Davis Strait, Lancaster Sound, Gulf of Bothia, Foxe Basin); five populations as declining (Southern Beaufort Sea, Norwegian Bay, Western Hudson Bay, Kane Basin, Baffin Bay); and six populations as data deficient (Barents Sea, Kara Sea, Laptev Sea, Chukchi Sea, Arctic Basin, East Greenland) with no estimate of trend available.  ARL117220-21 (LR).

Of the five identified as declining, one has a statistically significant population decline based on reliable data.  Specifically, the Service noted that the Western Hudson Bay population in Canada has experienced a gradual population decline of 22 percent over 18 years. ARL117300 (LR).  The Service noted that reproduction and polar bear cub recruitment are still occurring for this population, and it remains reasonably large (estimated at greater than 900 bears).  Id.  On these grounds and because the population's decline is not precipitous, the Service found that the Western Hudson Bay population was not presently in danger of extinction, but is likely to become so in the foreseeable future.  Id.  With respect to the remaining four populations

41

identified as declining, the decline in numbers for one population (Southern Beaufort Sea) is not yet statistically significant – although reductions in measures of polar bear vitality have been observed and a statistically significant decline in numbers is expected for this population in the foreseeable future (supporting a threatened, but not endangered listing). Id. Because changes in sea ice had not yet been associated with a statistically significant change in the size of the Southern Beaufort Sea population, the population remains fairly large (about 1,500 bears), and reproduction and recruitment are still occurring in the population, the Service found that "this population is not currently in danger of extinction but is likely to become so in the foreseeable future." ARL117301 (LR).

For the other three declining populations (Norwegian Bay, Kane Basin, and Baffin Bay), the Service found that they are not currently endangered based on the available data. ARL117301-02 (LR). The Service noted that for Norwegian Bay and Kane Basin, available population estimates are less reliable because they are older (circa 1998) and based on limited years and incomplete coverage of sampling. Id. On this ground and because of the possible longer persistence of sea ice in the area of these populations, the Service found that the best available information did not indicate that they were currently in danger of extinction. Id. As regards Baffin Bay, the Service noted that recent population estimates of 2,074 bears in 1998 and 1,546 bears in 2004 have limited reliability because of the population survey methods used, and because the apparent decline was most likely due to overharvest, a source of mortality that recent efforts have sought to reduce. ARL117301 (LR). Based on the foregoing, mixed evidence regarding the rate of future sea-ice declines in Baffin Bay, and the lack of data on body condition of polar bears or the survival of cubs or subadults in Baffin Bay, the Service found that it could not conclude that this population was currently in danger of extinction. Id. With respect to the

42

remaining 14 populations, the Service stated that "population status is considered stable, increasing, or data deficient, and there is not substantial information indicating that they may currently be in danger of extinction." AR119299 (LR). In Amstrup, et al. (2007), the USGS also created an additional population (Queen Elizabeth Island). ARL117299 (LR). The Service found that there was similarly no information indicating that this population was currently endangered. ARL117299 (LR).

In sum, given the polar bear's current distribution, population numbers and trends, and the lack of evidence showing that any population is presently undergoing a precipitous decline or is imminently at risk of extinction, the Service found that the polar bear is not currently endangered, but is likely to become in danger of extinction (i.e., endangered) within the foreseeable future due to the decline of its sea-ice habitat. ARL117219-21, 117299-301 (LR).

**2. The Service Rationally Applied the ESA's Definitions of Endangered and Threatened and Articulated a Rational Connection Between the Available Scientific Information and its Listing Determination**

When the Service's determination is reviewed against the ESA's statutory listing standards, there can be no dispute that the Service's determination was entirely lawful. The ESA defines an "endangered" species as one that "is in danger of extinction throughout all or a significant portion of its range" and a "threatened" species is defined as one that is not currently endangered, but "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). Congress did not include in the ESA a quantitative or explicit extinction risk level by which to assess whether a species is "in danger of extinction" or "likely" to become endangered, nor did Congress provide a time frame for assessing species endangerment or a definition of the "foreseeable future." Similarly, the Service has not endorsed any generally applicable quantitative or explicit

definitions of endangered or threatened.  As such, there is no litmus test the Service must use in

determining whether or not a species qualifies as endangered or threatened under the ESA.

Rather, as one court has explained, "[t]he Service's role in deciding whether to list [a species] as

endangered or threatened is to assess the technical and scientific data in the administrative record

against the relevant listing criteria in section 4(a)(1) and then to exercise its own expert

discretion in reaching its decision."  Northern Spotted Owl v. Hodel, 716 F. Supp. 479, 480

(W.D. Wash. 1988) (citation omitted); see also 16 U.S.C. § 1533(a)(1)(A)-(E), (b)(1)(A).  As the

Ninth Circuit recently noted, "[a]ssessing a species' likelihood of extinction involves a great deal

of predictive judgment.  Such judgments are entitled to particularly deferential review."  Trout

Unlimited v. Lohn, 559 F.3d 946, 959 (9th Cir. 2009).

While Congress did not provide express standards for distinguishing between endangered

and threatened species, it is evident in the plain language of the ESA's definitions of those terms

that Congress believed the immediacy of the impact from the threat(s) facing the species was in

large measure what separated an endangered species from a threatened species.  While both

categories are forward-looking, the phrase "in danger of" connotes a risk of extinction that is

both substantial and immediate, whereas the terms "likely" and "foreseeable future" connote a

risk that is comparatively lower or less imminent.[14]  The ESA's legislative history supports this

_____

[14] Past listing decisions demonstrate that the Service often has distinguished endangered from
threatened species based on the imminence of the impact from the threat(s) facing the species.
See, e.g., 72 Fed. Reg. 7843, 7850 (Feb. 21, 2007) (Service reaching a negative 90-day finding
on a petition to reclassify the Utah prairie dog from threatened to endangered because current
population numbers indicated "extinction is not imminent"); 65 Fed. Reg. 62302, 62,304 (Oct.
18, 2000) (Service finding that the Colorado butterfly plant "does not meet the definition of an
endangered species under the Act, because it is not in imminent danger of extinction in the
foreseeable future . . . . Therefore, listing as threatened is appropriate"); 74 Fed. Reg. 11319,
11324 (Mar. 17, 2009) (Service finding that endangered status for Hawaiian plant was warranted
due to "significant and immediate threat," which placed the species "at current risk of extinction

44

conclusion.  One of Congress' goals in enacting the ESA was to cure a defect in the statute that preceded it, the Endangered Species Conservation Act of 1969 ("ESCA"), Pub. L. No. 91-135, 83 Stat. 275 (1969), which provided protection only to species that already were in danger of extinction worldwide.  To cure this defect, the ESA added a second category of protected species: threatened.  Committee reports for the various bills that led to the passage of the ESA emphasize the importance of the new "threatened" category and evidence congressional intent to permit earlier action than was available under the ESCA.  H.R. Rep. No. 93-412 at 2; S. Rep. No. 307, 93d Cong. 1st Sess. 3 (1973).  For instance, a 1973 Senate committee report explains that the ESA was intended to "provide the Secretary with sufficient discretion in listing and delisting animals so that he may afford present protection to those species which are either in present danger of extinction or likely within the foreseeable future to become so endangered."  S. Rep. No. 93-307 at 3.  The committee report further explains that, "by affording the Secretary the additional power to list animals which he determines are likely within the foreseeable future to become threatened with extinction," the ESA "gives effect to the Secretary's ability to forecast population trends by permitting him to regulate these animals before the danger becomes imminent while long-range action is begun."  Id.; accord Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 680 (D.D.C. 1997) (quoting same).

In this case, the Service's determination of threatened status for the polar bear conforms precisely to the definitions found in the statute and to congressional intent.  As the Final Rule explains,  the  polar  bear  occupies  the  entirety  of  its  historical  range  and  has  a  worldwide

---

throughout its range"); accord 71 Fed. Reg. 17757, 17761-62 (April 7, 2006) (NMFS finding that a threatened, as opposed to endangered, listing was warranted for a DPS of green sturgeon because evidence indicated that the "Southern DPS is not at imminent risk of extinction, but that risk of extinction in the foreseeable future is possible over the longer-term if the threats to the species are not ameliorated").

population estimated at 20,000-25,000.   ARL117219, 117242 (LR).   However, despite its relatively abundant population numbers, the best available information shows that the polar bear's principal habitat – sea ice – has been declining, and will continue to decline within the foreseeable future (i.e., the next 45 years).  ARL117252-53, 117279-81 (LR).  Indeed, a certain amount of continued warming in the foreseeable future is unavoidable.   As the Final Rule explains, "[d]ue to the long persistence time of certain GHGs in the atmosphere, the current and projected patterns of GHG emissions over the next few decades, and interactions among climate processes, climate changes for the next 40–50 years are already largely set."  ARL117279 (LR). As an "ice-obligate" species that relies on sea ice as a platform for resting, breeding, seasonal movement, travel to denning areas, and hunting, the loss of sea ice will negatively affect polar bears, causing populations to decline in the foreseeable future.  ARL117223, 117279 (LR).  As explained previously (supra § VI.B.1.b), "there are no known regulatory mechanisms in place at the national or international level that directly and effectively address the primary threat to polar bears-the rangewide loss of sea ice habitat."  ARL117292 (LR).

The projected complete loss of summer sea ice and resulting population declines are not expected to be realized overnight, however, but rather to build gradually over the course of the proceeding decades.  See ARL117237 (LR) (Figure 7).  Accordingly, while the adverse affects of loss of sea ice are being felt by polar bears in populations where current loss of sea ice is most pronounced (e.g., Western Hudson Bay), the expected impacts to polar bears range-wide are not likely to be felt immediately.  The Western Hudson Bay population, the most extensively studied population in the world, provides a good example.  As the Final Rule explains, the Western Hudson Bay population has experienced a decline attributed "primarily to the effects of climate change (earlier break-up of sea ice in the spring), with harvest also playing a role."  ARL117242,

117300 (LR).  The decline has been gradual, occurring at a rate of approximately one percent per

year.  ARL117300 (LR).  The second-most extensively studied population is in the Southern

Beaufort Sea.  Although the Service did not find a statistically significant population decline for

this population, the best available information indicates that there will be a "statistically-

significant population decline in the coming decades."  ARL117272, 117300 (LR).

Given the absence of evidence showing that the polar bear is currently experiencing a

precipitous decline in abundance to such low levels that extinction could be imminent throughout

all or a significant portion of its range, but that a population decline is likely within the

foreseeable future, the Service determined that the polar bear is not currently endangered, but is

"likely to become in danger of extinction throughout all of its range due to declining sea ice

habitat" in the foreseeable future.  ARL117296 (LR).  The Service's application of the terms

endangered and threatened conformed precisely to the plain language of the ESA and

congressional intent, and the Service's factual findings described above are rational on their face.

ARL117297 (LR); see also infra § VI.C.4 (discussing the Service's DPS and significant portion

of the range ("SPR") analyses).  Based on the polar bear's biology and evolutionary history, no

party can claim that it was irrational to find that the polar bear is dependent on its sea-ice habitat.

Similarly, no party credibly can claim that it was irrational to conclude that sea-ice declines will

negatively impact polar bears throughout the species' range, or that there is a link between sea-

ice declines and polar bear population declines.  Negative impacts to polar bears already have

been recorded at the edges of the polar bear's range, where climate change is altering the habitat

in the same manner expected to occur range-wide in the foreseeable future.  ARL117271-73

(LR).  Indeed, leading indicators of negative impacts that preceded population declines in

Western Hudson Bay, such as reduced weight and skull size, already have been detected in

Southern Beaufort Sea.  See supra § VI.B.1.a.iii.  No party credibly can argue that it was irrational for the Service to conclude that polar bears will be unable to adapt to the ongoing climate change, given the species' dependence on its sea-ice habitat and the unprecedented rate and magnitude of the projected declines in that habitat.

Nor can any party credibly contend that the Service acted irrationally in considering the best available climate science, the state-of-the-art IPCC AR4 climate models, the conclusions of the IPCC AR4, and other extensive climate science.  At bottom, the Service agreed with mainstream climate science that the accelerating downward trend in Arctic sea ice caused by global warming is very likely to continue through at least mid-century, given GHGs already in the atmosphere and those likely to be emitted.  There is nothing irrational about this conclusion. The Service rationally found that the polar bear is threatened range-wide, given that climate warming from GHG emissions is a global phenomena and sea-ice declines are occurring and are projected to continue to occur across the polar bear's range.  Likewise, no party credibly can contend that it was irrational for the Service to conclude that the polar bear is not currently endangered range-wide or in any population or geographic area when, at present, the polar bear has relatively abundant population numbers worldwide, continues to occupy the entirety of its historical range, and there is no evidence that any population or region is experiencing a precipitous decline in numbers.

In sum, the Service's determination that the polar bear is not currently endangered, but is likely to become endangered within the foreseeable future, is consistent with the plain language of the ESA, supported by the best available scientific and commercial data, and easily meets "minimal standards of rationality."  Ethyl Corp., 541 F.2d at 36.  Indeed, as the Supreme Court has explained, reviewing courts are to be at their "most deferential," when, as in this case, an

agency is "making predictions, within its area of special expertise, at the frontiers of science."

Baltimore Gas, 462 U.S. at 103.

> **C.    Plaintiffs Have Not Demonstrated That the Service's Listing Determination Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law."  5 U.S.C. § 706(2)(A)**

> **1.    CBD and Joint Plaintiffs Distort the Statutory Standards for Determining Endangered and Threatened Status**

Although CBD petitioned to have the polar bear listed as threatened, CBD claims it was arbitrary and capricious for the Service to list the polar bear as threatened; CBD now argues that it was unlawful for the Service not to list the polar bear as endangered in some fashion, either across its entire range, a significant portion of its range, or within a DPS.  See, e.g. CBD's Mem. at 22.  Joint Plaintiffs, on the other hand, argue that it was unlawful for the Service to bestow any level of protection whatsoever upon the polar bear under the ESA.  See, e.g. JP's Mem. at 2.  The fundamental flaw in CBD's and Joint Plaintiffs' cases is that neither Plaintiff-group engages the correct legal standards for determining endangered and threatened status.  Rather, each group proffers its own distorted standards that would either lower or raise the bar, respectively, for ESA listing determinations.   As explained more fully below, CBD's and Joint Plaintiffs' misguided legal standards are contrary to the ESA's plain language, legislative history, and relevant case law.

> **a.    CBD**

CBD's attack on the Service's determination is based largely on CBD's theory that, if there is sufficient certainty of a species' future extinction, that species qualifies as endangered even if the threatened extinction is not imminent.  CBD's Mem. at 22.  Putting aside the fact that CBD's argument is based entirely on its erroneous assumption that the numerical results of a single prototype model provide conclusive evidence of the polar bear's extinction risk (CBD's

Mem. at 23-34), which the Service addresses below (<u>infra</u> § VI.C.3.c),[15] CBD's proffered legal standard is contrary to the plain language of the ESA as well as congressional intent.  As explained above, the phrase "in danger of" connotes a substantial and immediate risk of extinction, whereas the terms "likely" and "foreseeable future" connote a risk that is comparatively lower or less imminent.  Indeed, Congress' intent was to distinguish between species that are "in <u>present</u> danger of extinction" and those that are "likely within the foreseeable future <u>to become so endangered</u>."  S. Rep. No. 307 at 3 (1973) (emphasis added).  By definition, a species facing a future threat of extinction is not in present danger of extinction, rather it is likely to become in danger of extinction (<u>i.e.</u>, is threatened).  If adopted, CBD's theory that the certainty of a threat necessarily trumps the imminence of the impacts from that threat would rewrite the endangered category to include those species in present danger of extinction as well as those likely to become in danger of extinction in the future.  CBD has not cited, and cannot cite to any legal authority or listing decisions employing its proffered standard because there are none.

CBD's citation to <u>Western Watersheds Project v. Foss</u>, No. CV 04-168-MHW, 2005 WL 2002473 (D. Idaho Aug. 19, 2005), for the proposition that "the Secretary may not raise the bar for the threatened category" is puzzling given that the Service determined the polar bear is threatened.  CBD's Mem. at 23.  In <u>Foss</u>, the plaintiffs challenged the Service's decision <u>not</u> to list the slickspot peppergrass (a species of grass) as threatened.  The court found that, in determining that the species was not threatened based on "the standard, 'high risk of extinction' in the 'foreseeable future,'" the Service had "conflate[d] the terms 'endangered' and threatened,'"

---

[15] As explained <u>infra</u> § VI.C.3.c, CBD overstates the reliability of the numerical probabilities of extinction shown in the Bayesian modeling data.

and create[d] a higher standard for a 'threatened' species than Congress intended.'"  2005 WL

2002473 at *17.  Putting aside the fact that "foreseeable future" is not part of the definition of

endangered, <u>Foss</u> is inapposite here, where the Service found the polar bear to be threatened, and

it provides no support for CBD's theory that a high level of certainty of extinction automatically

conveys endangered status regardless of the timeframe of the predicted extinction.

 CBD also charges that the Service "broke with past practice" in finding the polar bear

was threatened and "ignor[ed] extinction risk thresholds previously used in ESA listing decisions

that would, if applied here, have necessitated an endangered listing."   CBD's Mem. at 24.

CBD's contention lacks legal and factual support.  As explained above (<u>supra</u> § VI.B.2), neither

the ESA nor its implementing regulations include any quantitative risk thresholds, and CBD fails

to identify a "past practice" from which the Service allegedly deviated, much less demonstrate

that such practice would have "necessitated" a determination that the polar bear is endangered.

Indeed, CBD references "extinction risk thresholds previously used in ESA <u>listing decisions</u>"

(CBD's Mem. at 24 (emphases added)), yet CBD fails to identify a single ESA listing decision in

support of its assertion.  Instead, CBD cites to a single recovery plan.  CBD's Mem. at 24 (citing

ARL158264).  Putting aside the fact that a recovery plan is not a listing decision, and thus by

definition cannot establish a "past practice" with regard to listing decisions, CBD misrepresents

what is stated in the cited recovery plan.  CBD asserts that the Service "found" that the Steller's

eider "qualifies" for reclassification from threatened to endangered when the probability of

extinction within 100 years exceeds 20%.  CBD's Mem. at 24.  In reality, what the recovery plan

states is that the population will be "considered for reclassification" in such an instance.

ARL158264.  The Stellar's eider recovery plan clearly fails to establish a "past practice" that

could have mandated listing the polar bear as endangered.   Moreover, CBD's attempt to

51

characterize the polar bear determination as inconsistent with "past practice" is inappropriate because the Service did not adopt or make any quantitative findings regarding the extinction risk for the polar bear that would permit any such numerical comparison.[16]  See infra § VI.C.1.b.i. Rather, the Service applied its expert judgment after conducting an exhaustive review of the best available scientific information and the relevant statutory requirements, in a manner entirely

---

[16] In a footnote, CBD cites Center for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223 (W.D. Wash. 2003) – failing to mention that the opinion was vacated as moot, Center for Biological Diversity v. Lohn, 511 F.3d 960 (9th Cir. 2007) – for the proposition that a species may be listed as endangered based on a 1% probability of extinction in 100 years.  CBD's Mem. at 25 n.10. Like the Foss case, 2005 WL 2002473, Trout Unlimited involved a challenge to NMFS' decision not to list a DPS of orca whale as threatened, not whether NMFS should have listed as endangered versus threatened.  Thus, Trout Unlimited does establish a "past practice" of listing decisions by the Service relevant to this case.  Furthermore, the central issue in Trout Unlimited was not whether the magnitude of the predicted extinction risk qualified the species for listing, but whether the DPS satisfied the "significance" criterion of the DPS Policy.  Thus, while the Trout Unlimited opinion makes a passing reference to the fact that a "group of scientists convened by NMFS" had recommended that a 1% probability of extinction in 100 years "could" meet the standard under the DPS Policy for listing as endangered, the statement is dicta.  296 F. Supp. 2d at 1232.  It is clear that no such determination was made in Trout Unlimited.

In the same footnote, CBD also asserts that NMFS determined that a DPS of beluga whales "qualifie[d]" as endangered because it faced a 26% chance of extinction within 100 years. CBD's Mem. at 25 n.10 (citing 73 Fed. Reg. 62919, 62923 (Oct. 22, 2008)).  Contrary to CBD's assertion, NMFS did not find that a 26% chance of extinction "qualified" the DPS as endangered, but rather that it "contributes to the determination to list this population as endangered."  73 Fed. Reg. at 62923 (emphasis added).  Moreover, the facts in the case of the Cook Inlet DPS clearly are distinguishable from the polar bear.  The Cook Inlet stock was numerically small to begin with and had experienced a decline in abundance of nearly 50%, down to an estimated 347 whales. Id. at 62920.  Evidence indicated that the population was not recovering and there was an 80% probability that it was declining.  Id. at 62920, 62923.  A precipitously declining DPS of 347 Beluga whales stands in marked contrast to a wide-ranging species like the polar bear that has not demonstrated precipitous population declines.  NMFS' determination that the Cook Inlet DPS qualified as endangered thus did not "necessitate" (CBD's Mem. at 24) that the Service reach an endangered finding for the polar bear.

consistent with its prior application of the endangered and threatened categories.  See supra §
VI.B.2.

Because the Service has not broken with any past practice, CBD's reliance on Friends of
Wild Swan, Inc. v. USFWS, 12 F. Supp. 2d 1121, 1135 (D. Or. 1997), for the proposition that
"[a]n agency acts arbitrarily when it departs from its precedent without giving good reason"
(CBD's Mem. at 25) is misplaced.  Indeed, Friends of Wild Swan clearly is distinguishable on its
facts.  In that case, the Service originally determined that a DPS of bull trout qualified for listing
but later reversed that finding in a revised listing determination, based on the same
administrative record.  12 F. Supp. 2d at 1134.  This factual scenario bears no resemblance to the
facts of this case, where the Service has issued a single listing decision that is in accordance with
the recommendations of its experts.  There is simply no support for CBD's claim that the Service
"deviate[d] . . . sharply from past practice."  CBD's Mem. at 25.

In sum, CBD's attack on the Final Rule is based on the faulty legal premise that if a
species' ultimate extinction risk anytime in the future is sufficiently certain, that species "by
definition cannot be merely threatened," even where the predicted extinction is not imminent.
Id. at 22.  As demonstrated above, this standard is contrary to the plain language and meaning of
the ESA and there exists no support for Plaintiffs' novel theory in the case law or in the Service's
"past practice" of listing decisions.[17]  Because CBD's case is built almost entirely upon this

---

[17] CBD overlooks the fact that the ESA accounts for the fact that the best available science and a
species' status may change over time by requiring the Service to conduct a status review of the
species "at least once every five years" to determine if the species should changed from
threatened to endangered or vice versa, or delisted.  16 U.S.C. § 1533(c)(2).  In addition, an
interested person may petition the Service at any time to remove or change the status of a listed
species.  50 C.F.R. § 424.14.  The ESA also provides the Service with the authority to issue
emergency regulations in regard to an emergency posing a significant risk to the well-being of
any wildlife species.  16 U.S.C. § 1533(b)(7).  Thus, in this case, legal mechanisms exist by

deficient legal foundation, its factual arguments that follow are doomed to fail. When viewed against the true statutory standards, the Service's determination is rational, supported by the administrative record, and therefore entitled to deference under the law of this Circuit.

### b.    Joint Plaintiffs

Joint Plaintiffs attempt to raise the bar for ESA listing determinations by distorting the applicable legal standards in at least four ways. As explained below, Joint Plaintiffs' claims lack merit.[18]

### (i)    The ESA Does Not Contain Quantitative Risk Thresholds for Listing, and the Service Did Not Adopt Any Such Thresholds for the Polar Bear

As explained previously (supra § VI.B.2), the ESA defines a threatened species as one that is not currently endangered, but "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Congress did not define the term "likely," and the Service has not adopted or endorsed any generally applicable quantitative or explicit extinction risk level interpreting the term. This is for good reason, as it is rarely possible to definitively quantify any given species' risk of becoming an endangered species. Rather than relying on numerical standards, determining if a species is likely to become endangered requires the Service to exercise its expert judgment on a case-by-case basis after considering the statutory listing factors in light of the best available science. See

which the Service can reconsider the Final Rule should the polar bear's status change unexpectedly in the future.

[18] In addition to distorting the applicable legal standards, as discussed below (see infra § VI.C.3.a), Joint Plaintiffs mischaracterize the nature and extent of the uncertainty in the available climate modeling data. Contrary to Joint Plaintiffs' characterization of data as "tremendous[ly] uncertain" (JP's Mem. at 17), there is scientific consensus that there will be substantial loss of sea ice – the polar bear's principal habitat – in most Arctic regions by 2050. As the Final Rule explains, "climate changes for the next 40–50 years are already largely set." ARL117279 (LR).

Trout Unlimited, 559 F.3d at 959 (noting that "[a]ssessing a species' likelihood of extinction involves a great deal of predictive judgment," the exercise of which is "entitled to particularly deferential review").

Although neither the ESA nor its implementing regulations contain a numerical standard for the term "likely," Joint Plaintiffs assert that, in the case of the polar bear, there existed a "statutorily requisite 'likelihood' (in the range of 67-90% certain)."   JP's Mem. at 2; see also Alaska's Mem. at 14; SCI's Mem. at 2, 13.   Joint Plaintiffs' suggestion that there is a numerical standard for "likely" set forth in the ESA clearly is incorrect.   Joint Plaintiffs make other varying, somewhat inconsistent, assertions that the Service either "determined," "concluded," "relied on," or "defined" the term "likely" as meaning 67-90% certain in the Final Rule, and they complain that the Service "failed to apply" this standard.   JP's Mem. at 9, 11.   Again, Joint Plaintiffs are incorrect.   Contrary to these assertions, the Service did not establish any numerical definition of "likely" in the Final Rule.   In an exhaustively thorough and comprehensive rule that spans nearly 100 pages in the Federal Register and explains in painstaking detail each step of the Service's analysis and rationale, the sole support for Joint Plaintiffs' contention that the Service defined "likely" as 67-90% certain is a lone statement found in a response to a comment, which Joint Plaintiffs take out of context.   Id. (citing to ARL117242 (LR) (response to PR12)).

In responding to the comment that the proposed rule did not "sufficiently question the reliability of scientific models used" and that "[s]cience is not capable of responding to vague terms such as 'it is likely' [and] 'foreseeable future,'" the Service stated, in part, that the IPCC AR4 had assigned specific probability values to terms such as "unlikely," "likely," and "very likely," and that the Service had "attempted to use those terms in a manner consistent with how they are used in the IPCC AR4."   ARL117241 (LR).   It is evident that the Service's response to

the comment was referring to the standards used to assess the reliability of climate models, which is entirely separate from the ultimate standard under the ESA for determining whether a species meets the statutory definition of threatened based on the entirety of the available science and the five listing factors, 16 U.S.C. § 1533(a)(1)(A)-(E).  Indeed, the very next sentence in the response to the comment states: "We have taken our best effort to identify the limitations and uncertainties of the climate models and their projections used in the proposed rule."  ARL117241 (LR) (emphasis added).  Thus, the Service neither "defined" the term "likely" for ESA listing purposes as meaning 67-90% probable nor stated anywhere in the Final Rule that there "must be a 67-90% probability that the polar [bear] will be endangered within the foreseeable future."  JP's Mem. at 9, 10.

Furthermore, Joint Plaintiffs' proffered standard of 67-90% probability, or a "high degree of probability" (id. at 11), would set the bar unreasonably high for determining threatened status.[19]  For instance, in the only decision to consider in any depth the meaning of the term "likely" in the phrase "likely to become an endangered species in the foreseeable future," the court held that it was consistent with the ESA for NMFS to interpret "likely" to mean that it is "more likely than not" (i.e., greater than a 50% likelihood) that the species will become endangered in the foreseeable future.  Trout Unlimited v. Lohn, 645 F. Supp. 2d 929, 944, 949 (D. Or. 2007).  The Trout Unlimited decision is consistent with dictionary definitions of "likely."  For instance, Black's Law Dictionary defines "likely" as "probable . . . . broadly defined as of

---

[19] Joint Plaintiffs assert that the climate models the Service considered "do not predict the complete loss of sea ice or the complete extirpation of the polar bear species over the next 45 years (i.e., within the foreseeable future)."  JP's Mem. at 4.  The statutory standard for determining threatened status is not whether or not the polar bear will be extinct in the foreseeable future, but whether or not it "is likely to become an endangered species within the foreseeable future."  16 U.S.C. § 1532(20).

such nature or so circumstantial as to make something probable and having a better chance of existing or occurring than not." Black's Law Dictionary 638 (6th Ed. 1991). Probable, in turn, is defined, in pertinent part, as "supported by evidence which inclines the mind to believe, but leaves some room for doubt; likely." Id.; accord Webster's New World Dictionary 782, 1073 (College Ed. 1991) (defining "likely" as "apparently true to the facts; credible; probable," and "probable" as "likely to occur or be; that can reasonably but not certainly be expected").

In sum, Joint Plaintiffs' attempt to set a numerical standard for the term "likely" lacks factual and legal support. Because Joint Plaintiffs are wrong as an initial matter to assert that the Final Rule established a quantitative definition of the term "likely," their attempt to show non-compliance with this non-existent standard fails.[20] Furthermore, the definition of "likely" that Joint Plaintiffs advocate of 67-90% probability, or a "high degree of probability" (JP's Mem. at 11), is unreasonably high and not supported by case law and ordinary definitions of the term. In any event, regardless of how the term "likely" could be numerically defined, the Service's threatened determination for the polar bear easily would meet that standard. As the Final Rule explains, there is scientific consensus that there will be significant loss of sea ice – the polar bear's primary habitat – in the foreseeable future throughout the Arctic. See, e.g. ARL117235, 117297 (LR). Joint Plaintiffs' assertion that the Service's listing decision is based on mere

---

[20] Joint Plaintiffs argue that the Service acted inconsistently with its 1996 Petition Management Guidance ("PMG") in finding the polar bear is threatened. JP's Mem. at 17, 20. Joint Plaintiffs overlook the fact that the PMG was enjoined by a court in this District in 2004 and that the Service did not consider that guidance document in reaching its determination in this case. See American Lands Alliance v. Norton, No. Civ. A. 00-2339 (RBW), 2004 WL 3246687 (D.D.C. June 2, 2004). Moreover, the Service based its determination on trends that could be confidently discerned, not on "uncertain" future threats as Joint Plaintiffs assert (JP's Mem. at 17).

"speculation" about "possible" impacts (JP's Mem. at 10) seriously mischaracterizes the available scientific information as well as the Service's articulated rationale for its determination.

### (ii)     The ESA Does Not Require Absolute Scientific Certainty for Listing

Joint Plaintiffs improperly attempt to raise the bar for listing decisions to a level approaching absolute scientific certainty.  See JP's Mem. at 13 (proffering a standard of "high certainty"); see also id. at 12 n.4 (asserting that the Service must possess a "high degree of certainty"); id. at 16-21.  Joint Plaintiffs assert that the Service's listing decision for the polar bear was irrational because the Service cannot be certain of the nature and extent of future climate change, the impacts on sea ice, and the impacts on the species.  JP's Mem. at 16.[21]  SCI goes so far as to suggest that the Service may not even base a listing decision on a prediction. SCI's Mem. at 8-9, 13.  Joint Plaintiffs' and SCI's contentions flatly contradict the plain terms of the ESA and an established body of case law.

As explained above, Congress has directed the Service to look into the "foreseeable future" and determine if a species is likely to become endangered in that time period.  16 U.S.C. § 1532(20); accord 16 U.S.C. § 1533(a)(1)(A) (listing Factor A referring to "present or threatened destruction" of habitat) (emphasis added).  This exercise necessarily requires the Service to make predictions based on its expert judgment.  Indeed, by adding the threatened

---

[21] CBD, on the other hand, makes the exact opposite assertion, arguing that the available scientific information is so certain that the Service committed "legal error" by affording it too little weight.  Compare CBD's Mem. at 27 with SCI's Mem. at 9 (alleging that the "Service erred by according too much weight to these predictions and modeling").  Neither group's contention has merit.  CBD overstates, while Joint Plaintiffs understate, the level of certainty of the available data.  See infra §§ VI.C.3.a-d.  Furthermore, both groups overlook the fact that, "where there are competing expert opinions, or where the scientific data are equivocal, it is the agency's prerogative 'to weigh those opinions and make a policy judgment based on the scientific data.'" Maine, 257 F. Supp. 2d at 389 (citations omitted).

category to the ESA, Congress intended to "give[] effect to the Secretary's ability to forecast population trends by permitting him to regulate these animals before the danger becomes imminent while long-range action is begun." S. Rep. No. 93-307 at 3. Determining if a species is "likely" to become endangered in the foreseeable future, by definition, does not require predictions that can be made with absolute certainty, but instead with a reasonable likelihood of occurrence. To that end, case law makes it clear that the ESA "contains no requirement that the evidence be conclusive in order for a species to be listed." Defenders, 958 F. Supp. at 679; accord Southwest Ctr. for Biological Diversity v. Norton, Civ. No. 98-934 RMU/JMF, 2002 WL 1733618, *9 (D.D.C. July 29, 2002) (same); Trout Unlimited, 645 F. Supp. 2d at 948-49 (same).

Rather, the standard for making listing decisions established in the ESA is that they be based "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The D.C. Circuit has explained that this "best available science" standard does not require that the data be perfect or certain. The standard under the ESA is that "the Service must utilize the 'best scientific ... data available,' not the best scientific data possible." Building Indus. Ass'n of Superior Cal. v. Norton, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (citation omitted). As the D.C. Circuit explained in Southwest Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58 (D.C. Cir. 2000), even if the available scientific and commercial data are "quite inconclusive, [the Secretary] may – indeed must – still rely on it." Id. at 60. The best available science requirement "'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006); accord Southwest Ctr., 215 F.3d 58.

This Court has explained that "[t]he ESA, by adopting a standard of the 'best scientific and commercial data available,' and not a standard of absolute certainty, reflects Congress'

intent that the FWS take conservation measures before a species is "'conclusively' headed for extinction." American Wildlands v. Norton, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (quoting Defenders, 958 F. Supp. at 680). In Defenders, the court held that the "[a]pplication of such a stringent standard [of conclusive evidence] violates the plain terms of the statute, and therefore justifies reversal of the agency's decision." 958 F. Supp. at 679. In this case, there can be no dispute that the Service based its decision on the best available science. The proposed listing rule was peer reviewed by 14 experts in the fields of polar bear biology and climatology, and the Final Rule presents a thoughtful and exhaustively comprehensive review of the best scientific data available from the fields of climatology and polar bear biology, including the latest, state-of-the-art climate models. The Service did not overstate the available data, but rather acknowledged and considered the limitations of the information that provided the basis for its analysis and decision-making, demonstrating that the Service's analysis was balanced and objective. For instance, the Final Rule explains that, "[d]espite being peer-reviewed, most scientific information has some limitations and statements of absolute certainty are not possible." ARL117255 (LR).

Joint Plaintiffs seem to believe that to make a prediction based on anything less than absolute scientific certainty amounts to "speculation or surmise," (JP's Mem. at 20), which is simply not correct. As explained above, the ESA, by definition, requires the Service to make predictions using its expert judgment based on its consideration of the best scientific and commercial information available, even if the evidence is inconclusive. Here, the available evidence did not allow the Service to forecast precise impacts to sea ice and the polar bear with absolute certainty, however the data did allow the Service to confidently predict that the polar bear is likely to become endangered within the foreseeable future. Joint Plaintiffs fail to

60

acknowledge the trend of Arctic sea-ice loss from 1979 to 2007, which has been proven by satellite photography, and they fail to present any evidence that the trend shown by the photographs will not continue within the foreseeable future.  Indeed, Joint Plaintiffs have offered no modeling studies that support their arguments.  Rather, Joint Plaintiffs simply look at the same evidence the Service considered and argue for a different conclusion.  The law of this Circuit is clear, however, that reviewing courts should defer to the judgment of the expert agency in such situations.  City of Waukesha v. EPA, 320 F.3d 228, 248 (D.C. Cir. 2003) (citations omitted) (noting that "we will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise"); National Wildlife Fed'n v. EPA, 286 F.3d 554, 565 (D.C. Cir. 2002) (permitting rejection of agency's choice of model or methodology only where it bears "no rational relationship to the characteristics of the data to which it is applied").

Indeed, Joint Plaintiffs ignore the well-settled principle of administrative law that reviewing courts are to be at their "most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science."  Baltimore Gas, 462 U.S. at 103.  In fact, the D.C. Circuit is "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information."  State of New York, 969 F.2d at 1150-51.  Thus, to the extent that there is any uncertainty in the climate modeling data, the Service is entitled to a more deferential standard of review, not less.  In essence, Joint Plaintiffs ask the Court to substitute their weighing of the available data and preferred conclusion for that of the Service.[22]  However, this Court has explained that it "is not in a position to make policy

---

[22] It is worth noting that Joint Plaintiffs assume that uncertainty can only overestimate the risks facing a species, and thus weigh against listing a species, overlooking the fact that uncertainty in the available data can underestimate the risks as well, and thus weigh in favor of listing.

judgments based on conflicting or uncertain scientific or technical data," American Wildlands,

193 F. Supp. 2d at 252, which is in accordance with the Supreme Court's holding that the

reviewing court "is not empowered to substitute its judgment for that of the agency." Overton

Park, 401 U.S. at 416.  Congress has charged the Service with weighing the available scientific

data, and its rational exercise of that duty is entitled to deference.  See Trout Unlimited, 559 F.3d

at 959 ("'To set aside the Service's determination in this case would require us to decide that the

views of Greenpeace's experts have more merit than those of the Service's experts, a position we

are unqualified to take' . . . . It is not our role to ask whether we would have given more or less

weight to different evidence, were we the agency").

**(iii)    Listing Under The ESA Does Not Require
Demonstrated Population Declines**

Joint Plaintiffs assert that the polar bear "is at an all-time historical high in population

numbers" and appear to argue that the Service cannot find a species threatened without "actual

observed population declines."  JP's Mem. at 1.  Joint Plaintiffs' assertions lack factual and legal

support.  First, Joint Plaintiffs' assertion that the polar bear population is at "the highest levels in

recorded history" is disingenuous.  Id. at 2; see also CCA's Mem. at 13; SCI's Mem. at 1.  As the

Final  Rule  explains,  many  polar  bear  populations  had  been  depressed  due  to  "severe

overharvest" prior to implementation of the 1973 Agreement on the Conservation of Polar Bears.

ARL117242 (LR).  That the polar bear has been able to recover from severe overharvest says

nothing about its ability to survive a significant loss of its primary habitat.  Moreover, to put the

polar bear population data into proper perspective, of the 19 total polar bear populations, the

PBSG found that six populations are designated as data deficient (Barents Sea, Kara Sea, Laptev

Sea, Chukchi Sea, Arctic Basin, East Greenland) with no estimate of trend, five populations are

designated as declining (Western Hudson Bay, Southern Beaufort Sea, Norwegian Bay, Kane

62

Basin, and Baffin Bay), six populations are stable (Northern Beaufort Sea, Southern Hudson Bay, Davis Strait, Lancaster Sound, Gulf of Bothia, Foxe Basin), and two populations are designated as increasing (Viscount Melville Sound and M'Clintock Channel).   ARL117221 (LR).   However, the two populations designated as increasing are two of the smallest polar bear populations, both of which were "severely reduced in the past and are recovering under conservative harvest limits."   ARL117221 (LR).   In addition, Joint Plaintiffs' assertion that there have been no "actual observed effects to the species" from global warming (JP's Mem. at 3) is false and contradicted by the administrative record, which shows that several polar bear populations, including the Western Hudson Bay and Southern Beaufort Sea (the two most heavily studied populations), have exhibited adverse effects of global warming, including reduced cub survival and body condition in many sex/age classes.   ARL117242, 117300 (LR).

Second, Joint Plaintiffs' suggestion that listing under the ESA must await a decline in population is directly contrary to established case law and Congress' intent "to require the FWS to take preventive measures before a species is 'conclusively' headed for extinction."   Defenders, 958 F. Supp. at 680.   As the court explained in Defenders, the purpose of creating a separate designation "for species which are 'threatened', in addition to species which are 'endangered', was to try to 'regulate these animals before the danger becomes imminent while long-range action is begun.'"   958 F. Supp. at 680 (citation omitted); accord Biodiversity Legal Found. v. Babbitt, 943 F. Supp. 23, 26 (D.D.C. 1996) ("Clearly, in passing the ESA, Congress did not intend the Secretary to wait until the particular species is on the verge of extinction before taking action"); Center for Biological Diversity, 296 F. Supp. 2d at 1236 (NMFS must "take preventive measures before a species is conclusively headed for extinction"); Oregon Natural Res. Council. v. Daley, 6 F. Supp. 2d 1139, 1152 (D. Or. 1998) ("The whole purpose of listing species as

'threatened' or 'endangered' is not simply to memorialize species that are on the path to extinction, but also to compel those changes needed to save these species from extinction. . . . The Secretary has no authority under the ESA to simply defer a listing decision for as long as he sees fit while waiting for some possible future event").

Indeed, as the Service noted in a previous listing decision, "actual loss of habitat and decline in the population is not required to list a species as threatened." 52 Fed. Reg. 11277, 11283 (April 8, 1987). In that case, the Service decided to list the Waccamaw silverside as threatened notwithstanding its high population levels on the grounds that "if, as expected, present nutrient loading continues to increase and the lake's habitat and water quality deteriorate, the species is likely to become endangered in the foreseeable future." Accord 16 U.S.C. § 1533(a)(1)(A) (listing Factor A referring to "present or threatened destruction" of habitat) (emphasis added); Endangered Species Conservation Act of 1972: Hearings on S. 249, S. 3199 and S. 3818 Before the Subcomm. on the Env't of the S. Comm. on Commerce, 92d Cong. 108 (1972) (letter from Acting Assistant Sec'y of the Interior Curtis Bohlen to Sen. William B. Spong, Member, S. Comm. on Commerce explaining that "[t]here could be known imminent threats to a healthy population that would entitle it to be considered 'endangered'"). Thus, in this case, it was entirely consistent with the ESA for the Service to list the polar bear as threatened in the absence of a demonstrated worldwide population decline.

As a corollary to their suggestion that listing requires a demonstrated population decline, Joint Plaintiffs argue that, before listing a species, the Service must establish a "minimum viable population" size or the "minimum amount of habitat" necessary to "support a viable population." JP's Mem. at 32; see also Alaska's Mem. at 8; CCA's Mem. at 14. Without such a standard, Joint Plaintiffs argue, the Service "cannot" determine if the polar bear is endangered or

threatened.   JP's Mem. at 5.   Joint Plaintiffs' argument has no basis in the ESA or its

implementing regulations.   There is simply no requirement that the Service quantify a minimum

amount of habitat or population size.  In <u>Home Builders Ass'n v. USFWS</u>, 529 F. Supp. 2d 1110

(N.D. Cal. 2007), the plaintiffs made a similar claim, alleging that the Service "did not articulate

a standard for ascertaining the salamander's threatened status."   <u>Id.</u> at 1115.   The court rejected

the claim, explaining that the Service had in fact "articulated a standard for listing, which was the

five-factor threats analysis provided by 16 U.S.C. § 1533."  <u>Id.</u> at 1118.   In this case, as in <u>Home</u>

<u>Bldrs</u>, the Final Rule demonstrates that the agency carefully and comprehensively considered

each of the ESA's enumerated listing factors and articulated a rational explanation of its finding

with respect to each factor.[23]   Joint Plaintiffs have not shown that the Service failed to consider

any relevant factors, and the Service's determination therefore should be upheld.   <u>National Ass'n</u>

<u>of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 658 (2007) (noting that the Court will

---

[23] Joint Plaintiffs also accuse the Service of "assuming," without adequate record support, that the polar bear is threatened based on "a loss of a certain percentage of habitat."  JP's Mem. at 30 (citing <u>Defenders of Wildlife v. Norton</u>, 258 F.3d 1136 (9th Cir. 2001)).   Joint Plaintiffs' assertion is incorrect; the Service did not base its threatened determination on a finding that the polar bear will lose a certain percentage of habitat.  Rather, the Service's conclusion was based on the record evidence as a whole and not, as Joint Plaintiffs assert, on any one model or item or evidence.  <u>See generally</u> <u>supra</u> §§ IV.A-E, VI.B.1.a-d; <u>supra</u> § VI.C.3.c.  There is substantial evidence in the administrative record to support the Service's determination that extensive sea-ice declines are very likely to continue, which is likely to cause the polar bear to become endangered within the foreseeable future.   Indeed, as the Service explained, polar bears in regions of the Arctic already are being affected by climate change, particularly in the Western Hudson Bay in Canada, Southern Hudson Bay, and Southern Beaufort Sea off the Alaskan coast. ARL117260, 117270-73 (LR).  Moreover, Joint Plaintiffs' reliance on <u>Defenders</u> is misplaced, as that case centered on a claim that, in deciding not to list the flat-tailed lizard, the Service had failed to separately consider whether it "is or will become extinct in 'a significant portion of its range.'"   258 F.3d at 1140.   Here, unlike in <u>Defenders</u>, the Service listed the polar bear as threatened throughout its entire range and separately considered whether or not it was endangered in a significant portion of its range.

65

set aside as arbitrary and capricious agency action only where the agency "'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise'") (quoting <u>Motor Vehicle Mfrs. Assn.</u>, 463 U.S. at 43)).

### (iv)   The Service Is Not Required to Demonstrate that an ESA Listing Will Benefit the Species

Joint Plaintiffs assert in several places that listing the polar bear will not prevent sea ice from melting, as if to suggest that a species can be listed under the ESA only where the Service can demonstrate that listing will improve the condition of the species.  JP's Mem. at 5, 22; <u>see also</u> CF'S Mem. at 6-8; SCI's Mem. at 2.  Joint Plaintiffs' suggestion is directly contrary to the plain language of the ESA, which requires that a species be listed if the Service determines that it is endangered or threatened based on even one of the five statutory listing factors, 16 U.S.C. § 1533(a)(1)(A)-(E), (<u>see</u> <u>Southwest Ctr.</u>, 215 F.3d at 60), and the law of this Circuit (<u>see</u> <u>City of Las Vegas v. Lujan</u>, 891 F.2d 927 (D.C. Cir. 1989)).  In <u>Lujan</u>, the D.C. Circuit noted in the context of the Service's emergency listing authority, 16 U.S.C. § 1533(b)(7), that the ESA "does not require the Secretary to demonstrate that invoking his emergency power to list a species as endangered will stave off the demise of that species, let alone that it will address the specific emergency that led to the listing."  891 F.2d at 934.  Thus, in this case, whether or not listing the polar bear will prevent sea ice from melting is immaterial because it is not a factor the Service could have considered in assessing whether or not the polar bear is endangered or threatened. <u>See</u> ARL117256 (LR) (response to comment 71).

**2.      The Service's Interpretation of the Foreseeable Future is Rational,
Supported by the Administrative Record, and Entitled to Deference**

As explained above (supra § VI.B.2), when Congress enacted the ESA in 1973, it
extended statutory protection to a new category of "threatened" species, defined as species that
are not currently endangered, but are "likely to become an endangered species within the
foreseeable future."  16 U.S.C. § 1532(20).  Congress did not define the term "foreseeable
future," and the Service had not promulgated any policy or regulation of general applicability
regarding its application at the time of this listing decision.  As a practical matter, it would be
difficult to implement a uniform definition of the "foreseeable future" given that every individual
species' life history and population dynamics are inherently different, as are the nature of the
threats they face.  Therefore, in the absence of a quantitative standard, the Service must
determine the "foreseeable future" on a case-by-case basis using its expert judgment.  See Foss,
2005 WL 2002473 at *16 (noting that there is "[no] bright-line rule for determining foreseeable
future," and "recogniz[ing] that the definition of 'foreseeable future' may vary depending on the
particular species – for example, 'foreseeable future' may be defined differently for a sequoia
tree (the National Park Service indicates an age of 3,200 years for a mature tree) than for the
slickspot peppergrass, which is an annual or biennial plant").

In a general sense, the "foreseeable future" is the period of time over which the best
scientific data available allows the Service to make predictions with reasonable confidence
regarding the future conservation status of the species.  Those predictions can be in the form of
extrapolation of population or threat trends, analysis of how threats will affect the status of the
species, or assessment of future events that will have a significant new impact on the species.
See S. Rep. No. 93-307 at 3 (1973 Senate committee report explaining that Congress intended
the "threatened" species category to "give[] effect to the Secretary's ability to forecast

population trends" and to provide a broad set of tools to take early strategic action before the danger of extinction becomes imminent).  Of course, some threats (particularly future threats) may not yet have manifested themselves in a population trend.  Accord 16 U.S.C. § 1533(a)(1)(A) (listing Factor A referring to "present or threatened destruction" of habitat) (emphasis added).  As explained above (supra § VI.C.1.b.ii), a reliable forecast does not require absolute certainty; it means that there is a reasonable degree of confidence in the prediction, in light of the conservation purposes of the ESA.  Thus, the foreseeable future extends to the point at which the Service can no longer make confident forecasts concerning the trends or the impacts of a particular threat to the species.

In this case, the Service determined that the foreseeable future was 45 years because the best scientific information available, including results of the IPCC AR4, allowed for reliable climate change projections, and thus impacts to sea ice – the polar bear's primary habitat – over the next 40 to 50 years.  ARL117258 (LR); see supra § VI.B.1.a.ii-iii.  The Final Rule explains that this time period bears a rational relationship to polar bear life history and population dynamics in that it "corresponds closely to the timeframe of three polar bear generations (45 years)."  ARL117258-59 (LR).  The Final Rule further explains that a 45-year foreseeable future was ideal because it "is long enough to take into account multi-generational population dynamics, natural variation inherent with populations, environmental and habitat changes, and the capacity for ecological adaptation."  ARL117243-44 (LR).  The Service considered whether a longer time period for the foreseeable future was appropriate; however it found climate change projections beyond 40 to 50 years to be less reliable, and thus did not allow for reliable threat predictions in that time period.  ARL117257 (LR); see also ARL117233 (Figure 5) (LR).  The Final Rule explains that a time period less than 45 years would not have been appropriate

because "the reliability of biological information and, therefore, population status projections, increases if a multigenerational analysis is used."  ARL117258 (LR).  The selected 45-year foreseeable future is consistent with the work of the PBSG, a group representing more than 40 technical polar bear experts from around the world, which reassessed the status of polar bears globally in June 2005 for purposes of the IUCN Red List classification.[24]  Id.  In addition, the 45-year foreseeable future garnered the near-unanimous support of peer reviewers that commented on this subject.  ARL117258 (LR).

Notwithstanding the rational basis articulated in the Final Rule for the Service's 45-year "foreseeable future," CBD argues it is "arbitrarily short" (CBD's Mem. at 30), while Joint Plaintiffs argue it is "simply too long" (JP's Mem. at 2).  Neither group's claim has merit.  There can be no dispute that the term "foreseeable future" is ambiguous.  It is well-established that, where a statute is "silent or ambiguous with respect to the specific issue," the agency charged with administering the statute (in this case, the Secretary of Interior, by and through his designee, the Service) has broad discretion to give meaning to the term.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984).  A reviewing court must defer to an administering agency's interpretation of the statute as long as it is reasonable.  Id.; accord Natural Res. Def. Council v. E.P.A., 571 F.3d 1245, 1263 (D.C. Cir. 2009) (upholding EPA's reasonable interpretation of ambiguous statutory language in Clean Air Act).  The controlling principle of Chevron is that, when the statute, viewed in light of its legislative history and the traditional tools

---

[24] Although the IUCN, like the Service, engages in assigning conservation statuses to species, it is worth noting that the IUCN has created its own listing standards, which are not identical to those contained in the ESA.  Thus, while the Service may review the IUCN processes and conclusions when implementing the ESA, ultimately the Service must make independent decisions according to the standards Congress set forth in the ESA.

of statutory construction, is ambiguous, the administering agency is entitled to make "a reasonable policy choice." Chevron, 467 U.S. at 845.

In this case, the Service's choice of 45 years as the foreseeable future for the polar bear listing determination is a reasonable interpretation of the ESA that is entitled to deference under Chevron. The Service reached its interpretation as a result of a rulemaking under the APA, 5 U.S.C. § 551 et seq., during which the Service sought peer review and public comment and incorporated all additional information received through those processes, where applicable. In the Final Rule, the Service articulated a rational explanation of why 45 years allowed for reliable climate change projections and also bore a rational relationship to polar bear life history and population dynamics. CBD and Joint Plaintiffs fail to even address the Chevron framework, much less carry their burden[25] of showing that the Service's determination is not "a reasonable policy choice." Chevron, 467 U.S. at 845.

---

[25] While CBD accuses the Service of unlawfully "don[ning] blinders to all information beyond 2050" (CBD's Mem. at 35), CCA makes the exact opposite allegation, accusing the Service of unlawfully "look[ing] far beyond the foreseeable future" (CCA's Mem. at 13-14). Of course, these accusations cannot be reconciled and neither is correct. Consistent with the statutory standard, the Service determined that, due to climate change, "all polar bear populations will be affected within the foreseeable future, and the species will likely become in danger of extinction throughout all of its range." ARL117280 (LR) (emphasis added). In other words, the Service found that the polar bear likely will be in danger of extinction by year 45, regardless of what happens after year 45. There is abundant evidence in the administrative record to support this conclusion. See supra §§ IV, VI.B.1.a. CCA offers no support for its assertion that the Service "had to" look beyond the foreseeable future to reach its conclusion (CCA's Mem. at 14), and there is none. As explained herein, CBD's claim that the Service's foreseeable future is too short also is a moot point because the Service found the polar bear likely to become an endangered species within the foreseeable future.

a.     **CBD's Claims**

CBD argues that the Service "arbitrarily truncated" the foreseeable future (CBD's Mem. at 34); however CBD overlooks the fact that the Service determined that the polar bear is "likely to become an endangered species within the foreseeable future."   16 U.S.C § 1532(20); ARL117297 (LR).  The length of the foreseeable future might have been relevant if CBD was challenging a decision not to list the polar bear as threatened; however that is not CBD's claim. CBD's claim is that the Service should have listed the polar bear as endangered in some fashion instead of threatened.  Even if the foreseeable future was extended to the year 2100, as CBD advocates (CBD's Mem. at 35), that would not change the Service's finding from threatened to endangered because it would not make the forecasted impacts to the species imminent.  CBD's attack on the foreseeable future fails because it is based on CBD's flawed premise that the polar bear is "endangered today, regardless of [the] time period considered" (CBD's Mem. at 36), which, as discussed above, conflates the definitions of endangered and threatened species (supra § VI.C.1.a).

Moreover, it was entirely reasonable for the Service to define the foreseeable future as extending only to the point at which the available scientific information allowed it to reliably forecast relevant trends and impacts to the species.  In this case, the Service determined that point was 45 years into the future, and that determination is supported by substantial evidence in the administrative record.  For instance, Figure 5 in the Final Rule depicts fairly uniform trend lines for global surface warming until the mid-21st century, at which point the trend lines begin to diverge significantly, making a reliable prediction based on those data difficult.  ARL117233 (LR).  CBD has not produced data that the Service failed to consider that would allow for more reliable predictions beyond the mid-21st century.  Rather, CBD merely has more confidence than

does the Service in the ability of the available data to reliably predict sea-ice conditions and impacts to the polar bear beyond 45 years.  CBD may weigh the data differently than the Service did; however, the Service had a rational basis for interpreting the term "foreseeable future" as it did and the Service's rational evaluation of the available data is entitled to deference.  Chevron, 467 U.S. at 843; accord Overton Park, 401 U.S. at 416 (holding that the reviewing court "is not empowered to substitute its judgment for that of the agency").

<b>b.      Joint Plaintiffs' Claims</b>

Joint Plaintiffs assert that the Service's foreseeable future determination is "legally inadequate" (JP's Mem. at 13), yet over the course of six pages in their brief they fail to articulate any violation of law by the Service, or to demonstrate how any of their arguments, even if true, would undermine the Service's determination that the polar bear is likely to become an endangered species within the foreseeable future.  See generally id. at 11-16.  Joint Plaintiffs make four separate arguments, none of which have merit.  First, Joint Plaintiffs assert that it is improper to determine the period of time that is foreseeable based solely on the biology of the species, and they argue this was how the foreseeable future for the polar bear was determined.  Id. at 9, 11-13; see also Alaska's Mem. at 13; SCI's Mem. at 11.  As an initial matter, the period of time selected for the foreseeable future must have some rational connection to the species' life history characteristics, such that it allows the Service to make a rational prediction regarding the effects of threats on the species within that time period.  In this case, the Final Rule explains that the foreseeable future was "based on the timeframe over which the best available scientific data allow us to reliably assess the effect of threats—principally sea-ice loss—on the polar bear, and is supported by species specific factors, including the species' life history characteristics (generation time) and population dynamics."  ARL117258, 117243 (LR).  There is no evidence

72

in the administrative record to support Joint Plaintiffs' argument that the foreseeable future was based solely on biological factors.

To the contrary, there is ample evidence in the administrative record to support the Service's determination of the foreseeable future based on its ability to reliably assess the effect of threats on the species.   For instance, the Final Rule explains that, "[d]ue to the long persistence time of certain GHGs in the atmosphere, the current and projected patterns of GHG emissions over the next few decades, and interactions among climate processes, climate changes for the next 40–50 years are already largely set."   ARL117279 (LR).   The fact that the Service, in the proposed rule, initially may have considered the foreseeable future to be 45 years in terms of polar bear biology does not change the fact that the Service ultimately determined in the Final Rule that it was able to forecast climate change projections and corresponding impacts to the polar bear with confidence for the next 45 years, making that period of time the foreseeable future.   See Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1163 (N.D. Cal. 2000) (holding that "an agency does not have a burden to explain a change in position from a proposed rule to the final rule, and that lack of an explanation for the change is not in itself evidence of arbitrariness").   The Service clearly articulated a rational connection between the facts found and the decision made, and that decision is amply supported by the administrative record.   Joint Plaintiffs may have less confidence in the available data than does the Service, but the Service's rational evaluation of the available data is entitled to deference.   Chevron, 467 U.S. at 843.

Joint Plaintiffs' second argument, that the Service "failed to analyze whether some shorter period would more appropriately represent the foreseeable future" (JP's Mem. at 12), overlooks the standard of review in this case.   The issue is not whether or not the Service could have selected some alternative period of time for the foreseeable future.   Rather, the period the

Service selected is presumed valid and must be upheld as long as it represents a "reasonable policy choice." Chevron, 467 U.S. at 845. Here, the Service was able to forecast climate change projections and corresponding impacts to the polar bear with confidence for the next 45 years, making that period of time foreseeable. A significantly shorter time period would not have been appropriate because it would not have allowed for multigenerational analysis of biological information. ARL117258 (LR). It was entirely rational for the Service to select as the foreseeable future the period of time in which it was able to reliably forecast threat trends in a biologically meaningful way to polar bears.[26] The Service's interpretation of the foreseeable future is a "reasonable policy choice" that is entitled to deference. Chevron, 467 U.S. at 845.

---

[26] As purported support for their contention that the Service failed to consider a shorter period for the foreseeable future, Joint Plaintiffs cite to an unidentified "document" in the administrative record that predated the Final Rule. JP's Mem. at 12 (citing ARL004018). Assuming for the sake of argument that a stray document with no author, date, or information to place the document in context could be at all informative of the agency's decision-making process, Joint Plaintiffs selectively quote from the document, seriously mischaracterizing it. The full quotation appears below, with the portions omitted by Joint Plaintiffs in italics:

> If an effort were taken to examine a different period of time for use as the "foreseeable future" for polar bears (e.g., 10, 20, or 30 years), then a similar analysis would need to be prepared to both gauge the relative reliability of the sea ice data modeled at those different time intervals and to compare the relative uncertainties and other limitations that attach to those new analyses. *In short, it would not be sufficient to say simply that a 10- or 20- projection is more reliable tha[n] one prepared for a 45-year period. As the slickspot peppergrass court found, if biological experts are sufficiently armed with facts so that they can project the status of a plant beyond the period of time established by the Service as the "foreseeable future," the Service can not simply ignore the experts' appraisal of the threat data without first explaining why their data sets and opinions are not sufficiently reliable.* Similarly, the use of a 10-, 20-, or 30-year period for polar bears would require both an independent science base (new modeling) **as well as** a science-based comparison of the new modeling versus the 45-year period *that bolsters the reliability of the new data while "poking holes" in the reliability of the 45-year analysis.*

ARL004018 (italics added).

Third, Joint Plaintiffs argue that the Service "ignored" what is foreseeable with respect to listing factors other than Factor A, 16 U.S.C. § 1533(a)(1)(A).  JP's Mem. at 14.  Joint Plaintiffs focus on Factor D, the inadequacy of existing regulatory mechanisms, 16 U.S.C. § 1533(a)(1)(D), asserting that 45 years into the future is too long to allow the Service "to assess what the 'existing' regulatory mechanisms are going to be at that time."  JP's Mem. at 14; see also SCI's Mem. at 10-11.  Joint Plaintiffs' suggestion that the Service could forego listing the polar bear under Factor D based on wholly speculative and uncertain future regulatory mechanisms is contrary to the ESA and the Service's "Policy for Evaluation of Conservation Efforts When Making Listing Decisions" ("PECE Policy"), 68 Fed. Reg. 15100 (March 28, 2003).  As the Final Rule explains, the PECE Policy "provides guidance for analyzing future conservation efforts and requires that the Service only rely on efforts that we have found will be both implemented and effective."  ARL117251 (LR) (emphasis added).  There is no evidence in the administrative record that any conservation efforts will, or even could, be implemented that will effectively address the loss of sea ice within the foreseeable future, and as such Joint Plaintiffs' argument lacks merit.[27]  See ARL117306 (LR) (explaining that "there are no known

---

The text omitted by Joint Plaintiffs counsels against making the very assumption Joint Plaintiffs make, namely that "projections going out only 10, 20, or 30 years are more reliable than projections 40-50 years out."  JP's Mem. at 13.  To the contrary, the document explains that any alternative period of time selected for the foreseeable future – whether it be greater than or less than 45 years – would not only have to be supported by data, but that data would have to be more reliable than the data supporting the 45-year period.  Joint Plaintiffs have not pointed to any such data, but merely ask the Court to substitute their evaluation of the available data for the Service's expert judgment.  The reviewing court, however, "is not empowered to substitute its judgment for that of the agency."  Overton Park, 401 U.S. at 415-16; accord Marsh, 490 U.S. at 378.

[27] SCI's unsupported assertion (SCI's Mem. at 11) that the Service should have performed the very same analysis that is prohibited under Factor D under listing Factor E, "other natural or manmade factors affecting its continued existence," 16 U.S.C. § 1533(a)(1)(E), is contrary to the PECE policy as well as the plain language of the statute, which requires the Service to determine

regulatory mechanisms in place, <u>and none that we are aware of that could be put in place</u>, at the national or international level, that directly and effectively address the rangewide loss of sea-ice habitat within the foreseeable future") (emphasis added).

Finally, Joint Plaintiffs argue that the 45-year foreseeable future corresponds to roughly four, not three polar bear generations as stated in the Final Rule because, by Joint Plaintiffs' calculations, a polar bear generation is "closer to 11 years" than the 15 years found by the Service.  JP's Mem. at 16; <u>see also</u> Alaska's Mem. at 14.  As an initial matter, none of the Joint Plaintiffs raised this objection during the administrative rulemaking process; rather they have asserted it for the first time in litigation.  The Supreme Court has held that objections not raised during the administrative process are waived.  <u>See</u> <u>Department of Transp. v. Public Citizen</u>, 541 U.S. 752, 764-65 (2004) (finding that, by failing to raise "particular objections" to an environmental assessment ("EA") during the administrative process, the plaintiffs had "forfeited any objection" to the EA on those grounds).  This principle of law also is well-established in the D.C. Circuit.  <u>See</u> <u>Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.</u>, 429 F.3d 1136, 1150 (D.C. Cir. 2005) (holding that the plaintiff had "forfeited the opportunity to seek judicial review of its claims" where it "did not raise these contentions during the rulemaking").  Thus, in this case, having failed to raise their objection regarding the length of a polar bear generation during the rulemaking, Joint Plaintiffs are foreclosed from raising it now.

Even if the Court were to consider Joint Plaintiffs' argument, it lacks merit for several reasons.  First, as explained above, the foreseeable future was not determined based solely on polar bear biology, but was based primarily on the Service's ability to reliably forecast future loss of sea ice, which in this case was 45 years.  ARL117258 (LR).  Second, there is substantial

---

if a species is endangered or threatened because of Factor E, not whether or not Factor E may minimize or eliminate the threats posed by the other listing factors.

evidence in the administrative record to support the Service's definition of a polar bear generation as 15 years and the application of three generations as the appropriate timeframe over which to evaluate polar bear population trends.  As noted above, the 45-year foreseeable future is consistent with the work of the PBSG, which involved 40 polar bear experts from around the world.  Id.  The Final Rule explains that none of the 40 experts involved with the PBSG raised an issue with the 45-year timeframe for analysis of population trends.  Id.  In addition, no peer reviewers of the proposed rule expressed the opinion that a 45-year foreseeable future was too long, and in fact the only peer reviewer that did not support the Service's foreseeable future thought it was too short.  Id.  Joint Plaintiffs may evaluate the available evidence differently than the Service did, but the Service had a rational basis for its decision and the Service's rational weighing of the data is entitled to deference.  Chevron, 467 U.S. at 843; Marsh, 490 U.S. at 378; Wisconsin Valley Improvement v. FERC, 236 F.3d 738, 747 (D.C. Cir. 2001) (internal citation omitted) ("But as the Supreme Court emphasized in Marsh, we are not called upon to weigh competing experts' opinions as an original matter . . . . We only inquire whether the agencies have based their policy choices on reasonable expert evidence").  Third, Joint Plaintiffs have failed entirely to show how a difference of 12 years (i.e., a 33-year versus a 45-year foreseeable future) would support a finding that the polar bear is not threatened.

In sum, as the agency charged with administering the ESA, the Service has broad discretion to give meaning to the ambiguous term "foreseeable future."  Here, the Service considered the best available scientific information and determined, in its expert judgment, that the available data allowed it to reliably forecast the primary threat to the polar bear until mid-century.  The Final Rule explains that this time period increases the reliability of biological information because it allows for multigenerational analysis of the polar bear.  CBD and Joint

Plaintiffs clearly would prefer alternative definitions of the foreseeable future, but neither party has identified any data superior to those considered by the Service. Rather, they merely argue that the Service should have reached a different conclusion based on its consideration of those data. The Court, however, may not substitute CBD's or Joint Plaintiffs' judgment for that of the Service. Overton Park, 401 U.S. at 415-16; accord Marsh, 490 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). The Service's statutory interpretation of foreseeable future was reasonable, consistent with the ESA, and entitled to deference under Chevron, 467 U.S. at 843.

### 3.     The Service's Listing Determination Is Well Supported by the Record and the Best Available Climate and Polar Bear Science

The ESA requires the Service to base listing determinations on the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The Service fully complied with this requirement in this case, and the Court should reject all arguments to the contrary.

Joint Plaintiffs attack the Service's consideration of the scientific data in three ways. First, Joint Plaintiffs argue that there is too much "uncertainty" with the climate and polar bear science for the Service to determine that the polar bear is a threatened species. JP's Mem. at 16-21; see also SCI's Mem. at 8-9; Alaska's Mem. at 14-15. This argument fails as a legal matter because it assumes, contrary to established D.C. Circuit case law, that scientific certainty is required before the Service may list a species as threatened under the ESA. See, e.g., Southwest Ctr., 215 F.3d at 60; supra § VI.C.1.b.ii. In addition, as explained below, Joint Plaintiffs mischaracterize the nature and extent of uncertainty with climate change projections. The best available climate science shows that further global warming and Arctic sea-ice declines are very likely to continue through at least the mid-21st century.

78

Second, Joint Plaintiffs argue that the Service improperly relied on USGS modeling of the range-wide impact of future sea-ice declines on polar bear numbers because of certain limitations with the models acknowledged by the Service.  JP's Mem. at 27-36; Alaska's Mem. at 7-11.  As explained below, this argument fails because the models are the best available science of their kind and their projected negative outcomes for the polar bear are consistent with the Service's broader findings based on the record as a whole.  Third, Joint Plaintiffs argue that the Service failed to consider the best scientific information available and to explain its findings regarding the Southern Beaufort Sea population.  JP's Mem. at 36-42; Alaska's Mem. at 11-13.  Contrary to this argument, the Service's findings for this population (most importantly, that it was likely to decline in numbers in the future) are amply supported by the record.

For its part, CBD does not dispute that the Service used the best available climate science or that the Service's findings of severe threats to the polar bear from sea-ice declines are supported by the record.  Rather, applying its incorrect legal premise that the Service must list a species as endangered whenever there is a high probability of extinction anytime in the future, CBD argues that the Service was required to list the polar bear as endangered based on one item of evidence – the Bayesian polar bear population model.  As is typical of many of the diametrical positions staked out by CBD and Joint Plaintiffs, Joint Plaintiffs argue the Service had to disregard the very same Bayesian Model that CBD considers dispositive of an endangered finding.  Charting the middle road between these polar opposites, the Service properly found that the Bayesian model supported the threatened listing and was consistent with other evidence, but reasonably declined to find as fact the specific numerical probabilities of extinction in a given year from the model, given that the model was a preliminary, first-generation effort.

a.     **Joint Plaintiffs Mischaracterize the Nature and Extent of "Uncertainty" in the Available Climate Modeling Data and Fail to Identify Any Superior Climate and/or Polar Bear Science**

As the Final Rule explains, the Service found that the best available science addressing the likelihood, magnitude, and rate of future global warming and Arctic sea-ice declines included the IPCC AR4, the USGS reports, and other studies that relied on the IPCC AR4's state-of-the-art climate models.   ARL117231 (LR); DeWeaver (2007) (ARL128797); Overland &Wang (2007) (ARL131033, 132812); Holland (2006) (ARL040064); Zhang & Walsh (ARL120901); and Stroeve (2007) (ARL125559).   Based on the IPCC AR4 and this other supporting climate science, the Service found that global warming and further extensive Arctic sea-ice declines are very likely to continue for the 45-year foreseeable future.   ARL117223-38, 117253, 117279, 117296 (LR); see also IPCC AR4 at ARL152436.

Joint Plaintiffs do not dispute that the Service relied on the best available science to project future global warming and sea-ice declines.  JP's Mem. at 16-21.  Nor do they identify any better available climate science for this purpose, or claim that the IPCC's conclusions or models are wrong or flawed in any way.  Id.  Rather, they argue only that the climate science is too uncertain for the Service to rely on it.   See, e.g., JP's Mem. at 17-18 ("The uncertainty present here should have prevented the Service from making a 'threatened' determination under the ESA.").  Joint Plaintiffs' argument is contrary to law.  As explained more fully above (supra § VI.C.1.b.ii.), and as the D. C. Circuit has held, the Service is required to make a determination based on the best available scientific data, even if that data is "quite inconclusive."  Southwest Ctr., 215 F.3d at 60.  On this basis alone, Joint Plaintiffs' "uncertainty" argument fails as a matter of law.  See also American Wildlands, 193 F. Supp. 2d at 252 ("This Court is not in a position to make policy judgments based on conflicting or uncertain scientific data. . . .").

80

Joint Plaintiffs also mischaracterize the nature and extent of uncertainty with climate change projections. Joint Plaintiffs assert the amount of uncertainty is "tremendous." JP's Mem. at 17. However, mainstream climate science as reflected in the IPCC AR4 reaches the opposite conclusion: that further global and regional Arctic warming is very likely to occur given GHGs already in the atmosphere and those likely to be emitted, and that the resulting impacts are very likely to be larger than those observed during the 20th century. IPCC AR4 at ARL152436 ("The Arctic is <u>very likely</u> to warm during this century more than the global mean."; "Arctic sea ice is <u>very likely</u> to decrease in its extent and thickness") (emphasis added); IPCC AR4 at ARL151205 ("Continued greenhouse gas emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st century that would <u>very likely be larger than</u> those observed during the 20th century."); IPCC AR4 at ARL152082 (emphasis added).

Joint Plaintiffs cite a statement in one of the USGS Reports that "uncertainty in projections of Arctic climate change is relatively high." JP's Mem. at 18. However, the report finds on the next page that climate model uncertainty is substantially reduced by considering an ensemble of multiple climate models, as USGS and the Service did here. ARL117232 (LR); ARL128806. The cited USGS report in fact examines a ten-model ensemble of the IPCC AR4 models that best replicate historical observations of sea-ice extent, and the ensemble mean projects a future decline in September Arctic sea-ice extent of over 30% by the mid-21st century. ARL117237 (LR); ARL128824.

While some uncertainty exists in predicting future climate change, Joint Plaintiffs fail to acknowledge the nature of that uncertainty. As the Service found, it is difficult to accurately forecast, for example, the level of sea ice in a given future year or the exact year that sea ice will

disappear in summer throughout the Arctic.  ARL117243 (LR); ARL110146-48.  However, as

the Service found, that difficulty does not prevent a credible, scientific assessment of the likely

future course and magnitude of sea-ice declines, based on the mean and range of the trends

shown by an ensemble of multiple climate models.  ARL117247, 117279 (LR); ARL110146-48.

As the IPCC AR4 itself states, despite some uncertainty in climate modeling, "models are

unanimous in their prediction of substantial climate warming under greenhouse gas increases,

and this warming is of a magnitude consistent with independent estimates derived from other

sources, such as from observed climate changes and past climate reconstructions."  ARL151845;

see also IPCC AR4 at ARL151207 ("Sea ice is projected to shrink in both the Arctic and

Antarctic under all [GHG emissions] scenarios.").  Thus, in reality, there is relatively little

uncertainty that global warming and further extensive Arctic sea-ice declines will continue

through at least mid-21st century.  As the Service found and discussed above, future climate

change is largely set.  ARL117279 (citing, inter alia, IPCC AR4 at 749, ARL152082), 117292

(LR).[28]

Further, it is patently rational for the Service to agree with the IPCC AR4 and other

supporting climate science that the substantial downward trend in Arctic sea ice caused by global

warming is very likely to continue for the foreseeable future.  Joint Plaintiffs never develop any

---

[28]   The Joint Plaintiffs also point to an IPCC statement regarding uncertainty with future
emissions.  JP's Mem. at 19.  However, as explained supra § IV.D., climate models that are run
under the most commonly used SRES emissions scenarios show a similar trend in global
warming out to about the mid-21st century.  ARL117233 and Figure 5 (LR).   There is greater
uncertainty after the mid-21st century, when the trends begin to diverge.  Id.   The Service
addressed this uncertainty resulting from the differences in emissions scenarios by using a 45-
year foreseeable future to reliably assess the effects of sea-ice loss on the polar bear.
ARL117257-59 (LR).  See also ARL077914 (peer reviewer comment that uncertainty associated
with emissions begins mid-century).

argument that the Service's prediction is irrational in that the science compels the opposite prediction that continued global warming and sea-ice declines are unlikely, or point to any contrary scientific evidence in the record that the Service failed to consider.  For all of these reasons, the Court should reject Joint Plaintiffs' argument that the climate science has too much "uncertainty" for the Service to rely on it.

Joint Plaintiffs also allege there is too much "uncertainty" for the Service to determine whether the expected sea-ice declines are likely to make the polar bear an endangered species within the foreseeable future.  JP's Mem. at 17.  This argument fails for the same reason as Joint Plaintiffs' argument about the "uncertainty" of the climate change science.  In finding that polar bears are likely to become endangered from sea-ice declines, the Service relied on a vast array of polar bear science and data, which the Service identified as the best scientific data available.  ARL117216-19, 117259-75 (LR); References Cited, ARL053670-96.  Joint Plaintiffs ignore almost all of this science and make a narrow and erroneous attack on: (1) the USGS modeling of the range-wide impact of future sea-ice declines on polar bear numbers; and (2) four USGS reports dealing with the Southern Beaufort Sea population.  JP's Mem. at 18 and 27-42; Alaska's Mem. at 7-14; 117272 (LR).  Even as to the USGS population modeling and reports about the Southern Beaufort Sea population, Joint Plaintiffs identify no better available scientific literature that the Service should have considered.  JP's Mem. at 27-42; see infra § VI.C.3.b & d.

In other words, as to all of the extensive polar bear science cited by the Service in support of its threatened listing, Joint Plaintiffs fail to make any showing that the information is not the best available scientific information, as the Service found.  Under the ESA and controlling case law, the Service is to make listing determinations based on the best available science, even where the science is not conclusive or entirely certain.  Building Indus. Ass'n of Superior Cal., 247

F.3d at 1246; <u>Southwest Ctr.</u>, 215 F.3d at 60.   The mere existence of "uncertainty" is not a legally valid reason to not list the polar bear, where the allegedly uncertain information constitutes the best available science and that science supports the Service's determination.[29]

**b.      The Service Properly Considered the USGS Polar Bear Population Models**

In this case, Joint Plaintiffs ignore the vast bulk of the Service's reasoning and the body of scientific evidence that it relied upon, and falsely proceed as if the Service's determination rests wholly or principally on one of the nine USGS reports that were prepared to assist the Service in making a final listing decision (Amstrup, et al. (2007)).   JP's Mem. at 27-37.   This USGS report contains two models of the range-wide impact of the projected sea-ice declines on polar bear numbers, the Carrying Capacity Model and Bayesian Model.   ARL082452.   Joint Plaintiffs argue that certain limitations with these two models render the Service's determination and use of the models arbitrary and capricious.   JP's Mem. at 27-36; Alaska's Mem. at 7-11. Joint Plaintiffs' argument fails for three principal reasons.

First, the Service made clear that its determination was based on the record as a whole and the findings discussed above (<u>supra</u> § VI.B.1.a).   ARL117253 (LR); <u>see also</u> ARL011361 (stating that while the USGS reports "contributed to our analyses, the final decision is supported and justified by the larger weight of evidence from the extensive published literature on climate and on polar bears, and the perspectives from 49 peer reviewers (23 peer reviewers for the USGS reports, 12 who reviewed the [2006 polar bear status review], and 14 who reviewed the proposed

---

[29] In addition, to the extent that the Service relied on climate and population model projections, the Service or the models themselves took into account or reduced uncertainty when possible (<u>e.g.</u>, by using a range of values for a model parameter or input, rather than a single value, and examining the mean or average output of multiple models or model runs).   <u>See</u> ARL110123, 110130, 110134, 110143, 110148; ARL117231-32, 117247-48 (LR).

rule).").   As to the USGS population modeling, the Service found only that the model outcomes were consistent with other record evidence demonstrating the severe negative impacts of sea-ice declines on polar bears.   ARL117278 (LR) ("We conclude that the outcomes of the BM are consistent with 'the increasing volume of data confirming negative relationships between polar bear welfare and sea ice decline' . . . and parallel other assessments of both the demographic parameter changes as well as trends in various factors that threaten polar bears . . . ."); ARL117300 (LR) (noting that the Bayesian Model is a "useful <u>contribution</u> to the overall weight of [the] evidence" and "consistent with other scientific information") (emphasis added).

Second, Joint Plaintiffs' fixation on the USGS population models, to the exclusion of all other record evidence, is misguided.   As a legal matter, the question is not whether these two models, in and of themselves, support the Service's threatened determination, but rather whether the agency's decision is supported by the record as a whole.   <u>Van Valin v. Locke</u>, Civil Action No. 09-961, 2009 WL 4068028, at * 5 (D.D.C. Nov. 23., 2009) (in examining whether the agency "adequately explained the rationale behind the Final Rule, the Court must examine the record as a whole.") (citing <u>San Luis & Delta-Mendota Water Auth. v. Salazar</u>, Civ. No. 09-407, 2009 WL 3428487, at * 19 (E.D. Cal. Oct. 15, 2009) (agency's action may be upheld if its reasoning can be discerned on the basis of the entire record)).   In this case, the Service reasonably considered the two population models, but irrespective of those models, the record as a whole contains more than adequate support for the Service's threatened determination.

Third, Joint Plaintiffs' various arguments against the Service's reliance on the USGS population models as supporting evidence fail because, at the time of the Service's determination, the models were the best available scientific modeling of the range-wide impact of future sea-ice declines on polar bear numbers.   While the Service recognized that both models

had limitations, the D.C. Circuit has held that the ESA requires the Service to use the best scientific information available at the time of its determination, even if that data is not perfect or conclusive.  See Building Indus. Ass'n of Superior Cal., 247 F.3d at 1246; Southwest Ctr., 215 F.3d at 60.  Joint Plaintiffs point to no alternative models that are better, and no such models were available at the time of the listing decision.

Joint Plaintiffs also make various arguments about the specific models that are erroneous. Joint Plaintiffs point out that the Carrying Capacity Model projects a decline in polar bear carrying capacity of between 10 and 22% globally by year 45, and suggest that amount is insufficient to threaten the polar bear.  JP's Mem. at 30; Alaska's Mem. at 8 (same); CCA/CORE Mem. at 13-14 (same).  Joint Plaintiffs ignore, however, the Service's finding that the Carrying Capacity Model was a "conservative view of the potential magnitude of the change in bear carrying capacity over time and area," because the model (1) does not incorporate seasonal ice extent, an important factor for polar bears (see ARL117265 (LR)) and (2) does not consider the effects of population stressors other than loss of sea-ice extent (e.g., changes in the composition of the ice or marine productivity).  ARL117277 (LR); ARL107850-51, 107855; ARL082476-78, 082486-87.  As Amstrup, et al. (2007) states, the Carrying Capacity Model is "an optimistic view" and "likely underestimates the effects future sea ice change will have on polar bears." ARL082478.

Joint Plaintiffs also broadly claim that the Service did not adequately explain or support the assumptions and methodology used for the Carrying Capacity Model, and thus the agency's use of the model was improper.  JP's Mem. at 27.  Despite this broad claim, however, they identify only a single specific issue, which the Service fully acknowledged – the Carrying Capacity Model is relatively simplistic compared to the Bayesian Model and takes current polar

bear densities (numbers of polar bears per unit of sea-ice habitat), applies them to projections of annual sea-ice extent and calculates a possible future number of polar bears in each ecoregion. JP's Mem. at 27-30; Alaska's Mem. at 7-8 (same); ARL117276-77 (LR); ARL110172, 110175; ARL082486-87.  In other words, the model assumes a linear or fixed relationship between sea-ice extent and possible numbers of polar bears (i.e., constant polar bear population densities over time).  The Service fully recognized this limitation, and responded that the more complex Bayesian Model that it also considered "did not assume a linear relationship" in polar bear densities.   ARL110163-64; see also ARL110167-68 (Bayesian Model offered to address limitations of Carrying Capacity Model).

Joint Plaintiffs argue the Service could not rely on the Bayesian Model either because the Service acknowledged that the model has some uncertainties, and at the time the Service made its determination, the model was a first-generation prototype based mainly on the direct input of one polar bear expert.  JP's Mem. at 32-34; Alaska's Mem. at 10-11 (same).  Contrary to this argument, the Service properly relied on the Bayesian Model as additional supporting evidence. First, as the Service stated, "[w]hile the [Bayesian Model] had direct input from one polar expert, this individual had extensive polar bear research experience as well as extensive background on the abundant literature available on polar bears and a working collaboration with numerous experts in the field."  ARL110164.  In addition, the USGS report containing the Bayesian Model was peer reviewed by four scientists not previously involved with the model's development.  Id. Joint Plaintiffs argue that "[t]he Service also discussed internally the many ways to make the [Bayesian Model] a more reliable model."  JP's Mem. at 33-34.  However, the law of this Circuit is that "the Service must utilize the 'best scientific . . . data available,' not the best scientific data possible."  Building Indus. Ass'n of Superior Cal., 247 F.3d at 1246 (citation omitted).

Second, recognizing that the Bayesian Model was a first-generation prototype that would benefit from further development, the Service did not rely on the precise numerical probabilities of the projected outcomes for polar bears in the model.  Instead, the Service focused on the "general direction and magnitude" of those outcomes, which were consistent with the "increasing volume of data confirming negative relationships between polar bear welfare and sea ice decline." ARL117278 (LR); ARL110165; ARL082483 (citing scientific literature confirming negative relationships between polar bear welfare and sea-ice declines); ARL117270-73 (LR) (citing more supporting scientific literature).

Joint Plaintiffs claim that the Service's middle-ground approach to the Bayesian model is improper, and thus the agency had to either: (1) accept the specific numerical probabilities of each outcome in a given year as fact (as CBD argues, see infra § VI.C.3.c); or (2) completely disregard the model's projected negative outcomes for the polar bear.  JP's Mem. at 35-36.  The Court should reject this argument because it ignores the substantial body of case law regarding the wide latitude accorded to a federal agency to weigh scientific data and information within the agency's area of expertise.  See, e.g., Ethyl Corp., 541 F.2d at 36; State of New York, 969 F.2d at 1150; American Wildlands, 530 F.3d at 1000.  Furthermore, disregarding the Bayesian Model would be at odds with D.C. Circuit case law requiring the Service to use the best available information for determinations under the ESA, even if inconclusive or imperfect.  Building Indus. Ass'n of Superior Cal., 247 F.3d at 1246; Southwest Ctr., 215 F.3d at 60.

Joint Plaintiffs cite cases for the proposition that, when an agency uses a model, it must explain the assumptions and methodology used, and if the methodology is challenged, provide a complete analytic defense.  JP's Mem. at 27 (citing U.S. Air Tour Ass'n v. FAA, 298 F.3d 997, 1008 (D.C. Cir. 2002), and Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506

(D.C. Cir. 1983)).  Here, the assumptions and methodology used for both models is explained in detail in the USGS report.  ARL082456-70.  The Service also defended the models in detailed responses to public comments about their assumptions and methodology.  ARL110162-78.

Further, the D.C. Circuit has held that a reviewing court "may reject an agency's choice of a scientific model 'only when the model bears no rational relationship to the characteristics of the data to which it is applied.'"  City of Portland, Oregon v. EPA, 507 F.3d 706, 714 (D.C. Cir. 2007) (quoting Appalachian Power Co. v. EPA, 135 F.3d 791, 802 (D.C. Cir. 1998); see also City of Waukesha, 320 F.3d at 248-49 (same); National Wildlife Fed'n, 286 F.3d at 565 (same); Appalachian Power Co. v. EPA, 249 F.3d 1032, 1052 (D.C. Cir. 2001)  ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it.") (emphasis added).  In this case, the Carrying Capacity Model takes current polar bear numbers per unit of sea-ice habitat, and calculates a possible future reduced number of polar bears based on the sea-ice declines projected by the IPCC AR4 models that best simulate observed sea-ice declines. ARL117276-77 (LR) (model); ARL117236 (LR) and ARL082459 (sea-ice data used).  The Carrying Capacity Model clearly bears a rational relationship to the characteristics of the data to which it is applied.

The Bayesian Model also clearly meets the standard articulated by the D.C. Circuit.  The Bayesian Model incorporates empirical data and projections of annual and seasonal sea ice availability and other environmental factors, other anthropogenic and natural stressors, and expert judgment regarding known relationships between these stressors and polar bear demographics to obtain probabilistic estimates of future polar bear distributions and relative numbers.  ARL117277 (LR).  Joint Plaintiffs do not even attempt to show, let alone demonstrate,

that the composition of the Bayesian Model bears no rational relationship to the characteristics of the data to which it is applied. JP's Mem. at 32-36.

Joint Plaintiffs argue that the Service fails to explain why it is more confident in the general direction and magnitude of the projected outcomes in the Bayesian Model than the specific numerical probabilities in the model. JP's Mem. at 35. Contrary to this argument, the Service found that the general direction and magnitude of the projected outcomes of the Bayesian Model are probative because they are consistent with other record information, including scientific assessments of polar bear "demographic parameter changes" (i.e, the declines in polar bear numbers, physical condition, and reproductive success in populations already being affected by climate change). ARL117278-79 (LR). Joint Plaintiffs attempt to dismiss this explanation on the basis that the prior "assessments" cited by the Service are models and "[t]he Service could just as easily show that the same uncertainties and limitations are inherent in all the models." JP's Mem. at 35. This argument is incorrect because the other "assessments" cited by the Service are not models, they include scientific literature and data regarding the observed declines in polar bear populations being affected by climate change. AR11270-73, 117278-79 (LR); ARL110165; ARL082483.[30]

Furthermore, the Service is the finder of fact here, and thus decides what conclusions to draw from particular items of evidence. American Bioscience v. Thompson, 269 F.3d 1077,

---

[30] Joint Plaintiffs cite Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183 (D.D.C. 2008), for the proposition that a model must have "a rational relationship to the reality it purports to represent." JP's Mem. at 27, 36. In that case, the Court rejected sound level modeling that it found was: (1) at odds with recorded sound levels; and (2) "almost exclusively" the justification for the agency's challenged plan. Greater Yellowstone, 577 F. Supp. 2d at 198-99. Neither of these facts are present in this case. In particular, Joint Plaintiffs make no showing that the Bayesian Model has no rational relationship to known facts. To the contrary, the Service found that the model's projections are consistent with observed facts and other record information.

1083 (D.C. Cir. 2001).  In this case, the Service reasonably decided that the first-generation nature of the Bayesian Model cautioned against drawing highly specific conclusions about the numerical probability of specific outcomes for polar bears in a given future year.  But that does not mean that the model has no probative value.  As noted above, it was developed by a leading polar bear expert and was peer reviewed by four other scientists.  The model is highly detailed, bears a rational relationship to the characteristics of the data to which it is applied, and was (along with the Carrying Capacity Model) the best available modeling of the impact of future sea-ice declines and other stressors on the polar bear range-wide.

For all of the foregoing reasons, the Court should reject Joint Plaintiffs' argument that the Service's listing determination is arbitrary and capricious based on the identified limitations with the best available range-wide population models from USGS.

> ### c.   Contrary to CBD's Argument, The Service Was Not Required to Find As Fact the Numerical Probabilities of Future Extinction in the Bayesian Model

While Joint Plaintiffs maintain that the Service had to disregard entirely the severe negative impacts to the polar bear indicated by the USGS models, CBD takes the diametrically opposite position.  CBD asserts that the Service was required to list the polar bear as <u>endangered</u> in all or parts of its range solely on the basis of the Bayesian Model.  Specifically, CBD argues that the ESA requires the Service to list a species as endangered if there is a "high probability" of the species' extinction anytime in the future.  CBD's Mem. at 22.  This claim fails for two reasons.  First, as explained above (<u>supra</u> § VI.C.1.a), this argument is contrary to the statute, the legislative history, and agency practice.  Congress intended that a species be listed as <u>threatened</u> where it is likely to become endangered due to future impacts associated with a threat, not that such species be listed as endangered now based on that threat.

Second, CBD's argument that the polar bear faces a high probability of future extinction is premised on the specific numerical probabilities of extinction in each ecoregion (at years 45, 75, and 100) from the Bayesian Model.  CBD's Mem. at 1-2, 10-11, 23-24, 27.  As stated above, the Service decided it could not confidently rely on the specific numerical probabilities of the projected outcomes in the Bayesian Model.  As the Service noted, the model was a first-generation prototype that incorporated the direct input of a single polar bear expert.  ARL117278 (LR).  The Service further explained that the Bayesian model combines expert judgment and interpretation with quantitative and qualitative empirical information, "therefore necessitating inputs from multiple experts (if available) before it can be considered final."  Id.  Based on these limitations, the Service found that it was "more confident in the general direction and magnitude of the projected outcomes rather than the actual numerical probabilities associated with each outcome."  Id.  The USGS report containing the Bayesian Model reaches these very same conclusions. ARL082478-79.[31]

Like Joint Plaintiffs, CBD argues that the Service could not take its middle-ground approach to the Bayesian Model – i.e., that the Service was required to find as fact the specific numerical probabilities of extinction at years 45, 75, and 100 from the model.  CBD's Mem. at 23-25.  The Court should reject this argument.  As stated above, the Service is the finder of fact

---

[31] CBD claims the Service takes the USGS authors' statements out of context because, in the same paragraph, the report states that "'[w]hen predictions result in high probability of one population outcome state and low or zero probabilities of all other states, there is low overall uncertainty of predicted results.'"  CBD's Mem. at 28.  The Service did not ignore or omit that second statement, as CBD claims.  Id.  In the Final Rule, the Service took account of the authors' observation that "situations with high probability of a particular outcome (e.g., of extinction) or consistent directional effect across sea ice scenarios suggest a higher likelihood of that outcome . . . ."  ARL117278 (LR).  However, the Service was not prepared to accept as fact the specific numerical probabilities of extinction outputted by the model in its current state.

here, and thus decides what conclusions to draw from particular items of evidence.  American Bioscience, 269 F.3d at 1083.  As noted above, the D.C. Circuit has held that where, as here, "Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence." Animal Legal Def. Fund v. Glickman, 204 F.3d 229, 235 (D.C. Cir. 2000).  The Bayesian Model is almost the definition of "equivocal evidence."   While consistent with other scientific evidence showing how profoundly polar bears are negatively impacted by sea-ice declines, it nevertheless is a first-generation model that needed further work to provide any basis for firm conclusions about actual probabilities of extinction.

CBD argues that the Service must base its determination on the best available scientific and commercial information and identifies the Bayesian Model as such.  CBD's Mem. at 23. However, the best-available-science requirement does not mean that the Service has to find as fact all of the specifics in a particular item of evidence – particularly one that is a model and attempts to predict the future.  As the expert finder of fact here, the Service is allowed to weigh and draw reasonable conclusions from the evidence, and its factual conclusions are accorded great deference.  City of Waukesha, 320 F.3d at 247 ("We will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise.") (citations omitted); Appalachian Power Co., 249 F.3d at 1051-52; Huls Am., Inc. v. Browner, 83 F.3d 445, 452 (D.C. Cir. 1996); Baltimore Gas, 462 U.S. at 103.  Here, the Service drew reasonable conclusions from the Bayesian Model and gave it due weight.

CBD's argument not only tosses aside the deference accorded to agency fact-finding, it ignores that the Service did not disregard the Bayesian Model.  CBD argues that under the ESA's best-available-science requirement, "the [Service] cannot disregard the USGS modeling because

it is not conclusive or perfect." CBD's Mem. at 26 (emphasis added). CBD also argues that "the ESA 'contains no requirement that the evidence be conclusive in order for a species <u>to be listed</u>,'" (<u>id.</u> (emphasis added) (citing <u>Defenders</u>, 958 F. Supp. at 679), but here the Service neither disregarded the Bayesian Model nor failed to list the polar bear. Rather, the Service found the model a "useful contribution to the overall weight of [the] evidence" and cited the model as additional support for its threatened listing. ARL117300 (LR).

CBD makes a number of other factual arguments relying on the Bayesian Model, but they all incorrectly presume that the question is whether the polar bear faces a high probability of future extinction, <u>i.e.</u>, that the dividing line between a threatened and endangered species is the level of probability of future extinction, rather than the imminence of the extinction threat. CBD's Mem. at 27. In this case, the Service did not apply CBD's incorrect legal standard. Rather, the Service found that the best available data shows that none of the 19 polar bear populations are currently endangered, based on their current population numbers and trend, distribution, habitat, and other facts -- while the species was likely to become endangered in the future as its sea-ice habitat continued to decline. ARL117219-21, 117299-301 (LR).

For the foregoing reasons, the Court should reject CBD's argument that the Service was required to find as fact the numerical probabilities of future extinction of the polar bear in the first-generation Bayesian Model.

### d.    Joint Plaintiffs Distort The Facts Regarding The Southern Beaufort Sea Population

Joint Plaintiffs contend that the Service's threatened determination is arbitrary and capricious based on its findings as to the SBS population, relying on three specious and misleading arguments. JP's Mem. at 36-42. First, they claim that the Service wrongly found that the SBS population is in a "[d]eclining [t]rend," when the data show that the SBS population

numbers have been "stable."  Id. at 36, 40.  This argument tries to obfuscate the Service's actual

finding – which was not that the SBS population had declined in numbers through the present,

but rather that it was likely to decline in numbers in the future.  This finding relied on USGS's

projection of a significant future decline in numbers for the SBS population (in Hunter et al.

2007, ARL082291).  Second, Joint Plaintiffs argue that USGS failed to use the best available

data in projecting a future population decline for the SBS population, because USGS used five

years of polar bear data when more data was available.  JP's Mem. at 37-39.  This argument is

wrong because, inter alia, only five years of the necessary type of data were available.  Third,

Joint Plaintiffs challenge the Service's finding that there have been declines in measures of polar

bear vitality and reproductive success in the SBS population.  JP's Mem. at 36-37, 40-41.  This

argument is contradicted by the scientific evidence, which shows that there have been such

declines in the SBS population, and that such declines were a precursor to a population decline in

the Western Hudson Bay population.

      With respect to their first argument, Joint Plaintiffs assert that "the available data . . .

actually do not indicate a . . . population decline in SBS population" and that "the available data

indicate that the SBS population over the past 20 years has been stable."  JP's Mem. at 40;

Alaska's Mem. at 11-13.  Thus, they contend, the Service erroneously found that the SBS

population is in a "[d]eclining [t]rend."  Id. at 36.  However, the Service did not find that there

was a clear population decline in the SBS population over the past 20 years.  Rather, the Service

found that: (1) there was not a statistically significant decline in polar bear numbers in the SBS

from 1986-2006 based on the available data;[32] but (2) in Hunter, et al. (2007), USGS projected a

---

[32] The estimated number of polar bears in the SBS in 1986 was 1,800, while in 2006 it was 1,526.
However, as the Service notes, "the precision of the earlier estimate . . . was low, and
consequently there is not a statistically significant difference between the two point estimates."

significant <u>future</u> decline in polar bear numbers in the SBS, when it took into account likely future sea-ice conditions in the SBS using ten climate models. ARL117273, 117275-76 (LR). Obviously, the fact that the SBS population has not experienced a statistically significant population decline through 2006 does not mean that it will not experience such a decline in the future, as the polar bear's sea-ice habitat continues to decline as projected by the models.

Again confusing past trends with futures ones, Joint Plaintiffs erroneously argue that the Service's finding of a likely significant future decline in numbers for the SBS population is premised on a finding of a past trend in the number of ice-free days in the SBS. JP's Mem. at 39-40 (citing data on the number of ice-free days for <u>1979-2006</u>). However, the Service relied on USGS's projection of a future decline in numbers for the SBS population (in Hunter, et al. (2007)), and that projection is not based on any finding that there was a past trend in the number of ice-free days in the SBS. Instead, the USGS projected a future decline in numbers based on the <u>future trend</u> in ice-free days in the SBS.[33] Specifically, the USGS first established a relationship between the polar bear population growth rate in a given year and the number of ice-free days in that same year. As Figure 6 from Hunter, et al. (2007) shows (<u>see</u> JP's Mem. at 38), when there are more than about 125 ice-free days over the continental shelf in the SBS, the

---

ARL117272 (LR). As noted in Regehr, et al. (2006), "[t]his may mean there has been no change in numbers in recent years, or it could reflect insufficient precision in current and past estimates to resolve such a change." ARL004367.

[33] The USGS also performed an alternate projection of polar bear numbers in the SBS based on the average frequency of bad ice years during 1979-2006, but that projection did not depend on a finding of <u>trend</u> in the number of ice-free days in the SBS. Rather, USGS used the overall average frequency of bad ice years in that period (21%). ARL117276 (LR). This projection showed a slower rate of decline than that based on the ten climate models. <u>Id.</u> Further, contrary to Joint Plaintiffs' argument (JP's Mem. at 38), the USGS did not use five years of sea-ice data for this alternate projection; it used data for 1979-2006. ARL117276 (LR).

population growth rate declines precipitously.  ARL117276 (LR); ARL082325.  On the basis of this finding, the USGS defined a year that had greater than 127 ice-free days as a "bad" ice year, while years with fewer ice-free days were "good" ice years.  ARL082306-07.  Using the ten climate models best replicating observed sea-ice declines, the USGS projected a significant future decline in numbers in the SBS population based on a projected increased frequency of "bad" ice years in the future (i.e., years where the ice-free period would be longer than 127 days and thus the growth rate would plummet).  ARL117276 (LR); ARL082306-08, 082314, 082331-32; see also ARL110133-34.  Thus, in arguing about the past trend in the number of ice-free days, Joint Plaintiffs entirely miss how the USGS projected a significant future decline for the SBS population that took into account future sea-ice conditions.[34]

With respect to their second argument, Joint Plaintiffs claim that the USGS' use of five years of data to establish a correlation between the number of ice-free days and the population growth rate was not based on the best data available because "much more data was available." JP's Mem. at 36-37.  As an initial matter, only the USGS studies were available to the Service. Joint Plaintiffs point to no other scientific studies (based on a larger data set) of the correlation between the population growth rate and the number of ice-free days.  As noted above, the law of

---

[34] While the USGS did not rely on a past trend in the number of ice-free days, Joint Plaintiffs paint an inaccurate picture of past sea ice conditions in the SBS.  In Hunter, et al. (2007), the USGS reevaluated the underlying data from Regehr, et al. (2007) (relied upon by Joint Plaintiffs, see JP's Mem. at 39, Figure 3), and after mathematically addressing the noise of the annual oscillations to discern the true trend, found that there was an "apparent increasing trend" in the "average frequency of bad ice years observed since 1979."  ARL082308, 082328.  See also ARL082310.  Joint Plaintiffs also overlook a substantial USGS study addressing the past and future fate of "optimal" polar bear habitat in the SBS (and in the polar basin generally).  In that study, USGS found that between the decades of 1985-1995 and 1996-2006, "[l]arge declines" in optimal habitat occurred in the SBS.  ARL129019.  The USGS also projected large future declines in optimal polar bear habitat in the SBS and the polar basin generally.  ARL117275 (LR); ARL129039, 129053, 129056.

this Circuit is that "the Service must utilize the 'best scientific . . . data <u>available</u>,' not the best

scientific data <u>possible</u>."   <u>Building Indus. Ass'n of Superior Cal.</u>, 247 F.3d at 1246.

Further, the USGS possessed only five years of the kind of polar bear data necessary to

determine whether a correlation existed between the number of ice-free days and the population

growth rate.   An intensive five-year coordinated capture-recapture study of the SBS population

was completed in 2006.   ARL117272 (LR).   In finding a correlation between the population

growth rate and number of ice-free days, the USGS relied heavily on the data obtained from this

study.   <u>See</u>, <u>e.g.</u> Regehr, et al. (2007) at 3; ARL082296, 082298, 082313.   As the Service noted,

the data used "were the most comprehensive and complete of any time period for this

population."   ARL110135.   Joint Plaintiffs attempt to improperly second-guess the scientists,

who recognized it would be preferable to use more data but determined they could not.   Regehr,

et al. (2007) at 1.[35]

With respect to their third argument, Joint Plaintiffs falsely assert that there is "no

trending decline in polar bear vital rates" for the SBS population.   JP's Mem. at 42.   Contrary to

this claim, researchers have found that a number of measures of polar bear physical condition

and reproductive success have declined for this population.   In a study examining data from

1982-2006 (Rode, et al. (2007)), the USGS found, <u>inter alia</u>, that: (1) mass (<u>i.e.</u>, weight), length,

---

[35] Joint Plaintiffs point to a reference in the Final Rule to data regarding "[s]urvival rates, weights, and skull sizes" for two periods of time, 1967-89 and 1990-2006.   JP's Mem. at 37. While the SBS population has been studied since 1967, the earlier, pre-2001 data were not suitable for the USGS' analysis of the relationship between ice-free days and population growth. As the Service stated, "[p]revious research efforts varied in objectives and sampling effort and therefore were not included."   ARL110125.   <u>See also</u> ARL004355 ("[s]ample sizes in many years before 2001 were approximately equivalent to those of 2001–06, but sampling strategies and time-frames of capture varied among many early years of study.   Therefore, all animals were not subjected to equal capture effort in many of those early years.").

and skull sizes of sub-adult males (ages 3-10) declined; (2) mass, length, and skull size of sub-adult females declined; (3) skull sizes and/or lengths of adult males and females declined; and (4) although cub production (births) increased over time, the number of cubs-of-the-year per female in the fall and yearlings per female in the spring declined,[36] suggesting reduced cub survival.   ARL117272-73; ARL082418, 082429-30.   Researchers also found correlations between the physical condition and reproductive success of polar bears and sea-ice conditions in the SBS.  Rode, et. al (2007) found that: (1) mass, length, skull size, and the "body condition index" (mass relative to length) of subadult males correlated with the percent of days when mean ice concentration over the continental shelf was less than 50%; and (2) mass and skull size of cubs-of-the year and the number of yearlings per female in the spring and fall also were correlated with the same.  Id.

   With one possible exception, Joint Plaintiffs do not dispute the foregoing evidence.[37] Instead, they assert that this evidence "is either not significant or is contradicted by other evidence."  JP's Mem. at 41.  In making this argument, Joint Plaintiffs point to claimed instances where: (1) researchers did not find certain types of declines or correlations that have not yet occurred for this population; or (2) the researchers' observations are allegedly contradictory. JP's Mem. at 41.  This argument fails for two reasons.  First, absence of some other types of declines does not mean that the actual observed declines did not occur.  Second, even assuming the evidence is mixed, the Service is the expert finder-of-fact and is permitted to draw reasonable

---

[36] "Cubs-of-the-year" are aged under one year, while yearlings are cubs aged one to two.

[37] Specifically, they argue that there has been no statistically significant decline in "juvenile survival" rates.  JP's Mem. at 41.  This is misleading because Regehr, et al (2006) found that cub survival had declined significantly, and Rode, et al. (2007) documented other declines suggesting reduced cub survival.  ARL117272-73 (LR).

conclusions about "equivocal evidence."  Animal Legal Def. Fund, 204 F.3d at 235.  Here, the Service reasonably observed that there have been some declines in the vitality of the SBS population, and that such declines preceded a decline in population numbers in the Western Hudson Bay.  ARL117272-73 (LR).[38]

Joint Plaintiffs' specific arguments regarding the observed declines also are misleading and highly selective.  For example, Joint Plaintiffs note that "cub production" (i.e., births) increased, but fail to mention that "cub survival" (i.e., once born, whether the cubs lived) declined.  JP's Mem. at 41. ARL117272-73 (LR).  Joint Plaintiffs also note that Regehr, et al. (2006) found that body weights and skull sizes for adult males declined, and claim this evidence is contradicted by Rode, et al. (2007), which found that the "condition" of adult males 11 years and older and of adult females did not decline and that "adult" (i.e., male and female) body mass did not show a trend with time.  JP's Mem. at 41.  Setting aside that Joint Plaintiffs are improperly comparing data for males and females, they fail to point out that the first study (Regehr, et al. (2007)) defined adult males as those over five years of age (not over 11 years like Rode et al., (2007)), so the comparison is apples to oranges even as to males.  ARL082419, 082426 ("The Regehr et al. (2006) observation of a decrease in body mass of adult males likely resulted because they included growing bears that we classified as subadults among their category of adults.").

---

[38] The Service did note, as Joint Plaintiffs emphasize (JP's Mem. at 36), that the SBS population occupies habitats similar to four other populations that have experienced sea-ice declines in recent years that have been more severe than those experienced in the SBS.  ARL117273 (LR) (citing ARL129038-39).  However, the fact that other polar bear populations have experienced worse declines in sea ice does nothing to undermine the threatened designation of the SBS population.

Joint Plaintiffs also argue that Regehr, et al. (2007) did not find a significant relationship between the number of ice-free days and survival rates of subadult males and females and adult males.  JP's Mem. at 41; Alaska's Mem. at 11.  This argument omits the fact that Regehr, et al. (2007) found a relationship between the number of ice-free days and the survival rates of adult females, which the USGS researchers found was the most important factor for population growth.  ARL117273, 117276 (LR).[39]  More fundamentally, Joint Plaintiffs ignore that these various factors affecting population growth were pieces of a puzzle, and once the researchers put them together, the clear picture that emerged was – as discussed above – when the number of ice-free days in the Southern Beaufort Sea exceeded about 125 days, population growth declined precipitously.  ARL117276 (LR); ARL110124.  Other than wrongly claiming that USGS could have used more than five years of polar bear data in reaching that bottom-line finding, Joint Plaintiffs fail to engage, much less refute, the scientists' finding.  JP's Mem. at 38-39.  For all of these reasons, the Court should reject Joint Plaintiffs' misguided cherry-picking of the evidence and improper suggestion that the Court should weigh that evidence differently than the USGS polar bear researchers and the Service.

For the foregoing reasons, Joint Plaintiffs' argument that the Service's threatened determination is arbitrary and capricious based on its findings with respect to the SBS population lacks merit and should be rejected.

---

[39] In emphasizing that body mass and "condition" of adult males over 11 years and adult females had not yet declined (JP's Mem. at 41), Joint Plaintiffs also overlook that body mass and "condition" (as defined by Rode, et al. (2007) to be mass relative to length), were used as indicators of variation in nutritional status from year to year, while skull size and length of adult bears were used to evaluate long-term trends because these latter measurements are insensitive to year-to-year variations in food availability or habitat quality.  ARL082420.  Rode, et al. (2007) did find that skull sizes and/or lengths of adult (and subadult) males and females declined. ARL117272 (LR); ARL082418 , 082424.

### 4.    The Service Reasonably Found That the Polar Bear Was Threatened Throughout Its Range

The ESA defines "species" as a species, subspecies, or "distinct population segment" of a vertebrate species.   16 U.S.C. § 1532(15).   In this case, the Service found that there were no geographic areas or populations of polar bears that qualify as a DPS for purposes of the ESA. ARL117297-98 (LR).   CBD, CF and SCI challenge this finding.   CBD's Mem. at 37; CF's Mem. at 14-19; SCI's Mem. at 3 (incorporating CF arguments).   As set forth below, the Service's DPS finding is reasonable and supported by the record.   The Court should reject all arguments to the contrary.

As discussed above (supra § VI.B.1.a.iv & d), the Service determined to list the polar bear as threatened throughout its range, but not endangered in any population.   CBD challenges the Service's finding that no populations or ecoregions meet the definition of an endangered species, while SCI and CF challenge the finding that the species is threatened throughout the range.   CBD's Mem. at 30-33, 41-43, 45; SCI's Mem. at 5-8; CF's Mem. at 19-21.   For the reasons set forth below, the Court should reject these arguments.

### a.    The Service Reasonably Found No Polar Bear Distinct Population Segments

Under the Service's established DPS Policy,[40] the Service considers three elements in determining whether a possible DPS should be listed as endangered or threatened under the Act:

1.    Discreteness of the population segment in relation to the remainder of the species to which it belongs;

2.    The significance of the population segment to the species to which it belongs; and

---

[40] Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy").

3.      The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

Id. at 4725. A population segment may be considered "discrete" if it satisfies either of the following conditions:

1.      It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

2.      It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

Id. If a population segment is found to be discrete, the Service also must consider its "significance," based on "available scientific evidence of the [DPS's] importance to the taxon to which it belongs." Id. Here, the Service determined that the discreteness criterion was not satisfied for any "geographic areas or populations" of polar bears. ARL117298 (LR). This finding is reasonable and supported by the record.

First, the record does not show marked separation among polar bears in the different populations or areas as a consequence of physical, physiological, ecological, or behavioral factors, as required by the DPS policy. While recognizing in the Final Rule that polar bears in different populations or ecological regions may have "minor differences" in behavior, life-history strategies, or demographic parameters, the Service found that "in general polar bears have a similar dependence upon sea-ice habitats, rely upon similar prey, and exhibit similar life history characteristics throughout their range." Id. This conclusion is supported by the scientific evidence. Throughout their range, polar bears rely on sea ice for essential life functions, principally feed on ice-dependent seals, prefer sea ice located over near-shore areas of high

marine productivity, and are adversely affected by sea-ice declines.  ARL117216-19, 117223, 117274 (LR). While polar bears adopt different strategies to deal with the seasonal absence of sea-ice (for example, polar bears in the Seasonal Ice ecoregion come on land, while polar bears in the Divergent Ice ecoregion generally move north on the less productive persistent pack ice), their response to declining sea ice is essentially the same, with the same negative result: they suffer nutritional stress because they spend longer amounts of time outside of their preferred sea-ice habitats where seals are accessible.  ARL117274 (LR).  While the Service acknowledged that there may be minor differences in behavior among polar bears in different areas, it found that the similarities outweighed the differences (meaning that the "marked separation" requirement of the Service's DPS policy is not met).  ARL117298 (LR).

The Service also noted that the evidence of only "small genetic differences" among polar bears in different areas indicated, among other things, "extensive population mixing" caused by the polar bear's "large home ranges and movement patterns," further confirming a lack of marked separation.  Id.  The Service acknowledged that the genetic evidence was mixed, because genetic analyses supported delineated boundaries for some populations, "while confirming the existence of overlap and mixing among others."  Id.  On balance, however, the Service found that there were not significant morphological or physiological differences (i.e., differences in physical form or function) among polar bears that indicated physical, evolutionary adaptations to environmental differences in the particular areas, and that the small genetic differences among polar bears in different areas were "not sufficient to distinguish population segments."  Id.

The Service also examined whether international boundaries might satisfy the discreteness requirement under the DPS policy.  The Service explained that:

> each range country shares populations with other range countries, and many of the shared populations are also co-managed.  Given that the threats to the polar bear's

> sea ice habitat is global in scale and not limited to the confines of a single country, and that populations are being managed collectively by the range countries (through bi-lateral and multilateral agreements), we do not find that differences in conservation status or management for polar bears across the range countries is sufficient to justify the use of international boundaries to satisfy the discreteness criterion of the DPS Policy.

ARL117298 (LR).  Because the Service  did not find that there are any "population segments" (i.e, DPSs) that satisfy the discreteness criterion of the DPS policy, the Service rationally concluded that there were no DPSs.  Id.

Neither CBD nor CF challenge the Service's DPS policy, rather they challenge the Service's application of the policy.  CBD argues that the "core" of the Service's DPS finding is that "'there are no morphological differences or physiological differences across the range of the species that may indicate adaptations to environmental variations,' and 'small genetic differences are not sufficient . . . .'"  CBD's Mem. at 37-39.  CBD asserts that "[b]oth of these claims are contradicted by the evidence in the record and completely ignore the significant behavioral differences among polar bears in different populations and Ecoregions."  CBD's Mem. at 38 (emphasis added).

CBD is incorrect.  In fact, the Final Rule shows that the Service did consider behavioral differences among polar bears in different populations or ecoregions, but found these differences to be minor.  The Service's statement that CBD quotes, regarding "morphological differences or physiological differences," refers to, respectively, physical differences in form and function, not behavioral differences.[41]  Genetic differences also are different from behavioral differences. Missing from CBD's description of the Service's purported "core" finding is the Final Rule's

---

[41] Webster's New World Dictionary, 884, 1020 (College Ed. 1991) (defining "morphology" as "the branch of biology that deals with the form and structure of animals and plants" and defining "physiology" as "the branch of biology that deals with the functions and vital processes of living organisms or their parts and organs").

105

actual discussion of behavioral and ecological differences, which appears in the immediately following sentence:

> Although polar bears within different populations or ecoregions (as defined by Amstrup et al. 2007) may have minor differences in demographic parameters, behavior, or life history strategies, in general polar bears have a similar dependence upon sea ice habitats, rely upon similar prey, and exhibit similar life history characteristics throughout their range.

ARL117298 (LR).  This finding is supported by record evidence as explained above, and CBD fails to even acknowledge it, much less refute it.

CBD points to allegedly negative comments by USGS and Service scientists on an earlier draft of the listing rule that contained some language similar to the supposed "core" statement from the final rule regarding "morphological or physiological differences" (CBD's Mem. at 20, 38), however, the statement on which the scientists commented is not, as CBD claims, the same as the one that appears in the final rule.  CBD's Mem. at 20.  The language in the draft cited by CBD states that "there are no morphological, physiological, or <u>behavioral</u> differences across the range of the species . . . ."  CBD's Mem. at 20; ARL096589 (emphasis added).  In the final rule, the reference to no "behavioral" differences does not appear and the above-quoted sentence (acknowledging that minor behavioral differences may exist) was included.  Moreover, the statement in the earlier draft on which CBD relies was not even part of any discussion of the DPS issue.  ARL096589-90.

More broadly, CBD's repeated suggestion that Service scientists did not approve of the DPS determination (and the threatened rather than endangered determination) is simply untrue. <u>See</u>, <u>e.g.</u>, CBD's Mem. at 19-20, 39.  As explained more fully below (<u>infra</u> § VI.C.5.b), Service biologists and members of its polar bear science team wrote, reviewed, and approved of the DPS/SPR portion of the Final Rule.  For example, approximately three months prior to issuance

106

of the Final Rule, a member of the Service's polar bear science team, Rosa Meehan, prepared a draft response to the comments of the Marine Mammal Commission ("MMC") regarding the DPS issue and whether the polar bear should be listed as endangered in some areas. ARL105271-80. The draft letter is similar in most respects to the substance of the Final Rule sections dealing with these issues, indicating that the regional scientists agreed with the analysis. <u>Compare</u> ARL117297-01 (LR) <u>with</u> ARL105271-80.

CBD also incorrectly argues -- without pointing to anything specific from the Final Rule – that the Service failed to evaluate whether any of the polar bear ecoregions identified by USGS should be designated as a DPS. <u>Id.</u> Contrary to CBD's assertion, at the conclusion of the DPS discussion, the Service expressly states that "we could not identify any <u>geographic areas or populations</u> that would qualify as a DPS under our 1996 DPS Policy (61 FR 4722)." ARL117298 (LR) (emphasis added). CBD also ignores the fact that the Service also expressly refers to "ecoregions" in the above-quoted portion of the DPS analysis. <u>Id.</u> For all of the foregoing reasons, CBD's argument that the Service disregarded the views of its scientists on the DPS issue and failed to evaluate whether to designate any of the polar bear ecoregions as a DPS lacks merit and should be rejected.

CF and SCI also take issue with the Service's application of the DPS policy, however, they fail to address the Service's reasoning. CF's Mem. at 14-15. Citing a single document about polar bear genetic structure, they assert that genetic differences among polar bear populations are adequate to show the "marked separation" required. <u>Id.</u> at 15. However, under the DPS policy, marked separation "as a consequence of physical, physiological, ecological, or behavioral factors" is required. DPS Policy, 61 Fed. Reg. 4725. Here, the Service found that despite "small genetic differences," there were not significant morphological or physiological

differences (i.e., differences in physical form or function) among polar bears in different populations or regions.  CF and SCI do not address this finding.  ARL117298 (LR).[42]

CF and SCI also assert that "[p]olar bear management is also acknowledged as 'delimited by international governmental boundaries' by the [Service's] evaluation of Factor D in the Final Rule." CF's Mem. at 15.  To begin with, polar bear management is not entirely delimited by international boundaries.  As the Service noted, populations are being managed collectively by the countries within the polar bear's range through bilateral and multilateral agreements.  ARL117298 (LR).  More importantly, under the Service's DPS policy, the question is not only whether areas occupied by the species are delimited by international boundaries.  These boundaries must also be "significant in light of section 4(a)(1)(D) of the Act," i.e., significant with respect to existing regulatory mechanisms.  DPS Policy, 61 Fed. Reg. 4725.  Here, as discussed above, the Service found that the threats to the polar bear's sea-ice habitat are global in nature.  Given that the primary threat to the species – loss of sea ice due to climate change -- is a problem that no individual country's regulatory mechanisms can address, international boundaries are not meaningful or significant here.  In light of these facts, which CF and SCI do not address, the Service reasonably found that international boundaries did not satisfy the discreteness criterion of the DPS Policy.  ARL117298 (LR).

For all of the foregoing reasons, the Court should find that the Service reasonably found that there are no distinct population segments of the polar bear.

---

[42] CF and SCI also assert that this document about genetic structure establishes that polar bear populations are markedly separate behaviorally.  However, this text concerns polar bear genetic structure only, not polar bear behavior.  ARL155964.

### b.  The Service Reasonably Found That No Populations or Ecoregions Were Endangered

Although the Service did not find that any polar bear populations or ecoregions qualified as a DPS under the first element set out in the DPS policy (discreteness), the Service nevertheless considered the third element -- whether any of the 19 populations (plus one created by the USGS) or four ecoregions were currently endangered, based on their current population level and trend, habitat, and other facts.  ARL117299-301 (LR).  The Service performed this analysis as part of examining whether the polar bear qualified as an endangered species in any "significant portions of [the] range" within the purview of 16 U.S.C. § 1532(20).  ARL117297-301 (LR). Thus, whether or not any polar bear DPSs exist is beside the point, as the Service separately found that no potential DPS (population or ecoregion) is currently endangered.

The Service's analysis underlying its finding that none of the 20 polar bear populations are currently endangered is set forth above (supra § VI.B.1.d).  In summary, the Service found that: (1) 15 of the 20 populations are increasing in numbers, stable, or without data showing a decline; (2) of the five populations identified as in decline, only one had a statistically significant decline in numbers based on reliable data (Western Hudson Bay); and (3) the Western Hudson Bay population has been undergoing a gradual rather than precipitous decline, is still reasonably large, and cub reproduction and recruitment are still occurring.  ARL117299-01 (LR).  With respect to the four ecoregions, the dispute over endangered status concerns only the Seasonal and Divergent Ice Ecoregions.  ARL117299 (LR).  Building on its analysis of the status of individual populations, the Service found that both of these ecoregions "currently are estimated to have

large numbers of bears,[43] and there is no evidence of any population currently undergoing a precipitous decline."  ARL117299-300 (LR).

CBD claims that the Service's finding that none of the polar bear populations (individually or as part of an ecoregion) is currently endangered "is contrary to the scientific evidence."  CBD's Mem. at 25.  However, CBD largely ignores and does not dispute the Service's evidentiary findings regarding the current population numbers and trends, habitat, and other immediate facts with respect to individual populations, which formed the basis for the Service's finding that the polar bear is not currently endangered.  CBD instead makes legal arguments that are thinly disguised as factual ones – premised on its incorrect legal argument that the Service is required to list a species as endangered whenever it faces a high probability of extinction, regardless of the imminence of the extinction risk.

For Western Hudson Bay, CBD asserts that the Service found that the population is not currently in danger of extinction "because 'reproduction and recruitment are still occurring.'"  CBD Mem. at 31.  CBD distorts the basis of the Service's finding.  The Final Rule expressly states that the Service found that the Western Hudson Bay population is not currently endangered because "the current rate of decline for the  . . . population is gradual rather than precipitous, reproduction and recruitment are still occurring, and the current size of the population remains reasonably large."  ARL117300 (emphasis added).  CBD does not dispute these findings, and thus cannot show that the Service's determination is irrational.

CBD similarly ignores the Service's findings with respect to the Southern Beaufort Sea population: that the population "remains fairly large," that "reproduction and recruitment is still

---

[43] The Seasonal Ice ecoregion is believed to contain about 7,200 bears, while the Divergent Ice ecoregion is believed to contain up to 9,500 bears.  ARL117221-22 (LR).

occurring," and that "changes in the sea ice have not yet been associated with changes in the size of the population."  ARL117301 (LR).  Rather than addressing the Service's finding that the population is not currently in danger of extinction, CBD leaps to arguments about the future status of the species, asserting that there is "an extinction probability of around 35-40 percent per year at year 45" and that the "risk of extinction 'exceeds 75% by the end of the century.'" CBD's Mem. at 32.[44]  With respect to Baffin Bay, CBD likewise argues that there is a high risk of a future population decline, citing a table that (as CBD does not disclose) reports the percentage likelihood or risk of a "decline after 15 years" (ARL053271).  CBD's Mem. at 33.  CBD's argument fails because, as discussed above, it is premised on CBD's incorrect interpretation of the term "endangered" as including a species facing a high probability of extinction any time in the future (see supra § VI.C.1.a).

CBD also argues that polar bears in "some areas" are endangered by severe hunting. CBD's Mem. at 41.  In making this argument, CBD relies on a table from the Final Rule which it claims shows a high likelihood of a future decline in numbers from hunting in certain populations.  Id.; ARL117283 (LR).  There are several major flaws with this argument.  First, the likelihoods of decline in the table are not solely from hunting, as CBD claims.  Rather, they are the probability of a decline in general, including from reduced "vital rates" (e.g., those caused by sea-ice declines).  ARL117283 (LR) (footnote a).  Further, while the table provides a "likelihood of decline (next ten years)" – the table does not support CBD's argument because it does not provide the size and rate of the decline.  Id. (noting in a footnote that the probability of "any

_____

[44] CBD claims that the Service misrepresents the USGS' projection of future declines for the Southern Hudson Bay population in Hunter, et. al 2007 (CBD Mem. at 32); however, the Service fully recognized (as CBD states) that in that report, the USGS projected future population declines based on a decline in sea ice conditions going forward.  See supra § VI.C.3.d; ARL117273, 117275-76 (LR).

decline" is shown).  For instance, a population could have a 99.9% likelihood of a gradual 2% decline over ten years, which could be indicative of a threatened as opposed to endangered listing.  Nor does the table show that any population has a high future probability of extinction (as opposed to an unspecified decline), which CBD claims is the sole question here.

CBD appears to claim that ten polar bear populations are endangered by severe overhunting.  CBD's Mem. at 41.  However, as explained above, the Service identified four of these populations (Lancaster Sound, Gulf of Boothia, Foxe Basin, and Davis Straight) as currently stable in numbers based on the best information available.  ARL117221 (LR); supra § VI.B.1.d.  While the Service found that four of the identified populations are declining (Norwegian Bay, Kane Basin, Western Hudson Bay, and Baffin Bay), it examined whether they were currently endangered based on their current numbers, habitat, rate of decline, and other facts and found that they were not.  ARL117299-01 (LR); supra § VI.B.1.d.  The Service examined harvest as a component of this analysis, finding that even with ongoing harvest in two of these populations (Western Hudson Bay and Baffin Bay), they were not currently endangered. Id.[45]  The last two of the ten populations identified by CBD (Chukchi Sea and East Greenland) are data deficient, and therefore the available information does not indicate that the populations are currently endangered.  ARL117299 (LR); supra § VI.B.1.d.  CBD does not identify any evidence to the contrary.[46]

---

[45] As to Norwegian Bay and Kane Basin, the table cited by CBD shows that the identified permitted harvest is relatively small and below the maximum estimated sustainable yield (i.e., maximum harvest). ARL117283 (LR).

[46] As to these two populations, CBD points only to anecdotal information that does not show that they are currently endangered from hunting.  For the Chukchi Sea, CBD cites only statements in the Final Rule that the population "may" be overharvested and that severe overharvest "is suspected" to have occurred, not data showing actual overharvest or a current precipitous decline

CBD also argues that the Service was required to examine whether the "significant threat" of overharvest, in combination with that from global warming, made the polar bear (or any DPS or SPR) currently endangered, and claims the Service failed to do so. CBD's Mem. at 45. However, as discussed above, the Service found that none of the five populations in decline were currently endangered, based on their current population, rate of decline, and other facts. The Service found that the remaining populations – which were either increasing in numbers, stable, or no information indicated a decline – also were not currently endangered. The effects of any hunting are necessarily encompassed in the Service's analysis of the status of these populations. In other words, if any of these populations were experiencing a precipitous decline in numbers, or were imminently faced with such a decline, because of the combination of climate change and overharvest, then the Service would have found them to be endangered based on such a decline. But none of them were experiencing or imminently facing such a decline based on the best available data. As indicated above, the Service also expressly considered hunting where warranted as part of its examination of whether individual populations were currently endangered. ARL117299-301.[47] Thus, the Service did analyze whether any populations were currently endangered from a combination of climate change and overharvest, contrary to CBD's argument.

---

from hunting. CBD's Mem. at 41; ARL117282 (LR). For East Greenland, CBD cites a statement that substantial harvest occurs in the absence of a scientifically derived population estimate, however that does not mean that the population is declining from hunting, let alone precipitously declining such that it is endangered. CBD's Mem. at 41; ARL117284 (LR).

[47] The Service's analysis does not address hunting for Southern Beaufort Sea, Kane Basin, and Norwegian Bay, but the harvest in these populations is below the maximum sustainable harvest. ARL117283 (LR) (Table 2).

In the course of arguing that the polar bear is currently endangered by overhunting in some populations, CBD also asserts that the Service wrongly found that hunting did not currently threaten the polar bear, and that the Service failed to examine the combined threat from hunting and sea-ice declines.  See, e.g., CBD's Mem. at 43 (referring to the Service's allegedly "arbitrary conclusion that overhunting does not threaten the polar bear").  In making this argument, CBD relies on a series of emails from Service personnel in the Alaska region.  Id. at 42-43.  CBD claims that these emails establish that the regional personnel advocated identifying overharvest as a threat for at least some populations.  Id.  First of all, CBD's argument, even if it were correct, is a moot point.  The Service listed the polar bear as threatened based mainly on habitat loss (factor A).  Changing the Service's finding under factor B (overutilization) from "no threat" to "threat" (for the species as a whole or individual populations) would still result in a threatened listing, because any one factor is sufficient to support a threatened listing.   16 U.S.C. § 1533(a)(1).

Furthermore, all but one of the emails cited by CBD concern edits to the draft 4(d) rule and are part of the 4(d) rule record, not that for the listing rule.  Id. at 43-45 (citing "AR4D" documents).   As stated above (supra § V), a reviewing court should determine agency compliance with the law solely on the record on which the decision was made.  Overton Park, 401 U.S. 402; Camp v. Pitts, 411 U.S. 142.  Accordingly, the Court should disregard CBD's arguments based on documents from the 4(d) record.[48]  CBD also ignores that the December 14, 2007 draft final listing rule (which CBD acknowledges was transmitted from the Service's

---

[48] If the Court deems it proper to consider documents from the 4(d) rule record, the Service notes that its Alaska Regional Director, Tom Melius, issued an email on February 27, 2008 that clarifies and retracts the comments made by region personnel in the earlier email exchange cited by CBD regarding the 4(d) rule language.  AR4D006925.

114

Alaska office to Washington, see CBD's Mem. at 18) did not identify overharvest as a current threat to the species.  ARL097126-27; ARL097892.  Rather, that December 14, 2007 draft, like the Final Rule, recognizes that harvest could become a threat in the future for populations experiencing nutritional stress or declining population numbers as a result of habitat change. ARL097126-27; ARL097892; ARL117284 (LR).

For the foregoing reasons, the Service's finding that the polar bear is threatened but not endangered in any population or ecoregion is based on a proper reading of the statute, is consistent with agency practice, and relies on a reasonable interpretation of the evidence that is entitled to deference by this Court.

### c.      The Service Reasonably Found That the Polar Bear Is Threatened Throughout Its Range

In their supplemental briefs, SCI and CF argue that the Service should not have listed, and did not adequately consider whether or not to list, the polar bear in the Archipelago and/or Convergent Ice ecoregions.  SCI's Mem. at 5-8; CF's Mem. at 18-20.  This argument is incorrect.  As discussed above (supra § VI.B.1.a.iv) and explained further below, the Service considered the science and data regarding this issue and reasonably decided to list the species as threatened range-wide.  As part of its broader analysis of listing Factor A, the Service found that while the impacts of sea-ice declines on polar bear populations will vary in their timing and magnitude, all populations are likely to be negatively affected by sea-ice declines and become endangered within the foreseeable future.  ARL117244-45, 117252-53, 117279-80 (LR).[49]

---

[49]  SCI points out that there is a separate section of the rule regarding whether the polar bear is endangered in any DPS or SPR, but no similar separate section dealing with whether the polar bear is not threatened somewhere.  SCI's Mem. at 7 (citing ARL117299-01 (LR)).  However, the absence of a separate section does not mean that the Service did not consider this issue.  The

As the Service found, the amount and quality of sea ice are declining and are projected to continue to decline across the range, including in the Archipelago and Convergent Ice ecoregions.  Id., ARL117275 (LR).  Sea-ice losses in the Archipelago and the Convergent Ice ecoregions were the largest observed to date in 2007.  ARL117275 (LR).  The USGS also projected significant declines in optimal bear sea-ice habitat for the Northern Beaufort Sea and East Greenland populations in the Convergent Ice ecoregion by mid-21st century (based on the climate model ensemble mean), as well as an overall decline for that ecoregion.  ARL117274-75 (LR); ARL129054.

In finding the polar bear to be threatened throughout its range, the Service also relied on the fact that Arctic sea-ice declines are outstripping climate model projections.  ARL117224, 117275, 117280 (LR).  The Service noted that the September 2007 record low sea-ice conditions "are an extension of an accelerating trend of minimum sea ice conditions and further support the concern that current sea ice models may be conservative and underestimate the rate and level of change expected in the future."  ARL117280 (LR).  Thus, the Service balanced model projections against actual observed sea-ice declines, did not equate the models with the maximum "rate and level of change expected in the future," and ultimately concluded that polar bears were likely to become endangered due to sea-ice declines even in areas where ice is projected to last relatively longer by the models.  Id.  Consistent with this conclusion, the IUCN has identified the polar bear as a "vulnerable" species throughout its range.  ARL004257-59.

CF asserts that "the IPCC climate models predict that the bears of the Canadian Archipelago . . . will have summer sea ice for at least the next 50 years."  CF's Mem. at 20.  In

---

Service considered this issue as part of its analysis of whether the polar bear was threatened throughout its range.  See supra § VI.B.1.a.iv; ARL117297-98 (LR).

support of this assertion, CF cites comments of the Government of Nunavut (which opposed listing), not any IPCC data. Id.; ARL061379. Further, the cited comments only claim that 60% of the models "predict summer ice throughout the next 40-50 years." Id. In other words, the models predict that ice will not completely melt away in summer, not that sea ice will not decline in the Archipelago ecoregion. As stated above, sea ice is already declining in the Archipelago ecoregion, and in 2007 these declines encroached well into the more northerly central Arctic basin. ARL117220 (Figure 1), 117275, 117280 (LR). As the Service noted, "Arctic sea ice receded so much in 2007 that the so-called 'Northwest Passage' through the straits of the Canadian Arctic Archipelago completely opened for the first time in recorded history . . . ." AR117224 (LR). Further, as the Service noted, many of the climate models predict that the entire Arctic will be ice-free in summer by the mid-21st century. ARL117296 (LR).

SCI argues that the USGS population models demonstrate that polar bears are not threatened in the Archipelago and Convergent Ice ecoregions. SCI's Mem. at 6. To the contrary, as discussed above (supra § VI.B.1.a.iv), the models are evidence that polar bears will experience population declines in all four ecoregions. The more sophisticated Bayesian Model projects that in the Convergent Ice ecoregion, a population "smaller in numbers" or "rare" was the predominant outcome at year 45, while in the Archipelago ecoregion, the most probable outcome at year 45 was a smaller population. ARL117278 (LR). The Carrying Capacity Model, while more simplistic and conservative because it does not take all factors into account, also generally indicates a decrease in numbers in these two ecoregions from sea-ice declines. ARL117277 (LR).

SCI refers to the Bayesian Model's projected loss of two-thirds of polar bears in the Seasonal and Divergent Ice ecoregions by year 45 (see ARL117278 (LR), and argues that, even

in such a circumstance, that would still leave one-third of polar bears remaining, i.e., in the other two ecoregions (the Convergent Ice and Archipelago ecoregions).  SCI's Mem. at 6.  SCI essentially argues that since complete extirpation is not the most likely outcome shown by the Bayesian Model for the Archipelago and Convergent Ice ecoregions by year 45, the Service was required to find that polar bears are not threatened in these regions.

There are major flaws with this argument.  First, even if the Service were required to find, based solely on the Bayesian Model, that some number of polar bears –  predominantly a "smaller" or "rare" number in the Convergent Ice ecoregion and a "smaller" number in the Archipelago ecoregion (ARL117278 (LR) – would persist through the end of the 45-year foreseeable future, that does not mean that this reduced number of polar bears would not be in danger of extinction by the end of that period.  The ESA defines a threatened species as one that it likely to become in danger of extinction – not extinct – within the foreseeable future.  Second, the Bayesian Model outcomes are premised on the climate model projections of sea-ice declines.  ARL117277 (LR).  As explained above, in finding that the polar bear is threatened throughout its range, the Service noted that observed sea-ice declines are outstripping these model projections.  ARL117275, 117280 (LR).  Thus, the Bayesian Model projection that even a reduced number of polar bears may persist in the Archipelago and Convergent Ice ecoregions may understate the likely impact on polar bears in these regions.

Third, as discussed above, the Service reasonably determined that it could not rely on the specific numerical probabilities of outcomes in the Bayesian Model, given that it was a preliminary, first-generation effort.  ARL117278 (LR).  SCI essentially is arguing that the Service was required to deem the Bayesian Model controlling, conclusive evidence and find that some number of polar bears would in fact persist in the Archipelago and Convergent Ice

ecoregions at year 45.  This is very similar to CBD's argument that the Service was required to find as fact the specific probabilities that the polar bear would be extirpated in the other two ecoregions, and is wrong for the same reasons discussed above.  The Service is the expert finder of fact here and may draw reasonable conclusions from the evidence -- particularly from a predictive, first-generation model.  Ethyl Corp., 541 F.2d at 36; State of New York, 969 F.2d at 1150; American Wildlands, 530 F.3d at 1000.  In this case, considering all of the record evidence including the extent of recent sea-ice declines in the more northerly areas of the Arctic, the Service reasonably concluded that the polar bear is threatened throughout its range.

Citing a statement in the Final Rule, SCI also asserts that the Service based its threatened determination on a finding that polar bears only will be "affected" by sea-ice declines range-wide, and that "being 'affected'" is not enough for a threatened listing under the ESA.  SCI's Mem. at 7 (citing ARL117253).  SCI takes the Service's statement out of the context of the larger rule.  The Service found that sea-ice declines "affect" polar bears by, inter alia: (1) increasing the energetic demands of movements on sea ice (ARL117260-61 (LR)); (2) forcing polar bears to seasonally adjust to greater time spent on land or less productive deep water areas, causing nutritional stress (ARL117261-63 (LR)); (3) causing reduced prey (seal) productivity and availability (ARL117263-64 (LR)); (4) causing reduced hunting success even when seals are present (ARL117266-67 (LR)); (5) increasing hazardous open-water swimming by polar bears (ARL117267 (LR)); and (6) reducing access to maternal denning areas and otherwise impairing reproductive success (ARL117267-70 (LR)).  See also AR 117279, 117296 (LR).  The Service further predicted that these and other adverse impacts are likely to translate to a steady decline in the physical condition of polar bears, leading to declines in polar bear reproduction and survival, and ultimately a decline in their numbers.  Id.; ARL117260, 117265-66, 117270-71 (LR).  Thus,

the Service found more than just that polar bears would be "affected" by sea-ice declines. Based on the science and evidence, it reasonably determined that the polar bear is likely to become an endangered species throughout all of its range because of sea-ice declines.

5.     **Plaintiffs' Claims of Procedural Irregularities Are Unfounded**

a.     **The State of Alaska's Section 4(i) Claim is Unreviewable, and, In Any Case, Without Merit**

In its supplemental brief, the State of Alaska attempts to challenge the Service's compliance with ESA Section 4(i), 16 U.S.C. § 1533(i), which requires the Secretary to submit "a written justification" to a State agency "for his failure to adopt regulations consistent with the agency's comments or petition." Alaska's Mem. at 6-15. Alaska does not dispute that a written justification was provided; rather, it asserts that the Service's response was inadequate. The State's claim is unreviewable, however, for two reasons. First, the "written justification" is not a final agency action because no legal consequences flow from it. Second, this subsection of the ESA is committed to agency discretion by law because it contains no standards by which the Court could gauge the Secretary's compliance. Moreover, even if the claim were reviewable, it lacks merit. In addition to the explanation provided in the Final Rule, the Service provided a timely written justification that addresses all of the State's comments. This is all the ESA requires; the Statute does not require the Service to "adopt regulations consistent with [a state] agency's comments or petition," as Alaska suggests. Finally, the remedy for such a violation, if there was one, would be to require the Secretary to complete a new written justification, not to set aside the listing decision.

(i)     **Background of Compliance with Section 4(i)**

Pursuant to ESA Section 4(i), after the Secretary has issued a regulation proposing to list a species, if a State agency

120

> files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments . . . the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

16 U.S.C. § 1533(i); see also 50 C.F.R. § 424.18(c).  In this case, after the Secretary issued a proposed rule to list the polar bear on January 9, 2007, as well as after the USGS reports were published and made available for public comment on September 7, 2007, respectively, the State of Alaska, including the Alaska Department of Fish and Game, provided comments in disagreement with the proposed regulation.  ARL084242-43, 084248-74, 124734-35, 124961-5006.  The Secretary's Final Rule listing the polar bear as threatened was published on May 15, 2008.  The Final Rule and the Service's separate 76-page response to comments on the USGS reports address the five issues raised by Alaska that are identified in its supplemental brief.[50] Alaska's Mem. at 1-2.  In addition, the Secretary, through the Director of the Service, provided a written justification to the State's comments in a 45-page justification letter on June 17, 2008, again responding to these five issues.[51]

The Service satisfied the requirement of ESA Section 4(i) to submit a "written justification" by providing the State with the June 17, 2008 letter.  The State's arguments as to the adequacy of the written justification, Alaska's Mem. at 6-15, are not subject to judicial review because the written justification is not a final agency action and because determining how to respond to comments submitted by States under ESA Section 4(i) is firmly committed to the

---

[50] ARL110163-64, 110167-68, 110171-72, 110175 (Carrying Capacity Model); ARL110164-65, 110169 (Bayesian Model); ARL110123-25, 110133-38 and ARL117242 (LR) (SBS population); ARL117243-44 (LR) (foreseeable future); ARL110113-14, 110146-48 and ARL117244-45, 117247-49, 117252-53 (LR) (scientific uncertainty and regional impacts).

[51] ARL011394-95, 011405-08 (Carrying Capacity Model); 011405-08 (Bayesian Model); ARL011389, 111399-403 (SBS population); ARL011365-66, 011382-83 (foreseeable future); ARL011363-70, 011395-98 (scientific uncertainty and regional impacts).

Service's discretion.  The ESA does not contain any standard(s) by which a court could gauge the Service's compliance with Section 4(i).

### (ii)       The Written Justification is Not Final Agency Action

Judicial review under the APA is limited to final agency action.  5 U.S.C. § 702, 704. The Supreme Court has established a two-part test to determine when an agency action is reviewable as "final."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997).  First, the action under review must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  Id.  Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.  Id.  Application of these principles to this matter illustrates that the Service's written justification is not final agency action within the meaning of the APA.

Here, while Defendants acknowledge that the written justification may mark the consummation of the agency's decisionmaking process, it is not an action by which rights or obligations have been determined, or from which legal consequences will flow.  The Final Rule is the action that determines the rights and obligations of the State of Alaska, and others, with respect to polar bears by designating the polar bear as a threatened species.  The written justification merely provides the State with an explanation of the reasons why the Service adopted a final rule that disagreed with the State's comments.  The justification does not obligate the State or any other entity to abide by any legal requirements.  Accordingly, the justification letter is not challengeable final agency action.  Bennett, 520 U.S. at 177-78.

### (iii) The Substance of the Written Justification is Committed to Agency Discretion by Law, and thus Not Reviewable

Even if the written justification were a final agency action, it is still not reviewable because the substance of the justification is committed to the Service's discretion by law. Section 10 of the APA, 5 U.S.C. § 701(a)(2), makes judicial review inapplicable "to the extent that agency action is committed to agency discretion by law." Agency action is deemed to be committed to agency discretion when "statutes are drawn in such broad terms that in a given case there is no law to apply," Overton Park, 401 U.S. at 410 (internal quotations omitted), or there is "no meaningful standard against which to judge the agency's exercise of discretion," Heckler v. Chaney, 470 U.S. 821, 830 (1985). As the Supreme Court has stated, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action." Id.

In this case, ESA Section 4(i) provides "no meaningful standard against which to judge the agency's exercise of discretion." Id. The statute states that "the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition." 16 U.S.C. § 1533(i). Nowhere in this subsection is there any standard for how or when the Secretary must prepare the "written justification" or what it must contain. Therefore, the substance of the letter is committed to agency discretion by law and unreviewable.

Challenges to statutory provisions similar to the one challenged here have been rejected as unreviewable pursuant to APA Section 10. See, e.g., Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) ("Hodel"); Natural Res. Def. Council v. Lujan, 768 F. Supp. 870, 881-83 (D.D.C. 1991). In Hodel, the petitioners claimed that the Secretary of Interior

violated a section of an appropriations act directing the Secretary to submit to Congress his response to certain designated proposals for outer continental shelf leasing because he did not adequately explain his rejection of three proposals.  The appropriations act required the Secretary to "indicate in detail why any specific portion of the proposals . . . was not accepted" and include the explanation in his final outer continental shelf program proposal to Congress.  865 F.2d at 316 & n.27.  The court held that the response was not reviewable for two reasons.  First, because the agency was not exercising prototypical agency power, but rather was "simply reporting back to the source of its delegated power," the function of judicial review of agency action had no place.  Id. at 318-19.  Second, the appropriations act section being challenged provided no basis for "formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of § 111."  Id. at 319.

The statutory provision at issue in this case is very analogous to the one rejected in Hodel.  Section 111 of the appropriations act challenged in Hodel requires the Secretary of Interior to explain his reasons for rejecting proposals for outer continental shelf leasing.  Similarly, ESA Section 4(i) requires the Secretary of the Interior to explain his reasons for not adopting regulations that are consistent with a State agency's comments.   Neither provision provides a standard for determining compliance.  Finally, while the provision in Hodel required the Secretary to report back to Congress, rather than a State agency, the function of judicial review of agency action equally has no place in this case because the agency is not exercising prototypical agency power.

The State of Alaska's attempt to inject a standard using the preamble to the Service's Section 4(i) regulation is unavailing.  Alaska's Mem. at 7.  To begin with, the statute, the regulation, and the legislative history contain no standard for the substance of the written

justification.   Even if the Court could look beyond these documents to the preamble of the regulation, the preamble's statement that the Service "adequately inform" State agencies "of the basis for any action that is not in agreement with that agency's recommendation" does not provide any more concrete a standard than the statute, regulation, or legislative history.   49 Fed. Reg. 38900, 38906 (Oct. 1, 1984).   Rather, the preamble statement is the Service's acknowledgement that the statute provides it with wide latitude in how to respond to State agency comments.   Indeed, the Service rejected the suggestion of one commenter to create a concrete standard.   The Wildlife Legislation Fund of America "recommended that any justification provided a State agency under § 424.18(c) be required to, '* * * set forth the reasons that the State agency's position was rejected, in sufficient detail and with sufficient supporting data, that the agency may have an evidentiary basis for comparing its position with that of the Secretary.'"   Id.   The Service responded to the comment by stating that it does "not believe that Congress intended to establish such a strict standard for justifications to State agencies."   Id.

Since the substance of the response provided pursuant to ESA Section 4(i) is committed to agency discretion by law, it is unreviewable.   Accordingly, the State of Alaska's Section 4(i) claim should be dismissed.

> **(iv)**     **Even if the Written Justification Were Reviewable, it is Rational and in Full Compliance with the Requirements of Section 4(i)**

Even if the Court were to determine that the substance of the letter is reviewable, the Service provided a timely and more than adequate justification explaining why it did not adopt a regulation consistent with Alaska's comments.   The Service provided Alaska with a response a little more than a month after publication of the Final Rule, consistent with the plain language of the statute.   ARL011361-408.   The Service addressed many of Alaska's comments in the Final

Rule and in the Service's response to comments on the USGS reports, but also addressed them in its 45-page response letter.  Consequently, the letter adequately informs the State of the basis for the Final Rule and the reason for not adopting a regulation consistent with the State's comments.

Contrary to the State of Alaska's contention, the Service appropriately provided its written justification letter five weeks after publication of the Final Rule.  Alaska's Mem. at 7 ("Despite the Service's mandatory obligations under Section 4(i), Alaska received only a post-decision response from the Service five weeks after the Service's promulgation of the Final Rule.").  Alaska provides no authority for its contention that a post-decision response is contrary to Section 4(i) and none exists.  In fact, the plain language of the statute directly contradicts Alaska's argument.  Section 4(i) states that if a State agency "files comments disagreeing with all or part of [a] proposed regulation, <u>and the Secretary issues a final regulation which is in conflict with such comments</u>, . . . the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments . . . ."  16 U.S.C. § 1533(i) (emphasis added).  Alaska fails to explain how the Secretary possibly could justify his failure to adopt a regulation consistent with the States' comments if he provided a written justification before adopting the regulation.  Indeed, until the Secretary adopts a regulation, there would be no conflict with the State.  Thus, the Service correctly provided its written justification after issuance of the Final Rule.  The Service did so within a reasonable timeframe, although no timeframe is required by the statute.

The Service also complied with Section 4(i) by providing a more than adequate justification for not adopting a regulation consistent with all of the State of Alaska's comments, including the five issues identified in Alaska's brief.  Alaska's Mem. at 1-2, 7-15.  As stated above, these comments are all addressed in the Final Rule itself and in the Service's response to

comments on the USGS reports.   Moreover, the Service's detailed letter to Alaska totals 45 pages, with each of the five comments being addressed thoughtfully and in detail (as stated above). While Alaska may have preferred an even more detailed explanation, none is required.

San Luis v. Badgley, 136 F. Supp. 2d 1136 (E.D. Cal. 2000), does not support Alaska's arguments that the Service's written justification in this case is inadequate.   Alaska's Mem. at 9-10, 13.   In San Luis, the Service had failed to provide any written justification to the State agency.   136 F. Supp. 2d at 1151.   In addition, the court found that the Service had ignored significant evidence contained in the administrative record that directly conflicted with its decision.   Id.   In this case, in contrast, Alaska concedes that the Service provided a written justification.   Alaska's Mem. at 4.   Furthermore, Alaska does not point to any data or information that the Service ignored.   Rather, it argues that the Service did not adequately explain its consideration of certain USGS reports.   Id. at 1-2.   As such, San Luis is distinguishable and does not provide any reason for the Court to disturb the written justification provided here.

> **(v)   Section 4(i) Does Not Support Alaska's Requested Remedy of Setting Aside the Service's Listing Determination**

Finally, even if the Court were to find that it could review the Service's written justification and that the justification was not adequate, the remedy would be to remand the 4(i) justification to the Service with instructions to provide a justification that complies with the statute.   Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C. Cir. 1991).   The remedy would not be, as Alaska contends, for the Court to set aside the Final Rule listing the polar bear as threatened.   Alaska's Mem. at 15.

**b.      The Secretary's Decision to List as Threatened is Consistent with the Expert Recommendations of Service Biologists, and Was Not an Improper Political Decision**

CBD erroneously suggests that the Secretary's decision that the polar bear "(either in whole or in part) did not warrant 'endangered' listing" was a "political, rather than scientific decision."  CBD's Mem. at 15-21.  The Court should reject this assertion because CBD cannot provide evidence demonstrating that "but for" any alleged political influence on the process, the Service would have listed the polar bear as endangered because of threats in a significant portion of the species' range or in distinct population segments.  Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 22 (D.D.C. 2001).  Most fatal to CBD's contention is that it cannot provide any evidence that any Service scientist ever recommended listing the polar bear as endangered in whole or in part, because no such recommendation was ever made.  CBD thus entirely fails to set forth a cause of action for improper political influence and the Court should disregard CBD's assertions to the contrary.

CBD attempts to support its contention that the decision not to list the polar bear as endangered in whole or in part was political by pointing to three points in the process leading to the final listing determination: (1) the Service's decision not to utilize a structured decision making ("SDM") process to make the final listing determination; (2) the development of the portions of the Final Rule on DPS and SPR; (3) the Service's decision to develop a 4(d) Rule; and (4) meetings held in Washington shortly before the final listing determination.  CBD's Mem. at 18-21.

As an initial matter, the fact that the Service decided not to use structured decision making, that the DPS and SPR portions of the Final Rule were drafted by the Washington Office, that the Service decided to develop a 4(d) Rule, and that meetings were held to discuss the

128

possible implications of listing the polar bear do not rise to the level of improper political interference in the decision not to list the polar bear as endangered in whole or in part.  CBD overlooks entirely the fact that decisions of an administrative agency are entitled to a presumption of regularity.  Overton Park, 401 U.S. at 415 (agency decision is entitled to a presumption of regularity), abrogated on other grounds, Califano v. Sanders, 430 U.S. 99 (1977); United States v. Chemical Found., 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") (citations omitted).

> To state a cause of action for improper political influence on an administrative agency, there must be some factual basis for a claim that:  1) the content of the pressure on the agency was to force it to decide upon factors not made relevant by Congress in the applicable statute; and 2) the agency's determination must have been affected by those extraneous considerations.

Town of Orangetown v. Ruckelshaus, 579 F. Supp. 15, 20 (S.D.N.Y. 1984) (citing Sierra Club v. Costle, 657 F.2d 298, 409 (D.C. Cir. 1981)).

Here, even accepting CBD's assertion that these four points in the process represent political influence on the process, they do not represent improper political influence because they do not show that there was an intention to force the agency to make its decision on anything but the factors provided in the statute or that, even if there was such intention, that the decision was affected by such extra-statutory factors.  On the contrary, it is clear from the record that the Service considered the five listing factors, after taking into consideration efforts made by States and foreign nations, and used the best available science in reaching its final decision.  Moreover, while CBD does not show involvement by political appointees in the process, even if it did, some involvement is contemplated by the statute – which leaves the final determination to "the Secretary."  16 U.S.C. § 1533(a).

Furthermore, as explained below, CBD is incorrect about each of these points as a factual matter.  With respect to the first point, CBD correctly notes that the Service considered using SDM to assist the decision makers in reaching a final listing determination.  SDM is an optional management tool that is sometimes used to help decision makers in ESA listing determinations.  In this case, the potential use of SDM was suggested by management, not by the scientists.  ARL062000, 062217, 062331, 062332, 77968-69.  A team of the Service's scientists from outside the Alaska region was assembled and some of the members met periodically on preliminary matters between June and September 2007.  ARL003802, 111178-79.  In September 2007, the Service abandoned its efforts to use SDM.  ARL082870.  The decision not to use this optional tool was driven not by concerns about "unhelpful facts," CBD's Mem. at 18, but primarily because of concerns that the SDM process would take too long and would require the Service to ask for an extension of time for the court-ordered final determination, which was not likely to be granted given the litigation history.  ARL062457, 062466, 062644, 062655, 063658.

With respect to the second issue, at no point either before or after the Service determined not to use a SDM process did the Service take the review of the listing status for the polar bear out of the hands of the Service's scientists or exclude the scientists from providing input on the sections of the Final Rule dealing with DPS and SPR.  CBD's Mem. at 18-20.  The record demonstrates that, because the Service's regional scientists were unfamiliar with preparing DPS and SPR analyses, they struggled with these determinations and requested assistance from the Washington Office of the Service and the Department of the Interior's Solicitor's Office.  ARL105289, 111178, 111182-83.  In the end, a Service scientist in the Washington office, Kurt Johnson, also a member of the SDM team, did an initial draft of these portions of the Final Rule.  ARL106017.  These drafts were provided to and commented on by the regional scientists.

130

ARL105281, 105289, 105294.  Thus, the drafting of these analyses and review of the proper listing status for the polar bear was entirely within the hands of the scientists, not political appointees.

With respect to the third issue, CBD incorrectly suggests that the threatened determination was driven by a need to have a 4(d) rule.  CBD's Mem. at 19.  In support of its contention, CBD cites to an e-mail from the 4(d) record.  Id. (citing AR4D2804).  The Court should disregard CBD's argument on this basis alone, because only the record for the listing decision is before the Court on CBD's challenge to the listing determination, not the 4(d) record.[52]  Overton Park, 401 U.S. 402; Camp v. Pitts, 411 U.S. 142.   In any case, the proposed rule and draft final rule authored by career Service biologists demonstrate that the threatened determination was appropriate regardless of the need for a 4(d) rule.  ARL09692526, 098283-619, 024432-33, and 024437-545.

Finally, the meeting notes CBD points to as evidence that "the Secretary and others were concerned with political, rather than scientific, factors" occurred after the decision to list the polar bear as threatened throughout its range had been made.  CBD's Mem. at 21 (citing ARL112032 and ARL116781).  Furthermore, there is nothing in the notes from these meetings to

---

[52]  CBD cites to a December 11, 2007 e-mail from the 4(d) record which indicates that the Service's Washington Office received direction concerning the drafting of a 4(d) rule as a result of a conversation between the Service Director and the Secretary, and posits that the draft threatened determination was submitted to Washington at the same time that the Service and Interior political appointees decided to issue a 4(d) rule.  CBD's Mem. at 19 (citing AR4D2804).  If the Court deems it proper to consider documents from the 4(d) rule record, the Service notes that CBD fails to acknowledge that career Service officials contemplated the issuance of a 4(d) rule well before this conversation between the Director and the Secretary and before submission of the draft final rule from the Region.  See AR4D002392.  In addition, non-political Service staff produced briefing papers presenting the options for issuance of a 4(d) rule prior to this conversation and submission of the draft final rule to Washington.  See AR4D002563 and AR4D002660.

suggest that the Secretary considered improper factors in the listing determination.  The April 22, 2008 notes appear to discuss the regulatory mechanisms for addressing climate change (Factor D) and the "Regulatory Implications for Consultations under Section 7 of the Act" portion of the preamble to the Final Rule (see ARL117303 (LR)).[53]   These issues were raised in public comments on the proposed rule.  See, e.g., ARL117256 (comment #72) and ARL117303 (LR). The May 14, 2008 notes appear to outline reasons in support of listing and possible responses from environmental groups to the threatened determination.  ARL116781 ("why not not list"-- double negative meaning why to list).   Most importantly, by April 22, 2008, the Service's threatened determination already had been submitted for policy review, and these deliberations did not change the decision that was proposed by the Region and Service scientists and, ultimately, issued by the agency.[54]   As for the May 14, 2008 meeting, this is the date that the Service issued the final polar bear listing announcement.  The final listing determination already had been made, and these notes represent the Department's preparation for the media/public roll-out of the decision.  See ARL117307 (LR) (Final Rule on file with the Federal Register May 14, 2008 at 3:15 p.m.).

In sum, CBD's attempt to raise the specter of improper political interference fails because it lacks legal and factual support.  Contrary to CBD's contention, there is no evidence that any Service scientist ever recommended listing the polar bear as endangered in any fashion.

---

[53] The Service never was able to identify who participated in these meetings, as indicated on the index to the administrative record.

[54] ARL096925 (memo dated 12/14/07 from AK to WO conveying final determination as threatened); ARL096927, 097633 (draft rule transmitted from AK to WO); ARL102750 (draft from 1/19/08 still showing threatened determination); ARL104818 (briefing for the director, recommendation from AK for threatened determination); ARL109318 (draft from 3/13/08 still showing threatened determination); ARL1111237 (draft from 4/11/08 showing threatened determination).

### c.      The Service Adequately Responded to CF's Comments

The administrative record demonstrates that the Service considered and responded to all significant points raised in the comments submitted in response to the proposed rule and the USGS reports, including those raised by CF.  With respect to the nine issues CF contends that the Service did not adequately address, CF's Mem. at 21-23, there is some question as to whether any of these issues qualify as "significant points" that required a response.  See Home Box Office, Inc. v. FCC, 567 F.2d 9, 168 & n.58 (D.C. Cir. 1977).  Indeed, CF found only one of these issues important enough to argue about on the merits in the rest of its briefing (the erroneous claim, addressed supra § VI.C.1.b.i, that the Service was required to quantify the impacts or risks to the polar bear before listing).  Regardless of whether the nine issues could be considered "significant," however, the Service adequately responded to all of them.  The Court therefore should reject CF's request to set aside the Final Rule based on the adequacy of the Service's responses to its comments.

Section 553 of the APA requires agencies to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . ." and "[a]fter consideration of the relevant matter present, . . . shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  The D.C. Circuit has explained that an agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."  City of Waukesha, 320 F.3d at 257 (citation omitted).  Furthermore, "the failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."  Id. at 258 (citations omitted).  As in City of Waukesha, "the record here does not demonstrate that [the Service] failed to consider the relevant factors."  Id.

133

The first two issues CF raises relate to a comment about the effect that sunspots and solar irradiation may have on the earth's climate.  CF's Mem. at 21; ARL152665.  The Service adequately responded to these comments when it explained that there is a lack of scientific agreement about these solar influences in climate change, that the most current synthesis in the IPCC does not indicate a long-term trend, and that solar influence "is a small effect relative to volcanoes and $CO_2$ forcing in the later half of the 20th Century."  ARL117250 (LR) (response to comment 35).  The Service also discussed numerous scientific studies in the Final Rule regarding the effects of solar radiation on sea ice and Arctic air and sea temperatures.  ARL117228-29 (LR) (studies by Francis and Hunter (2006), Serreze, et al. (2007), Lindsay and Zhang (2005), and Rothrock and Zhang (2005)).

CF's issues three and six relate to comments on the decline of the WHB polar bear population.  CF's Mem. at 22, 22-23; ARL152660-61.  The Service adequately responded, in sum, that it had extensive data on the WHB population that clearly indicates a declining trend that is attributable to global warming.  ARL117242 (LR) (response to comment 2), ARL117270-71 (LR) (detailed analysis of the WHB population).  See also supra § VI.B.1.a.iii.  The Service also responded to some of the particular items raised in issue three in its response to comments on the USGS reports.  ARL107954 (LR) (response to comment 22) and ARL107955-56 (LR) (response to comment 25).

CF's fourth issue relates to a comment questioning the objectivity of the USGS reports and the Service's use of these reports.  CF's Mem. at 22; ARL083996.  The USGS reports were peer reviewed, subject to notice and comment, and there was no scientific disagreement as to their accuracy.  ARL107938, 107947-48, 117329.  The Service also acknowledged that the USGS reports represented some of the best available data with which to assess the impact of

134

global warming on the polar bear.  ARL117251 (LR) (response to comment 46).  Moreover, the Service relied not only on the USGS reports, but on a plethora of other data in reaching the conclusion that the polar bear is threatened throughout its range.  See supra § VI.B.1.a and VI.C.3.b; ARL011361, 053670-96.

Issue five relates to the quantification of the degree of impact that the recession of sea ice will have on polar bears in the next 45 years.  CF's Mem. at 22.  As an initial matter, CF may have alluded to this issue in its comments, but did not specifically raise the issue.  See ARL152668.  Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553-54 (1978) (agency proceedings "should not be a game or forum to engage in unjustified obstructionism by making cryptic and obscure references to matters," and then seeking to invalidate agency action on the ground the agency failed to consider the matters).  In any case, the Service explained in the Final Rule why 45 years is a reliable time frame for assessing impacts from the recession of sea ice on polar bears.  ARL117257-58 (LR) (discussion of the Foreseeable Future).  In addition, as discussed above, the Service is not required to quantify these impacts.  See supra § VI.C.1.b.i.

Issue seven concerns polar bear survival during previous warming periods and a comparison to the current climate changes.  CF's Mem. at 23; ARL152665.  The Service addressed this issue by explaining, in sum, that the current climate change is resulting in an "unprecedentedly rapid loss of sea ice habitat" that "will limit the ability of polar bears to respond and survive in large numbers."  ARL117243 (LR) (response to comment 7).  This fact, combined with the "multiple stressors . . . that were not present during historical warming periods," "create[s] a unique and unprecedented challenge for present-day polar bears in comparison to historical warming events."  Id.; see also ARL117259-60 (LR) (section on "Previous Warming Periods and Polar Bears").

Issue eight relates to the data on the status of the polar bear population in the SBS and the Service's reliance on that data.  CF's Mem. at 23; ARL083998.  The Service explained, in sum, that the data indicate a decline in certain measures of polar bear vitality and reproductive success for the SBS population, even if population numbers had not yet declined through 2006. ARL117242 (response to comment 3), 117272-73 (LR); supra § VI.C.3.d.  The Service also explained that the USGS found a correlation between the number of ice-free days in the SBS and the growth rate in the SBS population, and projected a future decline in polar bear numbers in the SBS based on the increased frequency of ice-free days projected by the climate models ARL117273, 117276 (LR); ARL107940 (response to comment 1); supra § VI.C.3.d.[55]

Lastly, issue nine pertains to whether the northernmost Arctic region will become better habitat for polar bears and their prey even under the worst projections regarding climate change. CF's Mem. at 23; ARL152658.  The Service adequately responded to this comment when it explained, in sum, that while sea-ice recession may affect polar bears in the northernmost Arctic region later than polar bears in other areas, this archipelago region has a limited ability to sustain a large number of polar bears for a variety of reasons, including that the area "is characterized by lower prey productivity."   ARL117244-45 (LR) (response to comment 13).   See also ARL117263-64 (LR) (section on Effects of Sea Ice Habitat Changes on Polar Bear Prey – Reduce Seal Productivity) and ARL117280 (LR) ("Although climate change may improve

---

[55] The Service notes that CF misstates the concluding statement of the USGS report Hunter, et al. 2007.  CF's Mem. at 23 ("if conditions over the past 2001-2005 remained constant they would lead to a nearly stationary population in Southern Beaufort Sea").  The concluding statement in the report actually states:  "If conditions over the period 2001- 2005 remained constant they would lead to a nearly stationary population with a decline of about 0.3% per year." ARL082314.  Also, the study notes that "[n]o one predicts, of course, that Arctic sea ice conditions will be stationary."  ARL082310.

conditions for polar bears in some high latitude areas where harsh conditions currently prevail, these improvements will only be transitory.  Continued warming will lead to reduced numbers and reduced distribution of polar bears range-wide.").

In sum, to the extent that CF's nine comments might be considered "significant," the Service adequately responded to each of them and the Service is therefore entitled to summary judgment on this claim.

### 6. The Service Adequately Considered the Inadequacy of Existing Regulatory Mechanisms

As explained above (supra § VI.B.1.b), the Service's conclusion that "there are no known regulatory mechanisms in place at the national or international level that directly and effectively address" the primary threat to the polar bear within the foreseeable future – loss of sea-ice habitat due to climate change – is rational and supported by the administrative record, which indicates the "growth rate of atmospheric carbon dioxide ($CO_2$), the largest anthropogenic source of GHGs, is increasing rapidly," above forecasted levels.  ARL117291-92 (LR); ARL125623 (Canadell (2007)).  Notwithstanding the substantial evidence in the administrative record supporting the Service's determination, Joint Plaintiffs argue that the Service "has not shown" that existing regulatory mechanisms are inadequate.  JP's Mem. at 21.  Of course, the standard is not whether the Service has convinced Joint Plaintiffs of its determination.  Rather, as this Court has noted, "there is a presumption of validity of agency action," American Wildlands, 193 F. Supp. 2d at 251, and it is Joint Plaintiffs who bear the burden of demonstrating that such action fails to meet "minimal standards of rationality," Ethyl Corp., 541 F.2d at 36.

Joint Plaintiffs cannot carry their burden.  Joint Plaintiffs argue that existing regulatory mechanisms are adequate because: (1) there has been no "decline in overall population numbers"; (2) "no regulatory scheme can alter the trend in melting sea ice"; and (3) the Service

failed to define the minimum viable population that is in need of protection.  JP's Mem. at 22.

Joint Plaintiffs fail to identify a single existing regulatory mechanism that addresses the loss of

sea ice, and Joint Plaintiffs' attack on the Service's determination for listing Factor D fails for

that reason alone.   Furthermore, each of Joint Plaintiffs' contentions is flawed.   First, the

Service's analysis of existing regulatory mechanisms was not limited to whether they have

slowed a "decline in overall population numbers."   Instead, the Service analyzed the extent to

which the existing regulatory mechanisms are adequately addressing the primary threat to the

species – loss of habitat.   While the Service concluded that the existing regulatory mechanisms

adequately address the threat from direct take, disturbance by humans, and incidental or

harassment take, and that populations have "recovered from excessive harvests and severe

population reductions in many areas" (ARL117251 (response to comment 41), 117286, 117292

(LR)), the primary threat to the survival of the polar bear is loss of sea-ice habitat, and the

Service did not find any known regulatory mechanisms that directly and effectively address that

threat (ARL117291-92 (LR)).   Joint Plaintiffs' claim that the Service failed to analyze whether

existing mechanisms "can protect the polar bear given the threat" is baseless.  JP's Mem. at 21.

Joint Plaintiffs' second and third contentions are contrary to law.   With respect to their

second contention, the ESA simply does not require the Service to consider, when it is evaluating

the inadequacy of existing regulatory mechanisms, whether the ESA listing will improve the

condition of the species.  See supra § VI.C.1.b.iv.  Furthermore, the ESA does not require the

Service to quantify a minimum viable population in order to evaluate the inadequacy of existing

regulatory mechanisms.  See supra § VI.C.1.b.iii.   In sum, it was eminently rational for the

Service to find existing regulatory mechanisms inadequate where there are none that adequately

address the primary threat to the polar bear's survival, and Joint Plaintiffs' attempted attack on this finding lacks merit.

> **7.      Joint Plaintiffs' Claim that the Service Failed to Take Into Account Foreign Nations' Conservation Programs Is Unfounded**

Joint Plaintiffs offer the novel argument that the Service failed to consider whether "listing would harm efforts to conserve the polar bear."  JP's Mem. at 26; see also CF's Mem. at 8-12.  Specifically, Joint Plaintiffs assert that Canadian management programs "depend[] heavily on the financial contributions of U.S. trophy hunters," and that listing the polar bear under the ESA will dissuade Americans from hunting polar bears because they will no longer be allowed to import their polar bear trophies into the United States.  JP's Mem. at 26.  As the Final Rule explains, this argument lacks merit because the ESA does not allow the Service to consider the effects of listing in determining whether a species qualifies as endangered or threatened.  See ARL117246 (LR) (response to comment 21).  Rather, the Service must "list a species when the best scientific and commercial information available shows that the species meets the definition of endangered or threatened."  ARL117246 (LR).  Listing is required if the Service determines a species is endangered or threatened based on even one of the five statutory listing factors set forth in ESA Section 4(a)(1), 16 U.S.C. § 1533(a)(1)(A)-(E).  See Southwest Ctr., 215 F.3d at 60.

Neither ESA Section 4(a)(1) nor Section 4(b)(1)(A) authorize the Service to forego listing a species found to be endangered or threatened because of potential economic impacts of the listing such as the loss of financial contributions from American trophy hunters or potential impacts to foreign management programs.  Indeed, Section 4(b)(1)(A) expressly provides that listing decisions must be based "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  When Congress amended the ESA in 1982, it inserted

the word "solely" to make clear that listing decisions were to be strictly science-based determinations, and were not to be based on political or economic considerations.  Endangered Species Act Amendments of 1982, Pub. L. No. 97-304, 96 Stat. (1982); see also New Mexico Cattle Growers Ass'n v. USFWS, 248 F.3d 1277, 1282 (10th Cir. 2001) (noting that "economic analysis is not a factor in the listing determination"); Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 747 (W.D. Tex. 1997) ("The ESA requires the Secretary to disregard politics and to make listing decisions based solely on the best scientific and commercial data available").

The 1982 ESA amendments included the further requirement in Section 4(b)(1)(A) that listing determinations be made "after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices."  16 U.S.C. § 1533(b)(1)(A).  Congress did not define the term "efforts" or the phrase "take into account," and there is nothing in the legislative history to explain the intended relationship between this requirement and the listing factors in Section 4(a)(1).  Some overlap of analysis, however, is inevitable.  For instance, one court noted an overlap between the analysis required in Section 4(b)(1)(A) with listing Factor D, the inadequacy of existing regulatory mechanisms, 16 U.S.C. § 1533 (a)(1)(D), insofar as "efforts" to protect species per Section 4(b)(1)(A) could be regulatory in nature, and thus constitute "regulatory mechanisms" within the meaning of Section 4(a)(1)(D).  Oregon Natural Res. Council., 6 F. Supp. 2d at 1153.

In this case, the Service considered past and present harvest management practices in each of the range countries, including Canada, in its consideration of listing Factors B and D, and the Service requested information from foreign governments, consistent with its duty under Section 4(b)(1)(a).  See ARL000166-67, 000171, 000173 (responses to State Department

cables).  In addition, the Service hosted a meeting of the polar bear range countries at its facility in West Virginia during which they exchanged information on their management programs (ARL077424), and the United States developed a Memorandum of Understanding with Canada for the conservation and management of shared polar bear populations (ARL114001-04).  With respect to Factor B, "overutilization for commercial, recreational, scientific, or educational purposes," 16 U.S.C. § 1533(a)(1)(B), the Service found that national and local management regimes are adequate to ensure that harvests of polar bears are sustainable.  ARL117284 (LR). The Service noted that such management actions have demonstrated success in helping reverse "widespread overharvests by many jurisdictions that resulted in population depletion during the period prior to signing of the multilateral 1973 Polar Bear Agreement."  ARL117284 (LR).  The Service therefore concluded that overutilization does not currently threaten the polar bear throughout all or a significant portion of its range.[56]  ARL117284 (LR).  However, the Service noted that, for some populations, "the effects of habitat and environmental changes will far outweigh the effects of harvest, and consequently, that harvest regulation may have little effect on the ultimate population outcome."  ARL117284 (LR).

As explained above (supra §§ VI.B.1.b, VI.C.6), the Service undertook further analysis of "[r]egulatory mechanisms directed specifically at managing many of the threats to polar bears, such as overharvest or disturbance" in and amongst each of the range countries, including Canada, in its consideration of listing Factor D.  ARL117285 (LR).  The Service found that, although there are some localized instances where changes in management agreements may be necessary, Canada's existing regulatory mechanisms "have operated to minimize the threats of

---

[56] CBD argues that the Service should have found the polar bear to be endangered in part due to overharvesting (CBD's Mem. at 40-45), however as explained above (supra § VI.C.4.b), this contention lacks factual and legal support.

overharvest to the species." ARL117290 (LR). However, the Service ultimately concluded that there are no known regulatory mechanisms in place at the national or international level that directly and effectively address the primary threat to the polar bear's survival – loss of sea-ice habitat within the foreseeable future. ARL117292 (LR). Accordingly, in response to a comment that the Service had failed to "take into account" the effect that listing the polar bear would have on the financial contributions from American trophy hunters to Canadian conservation programs, the Service explained that such consideration was not a factor in analyzing threats and would not alter its finding that the polar bear is threatened, because any benefits accrued to the species from American trophy hunters do not offset or reduce the primary threat to the polar bear's survival – loss of sea-ice habitat. ARL117246 (LR). This explanation is eminently reasonable and consistent with its analysis of listing Factors B and D. The Final Rule demonstrates that the Service complied with the requirement that it "take into account" foreign conservation measures. Chevron, 467 U.S. at 843. Indeed, it defies logic for Joint Plaintiffs to suggest that, where existing conservation measures are inadequate to address the primary threat to a species' survival, the potential diminishment of those inadequate measures is grounds for a finding that the species is not threatened. Such a result would be contrary to the fundamental purpose of the ESA, which is to "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

## VII.   CONCLUSION

As demonstrated above, the Service acted in accordance with the relevant statutory and regulatory authorities and judicial precedents in determining that the polar bear is not currently endangered, but is likely to become endangered within the foreseeable future throughout its

range.   The Service conducted an extraordinarily careful and thorough review of the best

scientific and commercial information available and considered the relevant factors, precisely as

the ESA requires.   The Service's rulemaking process was transparent and its evaluation of the

available information was objective and balanced.   There is scientific consensus that global

warming is occurring and is very likely to continue to occur for the foreseeable future, causing a

loss of Arctic sea ice – the polar bear's primary habitat – throughout the species' range.   Adverse

impacts to polar bears due to the loss of sea ice are not theoretical; they are already being

observed in certain populations.   The Service's peer-reviewed conclusion that this "ice obligate"

species is threatened by the loss of its primary habitat due to a threat that existing regulatory

mechanisms cannot effectively address is patently rational and entitled to deference under the

law of this Circuit.

Plaintiffs State of Alaska, California Cattlemen's Association, Congress of Racial

Equality, and Conservation Force, et al. lack standing to challenge the Final Rule and their

claims should be dismissed accordingly.   With regard to the merits, because CBD and Joint

Plaintiffs cannot overcome the substantial evidentiary support for the Service's rational listing

decision, both Plaintiff-groups resort to misrepresenting the factual basis for the Service's listing

decision and distorting the applicable legal standards.   As the Service has shown, however, when

its listing determination is viewed in light of the true factual basis underlying it and the correct

legal standards, there can be no serious dispute that its determination is lawful.   Stripped of all

the rhetoric, this case is, at bottom, a policy disagreement: CBD would prefer endangered status

for the polar bear and Joint Plaintiffs would prefer no protection for the polar under the ESA,

when neither position is warranted by the facts or the law.   These policy disagreements do not

show a violation of law, and they do not provide grounds for vacating the Service's listing

143

determination.   For the reasons set forth above, the Court should enter summary judgment in favor of the Service and deny CBD's and Joint Plaintiffs' motions for summary judgment.

Respectfully submitted: December 7, 2009

> IGNACIA S. MORENO
> Assistant Attorney General
> Environment & Natural Resources Division
>
> JEAN E. WILLIAMS, Chief
> KRISTEN L. GUSTAFSON, Asst. Section Chief
>
> /s/ Clifford E. Stevens, Jr.
> CLIFFORD E. STEVENS, JR.
> Trial Attorney (SBN 463906 (DC))
> Email: clifford.stevens@usdoj.gov
>
> /s/ Robert P. Williams
> ROBERT P. WILLIAMS
> Trial Attorney (SBN 474730 (DC))
> Email: robert.p.williams@usdoj.gov
>
> /s/ Meredith L. Flax
> MEREDITH L. FLAX
> Sr. Trial Attorney (SBN 468016 (DC))
> Email: meredith.flax@usdoj.gov
>
> /s/ Kristen Byrnes Floom
> KRISTEN BYRNES FLOOM
> Trial Attorney (SBN 469615 (DC))
>
> U.S. Department of Justice
> Environment & Natural Resources Division
> Wildlife & Marine Resources Section
> Ben Franklin Station, P.O. Box 7369
> Washington, D.C. 20044-7369
> Telephone: (202) 305-0210
> Facsimile: (202) 305-0275
>
> **Attorneys for Federal Defendants**