UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION | Misc. Action No. 08-0764 (EGS)<br>MDL Docket No. 1993 |
| This Document Relates To:<br><br>*Center for Biological Diversity, et al. v. Salazar, et al.*, 1:08-cv-2113<br><br>*Defenders of Wildlife v.*<br>*United States Dept. of the Interior,*<br>1:09-cv-153 | |

**REPLY BRIEF IN SUPPORT OF INTERVENOR-DEFENDANT
ARCTIC SLOPE REGIONAL CORPORATION'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT ON 4(d) RULE CLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     THE 4(d) RULE IS A RATIONAL WAY TO FOSTER BETTER RELATIONSHIPS WITH ALASKA NATIVES AND to SUPPORT CONSERVATION EFFORTS .................................................................. 2

    II.    THE 4(d) RULE CONTAINS PRO-CONSERVATION BENEFITS FOR POLAR BEARS ................................................................................ 5

         A.    The MMPA's Non-lethal Deterrence Provision Provides a Tangible Benefit for Polar Bears ..................................................... 5

         B.    The "Good Samaritan" Exception Provides Another Conservation Benefit That Would Be Unavailable If ESA's "Take" Prohibition Applie ............................................................... 8

    III.   REMEDY ................................................................................................ 9

CONCLUSION .................................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**

*Committee for Humane Legislation, Inc. v. Richardson*,
  540 F.2d 1141 (D.C. Cir. 1976) .................................................................................... 7

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ....................................................................................................... 7

*\*Envtl. Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) ...................................................................................... 3

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ....................................................................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................................... 3

**Statutes**

16 U.S.C. § 1361 .................................................................................................................. 7

16 U.S.C. § 1371 ....................................................................................................... 6, 7, 8, 9

16 U.S.C. § 1539 .................................................................................................................. 6

16 U.S.C. § 1540 .................................................................................................................. 6

**Regulations**

50 C.F.R. § 17.40 ............................................................................................................ 1, 2

**Other Authorities**

62 Fed. Reg. 24345 ............................................................................................................. 7

62 Fed. Reg. 51805 ............................................................................................................. 8

Natural Resources Defense Council, *Sounding the Depths II* ....................................... 8

## INTRODUCTION

With the 4(d) Rule, the U.S. Fish and Wildlife Service (the "Service") applied certain of the Endangered Species Act's ("ESA") "take" prohibitions to the polar bear. As to activities on the North Slope of Alaska – where polar bears and predominantly Iñupiat Eskimos reside – the Service rationally decided not to apply the "take" prohibition to activities by the Iñupiat and others that comply with the stringent requirements of the Marine Mammal Protection Act ("MMPA"). *See* AR4D012925-45; 50 C.F.R. § 17.40(q)(2).[1] FWS cited three very good reasons why these activities should continue:

First, these activities do not pose a threat to the species. *See* AR4D012938 ("[N]one of the activities currently regulated under the MMPA . . . are factors that threaten the polar bear throughout all or a significant portion of its range[.]").

Second, Alaska Natives play a key role in conserving polar bears through voluntary limitations on subsistence hunting here and under international accords. Permitting MMPA-compliant activities fosters more cooperative relationships with Alaska Natives by avoiding duplicative and needless regulation. Better relationships translate into better conservation.[2]

Third, the MMPA contains pro-conservation tools for private citizens (largely Alaska Natives) to non-lethally deter "problem" bears, rather than killing them after an encounter

---

[1] Arctic Slope Regional Corporation ("ASRC") is simultaneously filing a joint reply brief with the other Alaskan Intervenors which addresses the assorted other arguments raised by CBD. This brief deals specifically with those issues raised in ASRC's opening brief and which relate most closely to the Alaska Native community.

[2] *See* AR4D012937 (permitting MMPA-compliant activities "clearly provide[s] for the conservation of the polar bear by fostering cooperative relationships with Alaska Natives who participate with us in conservation programs for the benefit of the species, limiting lethal bear-human interactions, and providing immediate benefits for the welfare of individual animals").

escalates, and to rescue polar bears if they become entangled in fishing gear. The ESA does not contain these pro-conservation tools. *See* AR4D012933.

Plaintiffs ("CBD") do not dispute, or even address, the Service's first two reasons. These un-rebutted, rational explanations are sufficient alone to uphold the 4(d) Rule. CBD instead focuses its attention on a few differences between the MMPA and the ESA and argues that the 4(d) Rule fails to provide conservation benefits for polar bears. CBD is incorrect, both factually and legally. Although CBD concedes, as it must, that the 4(d) Rule's provisions contain conservation benefits for polar bears – e.g., promotion of nonlethal deterrence rather than fatal encounters – CBD argues *against* these conservation tools, misreading statutes to deprive the polar bear of nonlethal deterrence protections and discounting Good Samaritan protections as purely "hypothetical."[3] In fact, the 4(d) Rule is a rational, pro-conservation measure that gives private citizens on the North Slope additional tools to help protect polar bears and should be upheld.[4]

## ARGUMENT

I. THE 4(d) RULE IS A RATIONAL WAY TO FOSTER BETTER RELATIONSHIPS WITH ALASKA NATIVES AND to SUPPORT CONSERVATION EFFORTS

The Service's action is entitled to substantial deference and must be affirmed "if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise

---

[3] Plaintiffs' Reply in Support of Their Motion for Summary Judgment and Opposition to Cross-Motions for Summary Judgment on the § 4(d) Rule Claims, Dkt. # 202 ("CBD Reply"), at 20, 22-23.

[4] The bulk of the briefing in this case has dealt with the Service's election not to apply the "take" prohibitions to activities occurring outside of the U.S. range of the polar bear. *See* 50 C.F.R. § 17.40(q)(4). CBD primarily contends that the ESA should be used to regulate greenhouse gas emissions and other conduct outside of the North Slope – principally the Lower 48. That issue is beyond the scope of this brief. For activities outside of the range of the polar bear, ASRC adopts the arguments raised by the Federal Defendants and the National Trade Associations.

disagree." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). The Service articulated multiple rational bases for the 4(d) Rule as it applies on Alaska's North Slope, any one of which suffices to justify affirmance of the rule. First, the Service recognized that permitting MMPA-compliant activities through the 4(d) Rule does not pose a threat to the species and would help foster stronger relationships with the Alaska Native community that are essential for core conservation efforts. *See supra* at 1. Second, the Service explained that adding the overlay of ESA Section 9(a)(1) would not benefit the polar bear and, in certain cases, may actually be harmful to the species. *See* AR4D012933, AR4D012938. As to each, the Service provided a rational connection between the facts found and the resulting 4(d) Rule. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Notably, CBD fails to challenge the first explanation anywhere in its 100 pages of briefing.

The Service's findings confirm the obvious: Alaska Natives play an enormously important role in the conservation of polar bears. As a practical matter, the day-to-day conservation effort for polar bears depends on the continued cooperation of the Alaska Native people who live on the North Slope. For example, Alaska Natives have *voluntarily* entered into agreements with other nations' indigenous groups to promote sustainable harvest limitations. *See* AR4D012935-36. Further, while Alaska Natives are statutorily permitted to engage in unlimited subsistence take of polar bears, they have voluntarily and effectively managed their hunting program at sustainable levels. *See* AR4D012935.[5] The Service relies on Alaska Natives' goodwill and responsible stewardship to protect the polar bear populations both here and abroad; the Service currently has no ability to regulate this conduct. Alaska Natives also

---

[5] *See generally* Statement of Points and Authorities in Support of Intervenor-Defendant Arctic Slope Regional Corporation's Cross-Motion for Summary Judgment on 4(d) Rule Issues and Opposition to the Motion for Summary Judgment Filed by Center for Biological Diversity, et al., Dkt. #183 ("ASRC Br."), at 2-5, 8-9, 14-18.

voluntarily collect and contribute biological specimens from subsistence-harvested animals for biological analysis, allowing the Service to better monitor the health and status of the polar bear stocks. *Id.* All of these voluntary actions provide conservation benefits to polar bears.

It follows that, when preparing the 4(d) Rule, the Service was keenly interested in developing better relationships with the Alaska Native community to help promote these important and voluntary pro-conservation activities. The Service found that permitting MMPA-compliant activities to continue would help conservation efforts because it would foster these strong relationships with the Alaska Native community. *See* AR4D012937. The Service correctly concluded that "[t]he 4(d) rule must include . . . meaningful involvement by Alaska Natives to ensure management of the harvest is sustainable." AR4D008139. In response to the proposed 4(d) Rule, an Iñupiat leader confirmed that the Iñupiat were very familiar with the protections the MMPA offered to polar bears, and that the Alaska Native community valued the cultural practices (e.g., creation of Native handicrafts and cultural exchange with other indigenous peoples) permitted by the MMPA. AR4D013277-78 (comment letter of North Slope Borough's mayor). In sum, the Service recognized that (1) conservation efforts on the North Slope depend in large part on the cooperation and active involvement by the Alaska Native community; (2) Alaska Natives are familiar with the MMPA and valued the activities permitted under that statute; (3) MMPA-compliant activities do not pose a threat to the species; and (4) adopting a 4(d) Rule that permits activities allowed by the MMPA would build stronger relationships with the Alaska Native community and thereby assist the Service's broader conservation efforts for polar bears. There is clearly a rational connection between the facts found by the Service and the 4(d) Rule ultimately promulgated.

This rational basis for the Service's decision is sufficient by itself for upholding the 4(d) Rule. As explained below, CBD presents no other viable grounds to set aside the 4(d) Rule.[6]

II.   THE 4(d) RULE CONTAINS PRO-CONSERVATION BENEFITS FOR POLAR BEARS

The 4(d) Rule also should be upheld on the independent ground that the Service rationally concluded that the MMPA's provisions are either comparable to or stricter than the ESA's provisions in all but a few circumstances and, as to those circumstances, the species would receive more conservation benefits under the MMPA. Accordingly, the Service's decision that the ESA's "take" prohibitions should not be applied to activities that comply with the requirements of MMPA comports with conservation needs. AR4D012937-38.

In its reply brief, CBD acknowledges that "[t]he MMPA is one of the nation's strongest wildlife protection laws and provides many protections for polar bears and other marine mammals."[7] Despite this, CBD largely rehashes its earlier round of criticisms that it was somehow improper for the Secretary to allow MMPA-compliant activities to continue.[8]

---

[6] ASRC supports and does not repeat the arguments presented by federal defendants and other defendant intervenors explaining that CBD posits an untenable legal argument on the meaning of Section 4(d). We show below only that even if the ESA was read to require a "conservation benefit" in each 4(d) Rule, as CBD argues, the FWS has met that burden in this case.

[7] Plaintiffs' Reply in Support of Their Motion for Summary Judgment and Opposition to Cross-Motions for Summary Judgment on the § 4(d) Rule Claims, Dkt. # 202 ("CBD Reply"), at 16.

[8] CBD had previously complained that the MMPA's lack of a citizen-suit provision left polar bears without an important protection mechanism, but has since conceded its error at least as to activities on the North Slope. *Id.* at 18 n.9 (recognizing that the citizen-suit provision was in force for activities in the current range of the polar bear). CBD also seems to recognize that its concerns about the differing definitions of "take" under the MMPA and ESA were overblown. *See id.* at 17 (stating it was "pleased" by the Federal Defendants' approach to habitat protection, which had been CBD's concern).

> A. <u>The MMPA's Non-lethal Deterrence Provision Provides a Tangible Benefit for Polar Bears</u>

CBD continues to assert that the MMPA's non-lethal deterrence protection is not actually a conservation benefit for polar bears. This contention remains flawed. There is no clearer example of a conservation benefit than one which permits and promotes non-lethal action instead of lethal action. The MMPA's non-lethal deterrence provision allows Alaska Natives and other private citizens to take reasonable steps to deter polar bears from damaging their private property, fishing gear, or catch, so long as the measures to not result in the death or serious injury of the polar bear. *See* 16 U.S.C. § 1371(a)(4)(A)(i)-(ii). If private citizens lacked the ability to deter polar bears in this safe way, there is an obviously higher likelihood that the polar bear would be killed outright and legally – either by an Alaska Native under the subsistence take provision, 16 U.S.C. § 1539(e), or by any private citizen if the encounter escalated such that self-defense or the life of another person required it (or in fear of such a result), 16 U.S.C. § 1540(a)(3). *See generally* ASRC Br. at 10-13, 19-21.

CBD recognizes, as it must, that non-lethal deterrence is a conservation benefit to the polar bear, but inexplicably contends that this 16-year old protection has never come into existence. *See* CBD Reply at 20-21. CBD's argument is contrary to basic principles of statutory construction.

First, the law provides that non-lethal deterrence measures are permitted "[e]xcept as provided in subparagraphs (B) and (C)." 16 U.S.C. § 1371(a)(4)(A). Subparagraph C permits the Secretary of the Interior to take affirmative steps to prohibit specific deterrence measures, after notice and opportunity for public comment. *Id.* § 1371(a)(4)(C). No such affirmative steps have been taken and accordingly no specific deterrence measures are prohibited. Subparagraph B simply says that the Secretary of the Interior is expected to publish guidelines for safe

deterrence approaches, and that any actions to deter polar bears consistent with those guidelines will not be a violation of the MMPA. *Id.* § 1371(a)(4)(B). Nowhere does it say that non-lethal deterrence, which is affirmatively allowed under subparagraph A, is prohibited until these guidelines are put into place. CBD is trying to manufacture a condition in the statute that simply does not exist. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). To the contrary, the guidelines create a safe harbor to protect people from prosecution for alleged violations of MMPA when deterring marine mammals. This does not mean that, until the guidelines are published, all non-lethal deterrence activities are prohibited.[9] If Congress had intended to predicate the availability of *any* non-lethal deterrence activity on the publication of such guidelines, it would have said so.

CBD's argument also fails for a second reason. CBD's interpretation of the non-lethal deterrence provision runs directly counter to the stated conservation purpose of the MMPA. *See id.* § 1361(6) (describing sense of Congress to protect marine mammals to the greatest extent feasible commensurate with sound policies of resource management); *Committee for Humane Legislation, Inc. v. Richardson*, 540 F.2d 1141, 1144, 1147 (D.C. Cir. 1976). The words of the MMPA must be read in their context and "with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal

---

[9] Notably, this exact issue arose when the Steller sea lion was reclassified in 1997. *See Threatened Fish and Wildlife; Change in Listing Status of Steller Sea Lions Under the Endangered Species Act*, 62 Fed. Reg. 24345, (May 5, 1997). The National Marine Fisheries Service ("NMFS") noted that there were reports of firearm use to deter sea lions from interfering with fishing operations. NMFS confirmed that it had recently proposed guidelines for deterring marine mammals under Section 101(a)(4) of MMPA, and stated, "*When these regulations and guidelines are finalized*, the use of any firearms to deter marine mammals from interacting with fishing gear or catch will be prohibited." *Id.* (emphasis added). That is, the use of firearms for non-lethal deterrence was permitted under 16 U.S.C. § 1371(a)(4) until such time as final guidelines were implemented that said otherwise.

quotation omitted).  Through the MMPA, Congress intended to protect marine mammals to the greatest extent feasible, and broadly permitting deterrence measures that do not result in the death or serious injury to these animals is certainly more consistent with Congressional intent than CBD's perplexing effort to strip this protection away.

Lastly, CBD's claim that nonlethal deterrence measures are not operative is inconsistent with at least one of the plaintiff's public statements:  "When Congress has engaged on these issues [of ocean noise], it has often been to exempt activities from the regulatory process, working clauses into the law's fine print.  An early example is the exception made for fisheries, added in 1994, which allows operators and owners a choice of non-lethal devices 'to deter a marine mammal from damaging the gear or catch.'"  Natural Resources Defense Council, *Sounding the Depths II*, at 43 (available at http://www.nrdc.org/wildlife/marine/sound/sound.pdf) (last visited Aug. 6, 2010) (citing 16 U.S.C. § 1371(a)(4)).  As described by the Natural Resources Defense Council, then, the non-lethal deterrence provision allows private citizens a choice of non-lethal devices to deter marine mammals even in the absence of regulations from the Service or NMFS.  This conforms with the existing, longstanding practice in dealing with marine mammals like pinnipeds.[10]

### B. The "Good Samaritan" Exception Provides Another Conservation Benefit That Would Be Unavailable If ESA's "Take" Prohibition Applied

CBD chastises the federal defendants and the intervenor-defendants for viewing the MMPA and ESA regulatory schemes as mutually exclusive, asserting that this approach "ignores the complimentary *[sic]* relationship between the two statutes[.]"  CBD Reply at 14.  While there

---

[10] *See, e.g.*, Taking of Marine Mammals Incidental to Commercial Fishing Operations; Pacific Offshore Cetacean Take Reduction Plan Regulations, 62 Fed. Reg. 51805, 51806 (Oct. 3, 1997) ("Regardless, even if the operation of pingers does constitute 'harassment' under the MMPA, section 101(a)(4) of the MMPA allows the use of certain measures by the owners of fishing gear to deter marine mammals so long as such measures do not result in the death or serious injury of a marine mammal.").

are many parts of the two statutes that are comparable, these two MMPA provisions – non-lethal deterrence and "Good Samaritan" – are not complementary with the ESA. The ESA's more restrictive provisions prohibit "harassment" of polar bears even if that harassment is done for the purpose (and with the result) of protecting the bears, whether by deterring them from private property and defusing a potentially lethal encounter or by rescuing them from being entangled in fishing gear. The Service rationally concluded that permitting MMPA-compliant activities would benefit polar bears even though the MMPA may not be as restrictive as the ESA. Through the 4(d) Rule, the added conservation benefit of the "Good Samaritan" provision, 16 U.S.C. § 1371(d), becomes available to polar bears.

As with non-lethal deterrence, CBD discounts the value of this benefit even though it self-evidently provides for the conservation of polar bears. This time, CBD asserts that the "Good Samaritan" provision has no value because it was unable to locate records of private citizens reporting that they had freed polar bears under that provision. *See* CBD Reply at 22-23. It should go without saying that polar bears are better off having this protection available to them whether or not any such rescues have been reported to the proper authorities or even whether or not such rescues have been performed to date. The proper focus is on whether the species receives a conservation benefit if private citizens – which would almost certainly be Alaska Natives – are empowered to rescue polar bears when they are entangled in debris or fishing gear. The fact that a pro-conservation tool may be infrequently invoked does not somehow change its character or eliminate it as a conservation benefit.

    III.    REMEDY

ASRC reiterates its earlier request that supplemental briefing must be permitted on remedy issues if the Court should find against ASRC or other defendants. The remedy should be tailored according to the Court's findings, and the parties should be allowed an opportunity to

address the potential impacts of alternate remedies. ASRC is constrained to note that vacating the 4(d) Rule would have severe consequences for both polar bears and the Alaska Natives who share their habitat. CBD contends that no such briefing is necessary because non-lethal deterrence will be addressed by the Secretary's forthcoming regulations. *See* CBD Reply at 46-47. Even if such regulations are finalized by late September, CBD again blithely ignores the Alaska Native community entirely. As the Service recognized, the 4(d) Rule's conservation impact today – not in 50 or 100 or 200 years as the sea-ice changes – hinges on meaningful involvement by the Alaska Native community. *See supra* at 4. If the 4(d) Rule is abruptly discarded, potentially disrupting time-honored cultural practices (e.g., cultural exchanges with other nations' indigenous peoples, creation and sale of Native handicrafts) as well as the local economy on the North Slope, there is a substantial risk that the positive relationships the Service has developed with the Alaska Native community will be severely impaired. Before allowing such consequences, the Court should hear from the parties.

## CONCLUSION

For the foregoing reasons, the Court should grant ASRC's motion for summary judgment.

Respectfully submitted,

/s/
Margaret P. Strand (D.C. Bar No. 936419)
John F. Cooney (D.C. Bar No. 936336)
David L. Feinberg (D.C. Bar No. 982635)
Venable LLP
575 7th Street, N.W.
Washington, DC 20004
Phone: 202-344-4699
Fax: 202-344-8300
mnstrand@venable.com
jfcooney@venable.com

-10-

                                              /s/
Jeffrey M. Feldman
Kevin M. Cuddy
Feldman Orlansky & Sanders
500 L Street, Suite 400
Anchorage, AK  99501
Phone: 907-272-3538
Fax: 907-274-0819
feldman@frozenlaw.com
cuddy@frozenlaw.com

Attorneys for Intervenor-Defendant ASRC

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 16, 2010, I electronically filed the foregoing *Reply Brief In Support Of Intervenor-Defendant Arctic Slope Regional Corporation's Cross-Motion For Summary Judgment And In Opposition to Plaintiff's Motion for Summary Judgment On 4(D) Rule Claims* with the Clerk of the Court for the United States District Court – District of Columbia by using the CM/ECF system.  Participants in this case No. 1:08-mc-00764 (EGS) who are registered CM/ECF users will be served by the CM/ECF system.


                                              /s/ Margaret Strand