UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION | Misc. No. 08-764 (EGS) MDL Docket No. 1993 |
| This Document Relates To: Safari Club Int'l, et al. v. Salazar,[1] et al., No. 08-881; Hershey v. Salazar, et al., No. 09-324; Kreider v. Salazar, et al., No. 09-325; Atcheson, et al. v. Salazar, et al., No. 09-941 | |

<u>MEMORANDUM OPINION</u>

On May 15, 2008, the U.S. Fish and Wildlife Service ("the Service" or "the agency") published its final rule listing the polar bear as a threatened species under the Endangered Species Act ("ESA") because of anticipated impacts to its sea ice habitat from increasing Arctic temperatures, which the agency attributed to global greenhouse gas emissions and related atmospheric changes. *See generally* Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008) ("Listing Rule").

---

[1]     Pursuant to Fed. R. Civ. P. 25(d), Interior Secretary Ken Salazar is automatically substituted as a defendant for his predecessor, Dirk Kempthorne, who was sued in his official capacity.

This Court recently upheld the Listing Rule as a reasonable exercise of agency discretion. *See In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, Misc. No. 08-764, 2011 U.S. Dist. LEXIS 70172 (D.D.C. June 30, 2011). The four cases currently before the Court arise out of the Service's related determination that, as of the effective date of the Listing Rule, sport-hunted polar bear trophies may no longer be imported into the United States under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h, which generally prohibits the import of marine mammal species that the Secretary has designated as "depleted."

The following plaintiffs have filed actions against the Service asserting violations of the MMPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706:

- Safari Club International and Safari Club International Foundation (collectively, "SCI");
- Ronald Kreider ("Kreider");
- Donald Hershey ("Hershey");[2]
- Keith Atcheson, Keith Halstead, Ben Hamel, Marcus Hansen, Aaron Nielson, Kevin Wieczorek, Dennis Dunn, and Conservation Force (collectively, "Atcheson plaintiffs").

Pending before the Court are the parties' cross-motions for summary judgment.

The SCI plaintiffs challenge the Service's legal determination that imports of sport-hunted polar bear trophies

---

[2]   Plaintiffs SCI, Kreider, and Hershey jointly moved for summary judgment and will be referred to collectively as the "SCI plaintiffs."

are no longer available as arbitrary, capricious, and contrary to the plain language of the MMPA.  As the SCI plaintiffs note, section 104(c)(5) of the MMPA specifically authorizes the import of sport-hunted polar bear trophies from approved polar bear populations in Canada.  The SCI plaintiffs argue, first, that Congress plainly intended this authorization to take precedence over the MMPA's prohibition on importing depleted marine mammal species.  The SCI plaintiffs further argue, however, that the prohibition on importing depleted species does not apply to the polar bear, which they claim was never properly designated as depleted.  On the same grounds, the SCI plaintiffs challenge the disposition of import permit applications submitted pursuant to section 104(c)(5) of the MMPA by individual plaintiffs Hershey and Kreider, which the Service administratively closed after the publication of the Listing Rule.

Having carefully considered plaintiffs' motions, the federal defendants' and defendant-intervenors' cross-motions, the oppositions and replies thereto, the arguments of counsel at a motions hearing held on April 13, 2011, the relevant law, the full administrative record, and for the reasons set forth below, the Court finds that the Service properly concluded that the polar bear is a depleted species within the meaning of the MMPA as of the publication of the Listing Rule.  The Court further finds that the MMPA mandates the Service's conclusion that

sport-hunted polar bear trophies are no longer eligible for import as a result of the species' depleted status.  Sport hunting is not among the narrow, enumerated exceptions to the MMPA's ban on taking and importing depleted marine mammals. Accordingly, the Court concludes that the Service did not err when it administratively closed permit applications that were pending when the Listing Rule took effect, including those submitted by plaintiffs Hershey and Kreider.  The Court therefore **DENIES** the SCI plaintiffs' motion for summary judgment and **GRANTS** the federal defendants' and defendant-intervenors' motions for summary judgment.

Whereas the SCI plaintiffs primarily argue that the polar bear is not a depleted species within the meaning of the MMPA, the Atcheson plaintiffs, for their part, do not contest that the polar bear was properly designated as depleted.  However, after the publication of the Listing Rule, the Atcheson plaintiffs nonetheless applied for permits to import their sport-hunted polar bear trophies under section 104(c)(4)(A) of the MMPA, which authorizes a narrow exception to the general prohibition on importing depleted marine mammals for activities that will "enhance" a depleted species, either by increasing its numbers or by otherwise contributing to the recovery of the species. The Service denied the Atcheson plaintiffs' permit applications, finding no evidence that either sport hunting itself or the

subsequent import of these specific sport-hunted polar bear
trophies would actually enhance the species within the meaning
of the statute.  The Atcheson plaintiffs challenge the denial of
their permit applications as arbitrary, capricious, contrary to
law, and procedurally deficient.

Having carefully considered plaintiffs' motions, the
federal defendants' and defendant-intervenors' cross-motions,
the oppositions and replies thereto, the arguments of counsel at
a motions hearing held on April 13, 2011, the relevant law, the
full administrative record, and for the reasons set forth below,
the Court finds that the Service reasonably concluded that the
Atcheson plaintiffs failed to meet the standard for an
enhancement exception to the MMPA's ban on importing depleted
species.  Accordingly, the Court **DENIES** the Atcheson plaintiffs'
motion for summary judgment and **GRANTS** the federal defendants'
and defendant-intervenors' motions for summary judgment.

I.   **BACKGROUND**

   A.   **Statutory and Regulatory Background**

Congress enacted the MMPA to preserve and replenish marine
mammal populations.  *See* 16 U.S.C. § 1361(2).  The Secretary of
the Interior has jurisdiction over most marine mammals covered
by the MMPA, including the polar bear.  *See id.*
§ 1362(12)(A)(ii).  The Secretary has delegated his duties under
the MMPA to the Service.  *See* 50 C.F.R. § 403.02(f).

The MMPA establishes a general moratorium "during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States."[3]  16 U.S.C. § 1371(a).  The statute enumerates several exceptions to this general moratorium.  One such exception authorizes the Service to issue permits for the import of polar bear parts taken in sport hunts in Canada, provided certain conditions are met.  *See id.* § 1374(c)(5).  In 1997, the Service issued regulations approving six Canadian polar bear populations for so-called "trophy" imports: Southern Beaufort Sea, Northern Beaufort Sea, Viscount Melville Sound, Western Hudson Bay, Lancaster Sound, and Norwegian Bay.  *See* 50 C.F.R. § 18.30(i)(1).

However, the MMPA imposes additional restrictions on the taking and import of marine mammals from species that are considered "depleted."  A species is depleted within the meaning of the MMPA when (1) the Secretary determines that the species or population stock is below its "optimum sustainable population" ("OSP"); (2) a state with management authority over the species determines that the species or stock is below its OSP; or (3) the species or population stock is listed as an

---

[3]     "Take" under the MMPA is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13).

endangered species or a threatened species under the ESA. 16 U.S.C. § 1362(1).

Under section 101(a)(3)(B) of the MMPA, "no permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal." Section 102(b) further provides:

> [I]t is unlawful to import into the United States any marine mammal if such mammal was - (1) pregnant at the time of taking; (2) nursing at the time of taking, or less than eight months old, whichever occurs later; (3) taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock; or (4) taken in a manner deemed inhumane by the Secretary.

Pursuant to these two provisions, therefore, members of a depleted marine mammal species or stock generally may not be imported into the United States.

The statute also enumerates some exceptions to this prohibition. Specifically, the Service may permit the take or import of depleted marine mammal species "for scientific research purposes, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock . . . , or as provided for under paragraph (5) of this subsection [authorizing the incidental, but not intentional, taking of marine mammals during the course of specified activities]." *Id.* § 1371(a)(3)(B).

To qualify for the narrow "enhancement" exception to the prohibition on taking and importing depleted species, the Service must determine that

(1)    taking or importation is likely to contribute significantly to maintaining or increasing distribution or numbers necessary to ensure the survival or recovery of the species or stock; <u>and</u>

(2)    taking or importation is consistent (I) with any conservation plan adopted by the Secretary under [the MMPA] . . . or any recovery plan developed under [the ESA] for the species or stock, or (II) if there is no conservation or recovery plan in place, with the Secretary's evaluation of the actions required to enhance the survival or recovery of the species or stock in light of the factors that would be addressed in a conservation plan or a recovery plan.

*Id.* § 1374(c)(4)(A) (emphasis added).

**B.    Factual and Procedural Background**

**1.    The Listing Rule**

On May 15, 2008, the Service issued a final rule listing the polar bear as a threatened species throughout its range. *See generally* 73 Fed. Reg. at 28,212; ARL 117215-307.[4]  Although

_____

[4]    The facts in this background section are excerpted from the administrative records for each of the agency actions before this Court on review.  Because the SCI plaintiffs have challenged the Service's legal conclusion, set forth in its Listing Rule, that import permits for sport-hunted polar bear trophies are no longer available under the MMPA, this Court will consider portions of the administrative record for the Listing Rule.  Citations to the administrative record for the Listing Rule will be abbreviated "ARL."  Citations to the administrative records in the Hershey and Kreider cases will be abbreviated "ARH" and "ARK," respectively.  Citations to the administrative record for the "enhancement" case (*Atcheson, et al. v. Salazar, et al.*, No. 09-941) will be abbreviated "ARE".

the Listing Rule does not purport to "designate" the polar bear

as a depleted species under the MMPA, the Service noted in

response to comments that

> [U]nder the MMPA, the polar bear will be considered a
> 'depleted' species on the effective date of this
> listing.  As a depleted species, imports could only be
> authorized under the MMPA if the import enhanced the
> survival of the species or was for scientific
> research.  Therefore, authorization for the import of
> sport-hunted trophies will no longer be available
> under section 104(c)(5) of the MMPA.

*Id.* at 28,236; ARL 117240.  The Service further noted:

> We acknowledge the important contribution to
> conservation from scientifically-based sustainable use
> programs.  Significant benefits to polar bear
> management in Canada have accrued as a result of the
> 1994 amendments to the MMPA that allow U.S. citizens
> who legally sport-harvest a polar bear from an MMPA-
> approved population in Canada to bring their trophies
> back into the United States.
>
> . . .
>
> While we recognize these benefits, the Service must
> list a species when the best scientific and commercial
> information available shows that the species meets the
> definition of endangered or threatened.  The effect of
> the listing, in this case an end to the import
> provision under Section 104(c)(5) of the MMPA, is not
> one of the listing factors.  Furthermore, the benefits
> accrued to the species through the import program do
> not offset or reduce the overall threat to polar bears
> from loss of sea ice habitat.

*Id.* at 28,242; ARL 117246.[5]

---

[5]    On May 23, 2008, the Solicitor of the Department of the
Interior issued a memorandum further explaining the legal basis
for the ban on importing sport-hunted polar bear trophies.  *See*
ARL 117714.  That memorandum is not before this Court on review.

The Service subsequently administratively closed all
applications for polar bear trophy import permits under section
104(c)(5) of the MMPA that were pending as of the date the
Listing Rule became effective.  *See, e.g.*, ARK 104.

### 2.    Plaintiff SCI

Shortly after the publication of the Listing Rule,
plaintiff SCI initiated an action in this Court challenging the
agency's legal conclusion that sport-hunted polar bear trophies
are no longer eligible for import permits as a result of the
species' threatened status.  *See generally* Complaint, *SCI, et
al. v. Salazar, et al.*, No. 08-881 (D.D.C. May 23, 2008), Docket
No. 1.  This action was consolidated with other related actions
for coordinated proceedings before this Court, pursuant to an
order of the Judicial Panel on Multi-District Litigation
("MDL").  Certified Copy of Transfer Order, Docket No. 1.[6]

On March 3, 2009, the federal defendants filed a motion to
dismiss plaintiff SCI's complaint.  *See generally* Motion to
Dismiss, Docket No. 21.  This Court denied the federal
defendants' motion to dismiss, finding that the agency's
determination that polar bear trophy imports are no longer
available constitutes a "final agency action" for the purposes
of judicial review under the APA.  *See In re Polar Bear*

---

[6]    Unless otherwise specified, all references to pleadings,
proceedings, hearings, opinions, and orders can be found on the
Misc No. 08-764 docket.

*Endangered Species Act Listing and § 4(d) Rule Litigation*, 627 F. Supp. 2d 16, 24 (D.D.C. 2009).  The Court further concluded that plaintiff SCI has standing to bring this action.  *Id.* at 27.

### 3.   Plaintiffs Hershey and Kreider

Plaintiff Kreider attests that he traveled to Canada and successfully took a polar bear on or about March 31, 2008, from an approved polar bear population in the Northern Beaufort Sea. Declaration of Ronald E. Kreider ("Kreider Decl."), Docket No. 132-6, at ¶¶ 3-4.  He avers that he spent approximately $40,000 on his hunt.  Kreider Decl. at ¶ 5.  Plaintiff Kreider applied to the Service for a permit to import his polar bear trophy on April 4, 2008, and received confirmation that his application was received on April 15, 2008.  Kreider Decl. at ¶¶ 6, 7. Plaintiff Kreider's permit application was administratively closed on July 29, 2008, after the polar bear was listed as a threatened species.  Kreider Decl. at ¶ 9.  The letter plaintiff Kreider received from the Service indicated that "importation of a polar bear from Canada as a sport-hunted trophy . . . is no longer an activity that can be authorized under the [MMPA]." ARK 104.  Accordingly, the Service informed plaintiff Kreider that it would not be able to continue processing his application and that his permit application processing fee would be returned.  *See* ARK 104.  Plaintiff Kreider avers that he

currently pays monthly fees to keep his trophy in cold storage in Canada.  Kreider Decl. at ¶ 10.  Plaintiff Hershey avers nearly identical facts.  *See generally* Declaration of Donald C. Hershey, Docket No. 132-7; *see also* ARH 102 (letter from the Service to plaintiff Hershey dated July 29, 2008).

Plaintiffs Hershey and Kreider filed petitions for review of the disposition of their permit applications in the Eastern District of Pennsylvania.  *See generally* Petition for Review, *Hershey v. Kempthorne, et al.*, No. 08-4660 (E.D. Pa. Sept. 26, 2008), Docket No. 1; Petition for Review, *Kreider v. Kempthorne, et al.*, No. 08-4662 (E.D. Pa. Sept. 26, 2008), Docket No. 1. These actions were subsequently transferred to this Court for coordinated proceedings under the ongoing MDL.  *See* Certified Copy of Transfer Order, *Hershey v. Salazar, et al.*, No. 09-324 (D.D.C. Feb. 11, 2009), Docket No. 18; Certified Copy of Transfer Order, *Kreider v. Salazar, et al.*, No. 09-325 (D.D.C. Feb. 11, 2009), Docket No. 5.

### 4.   The Atcheson Plaintiffs

Each of the Atcheson plaintiffs purportedly took a polar bear from the Gulf of Boothia polar bear population in Canada between April 18, 1999 and May 29, 2005.  *See* Atcheson Plfs. Mot. at 8.  The Gulf of Boothia population is not among the six polar bear populations that the Service has approved for trophy imports under section 104(c)(5) of the MMPA.  However, rather

than seeking trophy import permits pursuant to section 104(c)(5), each of the Atcheson plaintiffs sought a permit to import his polar bear trophy pursuant to the narrow exception set out at section 104(c)(4)(A) for activities that enhance the survival or recovery of a depleted species.  The individual Atcheson plaintiffs jointly submitted their applications for trophy import permits through plaintiff Conservation Force on July 9, 2008, after the effective date of the Listing Rule.  *See* Atcheson Plfs. Mot. at 8; *see also* ARE 28-96.

On February 2, 2009, the Service denied the Atcheson plaintiffs' permit requests.  *See, e.g.*, ARE 449-50 (letter from the Service to plaintiff Keith Atcheson dated Feb. 2, 2009).  In its denial letter, the Service asserted that plaintiffs had failed to provide sufficient evidence that either sport hunting itself or the importation of their sport-hunted trophies would enhance the survival or recovery of the polar bear.  *See, e.g.*, ARE 449-50.

On March 18, 2009, the individual Atcheson plaintiffs jointly submitted a request for reconsideration, again through plaintiff Conservation Force, which included additional supporting documentation.  ARE 464.  This request was denied on April 28, 2009.  *See, e.g.*, ARE 592 (letter from the Service to plaintiff Keith Atcheson dated Apr. 28, 2009).

The Atcheson plaintiffs initiated an action in this Court challenging the denial of their permit applications.  *See generally* Complaint, *Atcheson, et al. v. Salazar, et al.*, No. 09-941 (D.D.C. May 21, 2009), Docket No. 1.  This action was subsequently consolidated as a tag-along action with the ongoing MDL.  *See* Order Granting Motion to Consolidate Cases, Docket No. 112.

### 5.   Summary Judgment Briefing

On the recommendation of the parties, cross-motions for summary judgment in the actions filed by plaintiffs SCI, Hershey, and Kreider were briefed jointly.  Cross-motions for summary judgment in the action filed by the Atcheson plaintiffs were briefed separately, but simultaneously.

Plaintiffs filed their motions for summary judgment on November 23, 2009.[7]  The federal defendants filed cross-motions for summary judgment on January 7, 2010.[8]  This Court also

---

[7]   *See generally* Motion and Memorandum of Points and Authorities by Safari Club International, Safari Club International Foundation, Ronald Kreider, and Donald Hershey in Support of their Joint Motion for Summary Judgment in the Import Ban Cases, Docket No. 132, revised at Docket No. 136 ("SCI Plfs. Mot."); Statement of Points and Authorities in Support of Atcheson et al. Plaintiffs' Motion for Summary Judgment, Docket No. 134 ("Atcheson Plfs. Mot.").

[8]   *See generally* Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs SCI and Hershey/Kreider's Motion for Summary Judgment, Docket No. 142 ("Fed Defs. SCI Mot."); Federal Defendants' Combined Opposition to Plaintiffs Atcheson, et al.'s Motion for Summary

permitted the following parties to intervene on behalf of the federal defendants:

- Humane Society of the United States, International Fund for Animal Welfare, and Defenders of Wildlife (collectively, "HSUS");
- Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. (collectively, "CBD").

*See* Stipulation and Order Regarding Intervention, Docket No. 33, at 4-5; *see also* Order Granting Oral Motion to Intervene, Docket No. 112, at 2.  The defendant-intervenors filed their cross-motions for summary judgment on January 21, 2010.[9]  The Court heard arguments on plaintiffs' claims at a motions hearing held on April 13, 2011.  The parties' cross-motions for summary judgment are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

The APA provides a right to judicial review of final agency actions.  Under the APA, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

Judgment on Trophy Import Claims and Cross-Motion for Summary Judgment, Docket No. 140 ("Fed Defs. Atcheson Mot.").

[9]    HSUS filed briefs on behalf of all defendant-intervenors in this case.  *See generally* Import-Ban Intervenors' Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Docket No. 152 ("HSUS SCI Mot."); Import-Ban Intervenors' Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, Docket No. 154 ("HSUS Atcheson Mot.").

To make this finding, a court must determine whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (citing *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). The standard of review under the APA is a narrow one. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The court is not empowered to substitute its judgment for that of the agency. *Id.* An agency's permit decisions, in particular, are presumed to be valid. *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

This deferential standard does not, however, shield the agency from a "thorough, probing, in-depth" review. *Id.* at 415. Administrative action must be invalidated as arbitrary where the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This determination must be made solely on the basis of the record before the agency when it made its decision. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Where the Court must review an agency's interpretation of a statute it is charged with administering, the Supreme Court's opinion in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council* provides the appropriate framework of review.  467 U.S. 837 (1984).  Both the agency and the reviewing court must give effect to the Congress's unambiguously expressed intent.  *Id.* at 842.  Therefore, the Court must first determine "whether Congress has spoken directly to the precise question at issue." *Id.*  If the Court determines that the intent of Congress is not clear from the statute, "the issue for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  In that case, the Court must uphold any agency interpretation that is not "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  *United States v. Mead*, 533 U.S. 218, 227 (2001) (citing *Chevron*, 467 U.S. at 844).

## III. DISCUSSION

### A.   The SCI Plaintiffs' Claims

The SCI plaintiffs claim that the Service erred when it concluded that sport-hunted polar bear trophies are no longer eligible for import under the MMPA as a matter of law.  The SCI plaintiffs raise three primary arguments in support of this claim.  First, plaintiffs argue that the provision of the MMPA that allows for the import of polar bear trophies from Canada

trumps the Act's restrictions on importing depleted species and,
therefore, this provision continues to authorize imports from
approved polar bear populations, notwithstanding the species'
threatened status.  Second, the SCI plaintiffs argue that the
import restrictions for depleted species do not apply to the
polar bear because it was not properly designated as depleted
under the MMPA.  Finally, the SCI plaintiffs contend that, even
if the Listing Rule did serve to designate the polar bear as
depleted, the Service did not provide adequate notice that its
rule would have that effect.

In the alternative, even assuming the import of sport-
hunted polar bear trophies is properly restricted as a result of
the species' threatened status, the SCI plaintiffs assert that
these import restrictions only apply to a species that was
depleted at the time of taking.  Accordingly, plaintiffs
contend, their specific trophies are eligible for import because
they were taken from approved populations before the Listing
Rule took effect and before the bear became depleted under the
MMPA.

Each of these arguments is addressed in turn.

### 1.   Whether the MMPA Provisions Authorizing Import of Sport-Hunted Polar Bear Trophies Take Precedence over Restrictions on Importing Depleted Species

As noted above, although the MMPA establishes a general
moratorium on the taking and import of marine mammals and marine

- 18 -

mammal products, the statute provides a specific exception for

importing polar bear parts taken in sport hunts from approved

populations in Canada.   Section 104(c)(5) reads, in relevant

part:

> The Secretary may issue a permit for the importation
> of polar bear parts (other than internal organs) taken
> in sport hunts in Canada to an applicant which submits
> with its permit application proof that the polar bear
> was legally harvested in Canada by the applicant.
> Such a permit <u>shall be issued</u> if the Secretary, in
> consultation with the Marine Mammal Commission and
> after notice and opportunity for public comment, finds
> that – (i) Canada has a monitored and enforced sport
> hunting program consistent with the purposes of the
> Agreement on the Conservation of Polar Bears;
> (ii) Canada has a sport hunting program based on
> scientifically sound quotas ensuring the maintenance
> of the affected population stock at a sustainable
> level; (iii) the export and subsequent import are
> consistent with the provisions of the Convention on
> International Trade in Endangered Species of Wild
> Fauna and Flora and other international agreements and
> conventions; and (iv) the export and subsequent import
> are not likely to contribute to illegal trade in bear
> parts.

(emphasis added).   Because nothing in this provision expressly

excludes "depleted" polar bears, the SCI plaintiffs argue that

the plain language of this provision requires the agency to

grant a permit to import any polar bear trophy taken from one of

the six populations that are currently approved for import,

regardless of whether the polar bear is considered depleted

under the MMPA, unless and until the agency alters its findings.

The federal defendants reject plaintiffs' plain meaning

reading of the MMPA.   To the contrary, they argue, "Congress did

not intend to allow for the importation of sport-hunted polar
bear trophies after the polar bear acquired its depleted
status." Fed. Defs. SCI Mem. at 16.  This Court agrees.

As the federal defendants explain, the MMPA creates a
"stepwise" structure of prohibitions and exceptions.  First, the
statute imposes a general moratorium on the taking and
importation of marine mammals.  The statute creates exceptions
to this general moratorium, including an exception for
scientific research, for public display, for enhancement of the
species, for takes that occur incidental to commercial fishing
or other lawful activities, and for takes that prevent damage to
property or personal safety.  *See* 16 U.S.C. §§ 1371(a)(1), (2),
(4), (5).  One of the specified exceptions to the MMPA's general
moratorium is the exception for importing polar bear trophies.

The second "step" of the MMPA imposes additional
restrictions on taking and importation of depleted marine mammal
species or stocks.  Section 101(a)(3)(B) is clear that "no
importation may be made" of any depleted species except in
specified circumstances.  The statute establishes an outright
ban on the importation of depleted marine mammals unless it is
for one of these specified purposes.  *See id.* § 1371(a)(3)(B)
("Except for scientific research purposes, photography for
educational or commercial purposes, or enhancing the survival or
recovery of a species or stock . . . no permit may be issued for

- 20 -

the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any such mammal." (emphasis added)).

Sport hunting is not among the narrow exceptions to the prohibition on importing depleted species, and this Court declines to imply any such exception. *See Sierra Club v. EPA*, 719 F.2d 436, 453 (D.C. Cir. 1983) ("[W]hen a statute lists several specific exceptions to the general purpose, others should not be implied."). Therefore, under the MMPA's stepwise regime, while the importation of sport-hunted polar bear trophies from Canada is a permissible exception to the general moratorium on importing marine mammals and marine mammal products, it is not an authorized exception where depleted marine mammals are concerned. The Court notes, further, that nothing in section 104(c)(5) mandates permits for importing sport-hunted polar bear trophies, contrary to the SCI plaintiffs' assertions. Section 104(c)(5) merely provides that the Secretary "may issue" such permits, provided certain conditions are met. By contrast, the statute's prohibition on importing depleted marine mammals contains no similarly permissive language. This provision plainly forbids importation of depleted species in all but the most narrow of circumstances, none of which apply here.

The SCI plaintiffs contend that this plain-meaning reading of the MMPA constitutes a repeal of section 104(c)(5) by implication.  The Court finds this argument unpersuasive.  The MMPA establishes different regimes for the taking and import of marine mammals depending on the species' status.  As the defendant-intervenors note, the polar bear trophy import provision may again be available if the polar bear "is recovered to the degree where it is no longer threatened with extinction, and therefore no longer listed under the ESA and depleted under the MMPA."  HSUS SCI Mot. at 2.  The Court declines to find that the Service was required to expressly revoke its existing approvals under section 104(c)(5) in order to effect a ban on importing sport-hunted polar bear trophies.

Accordingly, for the foregoing reasons, the Court finds that the intent of Congress is clear, and the polar bear trophy import provision at section 104(c)(5) must give way to restrictions on importing depleted species.  The Court turns now to the SCI plaintiffs' argument that the import ban does not apply to the polar bear because it was never designated as depleted.

### 2.   Whether the Service Properly "Designated" the Polar Bear as a Depleted Species

Even if the restrictions on importing depleted species take precedence over the specific provision of the MMPA allowing

import of sport-hunted polar bear trophies, the SCI plaintiffs contend that those restrictions do not apply to the polar bear because the polar bear was never properly "designated" as a depleted species.  According to the SCI plaintiffs, the restriction on importing depleted species only applies to a species that the Secretary has determined, by special rule, is below its optimum sustainable population ("OSP").  It is undisputed that the Service made no such determination with respect to the polar bear.

If the agency had conducted a separate rulemaking, the SCI plaintiffs contend that it would likely not have designated the polar bear as depleted.  The SCI plaintiffs assert that a threatened species may be at or above its OSP at the time of listing even if the species will likely experience a population decline in the future.  In fact, the SCI plaintiffs insist that the polar bear is currently at historically high population numbers.  *See* SCI Plfs. Mot. at 28.  According to the SCI plaintiffs, Congress did not intend for import restrictions to apply to the polar bear and other similar species that are not below their OSP.

The federal defendants reject plaintiffs' narrow reading of the MMPA.  To the contrary, they argue that the text, structure, and legislative history of the statute compel the agency's conclusion that the polar bear became depleted within the

meaning of the MMPA upon being listed as threatened under the
ESA and, therefore, that the prohibition on importing depleted
marine mammals applies to the polar bear.  Having carefully
considered the parties' arguments, this Court agrees with the
federal defendants.

As a threshold matter, the MMPA expressly identifies three
methods by which a species earns "depleted" status: (1) the
Secretary determines that a species or population stock is below
its OSP; (2) a state with management authority over a species
determines that such species or stock is below its OSP; or (3) a
species or population stock is listed as an endangered species
or a threatened species under the ESA.  16 U.S.C. § 1362(1).
None of these methods is particularly defined or otherwise
referred to as a "designation."  The most natural reading of the
statute suggests that a species may be designated as depleted
through any one of these three methods.[10]

Moreover, the overall structure of the MMPA makes clear
that Congress intended to prohibit the taking and import of all
depleted marine mammals, regardless of how a species earned its

---

[10]     Indeed, as the federal defendants point out, other
provisions of the MMPA indicate that marine mammals may be
designated as depleted by means of listing under the ESA.  *See*
16 U.S.C. § 1371(a)(5)(E) (authorizing the incidental, but not
intentional, take of "marine mammals from a species or stock
designated as depleted <u>because of its listing as an endangered
species or threatened species under the Endangered Species Act</u>
of 1973" while engaging in commercial fishing operations).

depleted status.  The restriction on taking and import set out
at section 101(a)(3)(B) of the MMPA is the most significant
provision of the statute that applies specifically to depleted
species.  Under plaintiffs' reading of the MMPA, this
prohibition would not apply to species that obtained their
depleted status through two of the three procedural methods that
the MMPA prescribes (e.g., listing under the ESA and state OSP
determination).  This strained reading would suggest that
Congress intended to deny these additional protections to the
majority of depleted species, based solely on the procedural
vehicle by which each species earns its depleted status.  The
SCI plaintiffs cite no legislative history or other authority to
suggest that Congress intended such a bizarre result.

To the contrary, Congress recognized that species listed
under the ESA are "a *fortiori* not at their optimum sustainable
population."  H.R. Rep. No. 97-228, at 16, reprinted in 1981
U.S.C.C.A.N. 1458, 1466.  In view of this legislative history,
the Court concludes that Congress did not intend the Service to
engage in duplicative rulemaking to determine whether a species
that has been listed under the ESA is also below its OSP.

For the foregoing reasons, the Court finds that the MMPA's
prohibition on importing depleted species applies to <u>all</u>
depleted species, regardless of the procedural method by which a
species earns its depleted status.  Accordingly, the Service

- 25 -

properly concluded that the prohibition on importing depleted marine mammals applies to the polar bear by virtue of its listing as a threatened species under the ESA.

### 3. Whether the Service Provided Inadequate Notice of the Polar Bear's Depleted Status

The SCI plaintiffs go on to argue that even if the Service effectively designated the polar bear as a depleted species, the agency failed to provide sufficient notice that its Listing Rule would have that effect.  Had plaintiffs known, they claim that they would have submitted additional comments, specifically on the issue of whether the polar bear is below its OSP.  *See* SCI Plfs. Mot. at 31 (citing *Doe v. Rumsfeld*, 341 F. Supp. 3d 1, 14 (D.D.C. 2004) (For plaintiffs to establish prejudice, they must show that "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale" for the rule.)).  The federal defendants respond that the agency was under no obligation to provide notice that it was designating the polar bear as a depleted species because the polar bear earned its depleted status automatically as of the publication of the Listing Rule.

As a threshold matter, the SCI plaintiffs have misconceived the requirements of the MMPA.  Where a species earns its depleted status by virtue of being listed as a threatened or endangered species under the ESA, as discussed above, the

Service is not required to find that the species is also below

its OSP.  Therefore, even if the SCI plaintiffs had submitted

additional comments on the issue of whether the polar bear is

below its OSP, those comments would not have invalidated the

basis for the polar bear's depleted status.

To the extent any notice was required, however, the Court

is persuaded that the agency provided sufficient notice of the

potential effects of the Listing Rule and of the polar bear's

depleted status.  *See* ARL 053477 ("Regarding ongoing importation

of polar bear trophies taken from approved populations in Canada

into the United States, we anticipate conducting an evaluation

of continuing the presently authorized imports.  Under the MMPA

Section 102 – Prohibitions [Importation of pregnant or nursing

animals; depleted species which includes those listed as

threatened or endangered under the ESA] it is unlawful to import

into the United States any marine mammal if the mammal was taken

from a species or stock that the Secretary has, by regulation

published in the Federal Register, designated as a depleted

species or stock.").  The agency received comments in response

to this issue, including comments from plaintiff SCI expressing

concerns that listing under the ESA would make it "impossible

for U.S. citizens to import sport-hunted polar bear trophies

into the United States."  ARL 124921-22.  The agency considered

and responded to these comments in the final Listing Rule.  *See*

ARL 117246.  It is disingenuous for the SCI plaintiffs now to claim that they did not have adequate notice that the Listing Rule would confer depleted status on the polar bear.  *See also Ctr. for Biological Diversity v. Kempthorne*, No. 08-1339, 2008 U.S. Dist. LEXIS 52897, at *6-7 (N.D. Cal. July 11, 2008) (noting that "Conservation Force has been on notice since the publication of the proposed rule in January, 2007 that polar bears were likely to be listed as a threatened species and that such listing could potentially take effect immediately. . . . Particularly with respect to hunts that would take place after the nondiscretionary deadline for [the Service] to issue its final determination in January, 2008, Conservation Force's members assumed the risk that they would be unable to import their trophies.").

Accordingly, for the foregoing reasons, the Court finds that the agency's import ban determination, and subsequent disposition of plaintiffs' import permits, was not procedurally flawed for lack of notice.

### 4.   Whether the MMPA's Import Ban Only Applies to Species that Were Depleted at the Time of Taking

Finally, the SCI plaintiffs argue in the alternative that even if the restrictions on importing depleted species do apply to polar bears as of the date of the Listing Rule, those restrictions apply only to polar bears <u>taken</u> after that date.

In support of this interpretation, the SCI plaintiffs point specifically to section 102(b)(3) of the MMPA, which provides that importation of a depleted marine mammal is unlawful if "such mammal was -- . . . taken from a species or population stock which the Secretary has, by regulation published in the Federal Register, designated as a depleted species or stock." Because a take can only occur "in the present," the SCI plaintiffs contend that this provision only prohibits imports of marine mammals that were designated as depleted at the time of taking.  *See* SCI Plfs. Mot. at 32-33.

The federal defendants contend, by contrast, that nothing in the statute can be construed as limiting the import restriction to those marine mammals that already had acquired depleted status at the time of taking.  This Court agrees.

The Court is sensitive to the fact that plaintiffs Hershey and Kreider expended significant sums to participate in an arduous hunt, that they legally took polar bears from approved Canadian populations, that they applied for import permits before the effective date of the Listing Rule, and that they are now paying to store their trophies in Canada indefinitely. Nonetheless, this Court can only overturn the Service's disposition of plaintiffs' permit applications where it finds that the agency's decision was arbitrary, capricious, or contrary to law.  The SCI plaintiffs have identified no

substantial basis for such a finding in this case.  The plain language of the MMPA simply does not support the SCI plaintiffs' legal conclusion.  Indeed, the MMPA clearly dictates that "no import may be made" of any marine mammal that has been designated as depleted except in narrow circumstances that do not apply here.  16 U.S.C. § 1371(a)(3)(B).  The Court therefore declines to find that the Service acted arbitrarily, capriciously, or contrary to law when it concluded that no permit may be granted for the import of a sport-hunted polar bear trophy as of the effective date of the Listing Rule, regardless of when the trophy was taken.[11]

For the foregoing reasons, the Court upholds the Service's legal determination that the polar bear is depleted within the

_____

[11]    The SCI plaintiffs note that the other classes of species for which importation is unlawful include marine mammals that were "pregnant at the time of the taking," 16 U.S.C. § 1372(b)(1), and marine mammals that were "nursing or less than eight months old at the time of the taking," *id.* § 1372(b)(2).  According to the SCI plaintiffs, these provisions suggest that Congress intended for the same temporal restriction to apply to takings of depleted marine mammals.  The Court finds this argument unpersuasive.  Contrary to plaintiffs' assertions, the fact that Congress chose to restrict the importation of some non-depleted marine mammals based on certain characteristics "at the time of taking" but did not use the same language for depleted species is strong evidence that Congress did <u>not</u> intend for that restriction to apply to depleted marine mammals.  As the Supreme Court has often stated, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Kucana v. Holder*, 130 S. Ct. 827, 838 (2010) (citing *Nken v. Holder*, 129 S. Ct. 1749, 1759 (2009)).

meaning of the MMPA by virtue of being listed as a threatened species throughout its range under the ESA.  The Court also upholds the Service's legal determination that, as a result of the polar bear's depleted status, no permit may be granted to import sport-hunted polar bear trophies under section 104(c)(5) of the MMPA, as of the effective date of the Listing Rule and until further notice.  Finally, the Court upholds the Service's disposition of the permit applications submitted by plaintiffs Hershey and Kreider on these grounds.  Accordingly, the Court **DENIES** the SCI plaintiffs' motion for summary judgment and **GRANTS** the federal defendants' and defendant-intervenors' motions for summary judgment.

The Court turns now to the Atcheson plaintiffs' claim.

### B.   The Atcheson Plaintiffs' Claim

Whereas the SCI plaintiffs primarily argue that the polar bear is not a depleted species within the meaning of the MMPA, the Atcheson plaintiffs contend that the Service should have granted their trophy import permits <u>despite</u> the polar bear's depleted status, on a theory that sport hunting qualifies for the "enhancement" exception to the prohibition on importing depleted species.

As noted above, the MMPA provides a narrow exception to the general prohibition on importing depleted marine mammals where it can be demonstrated that the permitted import will "enhance"

- 31 -

the species.   16 U.S.C. § 1371(a)(3)(B).   Section 104(c)(4)(A)

sets out the circumstances under which a so-called "enhancement"

permit may be issued:

> A permit may be issued for enhancing the survival or
> recovery of a species or stock only with respect to a
> species or stock for which the Secretary, after
> consultation with the Marine Mammal Commission[12] and
> after notice and opportunity for public comment, has
> first determined that –
>
> (1)   taking or importation is likely to contribute
>         significantly to maintaining or increasing
>         distribution or numbers necessary to ensure the
>         survival or recovery of the species or stock; and
> (2)   taking or importation is consistent (I) with any
>         conservation plan adopted by the Secretary under
>         [the MMPA] . . . or any recovery plan developed
>         under [the ESA] for the species or stock, or
>         (II) if there is no conservation or recovery plan
>         in place, with the Secretary's evaluation of the
>         actions required to enhance the survival or
>         recovery of the species or stock in light of the
>         factors that would be addressed in a conservation
>         plan or a recovery plan.

The Atcheson plaintiffs argue that sport hunting meets both

prongs of this standard.   With respect to the first prong, the

Atcheson plaintiffs assert that "[I]t is undisputed that sport

hunting of Canadian polar bear contributes significantly to the

'maintenance' of their numbers and distribution" necessary to

ensure the survival of the species.   Atcheson Plfs. Mot. at 14.

---

[12]   In this case, the Marine Mammal Commission ("MMC") – the
federal agency charged with advising the Service on marine
mammal issues, including import permits – urged the Service to
deny the Atcheson plaintiffs' enhancement permits.   *See* ARE 401
(concluding based on the legislative history of the enhancement
exception that "Congress never intended sport hunting to be
considered an enhancement activity").

Plaintiffs point specifically to statements in the polar bear Listing Rule where the Service recognized the "important contribution to conservation that scientifically based sustainable use programs can have." *See* ARL 117240.  Plaintiffs also cite as support reports by Dr. Milton Freeman, a Senior Research Scholar with the Canadian Circumpolar Institute at the University of Alberta, which discuss the critical role that Canada native Inuits play in polar bear conservation.  *See generally* ARE 472-85.  According to plaintiffs, sport hunting programs keep these native resource managers invested in polar bear conservation, which helps maintain current numbers and distribution of bears.  Finally, plaintiffs assert that sport hunting may be said to increase polar bear numbers because the portion of polar bear "tags" that are allocated to sport hunts in Canada often go unused where a hunt is unsuccessful.[13]  *See* Atcheson Plfs. Mot. at 15.

With respect to the second prong, plaintiffs note that no recovery plan currently exists for the polar bear.  Accordingly, in order to grant plaintiffs' request to import sport-hunted polar bear trophies from the Gulf of Boothia population, the

---

[13]   The Court notes that under the Canadian polar bear management system, native hunters are required to "tag" and document every polar bear killed, either intentionally or unintentionally, to ensure that established quotas are being observed.  Management agreements allow native communities to set aside a certain number of the tags allocated to them each harvest season for non-native sport hunters.  *See* ARE 509.

Service would have to find that importation is in line with the factors that the Secretary deems likely to be addressed in a conservation or recovery plan for the species. *See* 16 U.S.C. § 1374(c)(4)(A)(ii).  The Atcheson plaintiffs assert that sport hunting is the driving force behind polar bear conservation in Canada because it provides Inuit hunters with a financial incentive to stay within established quotas. *See* Atcheson Plfs. Mot. at 17.  Plaintiffs also assert that sport hunting is an effective conservation tool for polar bears because sport hunters tend to select large male bears rather than female bears (whereas subsistence hunters are more opportunistic) and because sport hunting keeps bear populations below maximum carrying capacity, which leads to higher survival rates and better overall population health. *See* Atcheson Plfs. Mot. at 18. Accordingly, the Atcheson plaintiffs conclude, provisions for sport hunting would likely be included in a conservation or recovery plan for the polar bear.

As a threshold matter, the federal defendants point out that each of the Atcheson plaintiffs took his bear from the Gulf of Boothia polar bear population, which was never approved for trophy imports pursuant to section 104(c)(5) of the MMPA. Therefore, the federal defendants note, the Atcheson plaintiffs would need to make a significant showing to demonstrate that the importation of their trophies from a <u>non-approved</u> population

would enhance polar bear survival or recovery.  In denying the
Atcheson plaintiffs' permit applications, the federal defendants
contend, the Service reasonably concluded that plaintiffs had
failed to carry their burden of demonstrating that importing
these specific sport-hunted polar bear trophies would meet both
prongs of the enhancement standard.[14]

Having carefully considered the parties' arguments, the
plaintiffs' permit applications and requests for
reconsideration, and the agency's responses thereto, this Court
agrees with the federal defendants.  Plaintiffs' case boils down
to a bare assertion that sport hunting benefits polar bears
because it provides an incentive for native Inuit hunters to
adhere to established quotas.  However, while the agency
acknowledges that the participation of American hunters in
Canada's sport-hunting program has "generated funds that have

---

[14]    Because the MMPA authorizes the Service to grant or deny
enhancement permits on a case-by-case basis, the federal
defendants assert that the language of the statute is inherently
ambiguous and that the agency's permit denial decision should be
upheld as reasonable under step two of *Chevron*.  *See* Fed. Defs.
Atcheson Reply at 19-23, Docket No. 176.  The Court concurs that
a *Chevron* step two analysis is appropriate here, where Congress
expressly delegated to the Service the authority to grant import
permits on enhancement grounds, provided certain findings are
made.  *See Fontana v. Caldera*, 160 F. Supp. 2d 122, 128-29
(D.D.C. 2001) (holding that statutory interpretations
promulgated in the context of informal adjudications may be
entitled to *Chevron* deference where the agency has made a
legally binding adjudication pursuant to a Congressional
delegation of authority), *aff'd* 334 F.3d 80 (D.C. Cir. 2003).

provided conservation benefits to polar bear populations and
supplied an incentive to Inuit hunters to support sustainable
harvest quotas," *see* Fed. Defs. Atcheson Mot. at 26, the Service
concluded that these conservation benefits are not sufficient to
meet the statutory requirements for an enhancement permit under
the MMPA.  As the federal defendants point out, the standard for
granting an enhancement permit is not whether the permitted
activity would provide <u>any</u> conservation benefit to the species
but whether those benefits are significant and, indeed,
necessary to ensure the survival or recovery of the species.
Plaintiffs offer no substantial basis for this Court to find
that the Service arbitrarily concluded that importing these
specific polar bear trophies would not achieve the significant
conservation benefits required by the statute.

Specifically, with respect to the first prong of the
enhancement standard, the agency concluded that plaintiffs
provided no scientific evidence that sport hunting "actually
reduces the number of bears taken from the set quota, [or]
provide[s] a means to contribute significantly to maintaining or
increasing the number of polar bears necessary for the survival
or recovery of the species." *See* ARE 449-50.  Although
plaintiffs' supporting documentation shows the financial
benefits of sport hunting for local communities and native
guides, the agency nonetheless found no evidence that sport

- 36 -

hunting impacts the overall number of bears taken.  It is
eminently reasonable for the agency to conclude, therefore, that
neither sport hunting generally nor the specific imports at
issue would contribute significantly to "maintaining" the
distribution or numbers "necessary to ensure the survival or
recovery" of the species or stock.  *See Franks v. Salazar*, No.
09-942, 2011 U.S. Dist. LEXIS 115571, at *38-39 (D.D.C. Oct. 6,
2011) (holding that the Service reasonably denied permits to
import sport-hunted African elephant trophies where it found
insufficient evidence that the killing of African elephants
would "enhance" the survival of the species, even if, as a
general matter, sport hunting "may result in a net benefit to
African elephant populations").

     Plaintiffs' failure to satisfy the first criterion for
enhancement would itself be sufficient grounds to deny their
permit applications; however, the Service also found that
plaintiffs failed to satisfy the second prong of the enhancement
standard.  The second prong of this standard specifies that,
before an import permit may be issued on enhancement grounds,
the permitted import must be consistent with the Secretary's
evaluation of what actions would likely be included in a
conservation or recovery plan for a depleted species, if no such
plan currently exists.  *See* 16 U.S.C. § 1374(c)(4)(A)(ii).
Here, the Service explained that because habitat loss was

- 37 -

identified as the primary threat to the polar bear in the
Listing Rule, any recovery plan for the species would likely
focus on "actions needed to prevent or reduce habitat
degradation or loss." *See* ARE 450.  Plaintiffs provided no
evidence in their permit applications indicating that either
sport hunting itself or the importation of these specific sport-
hunted trophies into the United States would prevent or reduce
habitat degradation or loss from sea-ice decline.  Accordingly,
the Court finds that the agency reasonably concluded that
neither sport hunting itself nor the import of these sport-
hunted trophies would likely be included in a conservation or
recovery plan for the polar bear as actions that are "required
to enhance the survival or recovery of the species."[15]

---

[15]    In a related claim, the Atcheson plaintiffs argue that the
agency effectively established a new standard for granting an
import permit that would require an applicant to "engage in
activity that directly offsets the effects of the threat for
which a species was listed." *See* Atcheson Plfs. Mot. at 12.
According to the Atcheson plaintiffs, this new standard
constitutes a new "rule" (or, at the least, a new agency
interpretation of the MMPA), and the agency was therefore
required to conduct appropriate notice-and-comment rulemaking
procedures under the APA, 5 U.S.C. §§ 552-53, and the Federal
Register Act ("FRA"), 44 U.S.C. § 1505.  The Court finds that
plaintiffs' claim is without merit.  Permit decisions are
adjudications, not rulemakings. *See Franks*, 2011 U.S. Dist.
LEXIS 115571, at *21 (holding that the Service was not required
to conduct APA notice-and-comment rulemaking procedures when it
denied individual permits to import sport-hunted African
elephant trophies because "[a] permit decision-making proceeding
is clearly adjudication rather than rule-making." (quoting *Nat'l
Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 992 n.12 (D.D.C.
1983))).  Here, the Service made a fact-specific permit

In sum, the Court finds that the Service rationally concluded on the basis of the record before it that the import of these specific sport-hunted polar bear trophies is not necessary to ensure the conservation or recovery of the polar bear.  Plaintiffs have made no serious attempt to demonstrate that this conclusion was irrational.  As the federal defendants point out, many of plaintiffs' factual assertions lack any evidentiary support whatsoever.  Indeed, plaintiffs offer no evidence that the import of a few bears taken between 1999 and 2005 from a population that was never approved for import under the MMPA would achieve any of the conservation goals they describe.

In view of the lack of substantial contrary evidence, the narrow standard of review this Court must apply, and the deference owed to the agency's reasonable interpretation of the MMPA's "enhancement" standard, the Court declines to find that the Service's denial of the Atcheson plaintiffs' enhancement permit applications was arbitrary, capricious, or contrary to law.[16]  Accordingly, the Court **DENIES** the Atcheson plaintiffs'

_____

determination that is binding only on these individual applicants and has no broader applicability.  Accordingly, the Court concludes that the Service's decision to deny the Atcheson plaintiffs' permit applications was not procedurally flawed for failure to conduct rulemaking procedures.

[16]   The Atcheson plaintiffs argue, in addition, that the Service deprived them of procedural due process and violated

motion for summary judgment and **GRANTS** the federal defendants'
and defendant-intervenors' motions for summary judgment.

IV.  **CONCLUSION**

For the foregoing reasons, plaintiffs' motions for summary
judgment are hereby **DENIED**, the federal defendants' cross-
motions for summary judgment are hereby **GRANTED,** and the
defendant-intervenors' cross-motions for summary judgment are
hereby **GRANTED**.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **October 17, 2011**

---

rulemaking procedures when it failed to consider the additional
information they submitted in support of their request for
reconsideration.  *See* Atcheson Plfs. Mot. at 28.  The Court
concludes that this claim is without merit.  The Atcheson
plaintiffs have simply misconstrued a statement made in the
agency's denial letter, which read that the Service could not
consider "new information that changes the content of your
original application."  *See* ARE 456 (emphasis added).  The
record suggests that the agency did, in fact, consider the
additional information submitted in support of plaintiffs'
request for reconsideration.  *See* ARE 568 ("We received the
reconsideration package and are beginning to review the
material."); ARE 571 (email stating that the Service staff "read
through the material submitted by [Conservation Force] . . . to
reconsider the denial of their polar bear trophy import permit
applications").  Accordingly, in the absence of more substantial
evidence to the contrary, the Court concludes that plaintiffs
were afforded the full process they were entitled to.