**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| IN RE POLAR BEAR ENDANGERED SPECIES ACT LISTING AND § 4(d) RULE LITIGATION | ) ) ) ) ) Misc. No. 08-764 (EGS) ) MDL Docket No. 1993 ) |

---

This Document Relates To:

Ctr. for Biological Diversity, *et al.* v. Salazar,[1] *et al.*, No. 08-2113; Defenders of Wildlife v. U.S. Dep't of the Interior, *et al.*, No. 09-153

---

**MEMORANDUM OPINION**

On May 15, 2008, the U.S. Fish and Wildlife Service ("the Service" or "the agency") published its final rule listing the polar bear as a threatened species under the Endangered Species Act ("ESA"). *See* Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout Its Range, 73 Fed. Reg. 28,212 (May 15, 2008) ("Listing Rule"). This Court recently upheld the Listing Rule as a reasonable exercise of agency discretion. *See generally In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, Misc. No. 08-764, 2011 U.S. Dist. LEXIS 70172 (D.D.C. June 30, 2011) [hereinafter *In re*

---

[1]     Pursuant to Fed. R. Civ. P. 25(d), Interior Secretary Ken Salazar is automatically substituted as a defendant for his predecessor, Dirk Kempthorne, who was sued in his official capacity.

*Polar Bear*].  The two cases currently before the Court arise from a related agency rule, Special Rule for the Polar Bear, 73 Fed. Reg. 76,249 (December 16, 2008) ("Special Rule"), which specifies the protective mechanisms that apply to the polar bear as a result of its threatened status.

Section 4(d) of the ESA requires the Service to promulgate such rules as it deems "necessary and advisable to provide for the conservation of [threatened] species."  16 U.S.C. § 1533(d). Although the polar bear is already regulated in the United States under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h, as well as treaties and other international agreements, the Service determined that it is nonetheless necessary and advisable for the conservation of the species to extend additional ESA protections to the polar bear, pursuant to Section 4(d).  Among other things, the Service's Special Rule aims to address the threat of direct impacts to individual bears and their habitat from oil and gas exploration and development activities within the species' current range.

The plaintiffs in this case have challenged the agency's Special Rule for the polar bear under the ESA, 16 U.S.C. §§ 1531-1544; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.  Pending before the Court are the parties' cross-motions for summary judgment.  Plaintiffs

claim, first, that the Service's Special Rule violates the ESA because it fails to provide for the conservation of the polar bear.  Specifically, plaintiffs contend that the Service cannot effectively provide for the conservation of the polar bear without addressing global greenhouse gas emissions, which the agency itself identified as the cause of increasing Arctic temperatures that are expected to lead to a significant decline of the polar bear's sea ice habitat.  Plaintiffs argue that the Service purposely and unlawfully crafted its Special Rule in such a way as to avoid addressing this threat, in contravention of the ESA's conservation mandate.

The Court understands plaintiffs' frustration.  However, as this Court has previously observed, climate change poses unprecedented challenges of science and policy on a global scale, and this Court must be at its most deferential where the agency is operating at the frontiers of science.  *See In re Polar Bear*, 2011 U.S. Dist. LEXIS 70172, at *9-11.  Here, the Service concluded based on the evidence before it that Section 4(d) of the ESA is not a useful or appropriate tool to alleviate the particular threat to the polar bear from climate change caused by global greenhouse gas emissions, and plaintiffs have offered no compelling evidence to the contrary.  Although the Court is sensitive to plaintiffs' arguments for a strong mechanism to combat the effects of global climate change, the

Court finds that the agency's conclusion was not arbitrary, capricious, or contrary to law.  The Court is therefore prohibited from substituting either the plaintiffs' or its own judgment for that of the agency.  The question before the Court, then, is whether the Service reasonably concluded that its Special Rule provides for the conservation of the polar bear even if it does not reverse the trend of Arctic sea ice loss.  As will be discussed below, the Court is persuaded that the agency has done so.  Accordingly, with respect to plaintiffs' ESA claim, the Court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** the federal defendants' and defendant-intervenors' motions for summary judgment.

In addition to their claims under the ESA, plaintiffs claim that the Service violated NEPA by failing to analyze the potential environmental impacts of its Special Rule, which is generally required for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  With respect to this claim, the Court agrees with plaintiffs.  The Court declines to recognize the broad NEPA exemption that the federal defendants urge.

Accordingly, and for the reasons discussed below, the Court finds that the Service was required to conduct at least an initial assessment to determine whether its Special Rule for the polar bear warranted a full "environmental impact statement"

- 4 -

("EIS").  Here, the Service conducted no analysis whatsoever; as a result, its Special Rule for the polar bear violates NEPA. Accordingly, with respect to plaintiffs' NEPA claim, the Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** the federal defendants' and defendant-intervenors' motions for summary judgment.  The Court finds that vacatur of the final Special Rule is the appropriate remedy for the Service's NEPA violation.  Upon vacatur of the final Special Rule, the prior May 15, 2008, interim final Special Rule for the polar bear shall remain in effect until further Order of the Court.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    ESA

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  The ESA further defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species back to the point at which the measures provided are no longer necessary." *Id*. § 1532(3).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id*. § 1532(6).  A "threatened species" is "any

species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[2]  *Id.* § 1532(20).

Under the conservation program established by the ESA, a designation of "endangered" triggers a broad range of legal protections.  Most relevant to this case is the general prohibition on "taking" any endangered species, which is set forth in Section 9 of the ESA.[3]  *See id.* § 1538(a)(1).  The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  By regulation, the Service has further defined "harm" to mean "an act which actually kills or injures wildlife."  50 C.F.R. § 17.3.  Such acts may include "significant habitat modification or degradation where it actually kills or injures wildlife by

---

[2]   The ESA requires the Secretary of the Interior to publish and maintain a list of all species that are designated as threatened or endangered.  *Id.* § 1533(c).  The Secretary of the Interior and the Secretary of Commerce are responsible for making listing decisions.  *Id.* §§ 1532(15), 1533(a)(2).  The Secretary of the Interior has delegated his responsibilities under the ESA to the Service.  *See* 50 C.F.R. § 402.01(b).

[3]   In addition, Section 7 of the ESA provides that all federal agencies must take steps to ensure that any actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  The Special Rule does not purport to affect any obligations under Section 7 with respect to the polar bear.

significantly impairing essential behavioral patterns, including

breeding, feeding, or sheltering." *Id.*

Section 10 of the ESA creates exceptions to the general

rule against taking endangered species.  Specifically, the

Secretary may issue permits authorizing the taking of endangered

species if such taking is "incidental to, and not the purpose

of, the carrying out of an otherwise lawful activity."  16

U.S.C. § 1539(a)(1)(B).

The ESA does not prohibit the taking of threatened species.

However, Section 4(d) of the ESA provides:

> [W]henever any species is listed as a threatened
> species . . . the Secretary shall issue such
> regulations as he deems necessary and advisable to
> provide for the conservation of such species.  The
> Secretary may by regulation prohibit with respect to
> any threatened species any act prohibited under
> section 9(a)(1), in the case of fish or wildlife.
> . . .

*Id*. § 1533(d).  Section 4(d) of the ESA thus authorizes the

Service to extend any or all of the Section 9 take prohibitions,

as well as other necessary protective measures, to any

threatened species.

Pursuant to this section, the Secretary of the Interior has

issued a general regulation that extends all of the Section 9

take prohibitions to <u>all</u> threatened species.  *See* 50 C.F.R.

§ 17.31(a).  However, this regulation provides that where the

agency issues a special rule for a particular species pursuant

to Section 4(d), that special rule "will contain all the applicable prohibitions and exceptions" and "none of the provisions of [paragraph (a)] . . . will apply." *Id.* § 17.31(c). Accordingly, a special rule for a particular threatened species supersedes the general rule that applies to all threatened species.

## 2. MMPA

The MMPA has governed the management of polar bear populations in the United States since 1972. Congress enacted the MMPA to preserve and replenish marine mammal populations.[4] *See* 16 U.S.C. § 1361(2). The MMPA imposes a general moratorium on the taking and import of marine mammals and marine mammal products. *See id.* § 1371(a). Under the MMPA, the term "take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13).

Like the ESA, the MMPA provides some limited exceptions to its moratorium on taking marine mammals. The Secretary may issue permits authorizing the incidental, but not intentional, taking of a marine mammal while engaging in an otherwise lawful activity, *see id.* § 1371(a)(5)(A)(i), provided such take "will

---

[4]     The Secretary of the Interior has jurisdiction over most marine mammals covered by the MMPA, including the polar bear. 16 U.S.C. § 1362(12)(A)(ii). The Secretary of the Interior has generally delegated his duties under the MMPA to the Service. *See* 50 C.F.R. § 403.02(f).

have a negligible impact" on the species, *id.* § 1371(a)(5),
(D)(i)(I).

### 3. NEPA

Congress enacted NEPA for two purposes: (1) to inform
agency decision-makers of the significant environmental effects
of proposed major federal actions and (2) to inform the public
so that they "may also play a role in both the decisionmaking
process and the implementation of that decision." *Robertson v.
Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To
achieve these goals, NEPA requires every federal agency to
prepare an EIS for all "major Federal actions significantly
affecting the quality of the human environment."  42 U.S.C.
§ 4332(2)(C).  "Major federal actions" are defined by regulation
as "new or revised agency rules, regulations, plans, policies or
procedures."  40 C.F.R. § 1508.18(a).

An EIS must contain a detailed statement of:

(1)   the environmental impact of the proposed action;
(2)   any adverse environmental effects that cannot be
      avoided should the proposed action be
      implemented;
(3)   alternatives to the proposed action;
(4)   the relationship between local short-term uses of
      the environment and the maintenance and
      enhancement of long-term productivity; and
(5)   any irreversible and irretrievable commitments of
      resources that would be involved in the proposed
      action should it be implemented.

42 U.S.C. § 4332(2)(C).  Among other things, the agency must
compare the environmental effects of its proposed action and

other reasonable alternatives against a baseline of "no action." 40 C.F.R. § 1502.14(d).  In addition, every EIS must be made available for public review and comments, and the agency is required to consider and respond to all comments it receives. *Id.* § 1503.1, .4.

NEPA's implementing regulations establish guidelines for determining whether and when to prepare an EIS.  First, the agency must determine whether the proposed action is the type for which an EIS is normally required or the type for which an EIS is normally not required.[5]  *Id.* § 1501.4(a).  If the proposed action falls into neither category, the agency must prepare an environmental assessment ("EA").  *Id.* § 1501.4(b).

An EA is a "concise public document" that serves to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . ."  *Id.* § 1508.9(a)(1).  An EA must include "brief discussions of the need for the proposal, of alternatives [to the proposed action] . . . , of the environmental impacts of the proposed action and

---

[5]     Under NEPA, all agencies must promulgate regulations that specify (a) typical classes of actions which normally will require an EIS; (b) typical classes of actions which normally require neither an EIS nor an EA ("categorical exclusions"); and (c) typical classes of actions which normally require an EA but not necessarily an EIS.  40 C.F.R. § 1507.3(b)(2).  The Department of the Interior has adopted regulations for the implementation of NEPA, including specified categorical exclusions.  *See generally* 43 C.F.R. § 46.10-.450; *see also id.* § 46.210 (listing categorical exclusions).

alternatives, and a listing of agencies and persons consulted."
*Id.* § 1508.9(b).  If after preparing an EA the agency determines
an EIS is not required and the proposed action will not have a
significant effect on the human environment, the agency must
issue a Finding of No Significant Impact ("FONSI").  *Id.*
§ 1501.4(e); *see also id.* § 1508.13.

     **B.**    **Factual and Procedural Background**

     On May 15, 2008, the Service published its final rule
listing the polar bear as a threatened species under the ESA
throughout its range.  *See generally* 73 Fed. Reg. at 28,212.
Concurrent with the Listing Rule, the agency also published a
special rule for the polar bear pursuant to Section 4(d) of the
ESA.  *See generally* Special Rule for the Polar Bear, Interim
Final Rule, 73 Fed. Reg. 28,306 (May 15, 2008) ("Interim Final
Special Rule"); *see also* AR4D 8104-17.[6]  The Secretary made this
Interim Final Special Rule effective immediately.  AR4D 8115.
Following a 60-day comment period, on December 16, 2008, the
Secretary replaced the Interim Final Special Rule with a
substantially similar final rule for the polar bear.  *See* 73
Fed. Reg. at 76,249; *see also* AR4D 12925-45.  The Service's

---

[6]    The facts in this background section are excerpted from the
administrative record for the final Special Rule.  Citations to
the administrative record for the final Special Rule are
abbreviated "AR4D."

final Special Rule for the polar bear was subsequently codified at 50 C.F.R. § 17.40(q).

The agency's final Special Rule extends all of the take prohibitions available under Section 9 of the ESA to the polar bear, with two exceptions.  First, the rule provides that none of these prohibitions will apply to any activity that is already authorized or exempted under the MMPA, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, 993 U.N.T.S. 243 [hereinafter "CITES"], or both, provided that the person carrying out the activity has complied with all applicable terms and conditions.  *See* AR4D 12945; 50 C.F.R. § 17.40(q)(2).  In other words, under the Service's Special Rule for the polar bear, any activity that is already permitted or exempted under the MMPA or CITES will not require additional authorization under the ESA.

The Service determined that this exception is appropriate because polar bear populations in the United States were effectively managed and protected under the MMPA and CITES for thirty years prior to the publication of the Listing Rule.  *See* AR4D 12938.  Indeed, the agency noted, "none of the activities currently regulated under the MMPA and CITES are factors that threaten the polar bear throughout all or a significant portion of its range."  AR4D 12938.  Further, after comparing their

- 12 -

relevant provisions, the agency found that "[m]any provisions

. . . under the MMPA and CITES are comparable to or stricter

than similar provisions under the ESA, including the definitions

of take, penalties for violations, and use of marine mammals."

AR4D 12937.  Accordingly, the Service concluded that an

additional overlay of ESA authorization procedures for

activities currently permitted under the existing regulatory

regime is not necessary or advisable to provide for the

conservation of the polar bear:

> The comparable or stricter provisions of the MMPA and
> CITES, along with the application of the ESA
> regulations at 50 CFR 17.31 and 17.32 for any activity
> that has not been authorized or exempted under the
> MMPA and CITES . . . , address those negative effects
> on polar bears that can foreseeably be addressed under
> sections 9 and 10 of the ESA.  It would not contribute
> to the conservation of the polar bear to require an
> unnecessary overlay of redundant authorization
> processes that would otherwise be required under the
> general ESA threatened species regulations at 50 CFR
> 17.31 and 17.32.

AR4D 12938.

Second, the Service's Special Rule provides that none of

the ESA's Section 9 prohibitions will apply to any taking of

polar bears that is incidental to, but not the purpose of,

carrying out an otherwise lawful activity, unless that taking is

caused by an activity occurring within the current range of the

polar bear in the United States.  *See* AR4D 12945; 50 C.F.R.

§ 17.40(q)(4).  In other words, under the Service's Special

Rule, an "incidental take" of a polar bear that is not otherwise authorized under the MMPA and is caused by an activity occurring <u>within</u> the range of the polar bear will be considered a prohibited taking under the ESA and will be subject to penalties under both statutes.  By contrast, an unauthorized incidental take of a polar bear caused by an activity occurring <u>outside</u> the current range of the polar bear will not be considered a prohibited taking under the ESA and will only be subject to penalties under the MMPA.

In support of this provision, the Service explained that for activities occurring within the polar bear's range, "overlay of the incidental take prohibitions under [the ESA] is an important component of polar bear management because of the timing and proximity of potential takes of polar bears."  AR4D 12937.  As the agency described, future oil and gas development activities in Alaska may result in unauthorized incidental takes of polar bears that could be reduced or avoided by imposing additional penalties under the ESA.  AR4D 12937-38.  By contrast, the Service determined that an overlay of additional penalties and permitting procedures outside the range of the polar bear is "not necessary for polar bear management and conservation."  AR4D 12938.  "If it is shown that a particular activity conducted outside the current range of the species is reasonably likely to cause the incidental taking of a polar

bear, whether lethal or nonlethal," the agency explained, "any

incidental take that occurs is a violation of the MMPA" and,

accordingly, will be subject to "the full array of the statute's

civil and criminal penalties."  AR4D 12930-31.

In sum, the Service generally characterized its Special

Rule as follows:

> Under this final special rule, if an activity is
> authorized or exempted under the MMPA or CITES, we
> will not require any additional authorization under
> the ESA regulations associated with that activity.
> However, if the activity is not authorized or exempted
> under the MMPA or CITES and the activity would result
> in an act that would be otherwise prohibited under the
> ESA regulations at 50 CFR 17.31, the prohibitions of
> § 17.31 apply, and permits would be required under 50
> CFR 17.32 of our ESA regulations.  The special rule
> further provides that any incidental take of polar
> bears that results from activities that occur outside
> of the current range of the species is not a
> prohibited act under the ESA.

AR4D 12927.  Accordingly, pursuant to Section 4(d) of the ESA,

the Service concluded that this complementary management regime

is "necessary and advisable to provide for the conservation of

the polar bear."  AR4D 12938.

With respect to the primary threat identified in the

Listing Rule – i.e., loss of sea ice habitat and related effects

– the agency concluded that no additional ESA protections are

necessary or advisable because that threat "would not be

alleviated by the additional overlay of provisions in the

general threatened species regulations . . . or even the full

application of the provisions in section 9 and 10 of the ESA."
AR4D 12938.  Indeed, the Service concluded, "[n]othing within
our authority under section 4(d) of the ESA, above and beyond
what we have already required in this final special rule, would
provide the means to resolve this threat."  AR4D 12938.  In
response to comments, the Service further explained, citing a
policy memorandum issued by its Director on May 14, 2008, that
"the future indirect impacts of individual [greenhouse gas]
emitters cannot be shown to result in 'take' based on the best
available science at this time."  AR4D 12942.

    In December 2008, plaintiffs Center for Biological
Diversity, Natural Resources Defense Council, and Greenpeace
(collectively, "CBD") initiated an action challenging the final
Special Rule.[7]  CBD Third Am. Compl. ¶ 15, Docket No. 30.[8]

---

[7]    CBD initially filed suit in the Northern District of
California to compel the Service to issue its final Listing Rule
for the polar bear.  *See Ctr. for Biological Diversity, et al.
v. Kempthorne, et al.*, No. 08-1339 (N.D. Cal. Mar. 10, 2008).
After the Service issued its Listing Rule and Interim Final
Special Rule on May 15, 2008, the case was subsequently
transferred and assigned a new case number in this Court.  *See
Ctr. for Biological Diversity, et al. v. Salazar, et al.*, No.
08-2113 (D.D.C. Dec. 8, 2008).  CBD's Third Amended Complaint,
filed in this Court, includes claims for relief with respect to
the Listing Rule as well as both the Interim Final Special Rule
and the final Special Rule.  Plaintiffs have abandoned as moot
their claims for relief with respect to the Interim Final
Special Rule.  *See* Plfs. Reply at 35, n.24.  On June 30, 2011,
this Court entered final judgment with respect to CBD's Listing
Rule claims.  *See* Order, Docket No. 267.  Accordingly, only
those claims for relief relating to the final Special Rule
remain to be resolved.

Plaintiff Defenders of Wildlife initiated a similar action in
January 2009.  *See generally Defenders of Wildlife v. U.S. Dep't
of the Interior, et al.*, No. 09-153 (D.D.C. Jan. 27, 2009).
These cases have been consolidated before this Court, along with
nine related actions, pursuant to an order of the Judicial Panel
on Multi-District Litigation.[9]  *See generally* Certified Copy of
Transfer Order, Docket No. 1.

Plaintiffs jointly filed their motion for summary judgment
on December 4, 2009.  *See generally* Plaintiffs' Joint Motion for
Summary Judgment on the § 4(d) Rule, Docket No. 135 ("Plfs.
Mot.").  The federal defendants filed their cross-motion for
summary judgment on February 2, 2010.  *See generally* Federal
Defendants' Combined Opposition and Cross-Motion for Summary
Judgment on § 4(d) Rule Claims, Docket No. 156 ("Fed. Defs.
Mot.").  The Court also permitted several parties to intervene
on behalf of the federal defendants in support of the Special
Rule.  *See* Stipulation and Order Regarding Intervention, Docket

---

[8]     Unless otherwise specified, all references to pleadings,
proceedings, hearings, opinions, and orders can be found on the
Misc No. 08-764 docket.

[9]     In addition to the five actions challenging the Listing
Rule, which this Court has resolved, the four remaining actions
in this MDL challenge the Service's refusal to issue permits for
importing sport-hunted polar bear trophies under the MMPA.
These four actions have been briefed separately from the Special
Rule cases; therefore, the Court does not address the import ban
challenges here.

No. 33, at 4-5.  Defendant-intervenors grouped themselves as follows for briefing purposes:

- Alaska Oil and Gas Association, Arctic Slope Regional Corporation, and the State of Alaska (collectively, "Alaskan Intervenors");[10]
- American Petroleum Institute, Edison Electric Institute, National Petrochemical and Refiners Association, Chamber of Commerce of the United States of America, National Mining Association, National Association of Manufacturers, and American Iron and Steel Institute (collectively, "Trade Association Intervenors").[11]

The various defendant-intervenors filed their cross-motions for summary judgment on March 26, 2010.

---

[10]   The Alaskan Intervenors jointly filed a cross-motion for summary judgment.  *See generally* Alaskan Defendant-Intervenors' Cross-Motion for Summary Judgment on § 4(d) Rule Claims and in Opposition to Plaintiffs' Motion for Summary Judgment on Special Rule Claims, Docket No. 186 ("Alaskan Def-Int. Mot.").  In addition, two of the individual Alaskan Intervenors filed separate motions for summary judgment and supplemental memoranda in support.  *See generally* Defendant-Intervenor State of Alaska's Supplemental Memorandum of Points and Authorities Supporting Its and Alaskan Defendant-Intervenors' Cross-Motions for Summary Judgment and Opposing Plaintiffs' Motion for Summary Judgment on § 4(d) Rule Claims, Docket No. 188, ("State of Alaska Def-Int. Mot."); Statement of Points and Authorities in Support of Intervenor-Defendant Arctic Slope Regional Corporation's Cross-Motion for Summary Judgment on § 4(d) Rule Issues and Opposition to the Motion for Summary Judgment Filed by CBD, et al., Docket Nos. 182-83 ("ASRC Def-Int. Mot.").

[11]   The Trade Association Intervenors did not file a cross-motion for summary judgment but instead submitted supplemental memoranda in support of the federal defendants' cross-motion for summary judgment.  *See generally* Memorandum of the National Trade Associations in Opposition to Plaintiffs' Motion for Summary Judgment on the § 4(d) Rule, and in Support of Federal Defendants' Cross-Motion for Summary Judgment on the § 4(d) Rule, Docket Nos. 184-85 ("Trade Assoc. Def-Int. Mem.").

The Court heard arguments on plaintiffs' Special Rule claims at a motions hearing held on April 13, 2011.  Following this hearing, the Court ordered the parties to file supplemental briefs on the question of remedy and related issues.  *See* Minute Orders dated Apr. 15, 2011 and Apr. 19, 2011.  The parties' cross-motions for summary judgment are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

Agency action challenged pursuant to the ESA is subject to judicial review under the APA.  *Cabinet Mountains Wilderness/ Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685-86 (D.C. Cir. 1982).  Under APA review, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To make this finding, a court must determine whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (citing *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

The standard of review under the APA is a narrow one. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  The court is not empowered to substitute its judgment

for that of the agency. *Id.* This deferential standard does not, however, shield the agency from a "thorough, probing, in-depth" review. *Id.* at 415. Administrative action must be invalidated as arbitrary where the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). This determination must be made solely on the basis of the record before the agency when it made its decision. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Where the court reviews an agency's interpretation of a statute it is charged with administering, the Supreme Court's opinion in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* provides the appropriate framework of review. 467 U.S. 837 (1984). The first step in this review process is for the court to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If the court concludes that the statute is either silent or ambiguous with respect to the precise question at issue, the second step of the

court's review process is to determine whether the
interpretation proffered by the agency is "based on a
permissible construction of the statute." *Id.* at 843.  The
court must defer to agency interpretations that are not
"procedurally defective, arbitrary or capricious in substance,
or manifestly contrary to the statute." *United States v. Mead*,
533 U.S. 218, 227 (2001) (citing *Chevron*, 467 U.S. at 843-44).

An agency is generally not entitled to deferential review,
however, in interpreting NEPA or its regulations.  *See Citizens
Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144,
1150 (D.C. Cir. 2001) ("Because NEPA's mandate is addressed to
all federal agencies, the [Surface Transportation Board's]
determination that NEPA is inapplicable . . . is not entitled to
the deference that courts must accord to an agency's
interpretation of its governing statute.").

## III. DISCUSSION

Plaintiffs argue that the final Special Rule for the polar
bear is arbitrary, capricious, and contrary to both the ESA and
NEPA.  Before reaching the merits of plaintiffs' claims, the
Court must first address a threshold defense raised by the
Alaska Intervenors.  The Alaskan Intervenors argue that
plaintiffs' ESA and NEPA claims must be dismissed, pursuant to
Federal Rule of Civil Procedure 12(b)(6), because plaintiffs

have not challenged a reviewable final agency action, as required by the APA.[12]  The Court turns now to this defense.

## A.   Whether Plaintiffs' Claims Must Be Dismissed

The Alaskan Intervenors contend that this Court must dismiss plaintiffs' ESA and NEPA claims because the provisions of the Special Rule that plaintiffs have challenged are not "final agency action" for the purposes of APA review.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." (emphasis added)); *see also Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 n.4 (D.C. Cir. 2006) (failure to satisfy the APA's final agency action requirement warrants dismissal for failure to state a claim upon which relief may be granted).

The Supreme Court in *Bennett v. Spear* established a two-pronged test for determining the finality of an agency action: (1) the action must mark "the consummation of the agency's decisionmaking process"; and (2) the action must be the type by which "rights or obligations have been determined" or from which "legal consequences will flow."  520 U.S. at 177-78.  According to the Alaskan Intervenors, the only portion of the Special Rule that satisfies this test is 50 C.F.R. § 17.40(q)(1), the

---

[12]   The federal defendants have not joined in the Alaskan Intervenors' defense.

provision that actually extends the ESA's Section 9 take prohibitions to the polar bear.  However, the Alaskan Intervenors argue, that provision is not at issue in this case. Instead, the Alaskan Intervenors assert that plaintiffs have only challenged the specific exceptions that are set out in 50 C.F.R. § 17.40(q)(2) and (q)(4).  These provisions constitute inaction on the part of the agency, the Alaskan Intervenors argue, because they merely preserve the existing legal framework of the MMPA and CITES.  Accordingly, the Alaskan Intervenors conclude, the challenged portions of the Service's Special Rule are not actions from which "legal consequences will flow" and do not constitute final agency action.  *See* Alaskan Def-Int. Mot. at 16-17.

The Court finds this argument unpersuasive.  Plaintiffs have challenged the final Special Rule for the polar bear, which constitutes final agency action under any reasonable reading of the term.  It is undisputed that the final Special Rule for the polar bear represents the consummation of the agency's decision-making process and, therefore, meets the first prong of the finality test set forth in *Bennett.*  The Court finds that the Special Rule also meets the second prong of the *Bennett* test. Agency regulations provide that where the Service issues a special rule for a particular threatened species, as it did here, the effect of that rule is to supersede the general

regulations that otherwise apply to threatened species. *See* 50 C.F.R. § 17.31(c).  The legal consequence of the Service's Special Rule, therefore, is a new regulatory regime governing management of the polar bear under the ESA. *See Bennett*, 520 U.S. at 178 (finding that incidental take statement constituted final agency action where it "[altered] the legal regime to which the action agency is subject.").[13]  Accordingly, the Court concludes that the Special Rule for the polar bear satisfies both prongs of the *Bennett* test for finality, and it declines to dismiss plaintiffs' claims on these grounds.

The Court turns now to the merits of plaintiffs' ESA claim.

## B.  Plaintiffs' ESA Claim

In its Special Rule for the polar bear, the Service found that it is necessary and advisable to extend Section 9 take prohibitions to the polar bear, but that it is not necessary for the conservation of the species to apply those prohibitions to

---

[13]    Further, the Court cannot agree that the Special Rule does nothing more than preserve the regulatory status quo.  As the Service described, under this Special Rule, "if [an] activity is not authorized or exempted under the MMPA or CITES and the activity would result in an act that would be otherwise prohibited under the ESA regulations at 50 CFR 17.31, the prohibitions of § 17.31 apply, and permits would be required under 50 CFR 17.32 of our ESA regulations."  AR4D 12927.  For activities occurring within the species' range, the Special Rule overlays ESA penalties and permitting procedures <u>on top of</u> the existing penalties and permitting procedures under the MMPA. The Service's Special Rule therefore expressly provides for regulatory mechanisms that are not currently available under the MMPA and CITES.

(1) activities that are currently authorized or exempted under the MMPA or CITES; or (2) activities that are occurring outside the range of the species but may incidentally impact polar bears.  The Service determined that extending limited additional ESA protections to the polar bear is particularly appropriate in light of the comparable protections available under the MMPA, which apply to activities that impact polar bears regardless of where those activities occur.

Plaintiffs claim that the Service's Special Rule fundamentally violates the ESA because it fails to provide sufficiently for the conservation of the polar bear. Plaintiffs' claim relies in large part on two threshold assumptions: first, that the plain language of the ESA requires the agency to "provide for the conservation" of threatened species; and second, that the Service cannot "reduce" the protections that would automatically apply to the polar bear under 50 C.F.R. § 17.31, which extends all Section 9 take prohibitions to all threatened species, without demonstrating a valid conservation basis for diverging from that default rule. The Court will address each of these threshold issues in turn.

1.    **Whether the Service's Special Rule Must Be Necessary and Advisable to Provide for the Conservation of the Polar Bear**

Section 4(d) of the ESA reads, in relevant part:

[W]henever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.  The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 9(a)(1), in the case of fish or wildlife.

16 U.S.C. § 1533(d).  Plaintiffs assert that the plain language of this section establishes a strict standard that all special rules promulgated under Section 4(d) must be "necessary and advisable to provide for the conservation of [the] species." *See* Plfs. Mot. at 29.

In accordance with controlling D.C. Circuit precedent, the Court must reject plaintiffs' plain-language reading of Section 4(d), and it finds that the statute is ambiguous on this point. *See Sweet Home Chapter of Cmties. for a Great Oregon v. Babbitt*, 1 F.3d 1, 8 (D.C. Cir. 1993), *modified on other grounds on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds*, 515 U.S. 687 (1995) ("[T]here is a reasonable reading of § 1533(d) that would not require [the Service] to issue formal 'necessary and advisable' findings when extending the prohibitions to threatened species. . . . The second sentence gives [the Service] discretion to apply any or all of the [Section 9] prohibitions to threatened species without obliging

it to support such actions with findings of necessity.  Only the
first sentence of § 1533(d) contains the 'necessary and
advisable' language and mandates formal individualized
findings.").  However, in its Special Rule, the Service in fact
adopted the standard urged by plaintiffs: "[T]he regulations
promulgated under section 4(d) of the ESA provide the Secretary
the discretion to determine what prohibitions, exemptions, or
authorizations are <u>necessary and advisable</u> for a species, <u>so
long as the regulation provides for the conservation of that
species</u>."  AR4D 12937 (emphasis added).  Indeed, the Service
premised its Special Rule on a finding that the rule is
necessary and advisable to provide for the conservation of the
polar bear.[14]

   The Court finds that the Service's assessment of its
obligations under Section 4(d), as set forth in its Special Rule
for the polar bear, constitutes a reasonable and permissible
interpretation of the ESA.  Accordingly, the Court upholds the

---

[14]   In their briefs, the federal defendants contend that the
Service's Special Rule falls within the agency's broad
discretionary authority under the second sentence of Section
4(d) and, therefore, the Service was not required to find that
its Special Rule is necessary and advisable for the conservation
of the polar bear.  However, this Court can only uphold an
agency decision based on the grounds relied upon by the agency
itself and not the *post hoc* rationalizations of agency counsel.
*See Burlington Truck Lines v. United States*, 371 U.S. 156, 168-
69 (1962) ("[A] reviewing court . . . must judge the propriety
of [agency] action solely by the grounds invoked by the
agency.").

Service's interpretation under step two of the *Chevron*
framework, and it will review the Special Rule for the polar
bear pursuant to the "necessary and advisable" standard adopted
by the agency.

> **2.   Whether the Service Must Demonstrate a Valid
> Conservation Basis for Departing from 50 C.F.R.
> § 17.31(a)**

A second fundamental premise of plaintiffs' ESA claim is
that the Service cannot "reduce" the protections that would
otherwise apply to the bear under the Service's general
regulations for threatened species, set forth at 50 C.F.R.
§ 17.31(a), without demonstrating a valid conservation basis for
not applying the default rule.  Plaintiffs note that "for more
than 30 years, it has been the Service policy and administrative
practice to extend the ESA's full protections against take to
threatened species as the most effective approach for ensuring
their conservation." Plfs. Mot. at 30.  Therefore, plaintiffs
argue, any departure from this longstanding practice must have a
valid conservation purpose. *See also* Plfs. Mot. at 40-41
("Fundamentally, in order to provide a conservation 'benefit' to
the polar bear, the benefits to the polar bear from the Special
Rule must outweigh the benefits of any protections polar bears
would enjoy in the absence of a Special Rule.").

The Court finds this argument unpersuasive.  Plaintiffs are
correct that, in the absence of a special rule, management of

the polar bear under the ESA would be governed by the general
rule set out at 50 C.F.R. § 17.31(a), which extends all of the
Section 9 take prohibitions to all threatened species.  However,
section 17.31 also authorizes the Service to issue special rules
for particular species pursuant to Section 4(d).  This
regulation provides that where the agency chooses to issue a
special rule, that rule "will contain all the applicable
prohibitions and exceptions" and "none of the provisions of
[paragraph (a)] . . . will apply."  *Id.* § 17.31(c).  Nothing in
the regulation, or in the ESA itself, requires the agency to
demonstrate a conservation basis for <u>not</u> applying the general
regulation at 50 C.F.R. § 17.31(a).

Indeed, courts have recognized that the ESA does not
require regulations protecting threatened species from taking at
all.  Section 4(d) itself merely provides that the Secretary
"<u>may</u> . . . prohibit with respect to threatened species <u>any</u> act
prohibited under section 9(a)(1)" (emphasis added).  *See, e.g.,*
*Louisiana, ex rel. Guste v. Verity*, 853 F.2d 322, 333 (5th Cir.
1988) ("In addition to this mandatory duty [to issue regulations
that are necessary and advisable to provide for the conservation
of the species] . . . , the ESA also provides the Secretary
authority to prohibit by regulation the taking of any threatened
species of fish and wildlife." (emphasis omitted)); *Trout*
*Unlimited v. Lohn*, 559 F.3d 946, 962 n.12 (9th Cir. 2009)

(noting that Section 4(d) does not require regulations protecting threatened species from taking and that "[t]he combination of the discretionary 'may' and the phrase 'necessary and advisable' grant [the Service] much leeway in crafting regulations"); *Defenders of Wildlife v. Kempthorne*, No. 04-1230, 2006 U.S. Dist. LEXIS 71137, at *7-8 (D.D.C. Sept. 29, 2006) (noting that the Secretary may, but is not required to, extend prohibitions of Section 9 to threatened species). *See also* S. Rep. No. 93-307, at 8 (1973) ("Once an animal is on the threatened list, the Secretary has an almost infinite number of options available to him with regard to the permitted activities for those species. He may, for example, permit taking, but not importation of such activities, or he may choose to forbid both taking and importation but allow the transportation of such species.").[15]

---

[15]   Plaintiffs rely heavily on the Eighth Circuit's opinion in *Sierra Club v. Clark*, 755 F.2d 608 (8th Cir. 1985), in which the court held that the Secretary may exercise his discretion to permit taking of a threatened species only in the "extraordinary case where population pressures within a given ecosystem cannot otherwise be relieved." *Id.* at 613. The primary question before the court in that case, however, was whether the Service could issue regulations under Section 4(d) that authorized sport hunting of a threatened species. The Eighth Circuit struck down the Service's regulation, finding that "the [ESA] on its face limits the discretion of the Secretary to allow public sport hunting of threatened species." *Id.* at 615. Here, by contrast, the Service's Special Rule does not purport to authorize sport hunting or other regulated taking of polar bears. In fact, it seeks to limit the taking of polar bears. Therefore, while

Accordingly, the Court finds that the Service was not required to demonstrate that diverging from the general regulation at 50 C.F.R. § 17.31(a) is necessary and advisable to provide for the conservation of the polar bear.  Rather, the relevant question before the Court is whether the Service reasonably concluded that the specific prohibitions and exceptions set forth in its Special Rule are necessary and advisable to provide for the conservation of the polar bear. The Court turns now to that question.

> **3.    Whether the Service Reasonably Concluded that its Special Rule Is Necessary and Advisable to Provide for the Conservation of the Polar Bear**

The ESA defines "conservation" as "the use of all methods and procedures which are <u>necessary</u> to bring any endangered species or threatened species to the point at which the measures provided . . . are no longer necessary."  16 U.S.C. § 1532 (emphasis added).  Whereas the ESA itself prescribes certain measures that Congress deemed necessary to provide for the conservation of endangered species, Congress has generally delegated to the Secretary of the Interior the responsibility of determining what measures are necessary for the conservation of threatened species.  *See Wildearth Guardians v. Salazar*, 741 F. Supp. 2d 89, 105 (D.D.C. 2010) ("Congress delegated to the

---

*Clark* contains language favorable to plaintiffs, its holding is not on point.

Secretary the authority to determine the extent to which the ESA protects threatened species."). In this case, the Service determined that it is necessary and advisable to extend Section 9 take prohibitions to the polar bear but that it is <u>not</u> necessary for the conservation of the species to apply those prohibitions to activities that are currently authorized or exempted under the MMPA or CITES, or to activities that are occurring outside the range of the species that may incidentally impact polar bears.

Plaintiffs contend that the Service's Special Rule cannot be necessary and advisable to provide for the conservation of the polar bear because it does not address the primary threat to the species from greenhouse gas emissions and the loss of its sea ice habitat. Specifically, plaintiffs argue that the Service purposefully chose not to extend the full Section 9 take prohibitions to the polar bear "in order to . . . exempt greenhouse gas emissions from the reach of the ESA." Plfs. Mot. at 33. Although it is undisputed that the Special Rule does not address greenhouse gas emissions, the Court is persuaded that the rule nonetheless survives rational basis review.

As a threshold matter, and contrary to plaintiffs' assertions, nothing in the Special Rule expressly exempts greenhouse gas emissions from regulation under the ESA or any other statute. To the extent the Service discussed greenhouse

gases in the preamble to its Special Rule, the Service noted
that anticipated sea ice losses as a result of greenhouse gas
emissions "would not be alleviated" by an additional overlay of
incidental take provisions under the ESA.  AR4D 12938.  The
Service further explained in response to comments that "[t]here
is currently no way to determine how the emissions from a
specific action both influence climate change and then
subsequently affect specific listed species, including polar
bears."  AR4D 12942.  In other words, because climate modeling
does not currently allow the agency to draw a causal connection
between the greenhouse gas emissions from a specific source and
the impact on a particular polar bear, the Service determined
that it cannot identify when a "take" has occurred for the
purposes of enforcing the incidental take provisions of the ESA
against an individual greenhouse gas emitter.  AR4D 12942
(explaining that "the future indirect impacts of individual
[greenhouse gas] emitters cannot be shown to result in 'take'
based on the best available science at this time.").
Accordingly, the Service concluded that even extending the full
take prohibitions of the ESA to the polar bear would not
effectively address the threat to the species from sea ice
losses caused by global greenhouse gas emissions.

    The administrative record amply supports the Service's
conclusion.  In a memorandum summarizing the most recent

findings on this issue by the leading international climate
science research organizations, the United States Geological
Survey determined that "[i]t is currently beyond the scope of
existing science to identify a specific source of $CO_2$ emissions
and designate it as the cause of specific climate impacts at an
exact location." AR4D 14144A.02.  Similarly, in a memorandum to
the Service, the Environmental Protection Agency Office of Air
and Radiation observed that "[t]he climate change research
community has not yet developed tools specifically intended for
evaluating or quantifying end-point impacts attributable to the
emissions of [greenhouse gases] from a single source, and we are
not aware of any scientific literature to draw from regarding
the climate effects of individual, facility-level [greenhouse
gas] emissions." AR4D 14336.  Based on these findings, the
Service Director issued a subsequent policy memorandum in which
he concluded that "[t]he best scientific data available today do
not allow us to draw a causal connection between [greenhouse
gas] emissions from a given facility and effects posed to listed
species or their habitats." AR4D 14145.  The Department of the
Interior has echoed these conclusions in a similar policy
memorandum:

> Given the nature of the complex and independent
> processes active in the atmosphere and the ocean
> acting on [greenhouse gases], the causal link simply
> cannot currently be made between emissions from a
> proposed action and specific effects on a listed

species or its critical habitat.  Specifically,
science cannot say that a tiny incremental global
temperature rise that might be produced by an action
under consideration would manifest itself in the
location of a listed species or its habitat.
Similarly, any observed climate change effect on a
member of a particular listed species or its critical
habitat cannot be attributed to the emissions from any
particular source.  Rather it would be the consequence
of the collective greenhouse gas accumulation from
natural sources and the world-wide anthropogenically
produced [greenhouse gas] emissions since at least the
beginning of the industrial revolution.

AR4D 14328.

Notably, plaintiffs do not contradict this record evidence.

Rather, at bottom, plaintiffs' complaint appears to be that the

Special Rule pre-emptively forecloses the option of citizen

enforcement actions against greenhouse gas emitters in the

contiguous United States.  The citizen suit provision of the ESA

authorizes "any person" to commence a civil suit on her own

behalf to enforce certain provisions of the statute, including

penalties for prohibited takings of listed species.  16 U.S.C.

§ 1540(g).  Plaintiffs have expressed a concern that, because no

incidental take of a polar bear that occurs outside the range of

the species will be considered a prohibited taking within the

meaning of the ESA as a result of the Service's Special Rule, no

grounds exist for citizen enforcement actions against greenhouse

gas emitters operating outside the range of the species in

Alaska.  By precluding citizen enforcement in these

circumstances, plaintiffs contend, the Service has unlawfully

eliminated a potentially useful tool for addressing greenhouse

gas emissions and, ultimately, Arctic sea ice loss.  However,

although plaintiffs would undoubtedly prefer a broad citizen

enforcement option, the Court is not persuaded that the Special

Rule is arbitrary and capricious on these grounds.[16]

The Court is satisfied that the Service articulated a

rational basis for the prohibitions and exceptions set forth in

its Special Rule.  The Service determined that an additional

overlay of ESA permitting procedures and penalties within the

range of the polar bear is necessary and advisable to provide

for the conservation of the species due to the timing and

proximity of potential takings of polar bears from oil and gas

exploration and development activities in Alaska.  Specifically,

the Service concluded that ESA penalties, including citizen

enforcement actions, may be necessary to avoid or otherwise

---

[16]    The Court notes that nothing in the Special Rule would
preclude a citizen suit against a greenhouse gas emitter
operating without incidental take authorization within the range
of the polar bear.  Moreover, although the MMPA does not contain
a citizen suit provision, nothing in the Special Rule precludes
the agency itself from pursuing an enforcement action against a
greenhouse gas emitter for an unauthorized incidental take of a
polar bear under the MMPA, assuming a violation of that statute
can be identified.  Further, nothing in the Service's Special
Rule prohibits the agency from taking steps to address the
primary threat to the polar bear to the extent feasible within
its authority under other provisions of the ESA.  See AR4D 12939
("[N]othing in this special rule, the MMPA, or CITES precludes
us from developing and implementing a recovery plan or entering
into a treaty or conservation agreement that addresses the
specific threats to the polar bear as outlined in the listing
rule.").

reduce these direct impacts.  The Service found no evidence to
suggest that extending the ESA incidental take provisions
outside the range of the polar bear would produce similar
conservation benefits, however.  With respect to these indirect
impacts, in the event that an incidental take can be identified
and attributed to a specific cause originating outside the
species' range, the Service found that the incidental take
provisions of the MMPA are sufficient to address that
violation.[17]  AR4D 12938 ("[T]he Service will pursue any
violation under the MMPA for incidental take that has not been
authorized, and all MMPA penalties would apply.").  Accordingly,
the Service concluded that an additional overlay of ESA
incidental take permitting procedures and penalties outside the
range of the polar bear is not necessary for the conservation of
the species.  The Court finds that the agency's conclusions
follow from the evidence before it, and the Service has
articulated a rational basis for limiting the extent of the

---

[17]   Plaintiffs have argued that the Special Rule for the polar
bear is arbitrary and capricious and impermissibly overbroad
because it exempts not only greenhouse gases but all activities
outside the range of the polar bear from regulation under the
ESA.  The Service concluded, however, that where an unauthorized
incidental take of a polar bear is identified and attributed to
a particular source originating outside the species' range –
whether it be pesticides, chemical contaminants, or any other
pollutant – the incidental take provisions of the MMPA are
sufficient to address that violation.  In the absence of
evidence to the contrary, the Court finds that this conclusion
was rational.

Section 9 take prohibitions to the current range of the polar bear.

Moreover, the Court finds that the Service reasonably concluded that a complementary management regime encompassing the MMPA, CITES, and the ESA is necessary and advisable to provide for the conservation of the polar bear.  The Service conducted an exhaustive analysis in which it determined that the MMPA is comparable to, or even stricter than, the take provisions of the ESA in most respects.[18]  Accordingly, the Court finds that the Service reasonably chose to minimize

---

[18]    For example, the agency found that the MMPA's definition of "harassment" is more stringent than that contained in the ESA because it encompasses more activities, including "any act of pursuit, torment, or annoyance that has the 'potential to injure . . . or . . . to disturb" a marine mammal, including impacts to habitat.  AR4D 12927 (citing 16 U.S.C. § 1362(18)(A)).  Second, the agency found that the MMPA's standard for incidental take is stricter than the standard for incidental take under the ESA because it requires no more than a "negligible impact" on the species and its habitat, whereas the ESA requires a finding that the take will not "appreciably reduce the likelihood of the survival and recovery of the species in the wild" or, for Federal actions, that the take will not "jeopardize the continued existence" of a listed species.  See AR4D 12929 (comparing 16 U.S.C. § 1371(a)(5)(A)(I) to 16 U.S.C. § 1536(a)(2), 1539(a)(2)(B)).  Third, the agency found that while an ESA jeopardy determination must be made at the species or subspecies level, the MMPA authorizes the agency to consider impacts at the smaller "stock" level, which allows for finer-scale protection.  See AR4D 12929-30.  Fourth, the agency found that the procedural requirements for obtaining an incidental take permit are stricter under the MMPA than under the ESA.  See AR4D 12929.  Finally, the agency found that the MMPA authorizes non-incidental take in fewer circumstances than the ESA.  See AR4D 12932 (comparing 50 C.F.R. § 17.32(a) (allowing permits for zoological exhibition and educational purposes) to 16 U.S.C. § 1374(c)).

administrative redundancy after it determined that doing so would not sacrifice significant conservation benefits.  AR4D 12938 ("It would not contribute to the conservation of the polar bear to require an unnecessary overlay of redundant authorization processes that would otherwise be required under the general ESA threatened species regulations at 50 CFR 17.31 and 17.32.").[19]

In sum, having carefully considered the parties' arguments and the full administrative record, the Court finds that the Service reasonably determined that the prohibitions and exceptions set forth in its Special Rule for the polar bear are "necessary and advisable to provide for the conservation of [the] species," in accordance with Section 4(d) of the ESA. Particularly in view of Congress's broad delegation of authority to the Secretary to determine what measures are necessary and advisable to provide for the conservation of threatened species, plaintiffs have failed to carry their burden to demonstrate that the agency's conclusions were arbitrary and capricious.

---

[19]   Plaintiffs argue that the agency should have left both the ESA and the MMPA take prohibitions in place, even where they overlap.  Plaintiffs contend that the Secretary "cannot" use the MMPA as an excuse for not applying ESA protections as well. Plfs. Mot. at 41-42.  The Court finds this argument unpersuasive.  As discussed above, the ESA does not require the agency to extend Section 9 take prohibitions to threatened species.

The question at the heart of this litigation – whether the ESA is an effective or appropriate tool to address the threat of climate change – is not a question that this Court can decide based upon its own independent assessment, particularly in the abstract.  The answer to that question will ultimately be grounded in science and policy determinations that are beyond the purview of this Court.  *See Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979) (noting that the scope of the court's review of an agency's policy determinations is "limited to ensuring that the [agency] has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record"); *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) ("[The court] must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality.").  The question this Court must decide is whether the agency has articulated a rational basis for the protections set forth in its Special Rule for the polar bear.  For the reasons set forth above, the Court finds that the Service has done so.  Accordingly, with respect to plaintiffs' ESA claim, the Court **DENIES** plaintiffs' motion

for summary judgment and **GRANTS** the federal defendants' and

defendant-intervenors' motions for summary judgment.

The Court turns now to plaintiffs' NEPA claim.

## C.    Plaintiffs' NEPA Claim

NEPA requires every federal agency to prepare an EIS for

all "major Federal actions significantly affecting the quality

of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40

C.F.R. § 1501.4.  "Major Federal actions" are defined by

regulation as "new or revised agency <u>rules</u>, <u>regulations</u>, plans,

policies, or procedures."  40 C.F.R. § 1508.18(a) (emphasis

added).  Nonetheless, it is undisputed that the Service

conducted no NEPA analysis for its Special Rule for the polar

bear.  Plaintiffs contend that this omission was unlawful.

The federal defendants raise two arguments in defense of

the agency's failure to comply with NEPA.  First, the federal

defendants contend that rules promulgated pursuant to Section

4(d) of the ESA are generally exempt from NEPA as a matter of

law, relying on long-standing Service policy and on an

unpublished district court opinion from the Northern District of

California.  Second, the federal defendants contend that even if

these special rules are not generally exempt from NEPA, the

Special Rule for the polar bear in particular is not a major

Federal action within the meaning of the statute and, therefore,

NEPA does not apply to that rule.  The Court will address each
of these arguments in turn.

> **1.    Whether Rules Promulgated Pursuant to Section
>        4(d) of the ESA Are Exempt from NEPA as a Matter
>        of Law**

According to the Service, its Special Rule for the polar
bear is "exempt from NEPA procedures."  AR4D 12945.  The Service
assessed its duties under NEPA in the preamble to its Special
Rule:

> In 1983, upon recommendation of the Council on
> Environmental Quality, the Service determined that
> NEPA documents need not be prepared in connection with
> regulations adopted pursuant to Section 4(a) of the
> ESA.  The Service subsequently expanded this
> determination to section 4(d) rules.  A section 4(d)
> rule provides the appropriate and necessary
> prohibitions and authorizations for a species that has
> been determined to be threatened under section 4(a) of
> the ESA.  NEPA procedures would confuse matters by
> overlaying its own matrix upon the section 4 decision-
> making process.  The opportunity for public comment –
> one of the goals of NEPA – is also already provided
> through section 4 rulemaking procedures.  This
> determination was upheld in *Center for Biological
> Diversity v. U.S. Fish and Wildlife Service*, No. 04-
> 04324 (N.D. Cal. 2005).

AR4D 12945.

The federal defendants contend that the Service reasonably
relied on its own policy guidance in reaching this conclusion.
The Service's 1983 policy provides:

> The Fish and Wildlife Service has determined that
> Environmental Assessments, as defined by the National
> Environmental Policy Act of 1969, need not be prepared
> in connection with regulations adopted pursuant to
> Section 4(a) of the Endangered Species Act of 1973, as

amended.  These documents will no longer be prepared for such routine actions.[20]

48 Fed. Reg. 49,244 (Oct. 25, 1983).  This policy specifies that Section 4(a) actions include "listings, delistings, reclassifications, and Critical Habitat designations."  48 Fed. Reg. at 49,244.

The federal defendants further contend that the Service reasonably relied on the Northern District of California's unpublished opinion in *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, in which the district court held that special rules promulgated pursuant to Section 4(d) of the ESA are exempt from NEPA as a matter of law.  No. 04-4324, 2005 WL 2000928, at *12 (N.D. Cal. Aug. 19, 2005).  In *Center for Biological Diversity*, the court upheld the Service's decision not to conduct a NEPA analysis prior to issuing a special rule for the California tiger salamander under Section 4(d) of the ESA.  2005 WL 2000928, at *12.  Recognizing the Service's long-standing policy of exempting its listing decisions under Section 4(a) from NEPA review, the court held that rules promulgated pursuant to Section 4(d) are also exempt from NEPA.  *Id.*  The court found that this exemption was appropriate because a

---

[20]   This policy also states that it is based on recommendations from the Council on Environmental Quality ("CEQ"), NEPA's implementing agency, which determined that "Section 4 listing actions are exempt from NEPA review 'as a matter of law.'"  48 Fed. Reg. at 49,244.

special rule is "only triggered upon the listing" of a species
as threatened, and thus falls "within the scope" of a listing
decision under Section 4(a).  *Id.*

This Court declines to recognize a broad exemption from
NEPA for rules promulgated pursuant to Section 4(d) on the
grounds put forward by the agency.  In particular, the Court
rejects the federal defendants' invitation to follow *Center for
Biological Diversity*.  Although *Center for Biological Diversity*
appears to be the only case addressing the applicability of NEPA
to rules promulgated under Section 4(d), that unpublished
decision is not binding on this Court, and the Court does not
find its reasoning persuasive.

In reaching its conclusion, the *Center for Biological
Diversity* court primarily deferred to the Service, noting that
courts must defer to an agency's reasoned interpretation of its
own regulations – here, the agency's 1983 policy guidance.  2005
WL 2000928, at *12.  This Court finds, however, that the Service
is not entitled to deference.  As an initial matter, the D.C.
Circuit has recognized that agencies other than CEQ are
generally not entitled to deferential review in determining
whether NEPA applies to a proposed action.  *See Citizens Against
Rails-to-Trails*, 267 F.3d at 1150 ("Because NEPA's mandate is
addressed to all federal agencies, the [Surface Transportation
Board's] determination that NEPA is inapplicable . . . is not

- 44 -

entitled to the deference that courts must accord to an agency's interpretation of its governing statute."). Moreover, courts are not required to defer to a regulatory interpretation that is not supported by the regulation itself. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations . . . <u>unless it is plainly erroneous or inconsistent with the regulation</u>." (emphasis added)). Here, by its terms, the agency's 1983 policy guidance only applies to rules promulgated pursuant to <u>Section 4(a)</u> of the ESA (which it defines as listings, delistings, reclassifications, and critical habitat designations). Although the Service claims that the agency has since "expanded" its 1983 policy to apply to Special Rules as well as listing rules, AR4D 12945, the Service has cited no revisions of its policy in the Federal Register, and this Court is aware of none. Accordingly, the Court finds that the agency's 1983 policy provides no substantial basis for a broad exemption from NEPA for rules promulgated pursuant to Section 4(d) of the ESA.

It is undisputed that an exemption from NEPA is necessary and appropriate for listing decisions under Section 4(a) of the ESA. *See Pacific Legal Found. v. Andrus*, 657 F.2d 829, 836-37 (6th Cir. 1981) (noting that "the statutory mandate of the ESA prevents the Secretary from considering the environmental impact

when listing a species as endangered or threatened [because the]
Secretary is limited to using the best scientific and commercial
data on the five factors listed in [Section 4(a)]").  However,
the Court disagrees with the federal defendants that rules
promulgated pursuant to Section 4(d) of the ESA are necessarily
exempt from NEPA because they are "triggered" by a listing
decision, as the federal defendants contend.  Listing decisions
under Section 4(a) trigger <u>all</u> of the protective measures of the
ESA, including consultation requirements under Section 7,
critical habitat designations, recovery plans, take prohibitions
under Section 9, and special rules for threatened species under
Section 4(d).  The Court is not persuaded that all of these
measures are therefore exempt from NEPA review.  Indeed, this
Court and others have recognized that many of these actions
require NEPA analysis.  *See, e.g.*, *Ramsey v. Kantor*, 96 F.3d
434, 444 (9th Cir. 1996) (finding NEPA analysis required for an
incidental take statement); *Fund for Animals v. Hall*, 448 F.
Supp. 2d 127, 136-37 (D.D.C. 2006) (finding NEPA analysis
required for Section 7 consultation); *Cape Hatteras Access Pres.
Alliance v. U.S. Dep't of the Interior*, 344 F. Supp. 2d 108, 134
(D.D.C. 2004) (finding NEPA analysis required for critical
habitat designation under Section 4 of the ESA).

Finally, the Court finds wholly unpersuasive the federal
defendants' argument that rules promulgated pursuant to Section

4(d) are exempt from NEPA review because they are subject to the
notice-and-comment rulemaking procedures of the APA, which
sufficiently furthers the goals of NEPA.  *See* Fed. Defs. Mot. at
47 (citing *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1506 (9th
Cir. 1995) ("We . . . find that NEPA does not apply to the
designation of a critical habitat because the ESA furthers the
goals of NEPA without demanding an EIS.")).  As plaintiffs point
out, under the federal defendants' approach, <u>any</u> rulemaking
properly carried out under the APA would therefore be exempt
from NEPA, because the APA always requires the opportunity for
public comment before finalizing a rule.  An exception of such
staggering breadth would render NEPA meaningless.[21]

For the foregoing reasons, this Court concludes that rules
promulgated pursuant to Section 4(d) of the ESA are not exempt
from NEPA as a matter of law.  Accordingly, the Court declines
to uphold the Service's decision to forgo NEPA review on these
grounds.

---

[21]   The Court further notes that exemptions from NEPA are
available only in certain limited circumstances.  First, the
Supreme Court has held that an agency may be exempt from NEPA
where requiring the agency to prepare an EIS would "create an
irreconcilable and fundamental conflict with the Secretary's
duties" under another statute.  *Flint Ridge Dev. Co. v. Scenic
Rivers Ass'n*, 426 U.S. 776, 788 (1976).  The D.C. Circuit has
also recognized an exemption from NEPA where another statute
requires the "functional equivalent" of a NEPA analysis.
*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 384 (D.C.
Cir. 1973); *see also Envtl. Def. Fund v. EPA*, 489 F.2d 1247,
1256 (D.C. Cir. 1973).  The federal defendants do not argue that
either exemption applies in this case.

2.   **Whether the Special Rule for the Polar Bear is Exempt from NEPA Because it is Not a "Major Federal Action Significantly Affecting the Quality of the Human Environment"**

Whereas in the Special Rule itself the Service relies wholly on a conclusion that all rules promulgated pursuant to Section 4(d) are exempt from NEPA as a matter of law, in their briefs the federal defendants argue that even in the absence of a general exemption, NEPA nonetheless does not apply to the Special Rule for the polar bear in particular, because it is not a "major Federal action significantly affecting the quality of the human environment." According to the federal defendants, the Special Rule is not a "major Federal action" because it does not change the regulatory status quo. Rather, the federal defendants assert, the rule largely leaves in place the existing management regime for the polar bear under the MMPA and CITES, and it extends only limited additional protections to the polar bear under the ESA. The federal defendants argue, in addition, that the Special Rule for the polar bear does not "significantly [affect] the quality of the human environment" because the rule will have no impact on the physical environment. The Court finds that it cannot uphold the Service's decision to forgo NEPA review on any of these grounds.[22]

---

[22]   The federal defendants further argue that NEPA does not apply to the Special Rule for the polar bear because it actually provides a "conservation benefit" to the species. *See* Fed. Def.

Even assuming the federal defendants are correct, the Special Rule is not therefore exempt from NEPA review.  NEPA requires every federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment"; however, the statute and its implementing regulations also dictate the process by which an agency determines whether an EIS is required.  First, the agency must determine whether its proposed action is the type for which a full EIS is normally required, or whether it is the type for which a full EIS is normally not required (a "categorical exclusion").[23]  *See* 40 C.F.R. § 1501.4(a).  If the proposed action falls into neither category, NEPA directs the agency to

_____

Mot. at 44-45.  The Court finds this argument unpersuasive.  As a threshold matter, the D.C. Circuit has not recognized an exception to NEPA on these grounds.  Moreover, the cases cited by the defendants recognize an exemption from NEPA only where the action in question provides a general benefit to the environment.  By contrast, the primary focus of the Service's Special Rule is to provide for the conservation of the polar bear.  *See Catron Cnty. Bd. of Comm'rs v. U.S. Fish and Wildlife Serv.*, 75 F.3d 1429, 1437 (10th Cir. 1996) ("While the protection of species through preservation of habitat may be an environmentally beneficial goal, [agency] action under ESA is not inevitably beneficial or immune to improvement by compliance with NEPA procedure.").

[23]   Apart from a conclusory assertion by the Trade Association Intervenors that the Special Rule for the polar bear falls within the Department of the Interior's categorical exclusion for regulations that are "legal . . . or procedural" or whose environmental impacts are too "speculative, or conjectural," no party has substantially argued that rules promulgated pursuant to Section 4(d) of the ESA qualify for any categorical exclusion recognized by agency regulation.  *See* Trade Assoc. Def-Int. Mem. at 24 (citing 43 C.F.R. § 46.210(i)).

prepare an EA that provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* §§ 1501.4(b), 1508.9(a)(1). Here, it is undisputed that the Service did not prepare an EA for its Special Rule. Accordingly, the Court finds that the Service failed to comply with its obligations under NEPA. *See Catron Cnty. Bd. of Comm'rs*, 75 F.3d at 1437 ("[W]e believe Congress intends that the Secretary prepare an EA leading to either a FONSI or an EIS.").

The Court does not conclude at this stage that the Service was required to prepare a full EIS. Notwithstanding the arguments the federal defendants make in their briefs, the Service itself made no findings as to whether its Special Rule constitutes a "major Federal action significantly affecting the human environment." This Court cannot draw those conclusions on the agency's behalf based solely on the arguments of counsel. *See Comm. for Auto Responsibility (C.A.R.) v. Solomon*, 603 F.2d 992, 1003 n.46 (D.C. Cir. 1979) ("To ensure the agency's understanding of the statutory standards and its adequate consideration of the problem, we deem it important that <u>the agency</u> state its reasons for not preparing an EIS." (emphasis added)).

For the foregoing reasons, the Court is persuaded that the Service erred when it failed to conduct any NEPA review prior to issuing its Special Rule for the polar bear.  Accordingly, with respect to plaintiffs' NEPA claim, the Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** the federal defendants' and defendant-intervenors' motions for summary judgment.

### D.  Remedy

The APA directs that a court "shall . . . set aside" any agency action found to be "arbitrary, capricious, . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). Both the Supreme Court and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of violation. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case."); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("[A plaintiff who] prevails on its APA claim . . . is entitled to relief under that statute, which normally will be a vacatur of the agency's order.").  Having found that the Service violated NEPA and the APA in promulgating its final Special Rule for the polar bear, this Court concludes that vacatur and remand of the final Special Rule is the appropriate remedy here.  *See Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034-35 (D.C.

Cir. 2008) (vacating and remanding agency decision for NEPA and ESA violations).

When an agency replaces an existing regulation with a new regulation, and the Court vacates all or part of the new regulation, the Court must decide "whether the agency's prior regulation continues in effect or whether [its] action leaves no regulation in effect." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 553 (D.C. Cir. 1983); *see also Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 115 (D.D.C. 2003) (vacating 2003 snowmobile rule and leaving in place the modified 2001 snowmobile rule). Here, the December 16, 2008 final Special Rule for the polar bear replaced the Interim Final Special Rule, which was given immediate effect on May 15, 2008. Although plaintiffs argue that the Interim Final Special Rule for the polar bear should not be reinstated because it suffers from the same legal flaws as the final Special Rule, the Court finds this argument unpersuasive. The Interim Final Special Rule is not before this Court on review and, therefore, this Court cannot issue an advisory opinion as to its lawfulness. Accordingly, the Court concludes that the effect of vacating the final Special Rule for the polar bear will be to reinstate the rule previously in force. The May 15, 2008, Interim Final Special Rule for the polar bear shall remain in effect until further Order of the Court.

In their supplemental briefs, the federal defendants note that the Service is willing to commit to a schedule for completion of remand. *See* Fed. Def. Supp. Mem. on Remedy, Docket No. 263, at 21.  The Court agrees that a schedule for completion of remand is advisable.  In light of plaintiffs' concerns about the Interim Final Special Rule, the Court is sensitive to the need for remand to be completed as expeditiously as possible.  By no later than November 17, 2011, the parties are directed to submit a joint proposed timetable to the Court addressing the length of time within which NEPA review shall be completed.  In the event that the parties are unable to reach an agreement on a joint recommendation, each party shall submit an individual recommendation by that time.  The Court shall withhold issuance of its Order vacating and remanding the final Special Rule to the Service pending resolution of this issue.

## IV.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART**, the federal defendants' cross-motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART** and the defendant-intervenors' cross-motions for summary judgment are hereby **GRANTED IN PART** and **DENIED IN PART**.  This Court shall withhold its Order vacating and remanding the December 16, 2008, final

Special Rule pending the resolution of a timetable for the
completion of NEPA review on remand.  Upon vacatur of the
December 16, 2008 final Special Rule, the prior May 15, 2008,
Interim Final Special Rule shall remain in effect until further
Order of the Court.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
           **United States District Judge**
           **October 17, 2011**